**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **MAREINERS, LLC,** | **CASE NO. 2:22-CV-03433-EAS-KAJ** |
| **Plaintiff,** | |
| **v.** | **Judge Edmund A. Sargus, Jr.** |
| | **Magistrate Judge Kimberly A. Jolson** |
| **ANOMATIC CORPORATION,** | |
| **Defendant.** | **SEALED – CONTAINS HIGHLY** |
| | **CONFIDENTIAL INFORMATION** |

<u>**DEFENDANT ANOMATIC CORPORATION'S**</u>
<u>**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iv

LOCAL CIVIL RULE 7.2(a)(3) SUMMARY ............................................................. vi

I.     INTRODUCTION ............................................................................................. 1

II.    BACKGROUND ............................................................................................... 2

    A.    THE ANOMATIC PATENTS........................................................................ 3

    B.    MAREINERS' ALLEGED TRADE SECRETS ........................................... 4

        1.    The Trade Secrets Mareiners Does Not Contend Anomatic Misappropriated. ................................................................................. 5

            a.    The "████ Process" ........................................................ 5

            b.    The "███ Process" .......................................................... 5

        2.    The Trade Secrets Mareiners Contends Anomatic Misappropriated. ......... 5

            a.    Mareiners' "Process" ..................................................... 5

            b.    Mareiners' "████ Process" ........................................... 5

            c.    Mareiners' "██████ Process" .......................................... 6

            d.    Mareiners' ████ Process" ............................................... 6

III.    LEGAL STANDARD........................................................................................ 6

IV.    ARGUMENT ...................................................................................................... 7

    A.    ANOMATIC IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON MAREINERS' TRADE SECRET MISAPPROPRIATION CLAIMS. ................. 7

        1.    The Alleged Trade Secrets Are Not Entitled to Trade Secret Protection. .. 7

            a.    The Alleged Trade Secrets Are Not Stated With Sufficient Particularity and, Therefore, Are Not Entitled to Protection. ......... 8

                i.    Mareiners' Production Steps Are Too Vague and Too Inclusive to Qualify for Trade Secret Protection. ............... 9

                ii.    Mareiners Failed to Cure Its Vague and Undefined Terms. ................................................................................. 11

            b.    The '202 Patent Discloses Two of the Alleged Trade Secrets and, Therefore, They Are Not Entitled to Protection. .......................... 14

                i.    The '202 Patent Discloses the ██████ Process. 14

                ii.    The '202 Patent Discloses the ████ Process. .............. 15

        2.    The Anomatic Patents Do Not Disclose the Alleged Trade Secrets......... 16

            a.    The ████ Process Does Not Appear in the Anomatic Patents. 16

            b.    The ████ Process Combination Trade Secret Does Not Appear in the Anomatic Patents. ............................................................. 17

i

        i.      Reference to a "█████████" and "███" Do Not Disclose the ███████████ of Mareiners' █████████ Process. ........................................................ 19

        ii.     Anomatic's Process Contains Two Intervening Steps Not Claimed by Mareiners' ██████ Process........................... 22

    c.    The Anomatic Patents Do Not Disclose the Mareiners Process. .. 23

  3.    Mareiners' Inability to Establish Damages for Its Trade Secret Misappropriation Claims Necessitates Judgment in Anomatic's Favor. ... 27

    a.    Mareiners Has Failed to Put Forth or Identify an Admissible Theory of Damages. ....................................................... 27

    b.    Mareiners' Failure to Apportion Damages Precludes Any Recovery in this Case. ...................................................... 28

B.    ANOMATIC IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON MAREINERS' CORRECTION OF INVENTORSHIP CLAIMS. ...................... 30

  1.    Mareiners Lacks Standing to Pursue Its Correction of Inventorship Claim. ................................................................................................. 30

    a.    Mareiners Has Not Suffered an Injury in Fact and, Therefore, Does Not Have Article III Standing. ....................................... 31

        i.      There Is No Admissible Evidence to Establish that Mr. Goertzen Ever Assigned Any Intellectual Property Related to an Anodized Aluminum Transaction Card to Mareiners. ................................................................................... 31

        ii.     Mareiners Does Not Have an Ownership Interest in the Anomatic Patents because It Cannot Establish that Mr. Goertzen Was the Sole Inventor of the Anomatic Patents. 34

        iii.    Mareiners Does Not Have a Concrete Financial Interest in the Anomatic Patents. ....................................................... 36

  2.    Mr. Goertzen Is Not the Sole Inventor of the Anomatic Patents. ............. 38

    a.    Mr. Goertzen's Alleged Possession and Knowledge of Each and Every Claim of the Anomatic Patents Cannot Be Corroborated. . 41

        i.      Neither Mr. Jennings Nor Mr. Baer Can Corroborate Mr. Goertzen's Testimony. ..................................................... 44

    b.    The Available Evidence Fails, as a Matter of Law, to Corroborate that Mr. Goertzen Possessed Each and Every Feature Recited in the Anomatic Patents. .................................................... 46

        i.      Mr. Goertzen's Alleged Knowledge of the Claim Limitation Regarding the Use of a Magnetic Stripe or Barcode Integrally Contained within an Overlay Is Uncorroborated. .............................................................. 46

ii.    Mr. Goertzen's Alleged Knowledge of the Claim Limitation Regarding a Beveled or a Double Beveled Edge Is Uncorroborated. ............................................................. 48

iii.   Mr. Goertzen's Alleged Knowledge of the Claim Limitation Regarding the Method of Manufacturing an Anodized Metallic Transaction Card Is Uncorroborated.. 50

iv.   Mr. Goertzen's Alleged Knowledge of the Claim Limitation Regarding the Use of AA 5182 Aluminum Alloy Having a Particular Temper Designation Is Uncorroborated. ............................................................... 52

C.    ANOMATIC IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON MAREINERS' STATE LAW CONTRACT CLAIMS. ...................................... 53

    1.    The Anomatic Patents Do Not Disclose Mareiners' Trade Secrets and, Therefore, There Can Be No Breach of the Non-Disclosure Agreement or the Patent Licensing Agreement. ............................................................... 53

    2.    Anomatic Has Not Breached the Patent Licensing Agreement by Obtaining the Anomatic Patents. ........................................................... 55

        a.    Mareiners Put Forward No Admissible Affirmative Evidence that the Anomatic Patents Prevent the Manufacture or Sale of Anodized Aluminum Transaction Cards. ...................................................... 55

        b.    The Anomatic Patents Can Be Designed Around to Allow Others to Manufacture and Sell Anodized Aluminum Transaction Cards. ......................................................................................... 56

            i.    A Transaction Card Without an Overlay Would Not Infringe the '655 Patent. .................................................... 58

            ii.   A Transaction Card Without an Anodized Peripheral Surface Would Not Infringe the '518 Patent. .................. 59

            iii.  A Transaction Card Without a Colored Peripheral Surface Would Not Infringe the Anomatic Patents........................ 60

        c.    The PLA Expressly Authorized Anomatic to Obtain the Anomatic Patents and, Therefore, Any Impact the Patents May Have on Mareiners' Ability to License Its Technology Cannot Form the Basis of a Claim for Breach of Contract. ...................................... 60

    3.    Ohio Does Not Recognize a Standalone Claim for Breach of the Duty of Good Faith and Fair Dealing................................................................. 63

    4.    Mareiners' Breach of the Non-Disclosure Agreement and Patent Licensing Agreement Precludes It from Satisfying Its Burden of Proof on Its State Law Contract Claims. ............................................................... 65

    5.    Mareiners' Failure to Establish Damages Precludes It from Satisfying Its Burden of Proof on Its State Law Contract Claims. ................................. 67

V.    CONCLUSION................................................................................................. 68

# TABLE OF AUTHORITIES

**Cases**

*Atlantic Thermoplastics Co. v. Faytex Corp.*, 970 F.2d 834 (Fed. Cir. 1992) ............................ 58

*Avantax Wealth Mgmt. v. Marriott Hotel Servs., Inc.*, 108 F.4th 407(6th Cir. 2024) ................... 6

*Beech Aircraft Corp. v. EDO Corp.*, 990 F.2d 1237 (Fed. Cir. 1993) ........................................ 38

*Brackfield & Assocs. P'ship v. Branch Banking & Trust Co.*, 645 Fed. Appx. 428 (6th Cir. 2016) ........................................................................ 30

*Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th 368 (6th Cir. 2022) ... 8, 9, 11, 19, 23, 24, 29

*Chou v. Univ. of Chi. & Arch. Dev. Corp.*, 254 F.3d 1347 (Fed. Cir. 2001) ............................... 31

*Cincinnati Dev. III LLC v. Cincinnati Terrace Plaza, LLC*, Nos. 22-3303/3367, 2023 U.S. App. LEXIS 6132 (6th Cir. Mar. 14, 2023) ....................................................... 64, 68

*Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955 (Fed. Cir. 2001) ............................................. 46

*Finnigan Corp. v. ITC*, 180 F.3d 1354 (Fed. Cir. 1999) .................................................. 41, 44, 45

*GE v. Wilkins*, 750 F.3d 1324 (Fed. Cir. 2014) ..................................................................... 30, 38

*Hedrick v. Spitzer Motor City,* 2007-Ohio-6820 ....................................................................... 63

*Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976 (Fed. Cir. 1997) ............................. 38

*HIP, Inc. v. Hormel Foods Corp.*, 66 F.4th 1347 (Fed. Cir. 2023) ....................................... 49, 52

*Howe v. City of Akron*, 801 F.3d 718 (6th Cir. 2015) ................................................................. 34

*In re Jolley*, 308 F.3d 1317 (Fed. Cir. 2002) ............................................................................ 44

*James v. j2 Cloud Servs., LLC*, 823 Fed. Appx. 945 (Fed. Cir. 2020) ................................. 38, 40

*Klepper v. First Am. Bank*, 916 F.2d 337 (6th Cir. 1990) ............................................................. 7

*Lacks Indus. v. McKechnie Vehicle Components USA, Inc.*, 322 F.3d 1335 (Fed. Cir. 2003) .................................................................................................. 41

*Larson v. Correct Craft, Inc.*, 569 F.3d 1319 (Fed. Cir. 2009) .................................................. 31

*Lucarell v. Nationwide Mut. Ins. Co.*, 2018-Ohio-15 (2018) ..................................................... 64

*Magnesium Mach., LLC v. Terves, LLC*, Nos. 20-3779/3998, 2021 U.S. App. LEXIS 36065 (6th Cir. Dec. 6, 2021) ................................................................................................. 7

*Medgraph, Inc. v. Medtronic, Inc.*, 843 F.3d 942 (Fed. Cir. 2016) ............................................ 57

*Neely v. Benchmark Family Servs.*, 640 F. App'x 429 (6th Cir. 2016) ........................................ 7

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ............................................................. 57

*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984) ................................................................... 15

*Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344 (Fed. Cir. 2001) .................. 40

*Sewall v. Walters*, 21 F.3d 411 (Fed. Cir. 1994) ....................................................................... 38

*Shukh v. Seagate Tech., LLC*, 803 F.3d 659 (Fed. Cir. 2015) ................................................... 37

*Singh v. Brake*, 222 F.3d 1362 (Fed. Cir. 2000) ...................................................................... 40

*Skukh v. Seagate Tech., LLC*, 803 F.3d 659 (Fed. Cir. 2015) ................................................... 37

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ....................................................................... 31, 36

*V&M Star Steel v. Centimark Corp.*, 678 F.3d 459 (6th Cir. 2012) ........................................... 68

*Walden v. GE Int'l, Inc.*, 119 F.4th 1049 (6th Cir. 2024) ............................................................ 7

*Warth v. Seldin*, 422 U.S. 490 (1975) ....................................................................................... 31

*Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368 (Fed. Cir. 1998) ........................... 41

**Statutes**

18 U.S.C. § 1836 .......................................................................................................................... 7

18 U.S.C. § 1839(3) ...................................................................................................................... 8

18 U.S.C. § 1839(5)(B) ................................................................................................................ 16

O.R.C. § 1333.61(B)(2) ............................................................................................................... 16

O.R.C. §§ 1333.61–1333.69 .......................................................................................................... 7

## LOCAL CIVIL RULE 7.2(a)(3) SUMMARY

Although this Memorandum is detailed, that is not an indication of a substantial evidentiary record; instead, it reflects the need to address Mareiners' failure to produce evidence that creates an issue of material fact on its multiple claims and legal theories. Mareiners' claims fail for a number of reasons, almost all of which provide independent bases for disposing of entire counts or even multiple counts. The principal grounds for summary judgment are summarized below.

**I.     Arguments Concerning Plaintiff's Trade Secret Misappropriation Claims**

Mareiners cannot meet its burden to show the existence of protectable trade secrets, disclosure of trade secrets, or damages. Any one of these failures of proof entitles Anomatic to judgment as a matter of law on Mareiners' trade secret misappropriation claims.

**A.     Principal Argument One: Mareiners' Alleged Trade Secrets Are Not Entitled to Trade Secret Protection (Section IV.A.1 at p. 7)**

To qualify for trade secret protection, information must be both specific and secret. *See Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th 368 (6th Cir. 2022); *Novak v. Farneman*, No. 2:10-CV-768, 2010 U.S. Dist. LEXIS 123526 (S.D. Ohio Nov. 9, 2010). Mareiners' alleged trade secrets are neither. Despite this Court giving Mareiners the opportunity to correct the fact that its Process and ███████ Process were lists of "production steps, not . . . trade secrets" (ECF No. 32 at 7), Mareiners added no specificity to its alleged trade secrets (§ IV.A.1.a.ii). If anything, discovery has proven that Mareiners does not even know what it claims as its alleged trade secrets (§ IV.A.1.a.i). Likewise, Mareiners' '202 Patent discloses both its Pattern and Press Process and Locking Process, which destroys their secrecy (§ IV.A.1.b).

**B.     Principal Argument Two: Anomatic Did Not Disclose Mareiners Alleged Trade Secrets in the Anomatic Patents (Section IV.A.2 at p. 16)**

This is a disclosure case. Accordingly, Mareiners must establish that its alleged trade

secrets appear in the Anomatic Patents. It cannot. First, Mareiners' alleged ███ Process does not appear in the Anomatic Patents (§ IV.A.2.a). Mareiners admitted that the Anomatic Patents disclose a different process. Second, Mareiners' alleged ███ Process—a purported combination trade secret—does not appear in the Anomatic Patents (§ IV.A.2.b). The Anomatic Patents disclose a different process (§ IV.A.2.b.ii) and omit nearly every step of the "exact recipe" Mareiners allegedly disclosed to Anomatic (§ IV.A.2.b.i). Third, the Anomatic Patents do not disclose Mareiners' alleged Process (§ IV.A.2.c). The secrecy of the alleged Process remains intact because it is undisputed that necessary elements to the reproducibility of the Process do not appear in the Anomatic Patents. *See* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 40; *Penalty Kick Mgmt. v. Coca Cola Co.*, 318 F.3d 1284 (11th Cir. 2003).

## C. Principal Argument Three: Mareiners Cannot Establish Damages in Connection with Its Trade Secret Misappropriation Claims (Section IV.A.3 at p. 27)

Damages are a necessary element of Mareiners' trade secret misappropriation claims, *see Presidio, Inc. v. People Driven Tech., Inc.*, 686 F. Supp. 3d 652 (S.D. Ohio 2023), yet it has put forward no admissible theory of damages. When asked in discovery to "describe the quantum of damages" it was asserting, Mareiners "direct[ed] Defendant to the expert report of Jeff George." However, Mr. George's report and testimony are not admissible. First, they should be excluded for the reasons articulated in Anomatic's contemporaneously filed *Daubert* Motion (§ IV.A.3.a). Second, Mr. George's all-or-nothing approach incorporates in its valuation alleged trade secrets Mareiners concedes Anomatic has not misappropriated. This approach provides the jury with no way to apportion damages and is improper (§ IV.A.3.b). *See O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064 (N.D. Cal. 2005); *Versata Software, Inc. v. Ford Motor Co.*, No. 15-cv-10628; 15-11264, 2023 U.S. Dist. LEXIS 75318 (E.D. Mich. May 1, 2023).

## II.     Arguments Concerning Plaintiff's Correction of Inventorship Claims

Mareiners has failed to show that it has standing to pursue its claim for correction of inventorship or that Mr. Goertzen is the sole inventor of the Anomatic Patents. Either failure of proof entitles Anomatic to judgment as a matter of law.

### A.     Principal Argument One: Mareiners Lacks Standing to Pursue Its Claim (Section IV.B.1 at p. 31)

Standing is a threshold issue of law for the Court. *See Larson v. Correct Craft, Inc.*, 569 F.3d 1319 (Fed. Cir. 2009). Mareiners lacks standing to pursue its correction of inventorship claim for three independent reasons: (1) despite producing a document for the first time weeks after the close of discovery purporting to reflect an assignment to Mareiners, Mareiners offers no admissible evidence to establish Mr. Goertzen assigned his interest in an anodized transaction card to Mareiners (§ IV.B.1.a.i); (2) because Mr. Goertzen is not the ***sole*** inventor of the Anomatic Patents, Mareiners has no ownership interest (§ IV.B.1.a.ii.); and (3) Mareiners has no financial interest tied solely to its status as an inventor (§ IV.B.1.a.iii). Each is independently sufficient to find Mareiners has not suffered an injury in fact.

### B.     Principal Argument Two: Mr. Goertzen Is Not the Sole Inventor of the Anomatic Patents (Section IV.B.2 at p. 38)

Mareiners must overcome, by clear and convincing evidence, the presumption that Anomatic's Mark Ormiston is the "true and only inventor" of the Anomatic Patents. *GE v. Wilkins*, 750 F.3d 1324 (Fed. Cir. 2014); *see also James v. j2 Cloud Servs., LLC*, 823 Fed. Appx. 945 (Fed. Cir. 2020). To do so, Mareiners must corroborate, on a claim-by-claim basis, that Mr. Goertzen possessed and communicated to Anomatic each and every feature recited in the claims of the Anomatic Patents. *See Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344 (Fed. Cir. 2001). The little evidence that exists (§ IV.B.2.a) does not corroborate, let alone by clear and

convincing evidence, that Mr. Goertzen possessed and communicated to Anomatic numerous features claimed by the Anomatic Patents (§ IV.B.2.b).

### III.     Arguments Concerning Plaintiff's State Law Breach of Contract Claims

Mareiners has failed to carry its burden of proof on at least three elements of its state law breach of contract claims: (1) the existence of a breach; (2) that Mareiners itself is not in breach; and (3) damages. Any one failure is dispositive.

#### A.     Principal Argument One: The Anomatic Patents Do Not Disclose Mareiners' Alleged Trade Secrets or Otherwise Confidential Information (Section IV.C.1 at p. 53)

Mareiners alleges Anomatic breached the NDA and PLA when it disclosed "Mareiners' confidential information . . . by filing a patent application that incorporated Mareiners' confidential information." (ECF No. 77 at ¶¶ 118, 130.) First, as explained in Section IV.A.2, the Anomatic Patents do not disclose Mareiners' alleged trade secrets. Second, as demonstrated by Appendix D, the information the Anomatic Patents disclosed was either (1) generally known; or (2) independently known by Anomatic. Anomatic had no obligation to treat the information in Appendix D as confidential under the NDA.

#### B.     Principal Argument Two: Anomatic's Acquisition of the Anomatic Patents Is Not a Breach of the Patent Licensing Agreement (Section IV.C.2 at p. 55)

As this Court previously held, in negotiating the PLA, the Parties "anticipated the development of new intellectual property . . . [and that] Defendant would own the new intellectual property that was developed with the *use of* Plaintiff's confidential information." (ECF No. 34 at 6 (emphasis in original).) The natural consequence of the Parties' agreement is that Anomatic was entitled to obtain patent protection over a subset of goods that could otherwise qualify as Licensed Products, as defined by the PLA. Accordingly, any limitation on the potential scope of Mareiners' licensing activity as a result is not a breach of the PLA but rather reflects a right the Parties

expressly negotiated and agreed Anomatic would possess.

### C.  Principal Argument Three: Ohio Does Not Recognize a Standalone Claim for Breach of the Duty of Good Faith and Fair Dealing (Section IV.C.3 at p. 64)

Mareiners' alternative theory for breach of the PLA—based on a breach of the implied duty of good faith and fair dealing exercised in a manner inconsistent with Mareiners' reasonable expectations (*see* ECF No. 77 at ¶ 127)—is not a recognized claim under Ohio law. *See Lucarell v. Nationwide Mut. Ins. Co.*, 2018-Ohio-15; *Cincinnati Dev. III LLC v. Cincinnati Terrace Plaza, LLC*, Nos. 22-3303/3367, 2023 U.S. App. LEXIS 6132 (6th Cir. Mar. 14, 2023); *Orange Barrel Media, LLC v. KR Sunset Weho, LLC*, No. 2:21-cv-4988, 2022 U.S. Dist. LEXIS 119499 (S.D. Ohio July 6, 2022) (Sargus, J.). Since Anomatic is not otherwise in breach of the PLA, the Court should reject Mareiners' alternative theory.

### D.  Principal Argument Four: Mareiners Is In Breach of the Non-Disclosure Agreement and the Patent Licensing Agreement (Section IV.C.4 at p. 65)

Under Ohio law, proof that the nonbreaching party has performed its contractual obligations is a necessary element of a breach of contract claim. *See Orange Barrel Media, LLC*, 2022 U.S. Dist. LEXIS 119499 (Sargus, J.). Yet, Mareiners breached its confidentiality obligation by transmitting Anomatic's confidential information to third parties without authorization.

### E.  Principal Argument Five: Mareiners Cannot Establish Damages for Its State Law Breach of Contract Claims (Section IV.C.5 at p. 68)

In Ohio, the final element of any breach of contract claim is the existence of damages resulting from the breach. *See Milles v. Fifth Third Bank, N.A.*, No. 1:24-cv-186, 2024 U.S. Dist. LEXIS 215155 (S.D. Ohio Nov. 26, 2024). As explained in Section IV.A.3, Mareiners has put forward no admissible theory of damages. Furthermore, as explained in Section IV.C.2, the Anomatic Patents are not the "but for" cause of Mareiners' alleged damages. *See V&M Star Steel v. Centimark Corp.*, 678 F.3d 459 (6th Cir. 2012). Without damages, Mareiners' claims fail.

## I.   <u>INTRODUCTION</u>

Nearly three years ago, Anomatic wrote to Mareiners stating, "unless Mareiners informs Anomatic of the specific information it claims to have been Mareiners' trade secret, it is impossible for Anomatic to respond with a specific rebuttal" to the allegations. (ECF No. 25 at 2.) Despite the Court's (1) admonishment that Mareiners' alleged trade secrets lacked the requisite specificity and (2) directive that Mareiners "should be prepared to support its use of language" in the future (ECF No. 32 at 6–9), Mareiners has made no meaningful effort to heed the Court's warnings. Instead, what has become abundantly evident is that Mr. Goertzen—Mareiners' founder and keeper of Mareiners' alleged trade secrets, which have never been written down—does not even know what they include or claim. This lack of any specificity vitiates Mareiners' trade secret claims and necessitates judgment in Anomatic's favor.

Similarly, nearly a year and a half ago, the Court held that the Patent Licensing Agreement "anticipated the development of new intellectual property that *resulted from or related to* the confidential information disclosed by [Mareiners]. [Anomatic] would own the new intellectual property that was developed with the *use* of [Mareiners'] confidential information. Whether the '655 Patent is new intellectual property is one of the issues in this action that is disputed." (ECF No. 34 at 6 (emphasis in original).) Yet, over the course of lengthy and voluminous discovery, Mareiners has failed to adduce any corroboration that establishes by clear and convincing evidence that Mr. Goertzen is the **sole** inventor and conceived of and communicated each and every claim limitation found in the Anomatic Patents. **Joint** inventorship is not an option for Mareiners (1) because it is not alleged; and (2) because any **joint** invention would be owned by Anomatic.

Next, this Court granted Mareiners leave to amend its complaint to add a claim for breach of the duty of good faith and fair dealing, in part, because "it is the better exercise of discretion to

permit the amendment and allow the sufficiency of [Mareiners'] pleadings to be addressed in a dispositive motion before the District Judge." (ECF No. 74 at 8 (internal quotations omitted).) Yet, the undisputed facts establish that Anomatic has not breached any of its agreements with Mareiners; rather, Mareiners breached the NDA and PLA's confidentiality provisions. Accordingly, coupled with the fact that Ohio does not recognize a claim for breach of the duty of good faith and fair dealing, Mareiners cannot satisfy its burden of proof on its contract claims.

Lastly, Mareiners has offered no admissible evidence of damages, which is a necessary element of its trade secret misappropriation claims and state law contract claims.

## II.    **BACKGROUND**

Around 2003, Mr. Goertzen, at the suggestion of his then acquaintance and now mentor, Keith Jennings, began developing a process in which a ▮▮▮▮▮▮ image could be ▮▮▮▮▮▮ into ▮▮▮▮▮▮ a 3-dimensional piece of aluminum. (Ex. A to Declaration of Andrew D. Fleming in Support of Defendant Anomatic Corporations' Contemporaneously Filed Briefing[1] at 15:25–16:4; 17:5–24; 125:5–25; 129:21–24.) Mr. Goertzen, then working for Roscoe Manufacturing, filed a patent application that matured into U.S. Patent No. 7,022,202 on April 4, 2006 (*see* Ex. B (the "'202 Patent")). Roscoe Manufacturing would eventually assign its interest in the '202 Patent to Mareiners. (Ex. A at 19:25–20:5.) Beginning around 2006, Mr. Goertzen, then working for Mareiners, began developing and refining aspects of the technology related to the '202 Patent over which Mareiners claims trade secret protection. (Ex. A at 21:22–22:2.) However, Mr. Goertzen testified that he is unaware of ever having assigned his intellectual property to the Plaintiff in this case, Mareiners, including the alleged trade secrets or the

---

[1]    Unless stated otherwise, all exhibit references herein refer to those listed in the contemporaneously filed Declaration of Andrew D. Fleming in Support of Defendant Anomatic Corporation's Contemporaneously Filed Briefing.

transaction card discussed below. (*Id.* at 24:17–25:4.)

Around 2015, Mr. Goertzen conceived of a new application for Mareiners' ▮▮▮▮▮▮
decorating technology in the form of an image anodized aluminum transaction card. (Ex. A at
56:6–20.) However, no one had ever manufactured or developed an aluminum transaction card
that could pass the credit card industry's stringent testing protocols. (Ex. KK at 26–28, 30–35.)
Unable to manufacture such a card, Mareiners looked for anodizing facilities that could and on
July 31, 2017, Mr. Goertzen reached out to Anomatic. (Ex. II at 10–11.) Shortly thereafter, the
Parties executed a Non-Disclosure Agreement. (ECF No. 1-1 (the "NDA").) In November, the
Parties, along with Messrs. Baer and Jennings, convened at Anomatic's facility in New Albany,
Ohio, to discuss the possibility of a potential partnership. (Ex. N at 244:25–245:2; Ex. P.) Over
the next several months, the Parties continued to explore that potential partnership, which resulted
in the Parties entering into a Patent Licensing Agreement (ECF No. 9-1 (the "PLA"), which this
Court previously construed as (1) "anticipat[ing] the development of new intellectual property that
*resulted from or related to* the confidential information [allegedly] disclosed by [Mareiners]"; and
(2) conveying to Anomatic ownership of "the new intellectual property that was developed with
the *use of* [Mareiners'] confidential information" (ECF No. 34 at 6 (emphasis in original)).

## A.    THE ANOMATIC PATENTS[2]

Based on its efforts to develop an anodized aluminum transaction card that could pass all
industry certifications and, therefore, be sold to consumers, Anomatic filed a patent application
that matured into U.S. Patent No. 11,182,655 on November 23, 2021. (*See* Ex. J (the "'655

---

[2]    The Anomatic Patents share a common specification. Aside from minor variations in the
pagination of the Patents' specifications, the only difference between the two Patents is what is
claimed therein. Accordingly, as it relates to the disclosures Anomatic allegedly made in the
Patents, those allegations and substance thereof is identical. Accordingly, Anomatic will largely
cite to the '655 Patent unless the specific argument warrants differentiation between the Patents.

Patent").) Similarly, Anomatic filed a continuation patent application that matured into U.S. Patent No. 11,816,518 on November 14, 2023. (Ex. K (the "'518 Patent" and collectively with the '655 Patent, the "Anomatic Patents" or "Patents").)

The subject matter of the Anomatic Patents is unrelated to the subject matter of Mareiners' '202 Patent, Mareiners' decorating process of ███████ an image ██████ anodized piece of aluminum, and Mareiners' alleged trade secrets associated with the '202 Patent and its decorating process, which was the Licensed Technology in the PLA. Instead, the subject matter of the Anomatic Patents is directed to a particular type of transaction card, namely a metallic transaction card and method for manufacturing it, as described and claimed in the Patents. (*See, e.g.*, '655 Patent at Abstract.) While the Anomatic Patents describe a general method of decorating that card via ████████ (*see* Appendix B), only ███ of the Anomatic Patents' combined 43 claims relate to that process. (*See* '655 Patent at dependent claims ██ and ██ '518 Patent at dependent claim ██.) The remaining ██ claims concern specific features the transaction card and methods of manufacturing cards with those features.

## B. MAREINERS' ALLEGED TRADE SECRETS

Mareiners' alleged trade secrets relate to its decorating process of ████████ an image into an anodized piece of aluminum. (*See* Ex. HH at 8.) Mareiners' allegedly communicated its trade secrets to Anomatic only orally. (Ex. H at 16:25–17:19.) In fact, Mareiners has communicated its alleged trade secrets to each of its licensees only orally. (*Id.* at 18:9–19:7.) Mareiners does not maintain any written record of its alleged trade secrets (*id.* at 19:12–14) and, in fact, had never transcribed its alleged trade secret process before responding to Anomatic's Interrogatory No. 1. (Ex. H at 42:8–17.) Instead, the only record Mareiners maintains of its alleged trade secrets is in Mr. Goertzen's head. (*Id.* at 42:2–7.) There is no evidence in the record that

Mareiners' alleged trade secrets have ever been communicated to any person in the manner in which Mareiners describes them for purposes of this litigation. Given these concerns, this Court ordered Mareiners' articulation of its alleged trade secrets closed. (ECF No. 32 at 9.)

### 1. The Trade Secrets Mareiners Does Not Contend Anomatic Misappropriated.

#### a. The "██████ Process"

The first alleged trade secret Mareiners alleges it disclosed to Anomatic (but concedes Anomatic did not disclose in the Anomatic Patents) is its ████ ████ process (the "██████ Process"). (*See* Ex. II at 8.) Mareiners' ██████ Process is an alleged combination trade secret and is ████ of the Mareiners Process, defined below. (*Id.*; *see also* Ex. HH at 18.)

#### b. The "████ Process"

The second alleged trade secret Mareiners alleges it disclosed to Anomatic (but concedes Anomatic did not disclose in the Anomatic Patents) is its ████ process for █████████████ ████ the anodized surface (the "Timing Process"). (*See* Ex. II at 9.) Mareiners' ████ Process is an alleged standalone trade secret and is ████ of the Mareiners Process, defined below. (*Id.*; *see also* Ex. HH at 18.)

### 2. The Trade Secrets Mareiners Contends Anomatic Misappropriated.

#### a. Mareiners' "Process"

The first alleged trade secret Mareiners alleges the Anomatic Patents disclose is its █████ ██████ process for ██████ an image ████ anodized piece of aluminum (the "Mareiners Process"). (*See* Ex. II at 5–7.) The Mareiners Process is an alleged combination trade secret, which is outlined in Appendix C. (*Id.*; *see also* Ex. HH at 18.)

#### b. Mareiners' "████ Process"

The second alleged trade secret Mareiners alleges the Anomatic Patents disclose is its 9-

5

step process for ████████████████████████ piece of aluminum (the "Coating Process"). (*See* Ex. II at 7.) Mareiners' ████████ Process is an alleged combination trade secret, and is ████ of the Mareiners Process, outlined in Appendix C. (*Id.*; *see also* Ex. HH at 18.)

### c. Mareiners' "Pattern and Press Process"

The third alleged trade secret Mareiners alleges the Anomatic Patents disclose is its process for ████████████████ in a ████████████ operation (the "Pattern and Press Process"). (*See* Ex. II at 7–8.) Mareiners' Pattern and Press Process is an alleged standalone trade secret, and is Step 7 of the Mareiners Process, outlined in Appendix C (*id.*; *see also* Ex. HH at 18):

█ ████████████████████████████
████████████████████

### d. Mareiners' "Locking Process"

The fourth alleged trade secret Mareiners alleges the Anomatic Patents disclose is its process for ████████████████████ the anodized surface (the "████ Process"). (*See* Ex. II at 8.) Mareiners' ████████ Process is an alleged standalone trade secret and is ████ of the Mareiners Process, outlined in Appendix C (*id.*; *see also* Ex. HH at 18):

█ ████████████████████████████
████████████████████

## III. LEGAL STANDARD

"Summary judgment is proper when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Avantax Wealth Mgmt. v. Marriott Hotel Servs., Inc.*, 108 F.4th 407, 414 (6th Cir. 2024) (internal quotations omitted). While "this court must view the evidence in the light most favorable to the non-moving party," *id.* (internal quotations omitted), "the nonmoving party must put forth more than a 'scintilla' of evidence to support its claims," *Walden v. GE Int'l, Inc.*, 119 F.4th 1049, 1056 (6th

Cir. 2024). "'[C]onjecture' and 'conclusory allegations' will not suffice." *Id.* at 1056–57.

"To survive summary judgment, the nonmoving party must present significant probative evidence putting the material facts in doubt." *Id.* at 1057 (internal quotations omitted). In doing so, the nonmovant must demonstrate a genuine issue of material fact under the applicable evidentiary standard; facts that are adequate under a preponderance of the evidence standard will not suffice where, as here, the plaintiff is required to prove its case through clear and convincing evidence. *See Klepper v. First Am. Bank*, 916 F.2d 337, 343 (6th Cir. 1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56 (1986)). Thus, "summary judgment is proper where the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Neely v. Benchmark Family Servs.*, 640 F. App'x 429, 432 (6th Cir. 2016) (internal quotations omitted)).

## IV.   ARGUMENT

### A.    ANOMATIC IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON MAREINERS' TRADE SECRET MISAPPROPRIATION CLAIMS.[3]

Mareiners cannot meet its burden to "show the existence of a protectable trade secret and misappropriation of the trade secret," *Presidio, Inc. v. People Driven Tech., Inc.*, 686 F. Supp. 3d 652, 682–83 (S.D. Ohio 2023), and, therefore, Anomatic is entitled to judgment as a matter of law on Mareiners' trade secret misappropriation claims (Count I and II).

#### 1.    The Alleged Trade Secrets Are Not Entitled to Trade Secret Protection.

There are two different forms of alleged trade secrets at issue in this case: combination trade secrets and standalone trade secrets. Under both the DTSA and the OUTSA, a traditional or

---

[3]    Trade secret misappropriation is defined similarly under both the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 (the "DTSA"), and the Ohio Uniform Trade Secrets Act, O.R.C. §§ 1333.61–1333.69 (the "OUTSA"). *See Magnesium Mach., LLC v. Terves, LLC*, Nos. 20-3779/3998, 2021 U.S. App. LEXIS 36065, at *9 (6th Cir. Dec. 6, 2021).

standalone trade secret is "information that the owner 'has taken reasonable measures' to keep secret and that 'derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.'" *Presidio*, 686 F.Supp. 3d at 683 (quoting 18 U.S.C. § 1839(3)). Standalone trade secrets include all the forms and types of information typically considered to be trade secrets. *Id.* (quoting 18 U.S.C. § 1839(3)). However, Ohio also recognizes that a trade secret may be articulated as a combination of components. (ECF No. 32 at 6–7.) They "can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Coda Dev. S.R.O. v. Goodyear Tire & Rubber Co.*, 667 F. Supp. 3d 590, 602 (N.D. Ohio 2023) (internal quotation omitted).

> ### a. The Alleged Trade Secrets Are Not Stated With Sufficient Particularity and, Therefore, Are Not Entitled to Protection.

Despite the Court's clear warning, Mareiners has failed to describe its alleged trade secrets with the requisite specificity to qualify for protection. As this Court cautioned Mareiners, "the party alleging misappropriation must describe its trade secrets with reasonable particularity." (ECF No. 32 at 5.) This requires describing the asserted trade secrets with enough specificity to provide notice of what is alleged to have been misappropriated. (*Id.*) It is not enough to provide a list of production steps or broad categories of information. (*Id.* at 7.) Yet, that is all Mareiners has done.

Regarding Mareiners' alleged combination trade secrets, "the reasonable particularity requirement takes on special importance. A combination-trade-secret plaintiff must describe the secret with sufficient specificity that its protectability can be assessed and to show that its compilation is unique." *Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th 368, 381 (6th Cir. 2022) (internal quotations omitted).

        i.   **Mareiners' Production Steps Are Too Vague and Too Inclusive to Qualify for Trade Secret Protection.**

This Court held that the Mareiners Process "is a list of production steps, not a list of trade secrets." (ECF No. 32 at 7.) Yet, Mareiners made no meaningful effort to cure its "failure to describe the trade secrets with reasonable particularity." (*See id.*) Instead, the only substantive change Mareiners made in response to this ruling was to delineate which of those production steps when combined formed its asserted combination trade secrets and which of those production steps were on their own asserted standalone trade secrets. (*See* Ex. HH at 18.) Mareiners claims that its Process is an "[e]xact recipe" that must be followed precisely and sequentially (Ex. OO at 19; Ex. II at 37–40), yet what it describes is more akin to a choose-your-own-adventure puzzle with optional tooling (*e.g.*, ███████████████████████████████████; optional steps (*e.g.*, ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████ (*e.g.*, ███████████████ ███████████████████████████████████████████████████████████████████ █████████████████████████████"); ████████████████ (*e.g.*, "████████████ ██████")| ███████████████ (*e.g.*, "███████████████████████████████████ ███████████████████████"); and ████████████████████ (*e.g.*, *id.*). (*See* Appendix C.) These failures are dispositive: the claimed trade secrets are insufficiently specific.

The Mareiners Process and ███████ Process, in particular, are both too vague and too inclusive, as a matter of law, to "allow a jury to separate the trade secrets from the other information." *See Caudill Seed & Warehouse Co.*, 53 F.4th at 583–84. Mareiners' written responses to discovery and Mr. Goertzen's testimony at deposition highlight the utter lack of specificity contained in both its Process and ███████ Process. In discovery, Anomatic asked Mareiners to identify where each step and sub-step of the Mareiners Process appears in the

Anomatic Patents.[4] (Ex. II at 17, 22–26.) As one example, Mareiners identified the following

passage from the Anomatic Patents with respect to numerous steps of its alleged process: "Then,

the ███████████████████████████ may include a ██████ operation where

the card body ████████ for example, █████████████████████████

██████████████." (*See* Ex. L and Ex. M at Steps 9–12.) Inexplicably, Mareiners

asserts this statement discloses:



(*Id.*) There is no rational way to connect that single statement to any of these steps, let alone find

that it supports the disclosure of each.

    Mr. Goertzen's testimony in his capacity as Mareiners' Rule 30(b)(6) designee also shows

a complete and dispositive lack of specificity. For example, he testified that, in his mind, ██████

████████ is the same as ██████████████████

> Q.    Okay. So if the '655 patent discloses ████████████████
>       and your process requires
> ██████████████, how are those two things the same?
> A.    That would be in the range of ████████

(Ex. H at 129:1–6.) He further testified that the phrase ████████████" was not only "plural"

(*id.* at 94:3–10), but also disclosed the ████████ of Mareiners' ██████ Process in the specific

sequence and for the required ████████:

> Q.    Okay. So the fact that a ████████████ may be used [in the Anomatic
>       Patents] discloses that someone should use ██████████████

---

[4]    A comparison of the Mareiners Process and those portions of the Anomatic Patents
Mareiners identified in its response to Interrogatory No. 6 can be found at Ex. L and Ex. M.

██████████████████████████████████████

    A.       Yes.

(*Id.* at 95:5–11.) And, he testified that the phrase "other parameters" disclosed the specific use of

a ██████████████:

    Q.       So just one clarifying question, then, for you. That sentence that you just
           read, However, ████████████████████████████████
           It's your testimony that that sentence there discloses a second substep of
           ███████████████████████?
    A.       Correct. Other parameters, yeah. Other – other ways to ████████ –
    Q.       Okay.
    A.       -- is how I interpret that.

(*Id.* at 120:5–15.)

Mareiners squandered the opportunity the Court gave it to correct its failure to define its

trade secrets with reasonable particularity and has plowed forward with this case based on the same

unspecific and general production steps this Court already found to be insufficient. As is evident

from discovery in this case, the Court was correct then: Mareiners has failed to describe its Process

and ██████ Process "with sufficient specificity that its protectability can be assessed and to show

that its compilation is unique." *See Caudill Seed & Warehouse Co.*, 53 F.4th at 381 (internal

quotations omitted). Accordingly, Mareiners' trade secrets lack specificity, as a matter of law, and

Anomatic is entitled to judgment on Counts I and II.

           ii.   <u>Mareiners Failed to Cure Its Vague and Undefined Terms.</u>

Mareiners also fails to disclose its Process and ██████ Process with reasonable

particularity because those asserted trade secrets are replete with vague, undefined terms and

phrases that provide no context for what is required to complete that particular step or sub-steps.

As Anomatic previously argued to the Court, it is entirely unclear what "████████████" "████

████" "████████" "████████" "████████████" and ████████████████" mean within the

context of Mareiners' alleged Process and ███████ Process. (*See* ECF No. 25 at 10–11.) These steps (Steps 2 and 3) are incomplete and provide no context for: (1) what ███████ (2) ███████ ███████ (3) ███████ or (4) whether the repeated reference to ███████ (*Id.*) As the Southern District of Ohio previously held in a similar case, "the subject matter of the trade secret must be described with sufficient particularity . . . to permit the defendant [and the factfinder] to ascertain at least the boundaries within which the secret lies." *Ridge Corp. v. Altun LLC*, No. 2:21-cv-5915, 2023 U.S. Dist. LEXIS 19926, at *6 (S.D. Ohio Feb. 3, 2023) (internal quotations omitted).

The Court reserved ruling on this issue at the Motion to Compel stage because "[t]he Court [did] not possess the technical expertise to make this determination on its own." (ECF No. 32 at 8.) Instead, the Court provided "some guidance," suggesting that if the parties could not "arrive at a common understanding regarding Plaintiff's use of terminology" that Mareiners "should be prepared to support its use of language with an expert declaration." (*Id.*)

As of this filing, Mareiners has provided no further clarity on what its use of these terms mean. First, Mareiners has put forward no expert declaration as instructed by the Court. Second, and more importantly, Mareiners ***itself*** does not even understand what these terms mean. For example, Mr. Goertzen, Mareiners' Rule 30(b)(6) designee, could not explain the difference between ███████ referenced in Mareiners' '202 Patent and ███████ referenced in Mareiners' ███████ Process:

Q.   Is there a difference between a ███████ as it relates to your patent and the trade secrets?
A.   The consis – ███████ could be different.
Q.   What do you mean by the ███████ could be different?
A.   ███████ – I'm not a ███████ but when the anodizer says you can ███████ I assume those are two different – two different

* * *



Q.    What is different between the – ███████████ as disclosed in
      the '202 patent and ███████████████ in Mareiners' process?
A.    What is the difference between ███████████████
Q.    Correct.
A.    One – one says ███████████████████

              * * *

Q.    Is there █████████████████████████████████?
A.    Again, I – I'm – my background is not in ██████████████ That's a
      Mark Ormiston question there.

(Ex. H at 57:24–59:14.) Similarly, Mr. Goertzen, again, could not explain the difference between

a ████████████ referenced in Mareiners' '202 Patent and ███████████ referenced

in Mareiners' ████████ Process:

Q.    What is the difference, if any, between ██████████ and ███████████?
A.    So again, I'm – I'm not ████████████ I know that from previous
      testing with previous licensees, that we had better results with ████████
      than ██████████

              * * *

Q.    And ██████████████ that's referenced in your '202 patent is different
      than ██████████ that is referenced in the Mareiners process.
A.    Correct.
Q.    And what is the difference between those two steps in the process, the
      ██████████ and the █████████?
A.    Again, I – I don't know the ██████████ of the difference between the
      two. I just know that we had better results from the ██████ than the █████

(Id. at 60:8–61:6.) The only clarity he provided was that an ████████████████████

Q.    Well, what would you – what is the definition of ██████████ within the
      context of your Mareiners' process?
A.    ████████████████████████

(Id. at 99:17–20.)

Despite this Court's clear directive—"[Mareiners] should be prepared to support its use of

language" (ECF No. 32 at 8)—Mareiners has provided no further information to support any claim

that its use of these terms have any particular, defined meaning within the context of the Mareiners

Process or ████████ Process. If anything, the record demonstrates that Mareiners has no idea what

13

these terms mean. While the Court previously deferred ruling on this issue, it is case dispositive now. The Mareiners Process and ███ Process are simply not described with reasonable particularity. Accordingly, Mareiners is not entitled to trade secret protection and the Court should enter judgment in Anomatic's favor on Counts I and II of the Amended Complaint.

**b.** **The '202 Patent Discloses Two of the Alleged Trade Secrets and, Therefore, They Are Not Entitled to Protection.**

Mareiners' public disclosure of at least two of its alleged trade secrets necessitates judgment as a matter of law in Anomatic's favor. "Information is entitled to trade secret status only if the information is not generally known or readily ascertainable to the public." *See Novak v. Farneman*, No. 2:10-CV-768, 2010 U.S. Dist. LEXIS 123526, at *8–9 (S.D. Ohio Nov. 9, 2010) (internal quotations omitted). Because at least two of Mareiners' alleged standalone trade secrets—its ███████ and ██████ Processes—appear in its '202 Patent, that information "is not protectable trade secret information." *See Ridge Corp.* 2023 U.S. Dist. LEXIS 19926 at *8 (citing *Novak*, 2010 U.S. Dist. LEXIS 123526 at *8–9).

i. The '202 Patent Discloses the ████████ Process.

Mareiners publicly disclosed its ██████ Process in its '202 Patent and, therefore, that information is not entitled to trade secret status. *See Ridge Corp.*, 2023 U.S. Dist. LEXIS 19926 at *8. Mareiners asserts that it has a standalone trade secret over the following:



(Ex. GG at 10.) Yet, Mareiners' '202 Patent contains the same, if not a more fulsome disclosure of Mareiners ██████ Process:



(Ex. B at Col. 4, ll. 53–58 (annotated); Fig. 2.) And, Mr. Goertzen admitted at deposition that the '202 Patent disclosed the substance of Mareiners' ███████████ Process:

> Q.   So what's disclosed here indicates that one could ████████████
> ███████████████████████████████████████████████████████
> correct?
> A.   That's what it states.

(Ex. H at 69:17–21.)

Mareiners' public disclosure[5] of its ███████████ Process forecloses any entitlement to trade secret protection as a matter of law. This Court should enter judgment in Anomatic's favor as it relates to Mareiners' ███████████ Process.

ii.   The '202 Patent Discloses the ███████ Process.

Mareiners also publicly disclosed its ███████ Process in its '202 Patent and, therefore, that information is not entitled to trade secret status. *See Ridge Corp.*, 2023 U.S. Dist. LEXIS 19926 at *8. Mareiners asserts that it has a standalone trade secret over the following:



(Ex. GG at 10.) Yet, Mareiners' '202 Patent discloses the ███████ Process:

(Ex. B at Col. 6, ll. 42–48.) At deposition, Mr. Goertzen testified that the ███████ he recommends to licensees is ████████████████████████████████ (Ex. A at

---

[5]   As Anomatic's expert, Mr. Coudray, has indicated, this process is known as ███████ ████████████████████ which is not new or novel, and is a technique Mr. Coudray has personally used on numerous occasions. (*See* Ex. MM at 8; *see also* Ex. LL at 64.) This testimony is unchallenged. Notwithstanding its disclosure in the '202 Patent, Mareiners' ███████████ Process is generally known and, therefore, not entitled to trade secret protection. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) ("Information that is public knowledge or that is generally known in an industry cannot be a trade secret.").



35:5–38:6.) He went so far as to assert that ██████████████████████████

██████████████ (Ex. H at 129:1–6.) If ████████████ is ████████████

████" then the ███████████████ disclosed in Mareiners' '202 Patent must be as well.

Mareiners' public disclosure of its ████ Process forecloses any entitlement to trade secret protection as a matter of law. This Court should enter judgment in Anomatic's favor as it relates to Mareiners' ████ Process.

### 2. The Anomatic Patents Do Not Disclose the Alleged Trade Secrets.

Assuming, *arguendo*, that Mareiners' alleged trade secrets are entitled to trade secret protection, Anomatic has not misappropriated them. Under the DTSA and the OUTSA, one generally misappropriates a trade secret through "disclosure or use of a trade secret of another without express or implied consent." 18 U.S.C. § 1839(5)(B); *see also* ORC § 1333.61(B)(2); *Buckeye Wellness Consultants, LLC v. Hall*, 2022-Ohio-1602, ¶¶ 38–39 (10th Dist.). Here, only Anomatic's purported disclosure of Mareiners' alleged trade secrets is at issue; there is no allegation of misappropriation based on use: "[I]t is Anomatic's ***disclosure*** of Mareiners' [alleged] trade secrets in its patent application that forms the basis of Mareiners' trade secret misappropriation claims." (ECF No. 12 at 8, n.2 (emphasis in original).)

### a. The ████ Process Does Not Appear in the Anomatic Patents.

The ████ process described in the Anomatic Patents and Mareiners' ████ Process are materially different. Mareiners' ████ Process requires ████████████████████ █████████████████████████████████████████████████████████ ████ (Ex. GG at 10.) In contrast, the Anomatic Patents disclose a ████████████ █████████████████████████████████████████████████████████ (*See, e.g.*, '655 Patent at ████████████████) These processes are entirely different,

16

which Mr. Goertzen admitted:

Q.  Do you remember that you told me that, generally speaking, if one used █, that the image quality would not be what it's supposed to be?
A.  I – yeah, I recall.
Q.  And you told me that in order to actually – to ███████ the part properly, it was necessary that the part be – ████████; correct?
A.  Correct. The – the – the process that Mark – the process that Mark used, he actually told me that he ████████████████████
Q.  
A.  With the – with ████ as a – as a ████████████
Q.  █, correct?
A.  ████████ could be – could – yeah, in ████████

(Ex. H at 129:14–130:8.)

As is evident from Mareiners' '202 Patent (*see supra* § IV.A.1.b.ii), the ████████████████████████████████ anodized aluminum is not a secret.[6] And, to the extent that Mareiners maintains any trade secret protection over this process—despite disclosing, in the '202 Patent, the ████████████████████████████ anodized aluminum (*see id.*)—it can only be in connection with ████████████████████ Anomatic, having developed its own ████ process based on its own ████████████, disclosed an entirely different ████ than that articulated by Mareiners' ████ Process.

**b.    The Coating Process Combination Trade Secret Does Not Appear in the Anomatic Patents.**

Mareiners has identified its alleged ████ Process as follows:

---

[6]    Additionally, as explained further below (*see infra* § IV.C.1; Appendix D), Anomatic has ████████████████████ for decades.

17



The process steps outlined by the Anomatic Patents do not disclose Mareiners' ███ Process. The Anomatic Patents discuss ███ process steps between the time a transaction card body is made and the time it completes the anodizing process (*see* Appendix B):



These ████████ do not disclose the combination and particular sequence of Mareiners' ████ Process. Specifically, Mareiners' ████ Process is a series of ███ substeps, which when combined and followed sequentially, allegedly allow one to achieve ██████████████



██████ (Ex. H at 88:16–89:6.) Those ████ substeps are nowhere to be found in the Anomatic

Patents and certainly not in the order or sequence required.



       i.   Reference to a "████████████" and "███ Do Not Disclose the ██████ Steps of Mareiners' ███████ Process.

Setting aside the issue of specificity[7] addressed above, Mareiners' position is untenable for

several reasons. For starters, the Anomatic Patents make no reference to ████████████████

████ not a █████████████" a "███████████" or an ██████████" as called for by Mareiners'

███████ Process. Moreover, Mr. Goertzen has no idea whether ████████████—or any other

█████████████ in the Anomatic Patents—can be or is typically used in a █████████████ because

he does not know the difference between the various █████████████ or their ██████████

█████████████ As explained above, at deposition, Mr. Goertzen could not explain the difference

between the █████████████ referenced in Mareiners' '202 Patent and the █████████████

referenced in Mareiners' ██████████ Process. (*See* Ex. H at 57:24–59:14.) Similarly, Mr. Goertzen

has no idea if █████████████ or any other ████ referenced in the Anomatic Patents—can be

used █████████████ because he does not know the difference between the various █████████ and

their █████████████ Again, as shown above, Mr. Goertzen could not explain the

difference between a █████████████ referenced in Mareiners' '202 Patent and the █████████████

████ referenced in Mareiners' ██████████ Process. (Ex. H at 60:8–61:6.)

Instead, Mareiners' disclosure contention is predicated on two phrases: "██████████

██████████ and ███" As revealed during deposition, Mareiners contends that the Anomatic

Patents disclose the ██████████ steps of the ████████ Process—█████████████████████ for

---

[7]     The absurdity of Mareiners' positions and the gymnastics it must do in an effort to explain how ██████ steps of its ██████████ Process are disclosed by the use of the phrases █████████████████ and ██████████ serves to highlight the special importance the threshold issue of specificity takes on when considering a combination trade secret. *See Caudill Seed & Warehouse Co.*, 53 F.4th at 381.



██████████████████████████ by the ████████████████████████████,
██████ by the ████████████████████████████████████ by the ████████
██████████████████████████ by the ████████████████████████████
██████████ in sequential order because a card body may undergo a "████████████"[8] with
████████████████████████

    Q.    Okay. So the fact that ██████████████████ discloses that
           someone should ████████████████████████████████
           by ████████████████████████████████████
           ████████████████
    A.    Yes.
    Q.    Looking at ██████████████ the ██████████████████████
           ████████, where in the '655 patent does that appear?
    A.    So ████████████████████████ it specifically says ██████

(*See* Ex. H at 95:5–16.) Oddly and adding additional confusion, Mareiners does not claim that the
██████████ of its ██████ Process—the use of a ████████████████████████████
██████ the ████████████—is disclosed by ████████████████████ like the other
██████████████ of its ██████ Process; rather, it asserts that this ██████ is somehow assumed:

    Q.    And moving on to the ██████████ which is ████████████████
           ████████████████████ where does that appear in the
           '655 patent?
    A.    There again, an anodizer would have to ████████████████
    Q.    So that ██████ does not actually appear in the '655 patent; correct?
    A.    It's assumed.

(*Id.* at 97:8–16.)

    Similarly, Mareiners does not dispute that the Anomatic Patents make no reference to any
particular ██████████ for this "██████████████," let alone the ████████████████████
██████████ of Mareiners' ██████ Process. (Ex. H at 93:23–94:2.) In fact, the Anomatic

---

[8]    Mareiners also contends that the word "████████ discloses substep ██—the ████████████
████████████████████ the ████████████████████ (Ex. H at 103:19 – 104:5.)

Patents provide █████████████ for any of the process steps it discusses.[9]

Moreover, Mareiners does not dispute that the Anomatic Patents make no reference to any repetitive ██████ process—*i.e.*, █████████████ Instead, in Mr. Goertzen's view, a ███████████ somehow implies ████████████████

> Q.   Okay. And where in the '655 patent does Mareiners contend that the step of – ███████ – excuse me, the █████████ of Step █, ███ ████████████████ appear in the '655 patent?
> A.   So going back to that ████████████, Step may include a ███████ ████████. So █████████ is plural, in my view. It's all ████████

(Ex. H at 94:3–10.)

Based on Mr. Goertzen's testimony, Mareiners' contentions regarding the disclosure of its ███████ Process are as follows:



| Step | Mareiners' | Process Steps | Alleged Disclosure |
|------|-----------|---------------|--------------------|
| █ | ████████████████████ | | ███████ |
| █ | ████████████████████ | | ███████ |
| █ | ████████████████████ | | ███████ |
| █ | ████████████████ | | |
| █ ██ | ████████████████ | | ███████ |
| █ | ████████████████████ | | |

Disclosure of a █████████ and the ████████ cannot encapsulate the existence of and the specific sequence, timing, and equipment employed by the ██████ substeps of Mareiners' ██████ Process. Without disclosure, there can be no misappropriation of Mareiners' alleged ██████ Process and Anomatic is entitled to judgment as a matter of law.

---

[9]   As it relates to █████████ of Mareiners' ██████ Process, the Anomatic Patents do not disclose Mareiners' claimed ████████████████████ or the ████ █████████ for the ███████████████ (*See* '655 Patent at █████████████)

ii. <u>Anomatic's Process Contains Two Intervening Steps Not Claimed by Mareiners' ███ Process.</u>

The Anomatic Patents disclose an entirely different process than that claimed by Mareiners' ███ Process. Specifically, as discussed above, the ███ Process is a series of ██ substeps, which when combined and followed sequentially, allegedly allow one to achieve a ██████████████ (Ex. H at 88:16–89:6.) Mareiners has further emphasized that following the exact sequence of these substeps is what is required to achieve the consistency, durability, and quality that allegedly comes with its process. (*Id.* at 90:21–91:3; *see also* Ex. HH at 17 ("emphasiz[ing] . . . the need to follow the sequence set forth in ███ the Process").)

However, the Anomatic Patents contain at least two additional steps not contemplated by Mareiners' ███ Process. (*Compare* Appendix B *with* Appendix C.) First, following the ████████████" the Anomatic Patents disclose that a █████████████████████████ ███████████████████████████████████████ ███████████████████████ (*See, e.g.*, '655 Patent at ██████████) This step does not appear in the ███ Process. Instead, the Mareiners Process requires it be performed prior to the ███ Process:

Q.   ███ of your process in the ██████████ there's no ███████
     ███ that's identified in there, is there?
A.   It's in the previous trade secret step.
Q.   So it's in ██████
A.   ███ of – ███████ of my trade secrets.

(Ex. H at 102:23–103:4.) Second, following this ██████████ the Anomatic Patents disclose a ████████████ which "███████████████████████████████ ███████████████████████████████████████ ██████ (*See, e.g.*, '655 Patent at ████████ There is no mention of this substep in Mareiners' ███ Process.

The Anomatic Patents' additional processes are a material deviation from the emphasized sequence of substeps in Mareiners' ██████ Process. They are material because, as Mr. Goertzen testified, "what [has] worked with [Mareiners'] process . . . [is] what's required to achieve the consistency and durability and quality." (Ex. H at 91:1–3.) If one follows the approach outlined by the Anomatic Patents—*i.e.*, ████████████████████████████████ ████████████████████████████—then one is not in any way following Mareiners' ██████ Process's ████ sequential substeps that Mareiners contends must be performed. Therefore, for this additional reason, the Anomatic Patents do not disclose the ██████ Process.

### c. The Anomatic Patents Do Not Disclose the Mareiners Process.

To the extent this Court finds the Mareiners Process to be sufficiently specific for purposes of trade secret protection, Mareiners cannot carry its burden to establish disclosure of its "[e]xact recipe" by simply pointing to vague and/or short phrases in the Anomatic Patents. The "particular way" in which a combination trade secret is claimed and "the uniqueness of the combination [are] critical to establishing trade-secret protection." *Caudill Seed & Warehouse Co.*, 53 F.4th at 380. With this approach in mind, it is evident that the Mareiners Process is nowhere to be found in the Anomatic Patents, let alone Mareiners' "[e]xact recipe." (Ex. OO at 19.)

The Anomatic Patents omit a significant portion—at least half—of Mareiners' alleged ██ ██ Process.[10] The undisputed facts demonstrate that the Anomatic Patents omit:

- ████ and its ████████ (*see supra* § IV.A.2.b);
- ████ – the ████████ Process (*see* Ex. II] at 8 ("Anomatic did not disclose the following Asserted Trade Secrets in the '655 Patent . . ████ in Mareiners' Process".);
- ████████ (*see* Ex. KK at 15–16);
- ████ – ████████████████ (*see* Ex. H at 121:15–122:18 (admitting it is "an implied step");
- ████████ – the ████ Process (*see* Ex. II at 9 ("Anomatic did not disclose the

---

[10]    The Anomatic Patents omit more elements of the Mareiners Process, but, for purposes of this motion, Anomatic has focused its discussion on those elements that are not in dispute.

following Asserted Trade Secrets in the '655 Patent . . . ██████ of Mareiners'
Process"); and

- ██████████ – the ██████ Process (*see supra* § IV.A.2.a).

These omissions are material. The only evidence regarding the "particular way" in which
Mareiners claims its Process is that it is the "[e]xact recipe [that] is required in order to ██████████
embed an image ████ the metallic structure." (Ex. OO at 19.) According to Mareiners, its Process
"specifically dictates how each step in the anodizing process should be complete" in an effort to
avoid "the 'Butterfly Effect' [in which] one tiny change can have significant consequences." (*See*
Ex. II at 37.) Yet, the Anomatic Patents make far more than "one tiny" change. Rather, they omit
most, if not all, of the essential portions of the Process—*i.e.*, the ██████ Process ██████████
the ██████ Process (step 4), Mareiners' ████████████████████████ the
████ Process (step 11), and the ██████ Process (step 12)—that allegedly make the Mareiners
Process unique. A change to any one of these variables, let alone to all of them is likely, in
Mareiners' own words, to "have significant consequences," (Ex. II at 37), and prevent one from
████████████ embed[ing] an image ████ the metallic structure," (Ex. OO at 19).

These omissions are also dispositive because they preclude even those skilled in the art
from replicating the Mareiners Process. Because this is a disclosure case, not a use case, the
question of misappropriation turns on whether what is disclosed by the Anomatic Patents has
"destroy[ed] the secrecy necessary for continued protection of the information as a trade secret."
RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 40, comment c; *see also id.* at § 39, comment f
("Trade secret protection remains available unless the information is readily ascertainable [to
others] by [proper] means.").[11] The dispositive question in this disclosure case, therefore, is

---

[11]     The Sixth Circuit has looked to the Third Restatement of Unfair Competition for guidance
on trade secret issues. *See, e.g.*, *Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th
368, 380 (6th Cir. 2022) ("[W]e will return to this Restatement [(Third) of Unfair Competition]

whether what is disclosed by the Anomatic Patents allows another to learn and replicate the Mareiners Process. *Id.* at § 40, comment c ("Any conduct by the actor that enables another to learn the trade secret . . . is a 'disclosure' of the secret under the rules stated in this Section."); *see also Penalty Kick Mgmt. v. Coca Cola Co.*, 318 F.3d 1284, 1293 (11th Cir. 2003) ("To summarize, under the Restatement, a defendant is liable [in a disclosure case] for the misappropriation of a trade secret only if the plaintiff can show that the defendant [] disclosed information that enabled a third party to learn the trade secret"); *Uniram Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*, 617 F. Supp. 2d 938, 942 (N.D. Cal. 2007) (articulating that a party is presumed to disclose a combination trade secret as long as one skilled in the art could view the ***non-secret elements*** and replicate the combination).

The testimony offered by Mareiners in support of its position highlights the conditions that are necessary for one to understand and replicate the Mareiners Process. As Mareiners' licensee, Jamey Maack, has attested, it is impossible, even with professional assistance, to replicate the Mareiners Process if one does not know Mareiners' ███████ Process and ████████████████ ████████████ As Mr. Maack explained, when his company—Industrial Metal Plating ("IMP")—first started working with Mareiners, Mareiners generally trained IMP and its employees on how to conduct the Mareiners Process, but did not train IMP and its employees on Mareiners' ████████ Step ██████ and did not disclose Mareiners' ███████████████ ███████████████. (Ex. NN at ¶¶ 13 & 15.) Rather, IMP obtained all of its printed artwork directly from Mareiners. (*Id.* at ¶ 16.) After a few years of this arrangement, IMP decided that it wanted to print in house, so it spent thousands of dollars and hired a ████████████████ company—not Mareiners—to assist it in ████████████████████ as well as to provide

---

repeatedly throughout the opinion.").

training related to ███████████████████████ those images ████ the anodized aluminum. (*Id.* at ¶¶ 20 & 21.) Despite the fact that IMP continued to use the other steps of the Mareiners Process it had previously learned, it was unable to replicate the Mareiners Process based on the ███████████████████████ training it received from the ████████ printing company it hired. (*Id.* at ¶ 22.) Ultimately, IMP was forced to turn to Mareiners, who ultimately trained IMP on Mareiners' ███████████ Process and disclosed its ███████████████████████ (*Id.* at ¶¶ 23 & 25.) With the addition of Mareiners' ███████████████████████ in hand, as well as the knowledge of Mareiners' ███████████ Process, IMP has been able to move forward and perform the Mareiners Process entirely in house. (*Id.* at ¶¶ 24–25.)

This testimony, propounded by Mareiners, also conclusively establishes that the information disclosed by the Anomatic Patents is insufficient to allow another to learn and replicate the Mareiners Process and, therefore, has not destroyed the continued protection of the Mareiners Process as an alleged trade secret. It is undisputed that the Anomatic Patents do not disclose: (1) Mareiners' ███████████ Process, which is ███████ of the Mareiners Process (Ex. II at 8); or (2) Mareiners' ███████████████████████ which is ██████ of the Mareiners Process (Ex. KK at 15–16). As Mr. Maack has attested, despite knowing and being trained by Mareiners on every other step of the Mareiners Process, IMP was unable to replicate it without this information despite hiring industry professionals and spending thousands of dollars. (Ex. NN at ¶¶ 22–25.) Based on Mr. Maack's testimony, even assuming, *arguendo*, that the Anomatic Patents disclosed steps ████ and ████—which they do not—the omission of Mareiners' ███████████ Process ██████ and its ███████████████████████ from the Anomatic Patents precludes others from learning and replicating the Mareiners Process.

Accordingly, the undisputed evidence establishes that (1) the Anomatic Patents omit these

steps; and (2) the omission of these steps precludes another from learning of and replicating the

Mareiners Process. Therefore, this evidence precludes any finding of disclosure as a matter of law.

> ### 3. Mareiners' Inability to Establish Damages for Its Trade Secret Misappropriation Claims Necessitates Judgment in Anomatic's Favor.

>> #### a. Mareiners Has Failed to Put Forth or Identify an Admissible Theory of Damages.

If this Court grants Anomatic's contemporaneously filed *Daubert* motion to exclude

Mareiners' damages expert, Mr. George, from testifying in this matter, Mareiners cannot establish

damages, which is the final element of its trade secret misappropriation claims. *See Presidio*, 686

F. Supp. 3d at 692 (6th Cir. 2023) (citing 18 U.S.C. § 1836(b)(3)(B); Ohio Rev. Code § 1333.61)

("A plaintiff asserting trade secret misappropriation may prevail only upon a showing of damages

. . . 'caused by' the alleged misappropriation."). Mareiners' damages theory is entirely dependent

on Mr. George's testimony. In discovery, Anomatic served the following on Mareiners:

> **INTERROGATORY NO. 19:** For each separate cause of action asserted by you in the Complaint, describe the quantum of damages you assert you are entitled to recover, including the factual and legal basis you contend supports your contention that you are entitled to recover damages in this matter.

(Ex. II at 56.) Mareiners responded with little substance, "directing Defendant to the expert report

of Jeff George, which is incorporated by reference herein" and identifying the sources on which

Mr. George relied as the factual basis for its contention. (*Id.* at 58.) Mareiners' response did not

identify any quantum of damages for any claim. (*Id.*) Fact discovery is now closed and Mareiners

has identified no other theory or quantum of damage other than that articulated by Mr. George.

Accordingly, if Mr. George's testimony is excluded, as it should be, Mareiners has no other

damages theory it can pursue or quantum of damage it can recover at trial. Given that damages are

a necessary element of Mareiners' trade secret misappropriation claims that it cannot establish as

a matter of law, Anomatic is entitled to judgment on these claims.

### b. Mareiners' Failure to Apportion Damages Precludes Any Recovery in this Case.

Even if this Court does not exclude Mr. George's testimony (as Anomatic respectfully submits it should), his failure to apportion damages is fatal to Mareiners' case. As explained more fully in Anomatic's contemporaneously filed *Daubert* motion, Mr. George's report set out generally to value Mareiners' lost business opportunity. That business opportunity would have involved Mareiners eventually licensing ***all*** of its trade secrets to another to manufacture and sell an anodized aluminum transaction card. (Ex. S at 6–7.) However, as Mr. George confirmed at deposition, in estimating that value, he made no effort to apportion damages on a trade secret by trade secret basis. (Ex. R at 163:25–164:4; 165:4–5 ("I'm not apportioning damages for the jury in my report.").) His approach provides the factfinder no guidance on a way to attribute value to each individual trade secret. This guidance is particularly crucial where, as shown above, at least some, if not all, of Mareiners' alleged trade secrets fail as a matter of law. Rather, as Mr. George put it, if the factfinder wanted (or was required) to apportion damages, his approach provides the factfinder with only "a position of what they might value everything with," but it would be up to the factfinder to figure out the rest. (*Id.* at 164:5–22.)

The glaring problem with Mr. George's approach is that, even excluding the material deficiencies in Mareiners' case as outlined above, Anomatic is not alleged to have misappropriated "everything." Specifically, Anomatic is not alleged to have misappropriated two of the six trade secrets Mareiners allegedly disclosed to Anomatic regarding its ███████ process. (*See* Ex. II at 4–9.) Moreover, one of those two alleged trade secrets that Anomatic is not alleged to have misappropriated is Mareiners' ███████ Process (*id.*), which, as Mareiners' licensee Jamie Maack has attested, is a necessary predicate to performing Mareiners' ███████ process (*See* Ex. NN at ¶¶ 15, 19–25). Accordingly, by providing an approach of how one "might value

everything," Mr. George has (1) necessarily valued trade secrets Anomatic is not alleged to have misappropriated; but (2) not given the factfinder any way in which to assess and decrease the "value [of] everything" based on the alleged value of these non-appropriated trade secrets.

The Northern District of California's decision in *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064 (N.D. Cal. 2005), analyzed by the Sixth Circuit and applied by other courts in this Circuit, is instructive. In *O2 Micro*, "the plaintiff's damages expert testified that the theft of eleven trade secrets unjustly enriched the defendant by $16 million." *Caudill Seed & Warehouse Co.*, 53 F.4th at 389 (citing *O2 Micro*, 399 F. Supp. 2d at 1076). However, the jury ultimately found that "the misappropriation of only one trade secret resulted in the defendant being unjustly enriched." *Id.* Given the expert's "all-or-nothing approach," the jury was left to fashion its damages amount "based on speculation and guesswork, not on evidence." *Id.* (internal quotations omitted). The jury was forced to speculate and guess because the expert's "model turned on misappropriation of all the trade secrets without offering the jury a way to attribute value to each individual trade secret." *Id.* Accordingly, the court "struck the expert's testimony because it no longer provided a 'reasonable basis' to support a jury award." *Id.*

"The reasoning of *O2 Micro* is sound, and it applies here." *See Versata Software, Inc. v. Ford Motor Co.*, No. 15-cv-10628; 15-11264, 2023 U.S. Dist. LEXIS 75318, at *55 (E.D. Mich. May 1, 2023). Mr. George's approach provides the factfinder an "all or nothing" approach—*i.e.*, it is a way to "value everything." (Ex. R at 164:5–22.) However, his approach turns "on misappropriation of all the trade secrets without offering the [factfinder] a way to attribute value to each individual trade secret." *See Caudill Seed & Warehouse Co.*, 53 F.4th at 389; *Versata Software, Inc.*, 2023 U.S. Dist. LEXIS 75318 at *55–56. As in *O2 Micro*, any potential damages award in this case rests upon speculation and guesswork because Mareiners has not alleged that

Anomatic misappropriated "everything" and that speculation only compounds if the factfinder finds (as argued above) that Anomatic did not misappropriate one or more of the four trade secrets Mareiners alleges Anomatic misappropriated.

Without providing the factfinder any evidence from which it could determine the value of the trade secrets Anomatic is actually alleged to have misappropriated, Mr. George's approach fails as a matter of law. *See Versata Software, Inc.*, 2023 U.S. Dist. LEXIS 75318 at *56.

## B. ANOMATIC IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON MAREINERS' CORRECTION OF INVENTORSHIP CLAIMS.

The undisputed material facts establish that Anomatic is entitled to judgment as a matter of law on Mareiners' correction of inventorship claim (Count V).[12] Mareiners claims that Mr. Goertzen is the *sole* inventor of the Anomatic Patents. To establish this, Mareiners must prove by clear, convincing, and corroborated evidence that Mr. Goertzen knew and possessed each and every claim and claim limitation found in the Anomatic Patents. If Mareiners fails in this endeavor with respect to even one claim or claim limitation, so too must its inventorship claim because any *joint* inventorship with Anomatic would result in Anomatic owning the intellectual property, as this Court previously held (ECF No. 34 at 6), thereby depriving Mareiners of standing to assert its claim. As explained below, the evidence falls well short of establishing Mr. Goertzen as the sole inventor and, therefore, this Court should enter summary judgment in Anomatic's favor

### 1. Mareiners Lacks Standing to Pursue Its Correction of Inventorship Claim.

Whether Mareiners has Article III standing to pursue its correction of inventorship claim

---

[12] Given that inventorship is a question of law, *see GE v. Wilkins*, 750 F.3d 1324, 1329 (Fed. Cir. 2014), and standing to pursue correction of inventorship is also a question of law, *Brackfield & Assocs. P'ship v. Branch Banking & Trust Co.*, 645 Fed. Appx. 428, 429 (6th Cir. 2016) ("Whether a party has standing is a question of law[.]"), Anomatic is contemporaneously moving to bifurcate the issue of inventorship from any trial on the merits of Mareiners' other claims.

"'is a threshold question.'" *Larson v. Correct Craft, Inc.*, 569 F.3d 1319, 1325 (Fed. Cir. 2009) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). Mareiners can pursue this claim "only if the requirements for constitutional standing . . . are satisfied." *Larson*, 569 F.3d at 1326. Specifically, Mareiners "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

### a. Mareiners Has Not Suffered an Injury in Fact and, Therefore, Does Not Have Article III Standing.

The Supreme Court has stated "time and time again that an injury in fact must be both concrete *and* particularized." *Spokeo, Inc.*, 578 U.S. at 340 (emphasis in original). For an injury in fact to be concrete, "it must actually exist"—*i.e.*, it must be "'real,' and not 'abstract.'" *Id.* As it relates to the facts of this case, there are two ways in which Mareiners could establish the existence of an injury in fact. First, it could establish that it possesses an ownership interest in the Anomatic Patents. *Larson*, 569 F.3d at 1326. Second, without an ownership interest, the only other way in which Mareiners can establish an injury in fact is through the existence of a concrete financial interest that is independent of any financial interest associated with ownership of the patent—*i.e.*, a financial interest tied solely to inventorship, not one tied to the right to exclude others that flows inherently from ownership of the patent. *Id.* (discussing *Chou v. Univ. of Chi. & Arch. Dev. Corp.*, 254 F.3d 1347 (Fed. Cir. 2001)). As explained below, Mareiners cannot establish either interest as a matter of law and, therefore, lacks standing to bring its correction of inventorship claim.

> i. There Is No Admissible Evidence to Establish that Mr. Goertzen Ever Assigned Any Intellectual Property Related to an Anodized Aluminum Transaction Card to Mareiners.

Mareiners is the plaintiff in this case, not Mr. Goertzen. Despite this, Mareiners put forward no evidence in discovery to suggest, let alone establish, that Mr. Goertzen, the alleged sole inventor

of the Anomatic Patents (ECF No. 77 at ¶ 138), ever assigned to Mareiners any intellectual property rights he had to an invention for an anodized aluminum transaction card. Accordingly, Mareiners has suffered no cognizable injury and, therefore, lacks standing to assert this claim.

The Amended Complaint alleges in conclusory fashion that "Mr. Goertzen has assigned all of his intellectual property rights arising out of his work in sublimation to Mareiners, rendering Mareiners the rightful assignee of the [Anomatic Patents]." (*Id*. at ¶ 139.) Yet, in discovery, Mareiners made no effort to substantiate that allegation. Specifically, Mareiners was asked to:

> [i]dentify each agreement entered into between Mareiners and a party other than Anomatic concerning the Alleged Trade Secrets . . ., the '202 Patent, and/or technology related to Anodized Metallic Transaction Cards.

(Ex. JJ at 4.) Neither its original response nor its amended response—served after Mr. Goertzen's personal deposition on December 16 and 17, 2024—identified any agreements entered into between Mareiners and Mr. Goertzen regarding the alleged trade secrets, the '202 Patent, or technology related to anodized metallic transaction cards. The assignment that Mareiners alleged in its Amended Complaint to have occurred (*see* ECF No. 77 at ¶ 139) is certainly one of the agreements Anomatic expected Mareiners to have identified in response to this interrogatory.

Similarly, during his deposition, Mr. Goertzen was asked whether he had "executed any intellectual property assignments to Mareiners." (Ex. A at 24:17–25:13.) Mr. Goertzen testified that the only assignment he was aware of was an assignment from his former company, Roscoe Manufacturing, to Mareiners concerning the rights to the '202 Patent. (*Id.*) The inventorship of the '202 Patent is not at issue. At that time, Anomatic's counsel requested that to the extent any other assignments between Mr. Goertzen and Mareiners existed that they be produced and Mareiners' counsel agreed. (*Id.*) However, Mareiners did not produce any other assignments of intellectual property between Mr. Goertzen and Mareiners and Mareiners' amended response to Interrogatory

No. 22, served nearly a month after Mr. Goertzen's deposition, also fails to identify any assignments of intellectual property from Mr. Goertzen to Mareiners. (Ex. JJ at 6–7.)

Fact discovery closed on January 31, 2025. It was Mareiners' burden to establish before that date that it possessed an ownership interest in the technology claimed by the Anomatic Patents, namely an anodized metallic transaction card (*see e.g.*, Ex. J at Col. 1, ll. 1.). Yet, as of the close of fact discovery, there was no evidence to corroborate, let alone establish that Mareiners possesses any ownership interest in the intellectual property Mr. Goertzen allegedly invented with respect to an anodized aluminum transaction card. Whether Mr. Goertzen is the sole inventor of the Anomatic Patents is irrelevant if Mareiners cannot establish that Mr. Goertzen ever assigned his alleged invention of an anodized aluminum transaction card to Mareiners in the first instance.

On Tuesday, February 25, 2025, at 3:56 PM ET, Mareiners produced a document that purports to be an email sent on August 31, 2022, from Mr. Goertzen to Mareiners' counsel (specifically, to Sheridan Ross attorney, Matt Holohan, and legal assistant, Vonda Westlake). Attached to that email is a document that purports to be an assignment from Mr. Goertzen to Mareiners concerning intellectual property disclosed by certain patent applications filed by Anomatic. Yet, at deposition, Mr. Goertzen had no knowledge of its existence:

> Q.   Have you executed any intellectual property assignments to Mareiners?
> A.   From Roscoe to Mareiners.
> Q.   . . . And that assignment of intellectual property from Roscoe to Mareiners that you're talking about is the intellectual property associated with the '202 Patent; is that correct?
> A.   The assignment would have been for the '202 Patent.
> Q.   Are there any other assignments that you're aware of?
> A.   Not to – yeah. No, I'm not aware of any.

(Ex. A at 24:17–25:13.) Similarly, when asked in discovery on November 11, 2023, to produce any documents that would corroborate Mr. Goertzen's alleged inventorship of the Anomatic Patents (Ex. QQ at 7; *id.* at 6), Mareiners produced nothing. When asked in discovery to identify

each agreement entered into between Mareiners and a party other than Anomatic concerning anodized metallic transaction cards, Mareiners identified no documents, either initially or after supplementation. (Ex. JJ at 4.) Despite being asked at deposition twice to produce any assignments it had and despite Mareiners' counsel twice agreeing to do so, Mareiners produced nothing while discovery was open. (Ex. A at 20:24–21:11; 25:5–13.) No document had been produced, prior to Tuesday—three days before the deadline for the instant motion—despite the fact that Mareiners' counsel has had the purported document in its possession since before the case was filed and Anomatic has challenged Mareiners' standing to assert this claim throughout the duration of this case (*see* ECF No. 9 at 1–2). Mareiners' belated production after the close of fact discovery, without seeking leave of the Court, is inexcusable and should not be permitted. The Court should disregard this document and any affidavit Mr. Goertzen submits in an effort to correct his prior sworn testimony and, thereby, create a disputed issue of material fact. *See* FED. R. CIV. P. 37(C)(1) (barring a party from using as evidence in support of a motion information not produced or identified pursuant to Rule 26(e)); *Howe v. City of Akron*, 801 F.3d 718, 747 (6th Cir. 2015) (finding that although a district court may consider other sanctions, "exclusion of late or undisclosed evidence is the usual remedy for noncompliance with Rule 26(a) or (e).").

If the Court precludes this untimely "evidence," it does not need to reach the other standing issues or the merits of Mareiners' correction of inventorship claim because there is no evidence at all to suggest that Mareiners possesses any ownership interest in the relevant intellectual property.

        ii.  <u>Mareiners Does Not Have an Ownership Interest in the Anomatic Patents because It Cannot Establish that Mr. Goertzen Was the Sole Inventor of the Anomatic Patents.</u>

Assuming, *arguendo*, that Mr. Goerzen assigned his intellectual property rights in an anodized aluminum transaction card to Mareiners, Mareiners must establish by clear, convincing,

and corroborated evidence that Mr. Goertzen is the *sole* inventor of the Anomatic Patents in order for it to have suffered an injury in fact. Mareiners relinquished any and all ownership interest to the Anomatic Patents. (*See* PLA at Art. 6.1.) As this Court previously held, the PLA "anticipated the development of new intellectual property that *resulted from or related to* the confidential information [allegedly] disclosed by [Mareiners]"—*i.e.* Anomatic "would own the new intellectual property that was developed with the *use of* [Mareiners'] confidential information." (ECF No. 34 at 6 (emphasis in original).) The dispositive question for the Court was whether the Anomatic Patents contained new intellectual property. (*Id.*) The only way for Mareiners to affirmatively answer that dispositive question is by establishing that Mr. Goertzen was the *sole* inventor of the Anomatic Patents because anything less—*i.e.*, *joint* inventorship—would necessarily include "new intellectual property that was developed [by Anomatic] with the *use of* [Mareiners'] confidential information." (*See id.*) Accordingly, if Mareiners can establish only that Mr. Goertzen is a *joint* inventor of the Anomatic Patents, then it has not suffered an injury in fact and, therefore, has no standing to pursue a claim to correct the inventorship of the Anomatic Patents.

As explained in further detail below (*see infra* § IV.B.2), the undisputed material facts preclude Mareiners from establishing that Mr. Goertzen is the *sole* inventor of the Anomatic Patents. Given that the undisputed material facts show that Anomatic contributed at least some inventive aspects to the Anomatic Patents—*i.e.*, *joint* inventorship—the Anomatic Patents are, by definition, "new intellectual property that was developed with the *use of* [Mareiners'] confidential information." (ECF No. 34 at 6 (emphasis in original).) Accordingly, Anomatic owns the Anomatic Patents as new intellectual property under the terms of the PLA and Mareiners affirmatively disclaimed any ownership interest in it. (*See* PLA at Art. 6.1 ("[Mareiners] shall not . . . otherwise assert ownership of any rights, relating in any way to the Developed IP[.]").)

Mareiners lacks standing, as a matter of law, to pursue its correction of inventorship claim because it assigned any ownership interest it may have had to Anomatic in the PLA. The terms of the PLA are conclusive, and are not in dispute. The Court, therefore, should enter summary judgment in Anomatic's favor on Count V of the Amended Complaint.

### iii. Mareiners Does Not Have a Concrete Financial Interest in the Anomatic Patents.

Mareiners has no financial interest tied solely to *its status as an inventor*—*i.e.*, not tied to the right to exclude others that flows inherently from ownership of the patent—and, therefore, lacks standing to pursue its claim for correction of inventorship if it cannot establish an ownership interest. First, Mareiners has no status as an inventor. Rather, Mr. Goertzen is the alleged inventor of the Anomatic Patents. Accordingly, while *Mr. Goertzen* theoretically could have a financial interest tied *solely to his status as an inventor* and, therefore, could conceivably have Article III standing to pursue a claim to correct the inventorship of the Anomatic Patents, *Mareiners* has none because it has no inventor status from which to claim a financial interest.

Moreover, Mareiners is unable to identify any financial interest tied solely to its status as an inventor of the Anomatic Patents. In an effort to establish standing, Mareiners has put forth only two theories, neither of which is legally sufficient to establish that it has a financial interest tied solely to its status as an inventor. First, Mareiners argued in response to Anomatic's Motion to Dismiss that Mareiners has suffered "reputational harm." (ECF No. 12 at 11.) Even if this is true, it is insufficient to show that Mareiners possesses a financial interest tied solely to inventorship of the Anomatic Patents. First, "[f]or an injury to be 'particularized,' it must affect the plaintiff in a personal and individual way." *Spokeo, Inc.*, 578 U.S. 339 (internal quotations omitted). Second, as Federal Circuit precedent makes clear, the concrete and particularized injury must "flow from being designated as an inventor." *See Shukh v. Seagate Tech., LLC*, 803 F.3d 659,

663 (Fed. Cir. 2015) (citing *Chou v. Univ. of Chi. & Arch Dev. Corp.*, 254 F.3d 1347, 1359 (Fed. Cir. 2001)). In other words, the injury must be tied solely to the plaintiff's status as an inventor, not one tied to the plaintiff's right to exclude others that flows inherently from ownership of the patent. Mareiners (the plaintiff) is not an alleged inventor of the Anomatic Patents—Mr. Goertzen (a nonparty) is. (*See* ECF No. 77 at ¶ 138.) As a non-inventor, any "reputational harm" to Mareiners would necessarily relate to its ownership of the patent via a hypothetical assignment from Mr. Goertzen, the purported inventor, not Mareiners' status as the inventor. Accordingly, even if Mareiners has suffered "reputational harm," it is not the type of concrete and particularized injury that gives it standing to assert this claim because that harm would flow from Mareiners' status as ***an owner*** of the patent, not its status as the purported inventor thereof. *Cf. Skukh v. Seagate Tech., LLC*, 803 F.3d 659, 663 (Fed. Cir. 2015) (holding that reputational injury to "the claimed inventor" can give rise to Article III standing).

Moreover, in discovery, Mareiners was asked to "[d]escribe the factual and/or legal basis for [its] contention that Mareiners has a financial interest tied solely to its status as an inventor of the '655 Patent and/or the '518 Patent, as opposed to a financial interest that flows from its ownership of the '655 Patent and/or the '518 Patent." (Ex. JJ at 11.) Mareiners provided a one sentence response that "it was the innovator of the technology claimed in those patents and should have the exclusive right to control that innovation." (*Id.* at 12.) But as Mareiners' Amended Complaint concedes, Mr. Goertzen, not Mareiners, is the alleged "innovator of the technology." (*See* ECF No. 77 at ¶ 138 ("Mr. Goertzen is the sole contributor of the inventive concepts claimed in the [Anomatic Patents].").) Furthermore, the "exclusive right to control [the] innovation" is not a right that flows from one's status as an inventor, but rather flows from one's status as the owner of the patent. As the case law makes clear, an inventor has no right to control their invention unless

they are also simultaneously the owner of the patent covering that invention. *See Sewall v. Walters*, 21 F.3d 411, 417 (Fed. Cir. 1994) (quoting *Beech Aircraft Corp. v. EDO Corp.*, 990 F.2d 1237, 1248 (Fed. Cir. 1993)) ("It is elementary that inventorship and ownership are separate issues. . . . Inventorship is a question of who actually invented the subject matter claimed in a patent. Ownership, however, is a question of who owns legal title to the subject matter claimed in a patent, patents having the attributes of personal property."). Accordingly, even if Mareiners has lost the "exclusive right to control [the] innovation," that alleged harm is not a financial interest tied solely to Mareiners' status as an inventor and, therefore, is legally insufficient to confer Article III standing on Mareiners to pursue its correction of inventorship claim.

### 2. Mr. Goertzen Is Not the Sole Inventor of the Anomatic Patents.

All of the above aside, Mareiners is unable, as a matter of law, to establish that Mr. Goertzen is the sole inventor of the anodized metallic transaction cards claimed by the Anomatic Patents. The issuance of a patent creates a presumption that the named inventor is the true and only inventor. *See GE v. Wilkins*, 750 F.3d 1324, 1329 (Fed. Cir. 2014) (citing *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998)); *James v. j2 Cloud Servs., LLC*, 823 Fed. Appx. 945, 949 (Fed. Cir. 2020) (quoting *Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997)) ("'The inventors as named in an issued patent are presumed to be correct.'"). Therefore, Mareiners burden of showing nonjoinder "is a heavy one and must be proved by clear and convincing evidence." *GE*, 750 F.3d at 1329 (citing *Hess*, 106 F.3d at 980).

"Determining 'inventorship' is nothing more than determining who conceived the subject matter at issue." *James v. j2 Cloud Servs.*, 823 Fed. Appx. at 949 (internal quotations omitted) (quoting *Sewall*, 21 F.3d at 415). The subject matter of the Anomatic Patents relates to anodized metallic transaction cards—not, Mareiners' sublimation decorating technology. In particular, each

of the Anomatic Patents relates to a specific type of anodized metallic transaction card, namely the one described in claim 1 of the Patent:

| Claim | '655 Patent | '518 Patent |
|---|---|---|
| 1 | A transaction card, comprising: | A transaction card, comprising: |
| 1[a] | a metallic card body having a front face, a rear face, and a peripheral surface extending between the front face and the rear face, the front face and the rear face being anodized; and | a metallic card body having a front face, a rear face, and a peripheral surface extending between the front face and the rear face, wherein the peripheral surface and the front face and the rear face being anodized; |
| 1[b] | a magnetic stripe or a bar code integrally contained within an overlay, wherein the overlay is arranged on the anodized rear face; | wherein a front beveled peripheral surface is formed in the metallic card body where the front face meets the peripheral surface, and a rear beveled peripheral surface is formed in the metallic card body where the rear face meets the peripheral surface, the front and rear beveled peripheral surfaces extending about the periphery of the metallic card body; and |
| 1[c] | wherein a front beveled peripheral surface is formed in the metallic card body where the front face meets the peripheral surface, and a rear beveled peripheral surface is formed in the metallic card body where the rear face meets the peripheral surface; wherein the front and rear beveled peripheral surfaces extend about the periphery of the metallic card body; and wherein the front and rear beveled peripheral surfaces are colored to cover a metallic color of the card body. | wherein the front and rear beveled peripheral surfaces are anodized and colored to cover a metallic color of the metallic card body. |

The dependent claims of the Anomatic Patents describe additional features that can be added to or that would further enhance the transaction card described in claim 1. (*See, e.g.,* '655 Patent at claims 2–10.) Further, each of the Anomatic Patents includes independent claims that describe the method of manufacturing these anodized metallic cards. (*See, e.g.,* '655 Patent at claims 11 & 16.) This—not Mareiners ███████ technology—is the subject matter at issue here.

    To determine who conceived of the subject matter of the patents, "[i]t is settled that . . . a

party must show possession of every feature recited in the c[laim], and that every limitation of the c[laim] must have been known to the inventor at the time of the alleged conception.'" *James v. j2 Cloud Servs*, 823 Fed. Appx. at 949. The question of inventorship "is determined on a claim-by-claim basis," *id.* (internal quotations omitted), and where, as here, Mareiners seeks to have Mr. Goertzen declared the sole inventor of the Anomatic Patents, it is required to establish Mr. Goertzen's possession and knowledge of each and every claim limitation at the time of the alleged conception. *See Coda Dev.*, 667 F. Supp. 3d 567, 585 (N.D. Ohio 2023). Moreover, given the existence of the PLA in which the Parties agreed that Anomatic would own any intellectual property developed with the use of Mareiners' confidential information (*see* ECF No. 34 at 6), Mareiners must also demonstrate that Mr. Goertzen conveyed to Anomatic what he possessed and knew regarding each and every claim limitation.

It is "well-established . . . that a party claiming his own prior inventorship must proffer evidence corroborating his testimony." *Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1350 (Fed. Cir. 2001). The "plaintiff's testimony, standing alone, is insufficient." *Daneshvar v. Kipke*, 266 F. Supp. 3d 1031, 1043 (E.D. Mich. 2017) (citing cases); *Coda Dev. v. Goodyear Tire & Rubber Co.*, 667 F. Supp. 3d 567, 585 (N.D. Ohio 2023) (citing *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1358 (Fed. Cir. 2004)) ("Any testimony in support of a claim of inventorship must be corroborated; the putative inventor's oral testimony alone will not suffice."). In particular, "'[t]his rule addresses the concern that a party claiming inventorship might be tempted to describe his actions in an unjustifiably self-serving manner in order to obtain a patent or to maintain an existing patent.'" *Sandt Tech., Ltd.*, 264 F.3d at 1350 (quoting *Singh v. Brake*, 222 F.3d 1362, 1367 (Fed. Cir. 2000)). Moreover, given the concern over the fact that "post-invention oral testimony is more suspect, as there is more of a risk that the witness may have a

litigation-inspired motive to corroborate the inventor's testimony, and that the testimony may be inaccurate," *id.*, the Federal Circuit has held that "the need for corroboration exists regardless whether the party testifying concerning the invalidating activity is interested in the outcome of the litigation (*e.g.*, because that party is the accused infringer) or is uninterested but testifying on behalf of the interested party." *Finnigan Corp. v. ITC*, 180 F.3d 1354, 1367 (Fed. Cir. 1999). Further, the Federal Circuit has recognized that "the need for corroboration takes on special force when an otherwise uninterested witness shows some reason to be biased in favor of the interested party." *Id.* at 1368. Accordingly, corroboration is required of any witness testimony that is put forward to support Mareiners' claim that Mr. Goertzen possessed and knew of each and every claim limitation at the time of the alleged conception. *See id.* at 1367–69; *Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1371 (Fed. Cir. 1998) ("Corroboration of oral evidence of prior invention is the general rule in patent disputes."); *Lacks Indus. v. McKechnie Vehicle Components USA, Inc.*, 322 F.3d 1335, 1350 (Fed. Cir. 2003) (affirming lower court's cross-corroboration requirement of oral testimony by interested parties at summary judgment stage).

### a. Mr. Goertzen's Alleged Possession and Knowledge of Each and Every Claim of the Anomatic Patents Cannot Be Corroborated.

Despite its heavy burden, Mareiners has made no effort in discovery to corroborate Mr. Goertzen's alleged possession and knowledge of each and every claim limitation of the Anomatic Patents. In discovery, Anomatic requested that for each claim and claim limitation of the Anomatic Patents Mareiners "describe the manner and substance of Mr. Goertzen's alleged contribution, including the identification of all information, witnesses, and/or documents that would corroborate the same." (Ex. II at 46.) In response, Mareiners identified an email, dated August 21, 2017, in which Mr. Goertzen included a photograph of sample cards he sent to Anomatic:



(*Id.* at 50–51; *see also* Ex. PP.) Mareiners further produced a claim chart for each of the Anomatic Patents, but neither chart identified any corroborating documents or testimony. (*See* Ex. II. at Exs. A & B.) Instead, those charts merely stated, "[t]o the extent that Anomatic disputes this position, Mareiners will offer evidence at trial, including testimony from Reiner Goertzen or others and/or documentary evidence to confirm this." (*See, e.g.*, *id.* at Ex. A (Claim 2).) Similarly, at deposition, Mareiners failed to produce any of the transaction cards depicted in those charts and was unable to corroborate their date of manufacture beyond Mr. Goertzen's testimony. (Ex. A at 99:4–100:7.)

In addition to Mareiners' interrogatory responses, Mr. Goertzen disclosed in his deposition additional information that he asserted corroborated his possession and knowledge of each and every claim limitation of the Anomatic Patents. Specifically, Mr. Goertzen identified Messrs. Baer and Jennings as corroborating witnesses and a presentation given to Anomatic in August 2017.[13] (Ex. A at 108:6–16); *see also* Ex. OO; Ex. II at 12-13.) Mareiners and Goertzen also identified four sample cards during depositions. (Ex. E; Ex. F; Ex. I; Ex. Q.) Two of the sample cards were

---

[13]     Mr. Goertzen confirmed this testimony on behalf of Mareiners during Mareiners' 30(b)(6) deposition. (*See* Ex. H at 11:21–12:10.)

manufactured by a third party in or about 2016:



(Ex. I; Ex. Q.) Mr. Goertzen, however, was unable to corroborate the date of manufacture for the other two:



(Ex. E; Ex F.); *id.* at 111:22–112:6.)

Lastly, Anomatic produced two sample cards that it had received from Mareiners:





(Ex. C & Ex. D.) None of this alleged evidence corroborates anything about Mr. Goertzen's claimed inventorship, let alone by clear and convincing evidence.

> i. Neither Mr. Jennings Nor Mr. Baer Can Corroborate Mr. Goertzen's Testimony.

Mareiners cannot rely on Messrs. Baer[14] and Jennings to corroborate those missing pieces from the record that could otherwise demonstrate that Mr. Goertzen possessed and knew of each and every claim of the Anomatic Patents. *See In re Jolley*, 308 F.3d 1317, 1325 (Fed. Cir. 2002) ("[I]f there is no evidence in record that all of the elements of the c[laim] resided in the inventor's mind, a noninventor's testimony cannot supply the missing pieces."). As explained above, the Federal Circuit has been quite clear as it relates to the cross-corroboration requirement of oral testimony, particularly as it relates to interested witnesses, put forth on behalf of the purported inventor. *See, e.g., Finnigan Corp*, 180 F.3d at 1367–69 ("[T]he need for corroboration takes on

---

[14]    Additionally, Mr. Baer's inability to recall any details regarding any technical discussions between Mareiners and Anomatic precludes him from serving as a corroborating witness to Mr. Goertzen's alleged possession and knowledge of each and every claim of the Anomatic Patents. (Ex. T at 32:21–33:12; 36:10–25.)

special force when an otherwise uninterested witness shows some reason to be biased in favor of the interested party."). Such uncorroborated testimony, standing alone, is insufficient, as a matter of law, to survive a motion for summary judgment. *See Steven W. Sabasta & Sioux Falls Insulation Supply v. Buckaroos, Inc.*, 507 F. Supp. 2d 986, 998 (S.D. Iowa 2007) (finding, for purposes of summary judgment, that "[s]tanding alone, the Court agrees that [interested witness testimony] would be insufficient corroboration"); *Advanced Thermal Scis. Corp. v. Applied Materials, Inc.*, No. SACV 07-1384 JVS (JWJx), 2009 U.S. Dist. LEXIS 155231, at *24–25 (C.D. Cal. Aug. 12, 2009) (finding, for purposes of summary judgment, that one interested witness's uncorroborated testimony is insufficient to corroborate the purported inventor's testimony as a matter of law).

The cross-corroboration requirement is heightened here because Messrs. Baer and Jennings are both interested witnesses of the kind about whom the Federal Circuit has expressed distrust and skepticism. *See, e.g., Finnigan Corp*, 180 F.3d at 1367–69. Mr. Baer has served as a financial advisor to Mareiners for nearly a decade (Ex. T at 16:22–24; 25:9–14; 28:24–29:16) and is currently the CFO of USA Cards, Inc. (*id.* at 18:23–19:2), which attempted to enter the transaction card market with the intention of entering into a licensing agreement with Mareiners to use its intellectual property for purposes of making anodized aluminum transaction cards (*id.* at 80:3–9; 88:3–15). Mr. Jennings is the individual who: spurred Mr. Goertzen to develop his ███████ decorating technology (Ex. A at 125:5–25); has served as a mentor to Mr. Goertzen; (*id.* at 129:21–24); licensed Mareiners' sublimation decorating technology for a number of years (Ex. W at 16:2–5); is Mr. Goertzen's go-to reference with prospective licensees (Ex. A at 130:3–15); has served as an unpaid consultant for Mareiners (*id.* at 129:25–130:2); has resolved legal disputes for Mareiners (Ex. X; Ex. W at 72:7–75:2); and despite not being actually employed by Mareiners, has been held out as its Director of Business Development (Ex. A. at 193:20–194:23; Ex. G).

45

Given that Messrs. Baer and Jennings are interested witnesses, their testimony, standing alone, without additional corroborating evidence, is insufficient for Mareiners to sustain its burden to prove by clear and convincing evidence that Mr. Goertzen possessed and knew each and every claim of the Anomatic Patents prior to conception.

### b. The Available Evidence Fails, as a Matter of Law, to Corroborate that Mr. Goertzen Possessed Each and Every Feature Recited in the Anomatic Patents.

[B]ecause a putative inventor like [Goertzen (Mareiners)] seeking to be substituted as the *sole* inventor (and having [never asserted] any co-inventorship claim) must establish *every* limitation of *every* claim of the [Anomatic Patents], the Court . . . may properly focus on one limitation which, if not shown to have been conceived by [Goertzen], precludes recovery on any claim of sole inventorship.

*Coda Dev.*, 667 F. Supp. 3d. at 588 (citing *Ballard Med. Prods. v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1358 (Fed. Cir. 2001)). At this stage, the Court should "view the evidence through the prism of the evidentiary standard of proof that would pertain at trial on the merits." *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001). Where, as here, "the clear and convincing standard is applicable, a nonmovant cannot survive summary judgment by presenting facts sufficient to satisfy the preponderance of the evidence standard." *Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*, No. 99-1356 (JRT/FLN), 2004 U.S. Dist. LEXIS 18458, at *24 (D. Minn. Sep. 7, 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56 (1986)).

### i. Mr. Goertzen's Alleged Knowledge of the Claim Limitation Regarding the Use of a Magnetic Stripe or Barcode Integrally Contained within an Overlay Is Uncorroborated.

Setting aside the testimony of Messrs. Goertzen and Jennings, as this Court must, neither the documentary evidence nor the physical evidence corroborates that Mr. Goertzen was in possession of or had knowledge of the claim limitation regarding the use of a magnetic stripe or barcode integrally contained within an overlay as required by claims 1, 11, and 16 of the '655

Patent or claims 8, 15, and 18 of the '518 Patent. Mr. Goertzen admitted that none of the physical samples he provided to Anomatic (Ex. A at 81:13–24; 87:13–21) or his samples he brought with him to his deposition (Ex. A at 66:24–67:2; 112:10–12; 113:25–114:1) contained an overlay, let alone a magnetic stripe or barcode integrally contained within it. Similarly, none of the documentary evidence confirms that Mr. Goertzen was in possession of or had knowledge of this claim limitation. First, the image from the August 21, 2017, email does not depict any magnetic stripes or barcodes, let alone any that are integrally contained within an overlay. (Ex. II at 50–51.) Mr. Goertzen conceded this fact at deposition. (Ex. A at 74:13–19.) Second, the images from the August 2017 Presentation are equally deficient:



(Ex. OO at 10–11.) While some of these images do depict what appears to be a magnetic stripe, it is impossible to discern from them whether these cards contain an overlay, let alone one in which a magnetic stripe is integrally contained.

Given the lack of non-testimonial evidence in the record, Mareiners is unable, as a matter of law, to establish by clear and convincing evidence that Mr. Goertzen possessed, let alone communicated to Anomatic, knowledge of the claim limitation regarding the use of a magnetic stripe or bar code integrally contained within an overlay in connection with an anodized metallic card.[15] Accordingly, Mareiners cannot establish Mr. Goertzen as the sole inventor of the Anomatic

---

[15]     This lack of corroborating evidence to suggest the use of an overlay, let alone an overlay

Patents. The Court should enter summary judgment in Anomatic's favor.

> ii. Mr. Goertzen's Alleged Knowledge of the Claim Limitation Regarding a Beveled or a Double Beveled Edge Is Uncorroborated.

None of the documentary evidence provides any support for Mareiners' contention that Mr. Goertzen was in possession of and had knowledge of the claim limitations regarding the use of one or more beveled[16] edges or double beveled edges as required by claims 1, 6, 11, and 16 of the '655 Patent or claims 1 and 13 of the '518 Patent. None of those documents provide any detail or disclosure regarding the edge detail of the cards depicted in them. Moreover, the images of the cards contained in the documentary evidence are of the front and/or back face of the card and provide no view of the edge detailing on those cards.

The physical evidence fares no better for Mareiners. In discovery, Anomatic sent the two sample cards it received from Mareiners (Ex. C & Ex. D) to its expert, Alex Kinsey, to analyze the edges of those cards under a microscope. Mr. Kinsey confirmed that neither sample card contained a beveled edge extending around the circumference of the card body:



| Chase Sample | Reiner Mount Sample |
|---|---|

Figure 2: SEM images in SE mode (top) and BSE mode (bottom) of the edge of ATS 1. No bevel was observed. Mechanical damage to the coating (red arrow) was observed.

Figure 7: SEM images in SE mode (top) and BSE mode (bottom) of the edge of ATS 2. No bevel was observed.

with an integrated magnetic stripe or bar code, compels a finding that Mareiners cannot prove, by clear and convincing evidence, that Mr. Goertzen possessed any claim in the Anomatic Patents that claims the use of an overlay. (*See* claims 4, 5, 10, and 12 of the '655 Patent or claims 6, 7, 9, 10, 17, 19, and 20 of the '518 Patent.)

[16] The term "beveled" is not particularly technical. It generally means "cut at an angle that is not a right angle; having the slant of a bevel." www.merriam-webster.com/dictionary/beveled (last accessed February 28, 2025); *see also* Ex. AA at 196:5–197:23.

(Ex. FF at Ex. 1.) Mr. Kinsey's finding that "[n]o bevel was observed" on either card when viewed under a microscope is unchallenged. In fact, Mareiners chose not to depose Mr. Kinsey and has not provided any expert testimony to rebut Mr. Kinsey's findings.

Rather, Mareiners relies on the oral testimony of Mr. Goertzen to establish that the physical samples—including the two analyzed by Mr. Kinsey—make use of a beveled edge. However, Mr. Goerzen's understanding of the definition of a beveled edge is inconsistent with the teachings of the Anomatic Patents. *See HIP, Inc. v. Hormel Foods Corp.*, 66 F.4th 1346, 1352 (Fed. Cir. 2023) (reviewing patent specification to determine level of contribution by purported joint inventor). Specifically, at deposition, Mr. Goertzen testified that his sample cards had a beveled edge because they were "not a knife edge, so it is a rounded edge" and "if it was a sharp 90 degrees, it would be cutting me right now." (Ex. A at 54:6–12; 55:8–19 (discussing Ex. C analyzed by Mr. Kinsey); *see also id.* at 65:21–66:7 (discussing Ex. D analyzed by Mr. Kinsey).) However, as described and taught by the Anomatic Patents, a beveled edge is but one subcategory of a non-square edge:

> As used herein, the term non-square edges means edges that are not ninety degrees (90°). For example, non-square edges may include a rounded edge (e.g., a full radius edge or a double radius edge), a beveled edge (e.g., a double beveled edge, a triple beveled edge, etc.), or other edges that are not 90°. Providing the transaction cards **100** with such non-square edges (sometimes referred to as "edging"), regardless of whether the card body **102** thereof was milled or stamped, may yield an aesthetically appealing edge or periphery that is not sharp to the touch and, therefore, will not cut an end-user or wallet.

(*See, e.g.*, Ex. J at Col. 9, ll. 4–14.) Accordingly, the fact that physical cards may not have a ninety-degree edge does not mean that those edges are, in fact, beveled. Rather, it establishes only that the edges are "non-square edges" as taught by the Anomatic Patents. Moreover, the Anomatic Patents specifically distinguish between "rounded edges," as identified by Mr. Goertzen at deposition, and "beveled edges," which the Anomatic Patents claim. Both are a type of non-square edge, but only one—beveled edges—is claimed by the Anomatic Patents.

Mr. Goertzen's testimony, to the extent the Court even considers it, does only two things. First, it suggests that the physical cards may not have square edges, which is not enough to establish that the edges were also beveled. Second, Mr. Goertzen's testimony establishes that he did not possess or know the information as disclosed and claimed by the Anomatic Patents, namely there exist multiple types of non-square edges of which a beveled edge is one subset.

Based on the record, Mareiners is unable, as a matter of law, to establish by clear and convincing evidence that Mr. Goertzen possessed and knew, let alone communicated to Anomatic, his knowledge of the claim limitation regarding the use of one or more beveled edges or double beveled edges as taught and claimed by the Anomatic Patents. Accordingly, Mareiners cannot establish Mr. Goertzen as the sole inventor of the Anomatic Patents and the Court should enter summary judgment in Anomatic's favor on Count V of the Amended Complaint.

        iii.   <u>Mr. Goertzen's Alleged Knowledge of the Claim Limitation Regarding the Method of Manufacturing an Anodized Metallic Transaction Card Is Uncorroborated.</u>

Neither the documentary evidence nor the physical evidence suggests that Mr. Goertzen possessed or knew of the method of manufacturing an anodized metallic transaction card as claimed in claims 16–20 of the '655 Patent or claims 13–23 of the '518 Patent. Both independent claim 16 of the '655 Patent and independent claim 13 of the '518 Patent disclose a method of manufacturing a transaction card by: (1) forming a metallic card body; (2) anodizing a metallic card body; and (3) in the case of the '655 Patent, milling the metallic card body. Yet, neither the physical samples nor the images of the physical samples in the August 21, 2017, email can tell the factfinder anything about the manner in which they were formed, how they were anodized, and whether they were milled. Moreover, the August 2017 Presentation omits all of these manufacturing steps and procedures from its proposed facility layout:



(Ex. OO at 17.) As the drawing depicts, the method proposed by Mareiners involved receiving and storing raw materials before transitioning them to ███████████████████████ process in the ████ processing area" before the materials ██████████████ and inspected. (*Id.*) The August 2017 Presentation does not provide any evidence to support that Mr. Goertzen possessed and knew of a manufacturing process that involved (1) forming a metallic card body; (2) anodizing a metallic card body; and (3) in the case of the '655 Patent, milling the metallic card body. None of those manufacturing processes, claimed by the Anomatic Patents, are depicted anywhere in Mareiners' contemplated process drawing.

Given the lack of corroborating non-testimonial evidence in the record, Mareiners is unable, as a matter of law, to establish that Mr. Goertzen possessed and knew, let alone communicated to Anomatic, his knowledge of a manufacturing process that involved (1) forming a metallic card body; (2) anodizing a metallic card body; and (3) in the case of the '655 Patent, milling the metallic card body. Accordingly, Mareiners cannot establish Mr. Goertzen as the sole inventor of the Anomatic Patents. The Court should enter summary judgment in Anomatic's favor.

iv. **Mr. Goertzen's Alleged Knowledge of the Claim Limitation Regarding the Use of AA 5182 Aluminum Alloy Having a Particular Temper Designation Is Uncorroborated.**

There is no documentary or physical evidence to suggest that Mr. Goertzen possessed or knew of an anodized metallic transaction card wherein the metallic card body was comprised of AA 5182 aluminum alloy having a temper designation selected from H18, H19, H26, H34, or H39, as claimed in claims 2 and 3 of the Anomatic Patents. Moreover, Mr. Goertzen's understanding of how to stiffen 5000 series alloys, such as AA 5182, is inconsistent with the teachings of the Anomatic Patents. *See HIP, Inc. v. Hormel Foods Corp.*, 66 F.4th 1346, 1352 (Fed. Cir. 2023) (reviewing patent specification to determine level of contribution by purported joint inventor).

This inconsistency is further proof that Mr. Goertzen did not possess or know of an anodized metallic transaction card wherein the metallic card body comprised AA 5182 aluminum alloy with specific temper designations. At deposition, Mr. Goertzen was asked how he would go about making a 5000 series aluminum alloy stiffer to which he testified that he would heat treat it. (Ex. N at 322:6–18.) This approach conflicts with the Anomatic Patents' teachings. The Anomatic Patents teach that a 5000 series alloy can be used specifically to ***avoid*** heat treatment:

> As mentioned, 5000 series Aluminum may be utilized, including AA 5182 Hxx, AA 5052 Hxx, AA 5056 Hxx, etc. Aluminum AA 5182 Hxx is a wrought alloy with good corrosion resistance and favorable weldability characteristics. ***Instead of being subject to heat treatment***, this alloy is work hardened (e.g., in either in the rolling or forming operations) to achieve the appropriate tensile properties. Thus, utilizing work hardened (or cold hardened) ***Aluminum AA 5182 Hxx may provide the transaction card 100 with high tensile strength and yield strength without heat treatment***.

(*See, e.g.*, Ex. J at Col. 7, ll. 12–22 (emphasis added).)

Setting aside the lack of corroborating evidence, Mr. Goertzen's testimony establishes that he did not possess and did not know of an anodized metallic transaction card wherein the metallic card body comprised AA 5182 aluminum alloy with specific temper designations as taught and

claimed by the Anomatic Patents. Accordingly, Mareiners is unable, as a matter of law, to establish that Mr. Goertzen possessed and knew, let alone communicated, these claimed features of the Anomatic Patents to Anomatic. Therefore, Mareiners cannot establish Mr. Goertzen as the sole inventor of the Anomatic Patents and the Court should enter summary judgment in Anomatic's favor on Count V of the Amended Complaint.

## C. ANOMATIC IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON MAREINERS' STATE LAW CONTRACT CLAIMS.

Even if this Court draws all reasonable inferences in Mareiners' favor, there exist no genuine dispute as to any material facts relating to Mareiners' claim for breach of the NDA (Count III) or breach of the duty of good faith and fair dealing (Count IV). Based on these undisputed material facts, Anomatic is entitled to judgment on these claims.

### 1. The Anomatic Patents Do Not Disclose Mareiners' Trade Secrets and, Therefore, There Can Be No Breach of the Non-Disclosure Agreement or the Patent Licensing Agreement.

Anomatic did not breach the NDA or PLA in connection with its efforts to obtain the Anomatic Patents. Mareiners alleges that Anomatic breached the NDA and PLA when it disclosed "Mareiners' confidential information to the U.S. Patent & Trademark Office, and, later, the general public by filing a patent application that incorporated Mareiners' confidential information."[17] (ECF No. 77 at ¶ 118.) However, as explained above (*see supra* § IV.A.2), the Anomatic Patents did not disclose Mareiners' alleged trade secrets. Further, as explained below, the information Mareiners alleges (1) it disclosed to Anomatic and (2) appears in the Anomatic Patents was not confidential information. Because the contents of the Anomatic Patents did not disclose Mareiners'

---

[17]     Mareiners alleges that this same conduct is a breach of the PLA. (*See* ECF No. 77 at ¶ 130.) Given that the PLA expressly incorporates the terms of the NDA (PLA at Art. 7.1), the analysis is the same under either agreement. Accordingly, if this conduct does not constitute a breach of the NDA, then it cannot constitute a breach of the PLA.

confidential information, there can be no breach of the NDA or PLA.

Regardless of whether Mareiners treats certain information as "confidential" in the ordinary course of its business, the NDA provides that there are certain scenarios in which that same information is deemed ***not*** to be "confidential information" for purposes of that agreement. Specifically, the NDA provides:

> RECIPIENT's obligations under this Agreement with respect to particular information do not apply to the extent that: . . . (iii) such information is or becomes generally known in the relevant industry without fault of RECIPIENT; (iv) RECIPIENT independently developed such information prior to receipt of Confidential Information from DISCLOSER, as evidenced by written records and without breach of this Agreement[.]

(NDA at § 3(b).)

The anodizing and ▆▆▆▆▆▆ information disclosed by the Anomatic Patents falls wholly within one or both of these exceptions. In an effort to simplify that analysis for the Court, Anomatic has attached Appendix D, which compares the anodizing and ▆▆▆▆▆▆ information disclosed in the Anomatic Patents with evidence that demonstrates that this information was either (a) generally known in the relevant industry; or (b) independently developed by Anomatic prior to receipt of the information from Mareiners.[18] Because this information is not confidential under the plain and unambiguous terms of the NDA, Anomatic had no obligation to treat it as confidential. Accordingly, Anomatic's disclosure of that information in the Anomatic Patents cannot, as a matter of law, constitute a breach of the NDA or the PLA.[19]

For these reasons, the Court should enter judgment in Anomatic's favor on Count III and, to the extent this theory forms a basis for Mareiners' claim for breach of the PLA, Count IV of Mareiners' Amended Complaint.

---

[18]    Anomatic incorporates the contents of Appendix D as if fully restated herein.

[19]    Similarly, both the NDA and the PLA authorized Anomatic to file and obtain patent protection over "Developed IP." (*See* ECF No. 34 at 6; NDA at § 6; PLA at Art. 6.1.)

### 2. **Anomatic Has Not Breached the Patent Licensing Agreement by Obtaining the Anomatic Patents.**

#### a. **Mareiners Put Forward No Admissible Affirmative Evidence that the Anomatic Patents Prevent the Manufacture or Sale of Anodized Aluminum Transaction Cards.**

In its Amended Complaint, Mareiners' sole and exclusive theory of damages (an essential element of its trade secret and contract claims) is that "Anomatic's patents prevented USA Cards from coming to market." (ECF No. 77 at ¶ 96; *see also id.*, at ¶ 126.).[20]

But there is no evidence in the record to support Mareiners' contention that it was damaged in this way, or at all. Rather, as explained further below (*see infra* § IV.C.2.b), there are several ways one could manufacture and sell an image anodized transaction card without infringing the Anomatic Patents. In their depositions, each of the co-founders of USA Cards, Messrs. Molke and Baer, conceded that there is no basis whatsoever for the assertion that Mareiners was prevented from going to market with its own intellectual property, due to Anomatic's patent activity or otherwise. Indeed, Mr. Molke confirmed that neither he nor his co-founder ever even sought legal advice on the question:

> Q. … [I]n the process of trying to figure out what was going on, did you or Mr. Baer or USA Cards seek an opinion of counsel as to whether you were free to operate in – operate your plans in light of the '655 patent?
> A. No.

(Ex. BB at 158:4–9.)[21] Mr. Goertzen corroborated Mr. Molke's testimony, confirming that nothing

---

[20]    As discussed above, the calculation of Mareiners' alleged damages is supported solely by the anticipated testimony of its expert Mr. Jeffrey George. For the reasons set forth in Anomatic's contemporaneous *Daubert* challenge, Mr. George's testimony must be excluded. Because the essential element of damages cannot be proved without an admissible expert, and Mareiners' expert testimony is inadmissible for the reasons explained in the *Daubert* challenge, Anomatic is entitled to summary judgment on these claims.

[21]    In his deposition, Mr. Baer deferred to Mr. Molke on this point, confirming that his "understanding that the '655 patent prevented USA Cards from moving forward with its business plans [was] based on [his] reliance on Mr. Molke[]…" (Ex. T at 73:2–5.)

apart from his own unsupported speculation supports Mareiners' contention that it was prevented from coming to market:

> Q. Aside from your belief that Anomatic's '655 patent is preventing you or USA Cards from manufacturing an image anodized transaction card, is there anything else that's preventing you or USA Cards from coming to market with an image anodized transaction card?
> A. No.

(Ex. N at 277:15–21). Mere speculation is insufficient to support Mareiners' claim that it was in any way damaged, let alone establish that the Anomatic Patents are the "but for" cause of its damage. To the contrary, as discussed in more detail below, there is more than one way in which to manufacture and sell an image anodized transaction card without infringing the Anomatic Patents. Accordingly, an essential element of Mareiners' claims for which it seeks to collect damages is without evidentiary support. That alone compels summary judgment.

### b. The Anomatic Patents Can Be Designed Around to Allow Others to Manufacture and Sell Anodized Aluminum Transaction Cards.

Setting aside Mareiners' flawed reading of the PLA, the undisputed evidence is that neither Anomatic nor the Anomatic Patents have "prevented Mareiners from licensing other licensees to use [its] trade secrets to manufacture and sell image anodized aluminum transaction cards, from which [it] would have collected licensing revenue[.]" (ECF No. 77 at ¶ 126.)

First, there is no evidence that Anomatic has asserted the Anomatic Patents against anyone. Anomatic has not even threatened to assert the Anomatic Patents against anyone, including Mareiners, its licensees, or USA Cards.

Second, the undisputed evidence is that Mareiners' licensees can manufacture and sell image anodized aluminum transaction cards without infringing the Anomatic Patents. It is a "bedrock principle" of patent law that "the claims of a patent define the invention to which the

patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir.

2005) (internal quotations omitted). Accordingly, a product does not infringe a patent unless every

claim limitation is found in the accused product. *See Medgraph, Inc. v. Medtronic, Inc.*, 843 F.3d

942, 949 (Fed. Cir. 2016) ("[A] grant of summary judgment of noninfringement is proper when

no reasonable factfinder could find that the accused product contains every claim limitation or its

equivalent."). Stated differently, a party is permitted to manufacture and sell a product despite the

existence of a patent so long as the product omits at least one limitation from a patent's independent

claims. The undisputed evidence establishes that Mareiners and its licensees are able to

manufacture and sell image anodized transaction cards without infringing the Anomatic Patents.

The Anomatic Patents' independent claims relate to a certain type of transaction card:

| Claim | '655 Patent | '518 Patent |
|-------|-------------|-------------|
| 1 | A transaction card, comprising: | A transaction card, comprising: |
| 1[a] | a metallic card body having a front face, a rear face, and a peripheral surface extending between the front face and the rear face, the front face and the rear face being anodized; and | a metallic card body having a front face, a rear face, and a peripheral surface extending between the front face and the rear face, wherein the peripheral surface and the front face and the rear face being anodized; |
| 1[b] | a magnetic stripe or a bar code integrally contained within an overlay, wherein the overlay is arranged on the anodized rear face; | wherein a front beveled peripheral surface is formed in the metallic card body where the front face meets the peripheral surface, and a rear beveled peripheral surface is formed in the metallic card body where the rear face meets the peripheral surface, the front and rear beveled peripheral surfaces extending about the periphery of the metallic card body; and |
| 1[c] | wherein a front beveled peripheral surface is formed in the metallic card body where the front face meets the peripheral surface, and a rear beveled peripheral surface is formed in the metallic card body where the rear face meets the peripheral surface; wherein the front and rear beveled peripheral surfaces extend | wherein the front and rear beveled peripheral surfaces are anodized and colored to cover a metallic color of the metallic card body. |

| | about the periphery of the metallic card body; and wherein the front and rear beveled peripheral surfaces are colored to cover a metallic color of the card body. | |
|---|---|---|

Accordingly, any transaction card that omits one or more of these claim limitations would not infringe the Anomatic Patents regardless of whether it also uses Mareiners' ▮▮▮▮▮ decorating technology. *See Atlantic Thermoplastics Co. v. Faytex Corp.*, 970 F.2d 834, 846 (Fed. Cir. 1992) ("An accused infringer can avoid infringement by showing that the accused device lacks even a single claim limitation."). However, as discussed above, the record is unambiguous that ***none*** of these claim limitations are derived exclusively from Mareiners' confidential information or trade secrets, as is required for any claim for breach of contract to exist.

> i. A Transaction Card Without an Overlay Would Not Infringe the '655 Patent.

The record is clear: an anodized aluminum transaction card can be made without infringing the '655 Patent. One of the claim limitations of the '655 Patent is "a magnetic stripe or a bar code integrally contained within an overlay." (Ex. J at Col. 15, ll. 39–40.) The use of an overlay— which, again, is neither a Mareiners' trade secret[22] nor something Mr. Goertzen possessed, let alone communicated to Anomatic—is not the only way in which one can affix a magnetic stripe or barcode to a transaction card. As Mr. Molke of USA Cards testified at deposition, there are two ways to affix a magnetic stripe to a metallic transaction card: (1) you can etch the card and then inlay the magnetic stripe so that it is flush with the surface of the card; or (2) you can put the magnetic stripe on the overlay and attach the overlay to the surface of the card. (Ex. BB at 34:4– 9.) In fact, Mr. Molke testified that while he recalled affixing magnetic stripes to metallic

---

[22]     As discussed above, there is no evidence in the record that any of the allegedly confidential information shared by Mareiners, or its alleged trade secrets generally, incorporate or include "a magnetic stripe or a bar code integrally contained within an overlay." (Ex. II at 4–9.)

transaction cards using the first approach, he had no recollection of previously affixing a magnetic stripe to an anodized card using an overlay, as required by the '655 Patent. (*Id.* at 34:10–35:5.) Accordingly, any transaction card in which the magnetic stripe is affixed to the metallic transaction card directly without an overlay, as Mr. Molke had previously done, would not practice limitation 1[b] of the '655 Patent and would, therefore, be a non-infringing alternative that Mareiners or one of its licensees could manufacture and sell without fear of infringing the '655 Patent.

      ii.   <u>A Transaction Card Without an Anodized Peripheral Surface Would Not Infringe the '518 Patent.</u>

Similarly, the record is unambiguous that an anodized aluminum transaction card can be made without infringing the '518 Patent. One of the claim limitations of the '518 Patent is that "the front and rear beveled peripheral surfaces are anodized and colored to cover a metallic color of the metallic card body." (Ex. K at Col. 15, ll. 46–48.) The "peripheral surfaces" of the card body refer to the thin edge of the transaction card that transverses the circumference of the card between the front and rear faces of the card. (*Id.* at Col. 15, ll. 35–37.) Anodizing this surface is not necessary to Mareiners' ███████ decorating technology and, again, is not one of Mareiners' asserted trade secrets. In fact, Mareiners admitted that not anodizing the edges of the cards "would be a huge benefit and cost reduction." (Ex. EE.) Specifically, Mareiners, while working with one of its licensees to develop and bring an anodized transaction card to market, suggested that:

> pre-anodized rolls of aluminum [could] be bought and used for punching out the credit cards. The edges of the card **would not be anodized**, but I don't think that would be a problem. Not having to anodized [*sic*] the cards would be a huge benefit and cost reduction with this project.

(*Id.* (emphasis added); *see also* Ex. DD at 79:16–80:23.) Accordingly, any transaction card in which the peripheral surface—*i.e.*, the edge of the card—is not anodized, as Mareiners previously suggested, would not practice limitation 1[a] or 1[c] of the '518 Patent and would, therefore, be a

non-infringing product that Mareiners or its licensees could manufacture and sell without fear of infringing the '518 Patent.

               iii. <u>A Transaction Card Without a Colored Peripheral Surface Would Not Infringe the Anomatic Patents.</u>

Lastly, the record is devoid of any evidence to suggest that one could not design around both of the Anomatic Patents with one simple change. Claim limitation 1[c] of both the '655 Patent and '518 Patent requires that the peripheral surface of the transaction card be "colored to cover a metallic color of the metallic card body." (Ex. J at Col. 15, ll. 49–50; Ex. K at Col. Col. 15, ll. 47–48.) Coloring the edges of the card is not necessary to Mareiners' ████████ decorating technology and, again, is not one of Mareiners' asserted trade secrets. Accordingly, any transaction card in which the peripheral surface is not colored would not practice limitation 1[c] of either the '655 Patent or the '518 Patent and would, therefore, be a non-infringing alternative that Mareiners or one of its licensees could manufacture and sell without fear of infringing the Anomatic Patents.

        **c.**     **The PLA Expressly Authorized Anomatic to Obtain the Anomatic Patents and, Therefore, Any Impact the Patents May Have on Mareiners' Ability to License Its Technology Cannot Form the Basis of a Claim for Breach of Contract.**

Anomatic did not breach the PLA by obtaining the Anomatic Patents. Mareiners alleges that Anomatic breached "its express contractual 'agree[ment] that [Mareiners] may grant other licenses to other licensees and that the sales of [image anodized cards] manufactured by other licensees may be sold.'" (ECF No. 77 at ¶ 126 (alterations in original).) Despite the artful pleading, the reality is that the PLA contains no such provision. Rather, the PLA provides:

> [Anomatic] acknowledges and agrees that [Mareiners] may grant other licenses to other licensees and that sales of Licensed Products manufactured by other licensees may be sold.

(PLA at Art. 2.4.) The "Licensed Products" that may be manufactured or sold by others are:

> [A]ny article or good onto which a finish or an image is applied using the "Licensed Technology," but excluding all medical devices as that term is defined in the Federal Food, Drug and Cosmetic Act . . . and all devices used in or in connection with rendering of medical services to humans or animals.

(*Id.* at Art. 1.3.) The "Licensed Technology" used to apply an image to a Licensed Product is:

> [T]he technologies and subject matter specifically described in United States Patent No. 7,022,202, drawn to ███████████████████████████████ with ████████████████████ and wherein the Licensed Technology extends to . . . all know how related to the development and manufacture of Licensed Products (as defined below) provided to [Anomatic] by [Mareiners] or [Goertzen].

(*Id.* at Art. 1.2.) While an anodized aluminum transaction card—which is the subject of the Anomatic Patents (*see e.g.*, '655 Patent at Abstract)—may be an "article or good onto which a finish or image" may be applied using the "Licensed Technology," it is not the only type of "Licensed Product" contemplated by the PLA. The Anomatic Patents have no impact on Mareiners' ability to license its technology for use with any non-aluminum transaction card.

Instead, any analysis of Mareiners' right to license the use of its technology—particularly as it relates to its specific application to an anodized aluminum transaction card—must be read in light of Anomatic's ownership of any and all intellectual property rights that resulted from or related to its development, manufacture, or sale of Licensed Products that utilize the Licensed Technology or Confidential Information. Specifically, as it relates to "Licensed Products utilizing the Licensed Technology," the PLA provides:

> [A]ny and all intellectual property rights resulting from, or relating to, the manufacture, development or sale of Licensed Products utilizing Licensed Technology ("Developed IP"), or to the disclosure of Confidential Information (as defined in the Confidentiality Agreement), shall belong to [Anomatic] . . . . [Mareiners] shall not file patent applications, or otherwise assert ownership of any rights, relating in any way to the Developed IP or [Anomatic's] Confidential Information (as defined in the Confidentiality Agreement).

(PLA at Art. 6.1.)

Ohio courts follow the principle of *generalia specialibus non derogant—i.e.,* the "general maxim of contract construction that, when a general and specific provision are in apparent conflict, the specific provision prevails." *Columbus v. State Emp't Rels. Bd.,* No. 90AP-87, 1990 Ohio App. LEXIS 3957, at *11 (10th Dist. Sept. 4, 1990). Ohio courts apply this rule of contract interpretation "[b]ecause when the parties express themselves in reference to a particular matter the attention is directed to that, and it must be assumed that it expresses their intent, whereas a reference to some general matter, within which the particular may be included, does not necessarily indicate that the parties had the particular matter in thought." *Garofoli v. Whiskey Island Partners Ltd.,* 2014-Ohio-5433, ¶ 29 (8th Dist. 2014) (internal quotations omitted).

The Parties anticipated a scenario in which one of them might wish to seek patent protection relating to intellectual property rights that resulted from or related to the manufacture, development, or sale of Licensed Products utilizing Licensed Technology or the disclosure of Confidential Information. In so doing, as this Court previously held, the Parties contemplated and ultimately agreed that Anomatic would own any and all of the rights to any intellectual property (such as all patent rights) resulting from or relating to Anomatic's development, manufacture, or sale of articles or goods onto which a finish or image may be applied utilizing the technology Mareiners was licensing to Anomatic and that Mareiners (*not* Anomatic) was prohibited from filing a patent application relating to this intellectual property. (*See* ECF No. 34 at 6.)

The Parties could have handled this scenario in any number of ways, including a mutual prohibition or precluding Anomatic from filing patent applications altogether. Instead, as the Court previously held, the Parties contemplated the filing of a patent application concerning technology related to Anomatic's development, manufacture, and/or sale of articles or goods onto which a finish or image was applied utilizing the Licensed Technology. (*See id.*) By choosing to prohibit

only Mareiners—and not Anomatic—from filing a patent application relating to this technology, the Parties expressed their unambiguous intent that Anomatic owned that intellectual property and that Anomatic was permitted to perfect that intellectual property right through a patent application. *See Garofoli*, 2014-Ohio-5433, ¶ 29 (quoting *Hedrick v. Spitzer Motor City, Inc.,*, 2007-Ohio-6820, ¶ 16 (8th Dist.)) ("[W]hen the parties express themselves in reference to a particular matter the attention is directed to that, and it must be assumed that it expresses their intent."). The natural consequence of the Parties' agreement, therefore, is that Anomatic was entitled to obtain patent protection over a subset of goods that might otherwise qualify as Licensed Products, as that term is defined by the PLA.

Under any appropriate reading of the agreement, the specifics of Article 6.1—*i.e.*, the IP Ownership Provision—control as a matter of law over the general agreement between the Parties that Mareiners "may grant other licenses to other licensees and that sales of Licensed Products manufactured by other licensees may be sold." (PLA at Art. 2.4.) Any limitation on the potential scope of Mareiners' licensing activity as a result of the Anomatic Patents is not a breach of the PLA but rather reflects a right the Parties expressly negotiated and agreed Anomatic would possess. Accordingly, even if it were true that the existence of the Anomatic Patents impacted or prevented Mareiners from licensing its ███████ technology, those facts are insufficient, as a matter of law, to establish the existence of a breach of the PLA.

### 3. Ohio Does Not Recognize a Standalone Claim for Breach of the Duty of Good Faith and Fair Dealing.

Given that Anomatic did not breach the PLA when it disclosed in the Anomatic Patents generally known information regarding anodizing and ████████████ (*see supra* § IV.C.1.) or when it obtained the Anomatic Patents (*see supra* § IV.C.2.a.), the Court should enter judgment as a matter of law on Count IV of the Amended Complaint because Mareiners' alternative theory,

based on a breach of the implied duty of good faith and fair dealing exercised in a manner inconsistent with Mareiners' reasonable expectations (*see* ECF No. 77 at ¶ 127), is not a recognized, standalone claim under Ohio law.

Ohio law is firmly established: "[T]here is no independent cause of action for breach of the implied duty of good faith and fair dealing." *Lucarell v. Nationwide Mut. Ins. Co.*, 2018-Ohio-15, ¶ 44 (2018). The Supreme Court of Ohio was not vague in *Lucarell*, but rather, unambiguously emphasized that "there is no violation of the implied duty unless there is a breach of a specific obligation imposed by the contract, such as one that permits a party to exercise discretion in performing a contractual duty or in rejecting the other party's performance." *Id.* at ¶ 43. It inescapably follows that if there is no breach of an express contract provision—as is the case here—then there likewise can be no breach of an implied covenant—as is also the case here.

The Sixth Circuit and both of Ohio's federal district courts have cited *Lucarell* to reject the notion that breach of the implied duty of good faith and fair dealing can exist as a standalone claim. *Cincinnati Dev. III LLC v. Cincinnati Terrace Plaza, LLC*, Nos. 22-3303/3367, 2023 U.S. App. LEXIS 6132, at *25 (6th Cir. Mar. 14, 2023) ("Ohio does not recognize an independent cause of action for breach of the implied duty of good faith and fair dealing."); *Tatonka Educ. Servs., Inc. PBC v. Youngstown Preparatory Acad.*, No. 4:23-CV-0091, 2023 U.S. Dist. LEXIS 106788, at *12 (N.D. Ohio June 20, 2023) (same); *Orange Barrel Media, LLC v. KR Sunset Weho, LLC*, No. 2:21-cv-4988, 2022 U.S. Dist. LEXIS 119499, at *11 (S.D. Ohio July 6, 2022) (Sargus, J.) (same).

Accordingly, because Anomatic is not otherwise in breach of the PLA, the Court should reject Mareiners' alternative theory based on the implied duty of good faith and fair dealing and enter judgment in Anomatic's favor on Count IV of the Amended Complaint.

### 4. **Mareiners' Breach of the Non-Disclosure Agreement and Patent Licensing Agreement Precludes It from Satisfying Its Burden of Proof on Its State Law Contract Claims.**

Even assuming genuine disputes of material fact related to Anomatic's alleged breach of the NDA and PLA exist (and they do not), Mareiners' failure to perform its contractual obligations under the NDA and the PLA preclude its state law contract claims. Under Ohio law, proof that the nonbreaching party has performed its contractual obligations is a necessary element of a breach of contract claim. *See Orange Barrel Media, LLC*, 2022 U.S. Dist. LEXIS 119499, *9 (Sargus, J.). Thus, "an essential element to a breach of contract claim is the plaintiff's performance," and absent proof of such performance, a plaintiff will not prevail on its claim. *Nnazor v. Cent. State Univ.*, 2016-Ohio-8539, ¶ 16 (10th Dist.).

The NDA, which is expressly incorporated by reference in the PLA (*see* PLA at Art. 7.1), governs each Party's obligations regarding the treatment and use of the other's confidential information. Specifically, the NDA provides:

> RECIPIENT: (i) will not disclose Confidential Information to any third party; (ii) will not disclose the Confidential Information to its employees unless the employees have a need to know the Confidential Information for the Purpose; and (iii) will use the Confidential Information only for the Purpose and will not use it for any third party's benefit.

(NDA at § 3(a).) Mareiners has indisputably not complied with these contractual obligations.

The undisputed facts in this case establish that Mareiners not only disclosed Anomatic's confidential information to third parties but also used that information for a third party's benefit.

Mareiners routinely and regularly forwarded Anomatic confidential information to third parties.[23] The NDA provides that "[i]nformation will be considered to be Confidential Information

---

[23]    For brevity sake, Anomatic does not intend to discuss each and every example in which Mareiners' forwarded Anomatic confidential information on to a third party, in part, because only one instance is sufficient to find that Mareiners failed to perform under the NDA and the PLA.

and protected under this Agreement if it is identified as 'confidential' or 'proprietary'[.]" (NDA at § 2.) The material Mareiners forwarded to third parties was clearly marked by Anomatic as confidential, consistent with the requirements of Section 2 of the NDA. For example, on August 5, 2020, Mareiners forwarded to Keith Jennings a confidential presentation Anomatic had prepared for Chase, which was clearly marked "CONFIDENTIAL":



(Ex. Z; Ex. W at 80:20–81:9.) And, in some instances, Mareiners even forwarded Anomatic's confidential information along to third parties with an acknowledgement that the information was, in fact, "confidential." (*See, e.g., id.* at Ex. Y; Ex. Ex. W at 77:11–24.) Mareiners did all of this despite admitting to Anomatic that Mareiners' attorney had warned Mareiners about forwarding one party's confidential information to third parties. (Ex. O; Ex. N at 201:9–202:3.) Mareiners' disregard for and breach of its obligation to refrain from sharing Anomatic's confidential information with third parties precludes any recovery under its state law contract claims.

In addition to forwarding Anomatic confidential information to third parties, Mareiners also used Anomatic's confidential information in ways that were not consistent with the purpose of the NDA and in ways that would benefit a third party. That is expressly prohibited by the NDA. (*See* NDA at § 3(a).) In particular, Messrs. Baer, Goertzen, Jennings, and Molke were in discussions about starting a company, USA Cards, to make, among other things, anodized

aluminum transaction cards and were seeking outside investment in the same as early as July 8, 2019. (Fleming Decl. at Ex CC; Ex. BB at 86:16–88:9.) Over the course of the next year, this group, including Mareiners, continued to look for investors to produce cards, whether those were "a capital investment group or a company or whatever." (Ex. V; Ex. N at 194:13–195:14; 196:8–23.) During this same time, Mareiners routinely forwarded Anomatic's confidential information to members of this group, including Messrs. Baer and Jennings. For example, on July 14, 2020, Mareiners forwarded a confidential Anomatic presentation prepared for Chase to Mr. Baer. (Ex. U; Ex. T at 53:12–54:6.) One week later, on July 21, 2020, Mareiners forwarded another Anomatic communication regarding Chase to Messrs. Baer and Jennings with a declaration to the group that "We need some investors!!!" (Ex. V; Ex. N 194:13–195:14.) While Mareiners and others were certainly free to pursue other opportunities for making and selling anodized transaction cards without Anomatic, Mareiners was required, under the NDA, to do so without using Anomatic's confidential information. By using Anomatic's confidential information in this manner, Mareiners breached its most crucial obligations under the NDA and the PLA. Accordingly, Mareiners' failure to perform under the NDA and PLA precludes its ability to recover for its state law contract claims.

**5.**      **Mareiners' Failure to Establish Damages Precludes It from Satisfying Its Burden of Proof on Its State Law Contract Claims.**

Mareiners' inability to put forward a damages case at trial requires that this Court enter judgment as a matter of law on Mareiners' state law contract claims. The fourth and final element of any breach of contract claim under Ohio law is the "existence of damages resulting from the breach." *See Milles v. Fifth Third Bank, N.A.*, No. 1:24-cv-186, 2024 U.S. Dist. LEXIS 215155, at *10–11 (S.D. Ohio Nov. 26, 2024). However, as explained above (*see supra* § IV.A.3.a), Mareiners has put forward no admissible evidence of damages in this case and has not identified any alternative theory or computation of damages beyond that propounded by Mr. George.

Accordingly, without any admissible evidence or theory of damages, there are no disputed issues of material fact that would permit Mareiners to survive summary judgment. Accordingly, for this independent reason, the Court should enter summary judgment in Anomatic's favor.

Furthermore, even if Mr. George's testimony is allowed, Mareiners' failure to establish that the Anomatic Patents prevent anyone from manufacturing and/or selling an anodized aluminum transaction card that utilizes Mareiners ███████ decorating technology (*see supra* § IV.C.2.a and 2.b) precludes Mareiners from establishing that the Anomatic Patents are the "but for" causation of its damages, which is a necessary aspect of its burden of proof on its state law contract claims. *V&M Star Steel v. Centimark Corp.*, 678 F.3d 459, 466 (6th Cir. 2012) ("Under Ohio law, [plaintiff] must prove causation by a preponderance of the evidence in order to recover the claimed damages . . . as a result of breach of contract . . . ."); *Cin. Dev. III LLC v. Cin. Terrace Plaza, LLC*, Nos. 22-3303/3367, 2023 U.S. App. LEXIS 6132, at *16 (6th Cir. Mar. 14, 2023) ("A plaintiff must prove . . . damages caused by the breach."). By failing to establish "but for" causation, Mareiners cannot satisfy its burden of proof on the fourth and final element—damages resulting from the breach—of these claims. *See Milles*, 2024 U.S. Dist. LEXIS 215155 at *10–11 (outlining elements of breach of contract claim under Ohio law). Accordingly, judgment as a matter of law on Counts III and IV is warranted for this reason as well.

## V.      CONCLUSION

For these reasons, Anomatic Corporation respectfully requests that the Court enter summary judgment in its favor on Counts I–V of the Amended Complaint and such further relief as the Court deems appropriate.

Dated:     February 28, 2025          Respectfully submitted,

**Vorys, Sater, Seymour and Pease LLP**

 /s/ *Aaron M. Williams*
Aaron M. Williams, Trial Attorney (0090319)
Michael J. Garvin (0025394)
Marcel C. Duhamel (0062171)
Andrew D. Fleming (0104285)
200 Public Square, Suite 1400
Cleveland, Ohio 44120
Phone: 216-479-6180
Fax:    216-937-3405
Email: amwilliams@vorys.com
         mjgarvin@vorys.com
         mcduhamel@vorys.com
         adfleming@vorys.com

Brady R. Wilson (0101533)
52 East Gay Street, P.O. Box 1008
Columbus, Ohio 43216-1008
Phone: 614-464-6374
Fax:    614-719-4630
Email: brwilson@vorys.com

**Linklaters LLP**

Patrick C. Ashby (Bar No. 4622031)
Michael Pilcher (Bar No. 5521067)
Salma H. Shitia (Bar No. 6108112)
1290 Avenue of the Americas,
New York, NY 10104
Phone: 212-903-9268
Fax:    212-903-9100
Email: patrick.ashby@linklaters.com
         michael.pilcher@linklaters.com
         salma.shitia@linklaters.com

*Counsel for Defendant Anomatic Corporation*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system on February 28, 2025, and that true and correct copies were simultaneously emailed to all counsel of record.

/s/ *Aaron M. Williams*

Aaron M. Williams, Trial Attorney (0090319)
**Vorys, Sater, Seymour and Pease LLP**
200 Public Square, Suite 1400
Cleveland, Ohio 44120
Phone:   216-479-6100
Fax:        216-479-6060
Email: amwilliams@vorys.com

*One of the Attorneys for Defendant Anomatic Corporation*

# APPENDIX A – SUPPLEMENTAL AUTHORITY

Pursuant to the Order entered in this case on March 21, 2023 (ECF No. 21), Defendant Anomatic Corporation submits the following Appendix of Supplemental Authority of non-binding authority cited in its Memorandum in Support of Motion for Summary Judgment.

## Non-Binding Authority Related to Anomatic's Trade Secret Arguments

### Cases

*Buckeye Wellness Consultants, LLC v. Hall*, 2022-Ohio-1602 (10th Dist.)................................16

**Parenthetical:** Stated for the proposition that under the OUTSA, misappropriation of a trade secret occurs when one acquires the trade secret through improper means.

*Coda Dev. S.R.O. v. Goodyear Tire & Rubber Co.*, 667 F. Supp. 3d 590 (N.D. Ohio 2023) ................................................................................................................................8

**Parenthetical:** Stated for the proposition that trade secrets may be classified as "combination trade secrets" comprised of publicly available components that, when combined, become a unique and protectable trade secret.

*Novak v. Farneman*, No. 2:10-CV-768, 2010 U.S. Dist. LEXIS 123526 (S.D. Ohio Nov. 9, 2010) ........................................................................................................................14

**Parenthetical:** Stated for the proposition that information is not entitled to trade secret protection where generally known or readily ascertainable to the public.

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064 (N.D. Cal. 2005) ......................................................................................................................29

**Parenthetical:** Stated for the proposition that an expert's failure to apportion damages in a trade secret case improperly forces a jury to speculate regarding damages sustained.

*Penalty Kick Mgmt. v. Coca Cola Co.*, 318 F.3d 1284 (11th Cir. 2003)......................................25

**Parenthetical:** Stated for the proposition that, under the Third Restatement of Unfair Competition, a plaintiff in a disclosure case can only prove trade secret misappropriation by showing that the information disclosed allowed a third party to learn the trade secret.

*Presidio, Inc. v. People Driven Tech., Inc.*, 686 F. Supp. 3d 652 (S.D. Ohio 2023).............7, 8, 27

**Parenthetical:** Stated for the propositions that (1) the plaintiff in a trade secret case must demonstrate the existence of a protectable trade secret and misappropriation of the trade secret; (2) under the DTSA a traditional or standalone trade secret must derive independent economic value from not being generally known or readily ascertainable; and (3) ability to establish damages is an essential element of a trade secret misappropriation claim.

## APPENDIX A – SUPPLEMENTAL AUTHORITY

*Ridge Corp. v. Altun LLC*, No. 2:21-cv-5915, 2023 U.S. Dist. LEXIS 19926 (S.D. Ohio Feb. 3, 2023) .................................................................................................12, 14, 15

**Parenthetical:** Stated for the propositions that (1) the subject matter of the trade secret must be described with sufficient particularity; and (2) information publicly disclosed in a patent is not entitled to trade secret status.

*Uniram Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*, 617 F. Supp. 2d 938 (N.D. Cal. 2007) ...........................................................................................................................25

**Parenthetical:** Stated for the proposition that a party is presumed to disclose a combination trade secret as long as one skilled in the art could view the non-secret elements and replicate the combination

*Versata Software, Inc. v. Ford Motor Co.*, No. 15-cv-10628; 15-11264, 2023 U.S. Dist. LEXIS 75318 (E.D. Mich. May 1, 2023) ............................................................ 29, 30

**Parenthetical:** Stated for the proposition that a damages expert in a trade secret case must offer the factfinder a way to attribute value to each individual trade secret.

### Other Authorities

RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 40, comment c ..............................................24

**Parenthetical:** Stated for the proposition that combination trade secrecy is preserved where the elements to the reproducibility of the process are not disclosed.

RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 39, comment f ..............................................25

**Parenthetical:** Stated for the proposition that information may maintain trade secret protection unless it is readily ascertainable by proper means.

### Non-Binding Authority Related to Anomatic's Correction of Inventorship Arguments

### Cases

*Advanced Thermal Scis. Corp. v. Applied Materials, Inc.*, No. SACV 07-1384 JVS (JWJx), 2009 U.S. Dist. LEXIS 155231 (C.D. Cal. Aug. 12, 2009)...........................................................45

**Parenthetical:** Stated for the proposition that for summary judgment purposes, an interested witness's testimony, standing alone, is insufficient corroboration for a correction of inventorship claim.

*Coda Dev. v. Goodyear Tire & Rubber Co.*, 667 F. Supp. 3d 567 (N.D. Ohio 2023)............ 40, 46

**Parenthetical:** Stated for the propositions that (1) a plaintiff must show it had knowledge of every claim limitation at the time of the alleged conception to establish sole inventorship; and (2) a plaintiff's testimony, alone, is insufficient to establish such

## APPENDIX A – SUPPLEMENTAL AUTHORITY

inventorship.

*Daneshvar v. Kipke*, 266 F. Supp. 3d 1031 (E.D. Mich. 2017) ......................................................40

**Parenthetical:** Stated for the proposition that a plaintiff's testimony, alone, is insufficient to establish inventorship.

*Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1358 (Fed. Cir. 2004)..............................40, 46

**Parenthetical:** Stated for the propositions that (1) testimony in support of an inventorship claim must be corroborated, and that the putative inventor's testimony, standing alone, is insufficient to provide such corroboration; and (2) at the summary judgment stage, courts should view the evidence in accordance with the evidentiary standard of proof that would apply at trial.

### Non-Binding Authority Related to Anomatic's State Law Contract Arguments

### Cases

*Columbus v. State Emp't Rels. Bd.,* No. 90AP-87, 1990 Ohio App. LEXIS 3957 (10th Dist. Sept. 4, 1990) ............................................................................................................................62

**Parenthetical:** Stated for the proposition that, under Ohio law, specific provisions in a contract prevail over general provisions.

*Garofoli v. Whiskey Island Partners Ltd.,* 2014-Ohio-5433 (8th Dist. 2014) ........................62, 63

**Parenthetical:** Stated for the proposition that, under Ohio law, specific contractual provisions express the intent of the parties, whereas general contractual provisions fail to indicate whether the parties considered a particular matter.

*Milles v. Fifth Third Bank, N.A.*, No. 1:24-cv-186, 2024 U.S. Dist. LEXIS 215155 (S.D. Ohio Nov. 26, 2024) ...............................................................................................................68

**Parenthetical:** Stated for the proposition that, under Ohio law, the final element of any breach of contract claim is the existence of damages resulting from the breach.

*Orange Barrel Media, LLC v. KR Sunset Weho, LLC*, No. 2:21-cv-4988, 2022 U.S. Dist. LEXIS 119499 (S.D. Ohio July 6, 2022) .....................................................................................65

**Parenthetical:** Stated for the proposition that under Ohio law, proof that the nonbreaching party has performed its contractual obligations is a necessary element of a breach of contract claim.

*Tatonka Educ. Servs., Inc. PBC v. Youngstown Preparatory Acad.*, No. 4:23-CV-0091, 2023 U.S. Dist. LEXIS 106788 (N.D. Ohio June 20, 2023)............................................................64

**Parenthetical:** Stated for the proposition that Ohio does not recognize an independent cause of action for breach of the implied duty of good faith and fair dealing.



**APPENDIX C – THE MAREINERS PROCESS (HIGHLY CONFIDENTIAL)**



(*See* Ex. HH at 8–10.)

**APPENDIX D – CATALOG OF ANOMATIC'S PRIOR KNOWLEDGE**

**Anomatic Corporation's Anodizing Training Manual (Ex. SS):**

Anomatic created this internal Training Manual in May 1993 as a tool for training Anomatic employees on the anodizing concepts and technologies that Anomatic engineers are expected to understand. (Ex. RR at ¶ 4.) Anomatic continues to train employees with this Training Manual today, and its guidance remains relevant in Anomatic's day-to-day operations. (*Id.* at ¶ 5.) The Training Manual encompasses, among other things: (1) Anomatic's historic knowledge of aluminum alloys and their chemical and physical properties; (2) Anomatic's use of mechanical and chemical polishing techniques, including chemical polishing formulas and preferred alloy series to obtain bright and reflective parts; (3) Anomatic's understanding and implementation of ███████████████ as the ██████████████ and (4) the uniqueness of Anomatic's anodizing system, designed and patented in the 1960s. (*Id.* at ¶ 6.) The Training Manual encompasses the steps of Anomatic's process in detail, including alloy selection, fabrication techniques, surface treatment, precleaning, chemical cleaning, polishing, desmut, rinsing, anodizing, dyeing, sealing, and drying. (*Id.* at ¶ 7.)

**Technical Primer on Anodized Aluminum and Cosmetic Packaging Design (Ex. TT):**

Mr. Ormiston created this Technical Primer in June 2002 as a teaching guide for Anomatic employees and remains in use today. (*Id.* at ¶¶ 9–10.) The Technical Primer provides an overview of the basis anodizing concepts that all Anomatic engineers are expected to be proficient in. (*Id.* at ¶ 11.) At a fundamental level, the Technical Primer addresses (1) the qualities, characteristic, and application of various aluminum alloy grades; (2) the methods, variables, and scientific principes regarding the manner in which anodic coating is grown on aluminum; (3) the methods and techniques for rinsing and cleaning pretreated aluminum; (4) the methods and principles regarding the manner in which dye is transferred into an anodized surface; (5) the methods, solutions, substances, and techniques associated with sealing an anodized surface; and (6) the techniques and tools associated with the drying of seal anodized aluminum. (*Id.* at ¶ 12.)

**The Process Steps of the Anomatic Patents (Appendix B):**

The Process Steps of the Anomatic Patents are not considered confidential information under the terms of the NDA or PLA because, as explained below, those process steps were either (1) generally known; or (iv) independently developed or known by Anomatic decades prior to receipt of information from Mareiners:

| Evidence Demonstrating Process Steps Are Not Confidential Information | | |
|---|---|---|
| **Step** | **Description** | **Public or Prior Knowledge** |
| ██ | ████████████████ | ███████████████████████████ |
| ██ | ████████████████ | ███████████████████████████ |

# APPENDIX D – CATALOG OF ANOMATIC'S PRIOR KNOWLEDGE



# APPENDIX D – CATALOG OF ANOMATIC'S PRIOR KNOWLEDGE



# APPENDIX D – CATALOG OF ANOMATIC'S PRIOR KNOWLEDGE



**APPENDIX D – CATALOG OF ANOMATIC'S PRIOR KNOWLEDGE**



Case 2:22-cv-04833-EAS-KAJ Doc #: 103-4 Filed: 01/25/25 Page 92 of 92 PAGEID #: 1611

# APPENDIX D – CATALOG OF ANOMATIC'S PRIOR KNOWLEDGE

