**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MAREINERS, LLC** | ) | **Case No. 22-CV-03433-EAS-KAJ** |
| | ) | |
| Plaintiff, | ) | **Judge EDMUND A. SARGUS, JR.** |
| | ) | **Magistrate Judge:  Kimberly A. Jolson** |
| v. | ) | |
| | ) | **SEALED – CONTAINS HIGHLY** |
| **ANOMATIC CORPORATION** | ) | **CONFIDENTIAL INFORMATION** |
| | ) | |
| Defendants. | ) | **ORAL ARGUMENT REQUESTED** |

___

**PLAINTIFF MAREINERS, LLC'S MEMORANDUM IN OPPOSITION TO**
**DEFENDANT ANOMATIC CORPORATION'S MOTION TO EXCLUDE THE**
**OPINIONS OF JEFFREY GEORGE, CPA CA/ABV**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

LOCAL RULE 7.2(A)(3) SUMMARY ............................................................... v

I.    INTRODUCTION ....................................................................................... 1

II.   BACKGROUND .......................................................................................... 3

   A.   GEORGE RELIED UPON DATA PRODUCED BY INTERNATIONAL CARD
        MANUFACTURERS ASSOCIATION AND OTHER THIRD-PARTY SOURCES... 3

   B.   ANOMATIC'S VALUATION OF THE IMAGE ANODIZED TRANSACTION
        CARD OPPORTUNITY.......................................................................... 7

   C.   ANOMATIC'S THIRD-PARTY PEER REVIEW OF THE IMAGE ANODIZED
        TRANSACTION CARD OPPORUTNITY ................................................. 10

   D.   CHRIS MOLKE OF CATALYST CARDS AND ALCHEMY PLASTICS
        PRODUCED USA CARDS BUSINESS PLAN AND PROFORMA........................ 11

   E.   MOLKE'S EXPERIENCE WITH IMAGE ANODIZED TRANSACTION CARDS
        LEADING TO THE GENERATION OF USA CARDS
        BUSINESS PLAN AND PROJECTIONS. ................................................. 13

III.  ARGUMENT............................................................................................... 16

   A.   GEORGE VALUED THE OPPORUTNITY LOST WHEN ANOMATIC
        SECURED A MONOPOLY OVER MAREINERS' INNOVATION ...................... 17

      1.   Proper summary of George's Damages Model.................................... 17

      2.   George relied upon trusted and appropriate data and made reasonable assumptions
           based upon the record evidence. ................................................... 18

         i.    USA Cards and Mareiners agreed upon a 10% royalty prior to the
               creation of the USA Cards business plan and projections. ................. 18

         ii.   USA Cards knew how to use Mareiners' process to produce cards. ........... 19

         iii.  USA Cards had obtained $30 million in investment to pursue the
               image anodized aluminum credit card opportunity. .......................... 20

         iv.   Technical, scientific and regulatory challenges were accounted
               for in USA Cards business plan and projections. ............................ 20

         v.    Record evidence establishes ready demand for Image Anodized Cards ............. 21

         vi.   Record evidence establishes that USA Cards would have scaled its
               operations to meet the market demand. ........................................ 21

         vii.  Record evidence establishes that USA Cards growth would have
               tracked the market demand. .................................................... 21

      3.   George used expertise and reliable methods to select a discount rate. ...... 23

      4.   Mr. George's report is properly tied to Mareiners' breach of contract
           and trade secret claims. ........................................................... 28

B.  6TH CIRCUIT'S DECISION IN *ENDLESS RIVER* DOES NOT SUPPORT
EXCLUSION OF MR. GEORGE'S OPINIONS ....................................................... 29

# TABLE OF AUTHORITIES

**Cases**

*Andrew v. Power Mktg. Direct, Inc.*,
    10th Dist. No. 11AP-603, 2012-Ohio-4371, 978 N.E.2d 974 (Ohio Ct. App. 2012) ............. 17

*Ask Chola., LP v. Comput. Packages, Inc.*,
    593 F. App'x 506 (6th Cir. 2014) ...................................................................................... 17

*Buck v. Ford Motor Co.*,
    810 F. Supp. 2d 815 (N.D. Ohio 2011) ............................................................................. 11

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) .......................................................................................................... 16

*Endless River Techs., LLC v. TransUnion, LLC*,
    Nos 23-3087/3144, 2025 WL 233659 (6th Cir. Jan. 17, 2025) ................................ vii, 2, 29, 30

*Hanuman Chalisa, LLC v. BoMar Contracting, Inc.*,
    10th Dist. No. 20AP-406, 2022-Ohio-1111, 187 N.E.3d 1108 (Ohio Ct. App. 2022) ............. 17

*Hill v. Century Arms, Inc.*,
    No. 3:21-CV-31-TAV-DCP, 2023 WL 7431143 (E.D. Tenn. Nov. 9, 2023) .................... vi, 25

*Hutchens v. Abbott Labs., Inc.*,
    No. 1:14CV176, 2016 WL 10566144 (N.D. Ohio Dec. 22, 2016) ...................................... vi, 25

*In re Davol, Inc.*,
    546 F. Supp. 3d 666 (S.D. Ohio 2021) ........................................................................ v, 11, 23

*In re Scrap Metal Antitrust Litigation*,
    527 F.3d 517 (6th Cir. 2008) ....................................................................................... 16, 17

*Ritter v. Johnson*,
    No. 21-cv-10815-DJC, 2023 WL 6282909 (D. Mass. Sept. 26, 2023) .................................. 24

*Saginaw Chippewa Tribe of Mich. V. Blue Cross Blue Shield of Mich.*,
    745 F. Supp. 3d 524 (E.D. Mich. 2024) ................................................................... 12, 18, 23

*Swierczynski v. Arnold Foods Co.*,
    265 F. Supp. 2d 802 (E.D. Mich. 2003) .............................................................................. 25

*United States v. Downing*,
    753 F.2d 1224 (3d Cir. 1985) ............................................................................................. 17

*Yagour Grp., LLC v. Ciptak*,
    8th Dist. No. 112846, 2024-Ohio-73, 233 N.E.3d 840 (Ohio Ct. App. 2024).........................17

**Other Authorities**

LITIGATION SERVICES HANDBOOK, THE ROLE OF THE FINANCIAL EXPERT
    (2017), §§ 8.24 ....................................................................................................................24

## LOCAL RULE 7.2(A)(3) SUMMARY

But for Anomatic's unlawful monopoly obtained through three patents on Mareiners'
innovations, Mareiners' licensees would be selling image anodized transaction cards to banks and
institutions with which they have longstanding relationships. Mr. George has provided a reliable
analysis of the opportunity lost when Anomatic breached its agreements with Mareiners and used
Mareiners' trade secrets to secure patents on its innovation. Mr. George's opinions are founded on
at least six categories of reliable and proper record evidence: (1) Data generated by the
International Card Manufacturers Association ("ICMA") on the available transaction card market;
(2) Anomatic's own peer-reviewed financial projections; (3) unchallenged business projections
from Chris Molke, an undisputed industry expert; (4) seventeen third-party references, article, and
projections regarding the credit card market; (5) record evidence that Mareiners' process is
properly scalable; and (6) record evidence that Anomatic left the credit card market in 2019 for
reasons unrelated to Mareiners or the opportunity. Unlike the expert in *Endless River*, Mr. George
looked to reliable sources to corroborate the projections and properly relied upon evidence in the
record that (1) Anomatic did not come to market for reasons unrelated to this case and (2) USA
Cards did not test its evidence based projections because of Anomatic's patents prevented it. Mr.
George should be permitted to testify to his timely disclosed and evidence-based opinions.

## I.    GEORGE'S REPORT IS FOUNDED UPON RELIABLE EVIDENCE

Mr. George's report is based on six categories of reliable and proper record evidence—
none of which includes Plaintiff's own projections. First, Mr. George relied upon ICMA's (a global
trade organization comprised of the leading card manufacturers, personalizers, issuers, and
suppliers) Global Market Statistics Report for the Card Manufacturing and Personalization &
Fulfillment sectors of the card industry regarding the total addressable card market, as well as
Nilson data. Industry players, including Anomatic and USA Cards, regularly rely upon this Report

in forming their own financial projections. Second, Mr. George relied upon Anomatic's own six-year proforma valuing the image anodized transaction card opportunity, created by Steve Rusch (Anomatic's VP for New Products), Scott Rusch (Anomatic's President), and Mark Ormiston (Anomatic's Chief Safety Officer). Indeed, Anomatic provided these projections to Mr. Goertzen (Mareiners' principal) with the intent that he relies upon them. Anomatic continually updated these projections throughout the term of the parties' engagement with higher and higher projected revenues. Moreover, these projections were peer reviewed by L.E.K. Consulting at a cost of $250,000—a fact upon which Mr. George relied in trusting this data. Anomatic's decision to not pursue this opportunity was entirely unilateral and unrelated to its viability, as explained below.

Third, Mr. George reviewed and relied upon Chris Molke's analysis of the market opportunity that existed for USA Cards at the time Anomatic unlawfully secured the first of its patents. Mr. Molke's expertise in the field of credit card manufacturing and sales has not been challenged. Mr. George reliance upon Mr. Molke's expertise was entirely proper. *See In re Davol, Inc.*, 546 F. Supp. 3d 666, 676 (S.D. Ohio 2021) ("An expert is able to base an opinion on another expert witness for a point of expert knowledge not personally possessed. . . . Thus, experts with appropriate expertise may review scientific literature and other expert reports to form their opinions.").

Fourth, Mr. George relied upon at least seventeen third-party references, article, and projections regarding the credit card market of the type regularly relied upon by players in the transaction card industry. Fifth, Mr. George based his opinions upon record evidence the multiple parties, including both Anomatic and USA Cards, believed Mareiners' process was readily scalable to meet industry demand. Finally, Mr. George relied upon record evidence demonstrating that Anomatic left the image anodized transaction card market in 2019 of its own accord for

reasons unrelated to the viability of the opportunity. Namely, Anomatic shifted its focus to its core business (cosmetic products). That is, Anomatic's projections did not fail to pan out in the market.

## II.   MR. GEORGE PROPERLY VALUED THE OPPORTUNITY LOST WHEN ANOMATIC SECURED A MONOPOLY OVER MAREINERS' INNOVATION

Mr. George used the reliable record evidence above to value the opportunity lost when Anomatic secured the first of three patents on the transaction card that Mareiners asked Anomatic to mass produce, not patent. He identified the market Mareiners was set to monetize through its work with USA Cards but for the Anomatic Patent's interference. He did so brelying upon projections generated by third parties and Mr. George tested that projected market by accessing published reports from IMCA, Nilson and by assessing Anomatic's own projections created using over 70 years of experience, and which were buttressed by a L.E.K.'s analysis of the same market. Mr. George relied upon available and reliable record evidence to recreate the market for image anodized credit cards without the hinderance of Anomatic's Patents.

Indeed, most of the numbers Mr. George relies upon (e.g., the royalty rate) were agreed upon between the parties during their relationship. And Mr. George has relied upon and incorporated record evidence demonstrating that the parties' market projections would pan out as expected. For other numbers, such as the discount rate Mr. George applied, courts have repeatedly found such choice to be a matter for cross examination, not exclusion. *See, e.g., Hutchens v. Abbott Labs., Inc.*, No. 1:14CV176, 2016 WL 10566144, at *4–5 (N.D. Ohio Dec. 22, 2016) (holding expert's choice of single discount rate, instead of time-averaged discount rate, did not render opinion unreliable and was matter for cross examination); *Hill v. Century Arms, Inc.*, No. 3:21-CV-31-TAV-DCP, 2023 WL 7431143, at *4 (E.D. Tenn. Nov. 9, 2023) (holding expert's failure to update calculations from originals using outdated discount rate was matter for cross examination).

### III. GEORGE'S OPINIONS ARE PROPERLY TIED TO MAREINER'S CLAIM

Mr. George's opinions are also properly tied to Mareiners' claims in this case. His opinions are directly relevant to Mareiners' Claims 1–4 — lost business opportunity. Mr. George properly linked his analysis with the time Mareiners and its licensees learned of the patent and stopped their effort to come to market by late 2022 or early 2023. Furthermore, his opinions are not directed to causation, but instead he was asked to assume causation and misappropriation. His damages analysis tracks the known facts and timing for USA Cards' shutdown caused by Anomatic's breach. Thus, his opinions are properly tied to Mareiners' claims.

### IV. THE 6TH CIRCUIT'S NONPRECEDENTIAL *ENDLESS RIVER* DOES NOT SUPPORT EXCLUDING MR. GEORGE'S OPINIONS

In *Endless River*, the expert (Dr. Malec) was tasked with valuing software as of April 2018 when an underlying partnership ended. *Endless River Techs., LLC v. TransUnion, LLC*, Nos 23-3087/3144, 2025 WL 233659, at *7 –8 (6th Cir. Jan. 17, 2025). In forming his damages opinion, he relied on the plaintiff's own revenue projections created at the outset of the partnership three years earlier, not evidence of the actual value of the software shown throughout the partnership. *Id.* His opinions were excluded as impermissible parroting, especially in view of the stark contrast between the projections and the actual performance of the software in the market. *Id.*

Mr. George did not rely on untested, self-interested assertions from Mareiners. Instead, he relied upon the sources outlined above, including projections from third-party industry expert Mr. Molke, LEK and Anomatic itself. Further, unlike *Endless River*, there is no actual market performance to contrast with the projections Mr. George relied upon, since Anomatic unilaterally shut down the market through its contractual breach and opted against testing the market itself for unrelated reasons. Accordingly, *Endless River* is inapposite to the instant facts.

## I.     INTRODUCTION

Without permission and in breach of its agreements with Mareiners, Anomatic secured three patents on Mareiners' image anodized transaction card, precluding Mareiners, or its licensees, from capitalizing on the well-established marketplace for metallic credit cards in the United States. Mareiners introduced Anomatic to the metallic credit card market after execution of a mutual non-disclosure agreement. Through Mareiners, Anomatic received the specifications for manufacturing image anodized transaction cards that were produced using Mareiners' proprietary and secret image anodizing process – specifications that Anomatic secretly used to secure patents for itself. But for Anomatic's unlawful monopoly obtained through three patents on Mareiners innovation, Mareiners' licensees, USA Cards and HardCoat Inc., would be selling image anodized transaction cards to banks and institutions that had longstanding relationships with Mareiners' licensees.

Anomatic's hinges its arguments upon record evidence it characterizes as unreliable, including its own projections. Timely disclosed, Mr. George has offered an evidence-based, reliable analysis of the opportunity lost when Anomatic breached its agreements with Mareiners and used Mareiners' trade secrets to secure patents on its innovation. Mr. George's lost opportunity damages model is founded upon:

1.  Data generated by the International Card Manufacturers Association ("ICMA") to report on the total available market for transaction cards. ICMA data is derived directly from buyers and sellers of PVC, hybrid and metallic transaction cards and is relied upon regularly by the industry for business planning.

2.  Projections created by Anomatic's C-suite (Scott Rusch, Steve Rusch and Mark Ormiston) to value the opportunity of working with Mareiners, projections that were

1

peer reviewed by L.E.K. Consulting, a third-party consultant retained to assist
Anomatic's owner, THG, in assessing the opportunity.

3. Unchallenged[1] business projections and plans created by Chris Molke, an undisputed
expert in the field of credit card manufacturing, for a non-party business entity, USA
Cards, LLC.

4. Seventeen references, articles and projections from third parties regarding the credit
card market used to develop an understanding of the market.

5. Record evidence that Mareiners' Process is scalable to meet existing demand from
banks and financial institutions.

6. Record evidence that Anomatic exited the credit card market in 2019 for reasons
unrelated to Mareiners or the opportunity.

Importantly, Mr. George does not rely upon Plaintiff's projections or proformas, as in *Endless*
*River Techs., LLC v. TransUnion, LLC*, Nos 23-3087/3144, 2025 U.S. App.Lexis 1201 (6th Cir.
Jan. 17, 2025). Contrary to Anomatic's motion, Mr. George cross referenced Anomatic's
Projections (ECF 98-5 at PageID 1376) and USA Cards Business Plan (ECF 98-6, PageID 1380-
1401) with published data from ICMA and Nilson, as well as Anomatic's consultant retained to
analyze the same opportunity for Anomatic's German parent. He was not required to discount
Anomatic's Projections when Anomatic's CEO testified that he halted the AnoCARDs project for
reasons unrelated to the opportunity. Mr. George's damages analysis is properly linked to the
issuance of Anomatic's first patent at the end of 2021 and the revelation that Anomatic had the

---

[1] Anomatic filed a Motion to Exclude portions of Mr. Molke's testimony at ECF 97.
Anomatic has not challenged Mr. Molke's business projections and plans created for USA Cards as
reflected in ECF 98-6, at PageID 1380 and as disclosed in his declaration at Molke Dec., ECF-97-3,
PageID 1074-1077.

power to prevent others from making Mareiners transaction card in Q1 of 2022. Mr. George's opinions are not only reliable, but they are also founded upon the evidence that all parties relied upon during the events of this case. After a Daubert Hearing, Mr. George should be permitted to testify to his disclosed opinions.

## II.     BACKGROUND

### A.     GEORGE RELIED UPON DATA PRODUCED BY INTERNATIONAL CARD MANUFACTURERS ASSOCIATION AND OTHER THIRD-PARTY SOURCES

Mr. George's assessment of the market opportunity deprived by Anomatic's unlawfully obtained patents is based upon available market data, not solely Anomatic's Projections and/or USA Cards Business Plan and Proforma. George Report, ECF 98-4, PageID 1344-1351 & 1371. Absent from Anomatic's Motion to Strike is any reference to the fact that Mr. George looked to data published by ICMA and Nilson, among others, to ensure that the market described by Anomatic and USA Cards was reasonable. This alone tanks Anomatic's Motion.

ICMA is a global trade organization comprised of the leading card manufacturers, personalizers, issuers and suppliers of transaction cards to the global marketplace, the very roles that both Anomatic and USA Cards would have played in the industry but for Anomatic's patents. ICMA's stated mission is "to elevate the global card industry and showcase the value of its products and services. We provide an independent platform for professionals to share knowledge, exchange ideas and foster collaboration. Through forums, educational resources and networking opportunities, we empower members to navigate the complexities of card manufacturing and personalization, driving professional growth and industry excellence for a dynamic future in card markets across the world." See www.ICMA.com/About/. Annually, ICMA produces its Global Market Statistics Reports for the Card Manufacturing and Personalization & Fulfillment sectors

for the Card industry. In 2019, IMCA reported the total addressable card market, based upon data and statistics provided by its members, as follows:



Reliance upon ICMA's Annual Reports makes good sense. ICMA played a central role in Anomatic's decision to contract with Mareiners in 2018. To assess the opportunity with Mareiners, Anomatic's President, Scott Rusch, and Vice President of New Products, Steve Rusch, attended the 2018 ICMA Show with Mr. Reiner Goertzen. Ex. 1, Email dated March 22, 2018, from Scott Rusch to Reiner Goertzen (ANOMATIC00239048) (stating: "We view the ICMA Expo as the best opportunity to evaluate and validate the market by showing the process and thereby enabling Anomatic to validate the market opportunities.") Ex. 2, Scott Rusch Depo., pp. 299:22-304:18. Following attendance at the ICMA Show and after receiving training on the manufacture of image anodized transaction cards displayed at the 2018 ICMA show, Scott and Steve Rusch advised its German owner in April of 2018 that Anomatic stood to enjoy $2.94 billion in revenue through the end of 2024 on the sale of over a billion image anodized transaction cards. See Ex. 3, April 4, 2018, AnoCard Executive Summary, p. 13 (ANOMATIC00098945-00098958). As members of ICMA, Anomatic relied upon the statistics and data published by the IMCA in order to assist in producing these projections and plan for entry into the transaction card market with Mareiners' image anodized transaction card.

4

USA Cards did as well.  Mr. Molke relied upon the 2019 ICMA Report, in part, to guide the production of the USA Cards Business Plan and Proforma (ECF 98-6 at PageID 1380-1401).  See Molke Dec., ECF 97-3 at PageID 1074-75.  Unlike Anomatic, Mr. Molke had 30 years of experience manufacturing and personalizing credit cards and relied upon that data and experience to produce the USA Cards Business Plan and Proforma.  *Id*. at PageID 1074-76.

Mr. George did not accept USA Cards Business Plan and Proforma at face value.  Mr. George independently reviewed the 2019 ICMA Global Market Statistics Report. Ex. 4, 2019 ICMA Global Market Statistics Report; George Report, ECF 98-4, at PageID 1347.  Unreferenced in Anomatic's motion is Mr. George's reliance upon a series of additional resources to cross check the USA Cards Business Plan, such as resources from Nilson, another leading resource that is relied upon by card issuers, manufacturers, personalizers and industry experts. Id.  According to Nilson, "each Nilson Report Research Publication compiles one year of published statistics and data, plus unpublished research on businesses that don't make it among the top 50 and top 100 rankings."  Mr. George accessed the 2023 Nilson Report for Payment Cards in Circulation to cross reference the marketplace and its growth from 2019.  Id. at 7, which contained the following graphical representation of the market:



Scott Rusch, Anomatic's Vice President, similarly used Nilson to assess the market for Anomatic in October of 2017 and thereafter. Ex. 5, Steve Rusch Depo., pp 92:12-94:22.

To further cross reference the marketplace as portrayed in both the Anomatic Projections and the USA Cards Business Plan, Mr. George independently pulled, reviewed and relied upon the following references:

1. *Growth of Premium Metal Cards*, report by CompoSecure: Insights by Edgar, Dunn & Company (March 2022).

2. *U.S. National Consumer Credit Trends Report: Originations* (Data as of May 2022), Equifax (June 30, 2022).

3. *Elevating the User Experience with Specialty Cards*, ICMA (Nov. 9, 2021).

4. *Global Premium Metal Payment Card Market Report*, 2023, Historical Data 2019-2022, Estimates for 2023 and Forecasts 2024-2029, ResearchandMarkets.com (December 2023).

5. *Just How Big is the Market for Premium Cards?* Equifax (May 25, 2018).

6. *Metal Credit Cards Market Size is Growing at a CAGR of 24.4% with Worth ~ US$7058.2 million by 2032*, LinkedIn (March 26, 2024)

7. *Global General Purpose Cards Purchase Volume Worldwide 2016 v. 2026*, Nilson (January 2018).

8. *Largest Credit Card Portfolios Worldwide*, Nilson (November 2021)

9. *Payment Cards in Circulation Worldwide*, Nilson (October 2018).

10. *Payment Cards Projected Worldwide Through 2027 in Billions*, Nilson (January 2023).

11. *Payment Cards Projected Worldwide 2019 vs. 2025 (Bil.)*, Nilson (Oct 2020).

12. *Payment Cards Projected Worldwide Projected through 2026 (Bil.)*, Nilson (January 2023).

13. *Purchase Transactions Projected Transactions Worldwide (Bil.) in 2021*, Nilson (January 2022).

14. *Top issuers of Commercial Cards in the United States Volume (Bil.) in 2021*, Nilson (May 2022).

15. *US Payment Cards Projected Purchase Volume (Tril.) in 2020*, Nilson (Oct 2021).

16. *US Payment Cards Projected Purchase Volume (Bil.)*, Nilson (Nov. 2022).

17. *Payment Cards: Strategies to Optimize Sustainability and Circularity*, ICMA (January 26, 2024).

George Report, ECF 98-4 at PageID 1371. Anomatic's decision to ignore this foundation for Mr. George's report, both in his deposition and in their motion, may have been strategic, but is now fatal. Mr. George's opinions are founded upon his independent analysis of the marketplace for metallic transaction cards, specifically those designed by Mareiners, using established resources and data.

### B.   ANOMATIC'S VALUATION OF THE IMAGE ANODIZED TRANSACTION CARD OPPORTUNITY

Prior to entering into a contract with Mareiners, Anomatic internally developed a six-year proforma including unit sales, expenses, revenue, profits and royalties from the sale of Mareiners' image anodized transaction cards manufactured by Anomatic ("Anomatic's Projections"). *See* Anomatic Projections, ECF 98-5 at PageID 1376; *see also* Ex. 5, Steve Rusch Depo., pp. 167:15-173:12. Anomatic's Projections were initially created by Steve Rusch, Anomatic's Vice President for New Products. *Id.* He then reviewed them with Scott Rusch and Mark Ormiston and "given their collective 70 years of experience," adjustments were made to the numbers. *Id.* The following

projections were provided to Mr. Goertzen on March 22, 2018, after the three "felt comfortable presenting to Mr. Goertzen" for "purposes of him considering a relationship with Anomatic" (*Id.* at 170:25-172:11):

On Mar 22, 2018, at 01:32 PM, Steve Rusch <SRusch@anomatic.com> wrote:

Reiner and Cory,

Below is a snapshot of the phased approach we are envisioning to scale production to support the projected sales. Note from a timing perspective, the investment correlated to the installed capacities will move up, but for ease of understanding I have these listed directly side-by-side. For eg., we are projecting to invest $8M in 2019 to support a capacity expansion at our current facility in New Albany, Ohio, which would very likely run concurrent to the design and build of a new state-of-the-art facility.

To complete our Phase 1 analysis for Proof of Market and Proof of Principle, our expectation is for the following:
   i.  Identify and validate the production process, equipment required and the costs for capital and manufacturing.
   ii.  Validate the product through customer submissions and line trials to ensure the product is compliant to industry standards.
   iii.  Exhibit at the ICMA Expo with Reiner to show the product and hear first-hand from the industry and potential customers to validate the market opportunity.

| | Year | Unit Sales | Selling Price | Gross Sales | Proj Ano Investment | Capacity | Commission % | MARINERS $ | Notes |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | PROJECTED CAPACITY BUILD-OUT, SALES & COMMISSION SCHEDULE | | | | |
| PHASE I | 2018 Q3 | 500,000 | $10.00 | $5,000,000 | $2,000,000 | 6,000,000 | 2.5% | $125,000 | Production Startup - Outsource Fab |
| | 2018 Q4 | 1,200,000 | $10.00 | $12,000,000 | $1,000,000 | | 3.0% | $360,000 | Production Startup - Outsource Fab |
| | 2019 Q1 | 1,200,000 | $10.00 | $12,000,000 | null | | 3.0% | $360,000 | In-house Fab |
| PHASE II | 2019 Q2 | 1,500,000 | $9.00 | $13,500,000 | $1,000,000 | | 3.0% | $405,000 | In-house Fab |
| | 2019 Q3 | 3,000,000 | $8.00 | $24,000,000 | $8,000,000 | 15,000,000 | 3.0% | $720,000 | New Anodizing Line & Capacity Expansion at Company HQ |
| | 2019 Q4 | 3,500,000 | $8.00 | $28,000,000 | | | 3.0% | $840,000 | |
| PHASE III | 2020 Q1 | 15,000,000 | $7.00 | $105,000,000 | $50,000,000 | 100,000,000 | 3.0% | $3,150,000 | New Dedicated Manufacturing Site Incl Equipment for Installed Capacity of 100M |
| | 2020 Q2 | 20,000,000 | $6.50 | $130,000,000 | | | 3.0% | $3,900,000 | |
| | 2020 Q3 | 35,000,000 | $6.00 | $210,000,000 | $40,000,000 | 200,000,000 | 3.0% | $6,300,000 | Capacity Expansion |
| | 2020 Q4 | 45,000,000 | $5.50 | $247,500,000 | | | 3.0% | $7,425,000 | |
| PHASE IV | 2021 | 150,000,000 | $5.00 | $750,000,000 | $75,000,000 | 400,000,000 | 3.0% | $22,500,000 | Capacity & Facility Expansion |
| | 2022 | 250,000,000 | $4.50 | $1,125,000,000 | | | 3.0% | $33,750,000 | |
| | 2023 | 300,000,000 | $4.00 | $1,200,000,000 | $40,000,000 | 500,000,000 | 3.0% | $36,000,000 | Capacity Expansion |
| | 2024 | 400,000,000 | $4.00 | $1,600,000,000 | $10,000,000 | | 3.0% | $48,000,000 | Capacity Expansion |
| | | | | | $227,000,000 | | | $163,835,000 | |

Please let us know your availability to again discuss.

Thanks and Best

Anomatic Projections, ECF 98-5 at PageID 1376. As noted by Steve Rusch, the Anomatic Projections were provided with the intent that Mr. Goertzen would rely upon them:

> Q: Did you expect that Mr. Goertzen would rely upon this information in making a decision on whether to enter into a further agreement with Anomatic?
>
> A: Well, sure.

Ex. 5, Steve Rusch Depo. at 173:8-12.

Following attendance at the 2018 ICMA Show, Anomatic provided nearly identical projections to THG, its German parent, in April of 2018, albeit with higher projected revenue (*Id.* at 178:12-181:2):

8

**CONFIDENTIAL**

# PROJECTED PRODUCTION SCALE & SALES SUMMARY



- See next slide for detailed capital investments to support capacities

| | Year | Unit Sales | Selling Price | Gross Sales | Proj Ano Investment | Capacity | Commission % | MAREINERS $ | Notes |
|---|---|---|---|---|---|---|---|---|---|
| PHASE I | 2018 Q3 | 300,000 | $13.00 | $3,900,000 | $2,000,000 | | 2.50% | $125,000 | Production Startup - Outsource Fab |
| | 2018 Q4 | 1,000,000 | $13.00 | $13,000,000 | $1,000,000 | 5,000,000 | 3.00% | $360,000 | Production Startup - Outsource Fab |
| | 2019 Q1 | 1,000,000 | $13.00 | $13,000,000 | null | | 3.00% | $360,000 | In-house Fab |
| | 2019 Q2 | 1,200,000 | $10.00 | $12,000,000 | $1,000,000 | | 3.00% | $405,000 | In-house Fab |
| PHASE II | 2019 Q3 | 3,000,000 | $8.00 | $24,000,000 | $8,000,000 | 15,000,000 | 3.00% | $720,000 | New Anodizing Line & Capacity Expansion at Company HQ |
| | 2019 Q4 | 3,500,000 | $8.00 | $28,000,000 | | | 3.00% | $840,000 | |
| PHASE III | 2020 Q1 | 15,000,000 | $7.00 | $105,000,000 | $50,000,000 | 100,000,000 | 3.00% | $3,150,000 | New Dedicated Manufacturing Site |
| | 2020 Q2 | 20,000,000 | $6.50 | $130,000,000 | | | 3.00% | $3,900,000 | Incl Equipment for Installed Capacity of 100M |
| | 2020 Q3 | 35,000,000 | $6.00 | $210,000,000 | $40,000,000 | 200,000,000 | 3.00% | $6,300,000 | Capacity Expansion |
| | 2020 Q4 | 45,000,000 | $5.50 | $247,500,000 | | | 3.00% | $7,425,000 | |
| PHASE IV | 2021 | 150,000,000 | $5.00 | $750,000,000 | $75,000,000 | 400,000,000 | 3.00% | $22,500,000 | Capacity & Facility Expansion |
| | 2022 | 250,000,000 | $4.50 | $1,125,000,000 | | | 3.00% | $33,750,000 | |
| | 2023 | 300,000,000 | $4.00 | $1,200,000,000 | $40,000,000 | 500,000,000 | 3.00% | $36,000,000 | Capacity Expansion |
| | 2024 | 400,000,000 | $4.00 | $1,600,000,000 | $10,000,000 | | 3.00% | $48,000,000 | Capacity Expansion |
| | | | | $5,461,400,000 | $227,000,000 | | | $163,835,000 | |

Ex. 3, April 4, 2018, AnoCard Executive Summary, p. 13 (ANOMATIC00098945-00098958). These updated projections reflected Anomatic's "best understanding of the marketplace moving forward at that time" especially coming out of the ICMA Show." Ex. 5, Steve Rusch Depo., pp 180:13, 180:25-181:3. Following the presentation, THG noted its support and willingness to invest $2 million in production. *Id.* at 182:15-184:1.

Anomatic's Projections are inherently reliable as they were produced based upon 8 months of due diligence into Mareiners' image anodized transaction cards, 70 years of collective manufacturing experience, attendance at the ICMA Show in March of 2018, and with the intent that Mareiners and its German parent would independently rely upon the figures for purposes of contracting and investment. While Anomatic may want to dismiss its own projections now, the Court should not dismiss Mr. George for relying upon them as a data point in assessing damages. As noted below, these projections were never tested as Anomatic halted all production for reasons unrelated to Mareiners' process or the market opportunity. Ex. 2, Scott Rusch Depo., pp. 167:20-174:17.

## C.  ANOMATIC'S THIRD-PARTY PEER REVIEW OF THE IMAGE ANODIZED TRANSACTION CARD OPPORUTNITY

Mr. George's reliance upon Anomatic's Projections is in part based upon the fact that Anomatic retained L.E.K. Consulting to review its projections.  George Report, ECF 98-4 at PageID 1347, fn. 18. When Anomatic requested that THG invest $4.2 million, THG's Jurgen Heite recommended Anomatic's Scott Rusch obtain a market study on the metal card market. Ex. 6, Anomatic Emails Regarding LEK. Anomatic paid L.E.K. $250,000 to study the market for anodized aluminum credit cards. *Id*.  On July 30, 2019, L.E.K. issued its report. See Ex. 7, L.E.K. Consulting Report. On October 17, 2019, THG approved the $4.3 million investment into AnoCARDS.  Ex. 6.

By the end of Q3 of 2019, however, Anomatic's Scott Rusch had terminated the AnoCARDS project in order to focus on the company's traditional core business – cosmetics: "I was closing down all activities related to AnoCARDS." Ex. 2, Scott Rusch Depo., pp. 167:20-174:17. The decision was unrelated to AnoCARDS-- a major customer had canceled an order that amounted to 30% of Anomatic's revenue. *Id*. at 189:3-10.  "Specifically on AnoCards, at this point, we had, for the most part, stopped all development costs and all actions or input from engineering, and the only person that really was instructed to keep going in development was Mark Ormiston" who had no budget or timeline for his efforts. *Id*. at 424:20-426:10.

At the time AnoCARDS was shut down, Anomatic's engineers knew that that they had the ability to use Mareiners' process to meet demand, i.e., it was scalable.  Ex. 2, Scott Rusch Depo, pp 427:10-12 (noting that Jeff Godwin and Troy Hobbs were working to scale ████████); Ex. 8, Jeffrey Godwin Depo., pp 34:3-38:11; Ex. 9, Troy Hobbs Depo., pp. 49:1-52:2. Mr. Hobbs and Mr. Godwin were principally responsible for scaling Mareiners' process and confirmed that they could manufacture 5 million units annually, the figure that Anomatic had agreed to in November

10

of 2017. Ex. 5, Steve Rusch Depo. pp 113:21-116:10 (stating that in consultation with internal manufacturing process experts, Anomatic agreed it could produce 5 million cards annually).

Anomatic concealed its decision to halt all production. On March 8, 2022, Anomatic disclosed for the first time that "the ████████ process development work remains on hold." Ex. 10, March 8, 2022, Email between Rusch and Goertzen (ANOMATIC00033647). This was the same day that Anomatic revealed it had sought a patent on Mareiners' anodized aluminum card body. On March 8, 2022, Steve Rusch disclosed that "Anomatic has successfully patented the 'contact only' AnoCard" that "has been validated by FIME and subsequent report . . . ." Ex. 18, Email dated March 22, 2018 from Steve Rusch to Reiner Goertzen, Deposition Ex. 189. In one breath, Mareiners learned that its innovation was validated by FIME, but unavailable to anyone but Anomatic due to Anomatic's secret patent.

### D. CHRIS MOLKE OF CATALYST CARDS AND ALCHEMY PLASTICS PRODUCED USA CARDS BUSINESS PLAN AND PROFORMA

In conjunction with the above data, Mr. George reviewed and relied upon Chris Molke's analysis of the market opportunity that existed for Mareiners at the time Anomatic unlawfully secured its first of three patents on Mareiners' image anodized transaction cards. It is appropriate for an expert to rely upon the work of other experts in completing their analysis. *In re Davol, Inc.*, 546 F. Supp. 3d 666, 676 (S.D. Ohio 2021) ("An expert is able to base an opinion on another expert witness for a point of expert knowledge not personally possessed. . . . Thus, experts with appropriate expertise may review scientific literature and other expert reports to form their opinions."); *Buck v. Ford Motor Co.*, 810 F. Supp. 2d 815, 844 (N.D. Ohio 2011) ("an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts," especially if "an expert's consultation of another expert's opinion is a resource 'reasonably relied upon by experts in the particular field'"); *Saginaw Chippewa Tribe of Mich. V. Blue Cross Blue*

*Shield of Mich.*, 745 F. Supp. 3d 524, 534 (E.D. Mich. 2024) (explaining that "an expert may rely on the opinions and conclusions of other experts when forming their own independent conclusions throughout their independent investigation" so long as he does not "'parrot,' 'echo,' 'regurgitate,' or 'bootstrap' the opinion or conclusion of another expert without any independent evaluation or analysis,"). Mr. Molke's analysis of the credit card opportunity is based upon reliable and actual data obtained by Mr. Molke through his years of experience manufacturing and selling credit cards. Molke Dec., ECF 97-3, PageID 1074.

At the outset, Anomatic has not challenged Mr. Molke's expertise in the field of credit card manufacture and sales, including his expertise in the area of the production of proformas addressing the costs associated with manufacturing credit cards and the associated revenue that comes from the sale of transaction cards. While Anomatic has challenged Mr. Molke's ability to read a patent on a credit card body, Mr. Molke's expertise and opinions expressed in USA Cards Business Plan is not challenged, for good reason. Mr. Molke completed an MBA in Finance at Fairleigh Dickenson in 2000 before joining sales and new product development teams at AT&T. Molke Dec., ECF 97-3 at PageID 1068[2]; Ex. 11, Molke Depo, pp 15:5-16:25. He progressed to PMC in Vancouver where he led 900 technical engineers in the development and distribution of chip design for consumer products, including a revolutionary chip module used in cable modems and routers. Molke Dec., ECF 97-3 at PageID 1069; Ex. 11, Molke Depo at p 17. Under Mr. Molke's leadership, PMC was able to secure 30% of the global market for these innovative products.

In 2006, Mr. Molke founded Alchemy Plastics, a global leader in the manufacture of magnetic strips, overlays and adhesives that are sold to credit card companies for placement on

---

[2] Mr. Molke confirmed during his deposition that the Declaration (ECF 97-3) is his content and that he is prepared to testify to each statement under oath. Ex. 11, Molke Depo. at 24:7-27:24.

PVC, aluminum, steel, carbon, and tungsten transaction cards. Molke Dec., ECF 97-3, PageID 1069; Ex. 11, Molke Depo, pp 12-15. In 2012, he discovered that Visa and MasterCard were going to require its issuers include chips in cards for security. In response, he founded Catalyst Card Company and established the first PCI Compliant card manufacturing facility in the United States that could provide Visa and MasterCard approved chipped credit cards ("EMV")[3]. In fact, he successfully opened two different PCI Compliant[4] manufacturing and personalization facilities in under six months, including a facility in Omaha, NE, which popularized colored edge applications that caused cards to stand out to consumers. Molke Dec., ECF 97-3 at PageID 1070; Ex. 11, Molke depo. pp 46-49. Additionally, Mr. Molke has managed thousands of unique cards bodies through CQM compliance with VISA and Mastercard. Ex. 11, Molke depo. pp 48:22-49:19. Catalyst performed personalization on both PVC and metallic cards, i.e., it added the name and coded the magnetic stripe and chip with the customer's information and account. *Id.* at pp. 30:22-31:12.

Mr. Molke was uniquely qualified to produce the USA Cards Business Plan. Catalyst was one of twelve companies in the United States that manufactured and sold credit cards. *Id.* at pp. 178:07-16. At the time of sale in 2019, Catalyst supplied major banks, credit unions, community banks and third-party processors with completed cards inside of a week or less. Molke Dec., ECF 97-3 at PageID 1070. As CEO of Catalyst, Mr. Molke regularly accessed historical data, industry trends and customer demands to generate proformas forecasting financial performance. *Id.* His projections were a reliable tool used by Catalyst to ensure success as a company. *Id.*

### E. MOLKE'S EXPERIENCE WITH IMAGE ANODIZED TRANSACTION CARDS LEADING TO THE GENERATION OF USA CARDS BUSINESS PLAN AND PROJECTIONS.

---

[3] EMV (Europay, MasterCard, Visa) cards, commonly referred to as "chip cards", store data on circuit chips in addition to magnetic stripes for backward compatibility with transaction card readers.
[4] PCI Compliance is a required certification a manufacturer must get from VISA and MasterCard in order to use their logos and holograms on the cards. Ex. 11, Molke Depo. pp 29:17-30:6

Mr. Molke was introduced to Mr. Goertzen in 2017 by Ms. Dori Skelding of VISA. Ex. 11, Molke Depo. 27:10-29:02. Mr. Molke did sample work for Mareiners before Mareiners approached Anomatic, including "testing DOD, drop on demand, lasering, milling and bedding, personalization of the chip to make sure there wasn't any crosstalk." *Id*. at pp 32:5-33:7. Through Catalyst, Mr. Molke was engaged in the process of bringing Mareiners' image anodized transaction card to market as the personalizer, and with Anomatic as the job shop anodizer. *Id*. at pp 170:1-172:9, 176:18-177:06.

As Anomatic explored coming to market with Mareiners' image anodized credit card, Anomatic considered constructing its own PCI Compliant credit card manufacturing facility. As Mr. Molke had sold Catalyst, Anomatic "brought me out to their facility. They had expressed to me that they had an interest to become PCI certified; that they had no background in card manufacturing, so they were looking to bring in an expert to bring their facility up to speed so that they could produce cards." *Id*. at pp 73:10-14. In January of 2020, Mr. Molke presented a proposal to Anomatic that included two different paths to market. *Id*. at pp 78:20-83:11. Mr. Molke's first proposal called for a third party, such as Catalyst, to add the secure elements to the card after the card body was image anodized using Mareiners' process. *Id*. at pp 79:20-83:11; Ex. 12, January 16, 2020, email from Molke to Steve Rusch, Deposition Exhibit 67. The second proposal called for Mr. Molke to construct a PCI Compliant manufacturing facility at Anomatic for $386,250 in capital expense. *Id*. at 78:4.

When Anomatic's pace to market waned for reasons that were never shared with Mareiners, Mr. Molke and Mr. Cory Baer discussed the option of forming a new company that would license Mareiners' technology and take advantage of the demand for metallic transaction cards. Ex. 13, Baer Depo., 57:03-57:25, 59:13-60:18. Mr. Baer had been working with Mareiners

since 2015 to assist it in monetizing the technology and was now stepping in an operator with Mr. Molke. *Id.* Mr. Molke produced a cost estimate reflecting the capital that would need to be raised in order to open an image anodizing facility (Ex. 11, Molke Depo, pp. 113-124):

### Cost Timeline

| | TOTAL | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 |
|---|---|---|---|---|---|---|---|---|---|---|
| Building - Lease | $450,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 |
| Employees/Benefits | $1,450,000 | $50,000 | $50,000 | $50,000 | $50,000 | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 |
| Tenant improve | $700,000 | $250,000 | $250,000 | $200,000 | | | | | | |
| Equipment | | | | | | | | | | |
| | $10,000,000 | $3,000,000 | | $5,000,000 | | $2,000,000 | | | | |
| Personalization/Ful | $14,000,000 | $4,200,000 | | $7,000,000 | | $2,800,000 | | | | |
| Working Capital | $1,000,000 | | | $500,000 | | | $500,000 | | | |
| TOTAL | $27,600,000 | $7,550,000 | $350,000 | $12,800,000 | $100,000 | $5,100,000 | $800,000 | $300,000 | $300,000 | $300,000 |

USA Cards Business Plan, ECF 98-6 at PageID 1391. Based upon his success in opening two PCI-Compliant credit card manufacturing facilities, Mr. Molke produced a detailed, 6-9 month project management timeline associated with achieving a production ready facility. USA Cards Business Plan, ECF 96-6 at PageID 1389-90; Ex. 11, Molke Depo. pp 90:5-92:9; 113-124; 184:02-124:16 (stating that he was 100% confident USA Cards would have been in production in accord with these timelines given his experience). Mr. Molke then produced projections based upon data published by ICMA as well personal experience in establishing and operating PCI Compliant facilities, personal knowledge from working in the transaction card space and information from longstanding clients and contacts. Molke Dec., ECF 97-3 at PageID pp. 1075-76; Ex. 11, Molke Depo, pp.127:11-130:9; 131:10-132:6. This included customers that USA Cards and/or Mareiners had already connected with regarding the product and had expressed demand for the product. *Id.* at pp. 146:01-147:09.

Using his contacts in the investment world, and the USA Cards Business Plan, Mr. Baer secured $30 million of investment from a pool of investors, including his own firm: "Part of it was

going to be from a couple of institutions, ours included, Strait & Sound included, that would include a number of smaller investors, but I would count those each as one in and of themselves; and then there was three individuals."[5]  Ex. 13, Baer Depo., pp. 69:7-72:21 (stating "we had what we needed"); *see also* Ex. 11, Molke Depo., pp. 154:2-154:19.  At the time Anomatic's patent was revealed, USA Cards had lined up a manufacturing facility and a team that would operate the facility in accord with the time line set forth in ECF 98-6 at PageID 1389-90, (Ex. 11, Molke Depo., pp. 119:23-119:15), including Mr. Goertzen and his licensee Jamie Maack to assist with image anodizing.  *Id*. at pp 180:05-183:2  Mr. Molke terminated the lease when Anomatic's patents were issued and revealed.  *Id*. at pp 155:5-8, 191:19-192:16.

Based upon the funding Mr. Baer had secured and the infrastructure that Mr. Molke had arranged, USA Cards expected to be manufacturing image anodized transaction cards by January of 2023.  Upon learning of Anomatic's patent issued in November of 2021, USA Cards ceased all operations and did not start to revenue generate by the end of 2022.  For this reason, the damages have been calculated starting January of 2023.

## III.    ARGUMENT

Federal Rule of Evidence 702 governs the admissibility of expert testimony and generally requires that (1) the expert "be qualified by 'knowledge, skill, experience, training, or education'"; (2) the expert's testimony be relevant such that it "will assist the trier of fact"; and (3) the expert's testimony be reliable. *In re Scrap Metal Antitrust Litigation,* 527 F.3d 517, 528-29 (6th Cir. 2008) (quoting Fed. R. Evid. 702). Relevance "requires a valid scientific connection to the pertinent inquiry as a precondition for admissibility." *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 592 (1993). Relevant evidence is "sufficiently tied to the facts of the case" such that it will "aid

---

[5] Anomatic expressly opted against asking for the identities of the other investors: "Aaron Williams: Yeah. I will – just for the record, I'm not planning to try to dig into individual names." Ex. 13, Baer Depo., pp 66:12-68:03.

16

the jury in resolving a factual dispute." *Id.* at 591 (quoting *United States v. Downing,* 753 F.2d 1224, 1242 (3d Cir. 1985)). Reliability speaks to whether an expert's testimony "is based upon `sufficient facts or data,' whether the testimony is the `product of reliable principles and methods,' and whether the expert `has applied the principles and methods reliably to the facts of the case." *Scrap Metal,* 527 F.3d at 529 (quoting Fed. R. Evid. 702). "The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *Scrap Metal,* 527 F.3d at 529-30. To meet this task, the district court "must concentrate 'solely on principles and methodology, not on the conclusions that they generate.'" *Ask Chola., LP v. Comput. Packages, Inc.,* 593 F. App'x 506, 509 (6th Cir. 2014) (quoting *Daiibert,* 509 U.S. at 595).

### A. GEORGE VALUED THE OPPORUTNITY LOST WHEN ANOMATIC SECURED A MONOPOLY OVER MAREINERS' INNOVATION

#### 1. Proper summary of George's Damages Model

Mr. George properly valued the opportunity lost[6] when Anomatic secured the first of three patents on the transaction card that Mareiners asked Anomatic to mass produce, not patent. Mr. George identified the market that Mareiners was set to monetize through its licensee USA Cards but for the existence of a monopoly created by the patents. Mr. George relied upon data and projections generated by third parties, namely ICMA, USA Cards, and Mr. Molke to define the

---

[6] Lost business opportunity is a damages theory recognized by Ohio courts. *See Hanuman Chalisa, LLC v. BoMar Contracting, Inc.*, 10th Dist. No. 20AP-406, 2022-Ohio-1111, 187 N.E.3d 1108, 1115 (Ohio Ct. App. 2022) (explaining breach of contract expectation "damages include future lost profits"); *Andrew v. Power Mktg. Direct, Inc.*, 10th Dist. No. 11AP-603, 2012-Ohio-4371, 978 N.E.2d 974, 992 (Ohio Ct. App. 2012) ("The remedies available for breach of contract . . . include both actual and consequential damages, such as lost future profits."); *Yagour Grp., LLC v. Ciptak*, 8th Dist. No. 112846, 2024-Ohio-73, 233 N.E.3d 840, 852 (Ohio Ct. App. 2024) (explaining the requirements and standard for recovering under such a theory).

market and available opportunity through USA Cards and tested that market by accessing published reports from Nilson. Mr. George then tested the market opportunity by assessing the projections produced by Anomatic's 70 years of experience, as buttressed by L.E.K. analysis of the same market. Mr. George's report sets for a reasonable model valuing the following lost opportunities:

- USA Cards operations generating 10% royalties on sale of Mareiners' image anodized transaction cards starting in January of 2023 based upon the USA Cards Business Plan created by Mr. Chris Molke.

- A proxy company[7] generating 10% royalties on the sale of Mareiners image anodized transaction cards in place of Anomatic, who exited the market with monopoly in hand, using Anomatic's Projections

Mr. George relied upon available and reliable record evidence to recreate the market for image anodized credit cards without Anomatic's patents, using data from ICMA, Nilsen, USA Cards, Anomatic, L.E.K. and the published references to determine the market opportunity. Anomatic's criticisms make for proper cross examination, but do not support exclusion.

### 2. George relied upon trusted and appropriate data and made reasonable assumptions based upon the record evidence.

Mr. George reasonably relied upon established facts to express his opinion. *See Saginaw Chippewa*, 745 F. Supp. 3d at 534 (explaining the types of evidence experts may rely upon, including the reports of other experts). Anomatic seeks to inject uncertainty where none exists.

### i. *USA Cards and Mareiners agreed upon a 10% royalty prior to the creation of the USA Cards business plan and projections.*

Mr. George based the damages model upon the royalty percentage that USA Cards had agreed to pay Mareiners for the use of Mareiners' Process to produce Mareiners' image anodized

---

[7] Michael Kelner of HardCoat confirmed in his deposition that he was prepared to fill the void left by Anomatic but only after Anomatic's patent ownership is addressed. Ex. 17, Michael Kelner Depo., pp. 146:09-149:24.

transaction cards. Ex. 11, Molke Depo, pp 99:9-16 ("Q: What would you be paying a 10% royalty for? A: The use of Reiner's intellectual property and trade secrets."). On December 17, 2020, USA Cards sent Mr. Goertzen the business plan with the corrected Royalty of 10% royalty on image anodized card sales:

| USA Cards, Inc. 5-Year ProForma Conservative Sales Projections | | | | | |
|---|---|---|---|---|---|
| Description | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
| Projected Income | | | | | |
| Income | | | | | |
| Sales | | | | | |
| Unit Sales as Percentage of 2019 TAM | 1.37% | 4.02% | 8.67% | 12.27% | 18.44% |
| Anodized | $ 56,712,500 | $ 150,650,000 | $ 319,500,000 | $ 446,400,000 | $ 683,500,000 |
| PVC | $ 23,250,000 | $ 76,000,000 | $ 163,435,000 | $ 301,125,000 | $ 374,820,000 |
| Perso and Fulfillment | $ 9,309,375 | $ 31,257,000 | $ 73,768,000 | $ 133,389,000 | $ 172,765,000 |
| Shipping and Delivery Income | $ 250,875 | $ 913,500 | $ 2,168,000 | $ 4,251,000 | $ 5,695,000 |
| Total Sales | $ 89,522,750 | $ 258,820,500 | $ 558,871,000 | $ 885,165,000 | $ 1,236,780,000 |
| Total Income | $ 89,522,750 | $ 258,820,500 | $ 558,871,000 | $ 885,165,000 | $ 1,236,780,000 |
| Cost of Goods Sold | | | | | |
| Productions Costs (Anodized Cards) | $18,148,000 | $46,701,500 | $95,850,000 | $129,456,000 | $184,545,000 |
| Productions Costs (Plastic Cards) | $10,462,500 | $33,440,000 | $71,911,400 | $123,461,250 | $153,676,200 |
| Production Costs (Royalty for Imaging Patent) | $7,996,250 | $22,665,000 | $48,293,500 | $74,752,500 | $105,832,000 |
| Productions Costs (Personilization and Fulfillment) | $1,675,688 | $5,313,690 | $12,540,560 | $21,342,240 | $27,642,400 |
| Freight and Shipping Costs (Fulfillment) | $ 245,858 | $ 895,230 | $ 2,124,640 | $ 4,165,980 | $ 5,581,100 |
| Total Production Expense | $ 38,528,295 | $ 109,015,420 | $ 230,720,100 | $ 353,177,970 | $ 477,276,700 |
| Total COGS | $ 38,528,295 | $ 109,015,420 | $ 230,720,100 | $ 353,177,970 | $ 477,276,700 |
| Gross Profit | $ 50,994,455 | $ 149,805,080 | $ 328,150,900 | $ 531,987,030 | $ 759,503,300 |

USA Cards Business Plan, ECF 98-6 at PageID 1389-90. With no testimony or document that refutes the agreed upon royalty rate, Mr. George should be expected to use a 10% royalty rate in his damages model. That Anomatic leads with this argument is revealing.

        *ii.*     *USA Cards knew how to use Mareiners' process to produce cards.*

Mr. George properly relied upon the fact that USA Cards had ready access to multiple experts in image anodizing to assist with the production of image anodized transaction cards. Mr. Reiner Goertzen, the principal innovator of the image anodized transaction card, was set to provide the necessary image anodizing expertise through his licensees. Ex. 11, Molke Depo., pp 180:16-182:24. US Anodize and Jamie Maack were providing expertise and consultation. *Id.*

### iii. USA Cards had obtained $30 million in investment to pursue the image anodized aluminum credit card opportunity.

Mr. George rightly relied upon the record evidence that USA Cards had established $30 million in initial investment to fund the capital needs detailed in USA Cards Business Plan. Ex. 13, Baer Depo., 66:12-68:03, 69:7-72:21 (stating "we had what we needed"). Mr. George interviewed Mr. Molke and Mr. Baer regarding USA Cards capital needs and the established funding to confirm. George Depo., ECF 98-3 at PageID 1165-67. Importantly, Anomatic elected against questioning Mr. Baer regarding the precise source of the funding despite his willingness to provide the sources under the protective order. Ex. 13, Baer Depo., 66:12-68:03, 69:7-72:21 (stating "we had what we needed"). Mr. George relied upon the record evidence, rather than assumed, that USA Cards was properly capitalized.

### iv. Technical, scientific and regulatory challenges were accounted for in USA Cards business plan and projections.

Anomatic has not identified the technical, scientific and regulatory challenges that existed sufficient to impact USA Cards Business Plan. The record evidence establishes that any hurdles would be addressed as detailed in USA Cards Timeline (ECF 98-6 at PageID 1389-90) by Chris Molke, his team, and Mr. Goertzen/Mr. Maack. After all, Mr. Molke had opened two PCI Compliant credit card facilities, had obtained approval for over 3000 credit card bodies from VISA, MasterCard, etc., and Anomatic had obtained FIME certification as late as 2019 for Mareiners aluminum transaction card.

Here, Anomatic leans on its own failures to suggest that Mr. George should have assumed USA Cards would have similarly failed. This argument should be left for cross examination particularly when Anomatic's failure to enter the market was driven by unrelated forces and the decision of Mr. Scott Rusch to focus on Anomatic's core business – cosmetic packaging such as caps and lids. Ex. 2, Scott Rusch Depo., pp. 167:20-174:17.

#### v. *Record evidence establishes ready demand for Image Anodized Cards*

Mr. George relied upon countless documents in this case that establishes the demand for image anodized transaction cards. Once again, Anomatic has attempted to inject uncertainty where none existed. *See e.g.*, Ex. 6. Anomatic attended the ICMA Show in 2018, met with JP Morgan Chase, AMEX, Capital One, US Bank and others and concluded that the demand supported its proformas. Absent from Anomatic's Motion is any evidence that the market for image anodized cards was soft or anything other than what Anomatic, KEP and USA Cards projected. There is no reason for Mr. George to undermine these projections when they are directly based upon ICMA data, as confirmed by Nilson.

#### vi. *Record evidence establishes that USA Cards would have scaled its operations to meet the market demand.*

USA Cards identified its plan to scale production using the team from Catalyst and the anodizing expertise of Mr. Maack and Mr. Goertzen. Mr. George's assumption that USA Cards could scale is supported by Anomatic's similar belief that it could scale production. At the time AnoCARDS was shut down, Anomatic's engineers knew that that they had the ability to use Mareiners' process to meet demand, i.e. it was scalable. Ex. 8, Godwin Depo., pp. 34:3-38:11; Ex. 9, Hobbs Depo., pp. 49:1-52:2.

#### vii. *Record evidence establishes that USA Cards growth would have tracked the market demand.*

Mr. George properly assumed that USA Cards would be able to attract market share with a metal transaction card that was priced at 10-20% of the price for metal cards on the market. Mr. George properly relied upon Mr. Molke's experience within the industry on pricing and on the available market share for image anodized transaction cards, while referencing IMCA and Nilson to ensure that the overall market was being properly stated.

Anomatic's reliance upon Kevin McElroy to suggest that Mr. George's report is unreliable is highly problematic. Regarding Mr. Molke, Mr. McElroy noted that he "has significant experience in the credit card transaction card space. You know, there are obvious elements of this particular card that are different from your normal card, and so, you know, how much experience he has relevant to the things that prove most challenging about this project, that's something I don't have as much of a basis for knowing, but, you know, I take your representation of his experience and not an industry expert, but where I'm sitting, it seemed like ample experience in the credit card industry." Ex. 14, Kevin McElroy Depo, pp 108:11-109:09. Regarding the Anomatic Projections, Mr. McElroy agreed that they do illustrate a potential market opportunity for Mareiners:

> **Q. And the chart is called: Projected Capacity Buildout Sales and Commission Schedule. Would you agree with me that this chart illustrates a potential opportunity for Mareiners with Anomatic?**
>
> A. I mean, I think that's certainly a reasonable conclusion to draw from the document. Mareiners has mentioned specifically Anomatic is who's sending the e-mail, so I would draw that conclusion.

*Id.* at pp. 91:15-93:5. While Mr. McElroy is of the opinion that Anomatic's failure to come to market is evidence that USA Cards could not come to market, Mr. McElroy demonstrated a fundamental lack of knowledge regarding the actual reasons Anomatic did not come to market. *Id.* at 52-109. Mr. McElroy did not know that Anomatic lacked prior experience with credit card manufacturing. *Id.* at 52:8-24. He was unaware that Anomatic provided the Anomatic Projections to THG for its use in assessing the opportunity. *Id.* at 79:17-23. He did not know what Anomatic had done to evaluate Mareiners' Process. *Id.* at 80:22-81:10. He did not know that Mareiners had provided Anomatic with manufacturing specifications including the ISO standards. *Id.* at 81:21-84:23. He was unaware of what Anomatic had done in terms of due diligence from August of 2017

to March of 2018 before finalizing the Anomatic Projections.  *Id*. at 87:09-87:23.  He did not know

that his source, Mr. Ormiston, had handed off the task of determining if the Mareiners Process

could be scaled to Troy Hobbs and Jeff Godwin, *Id*. at 87:24-88:18, both of whom testified that

the process was scalable. Ex. 8, Godwin Depo., pp 34:3-38:11; Ex. 9, Hobbs Depo., pp. 49:1-52:2.

Mr. McElroy did not know that Anomatic had received FIME Certification by the end of 2019.

*Id*. at pp. 94:15-95:18. He was unaware the card that passed FIME certification had the features

Mareiners brought to Anomatic in 2017.  *Id*. at 98:17-99:1. Finally, he did not know that in

September of 2019, Scott Rusch "put a stop to all AnoCard work due to reasons unrelated to the

project." *Id*. at 99:2-101:5.

     Mr. George's opinions, founded on the actual facts of the case and the testimony of true

experts in the industry such as Mr. Molke, stand upon a reliable foundation of known and provable

facts. *See Davol*, 546 F. Supp. 3d at 676 (explaining proper sources for experts to rely upon);

*Saginaw Chippewa*, 745 F. Supp. 3d at 534–35 (same). Mr. McElroy's criticisms fail to erode that

foundation. The jury should consider the opinions of both experts in assessing the case and the

damages caused by Anomatic's conduct.

     **3.  George used expertise and reliable methods to select a discount rate.**

     Mr. George selected a 14% discount rate using the Kroll Cost of Capital Navigator.  This

was a proper method to assess the risk associated with credit card manufacturing and sale as

described in the publications he reviewed from ICMA, Nilsen, the report he reviewed from K.E.P.

as well as extensive work product developed by Anomatic regarding the opportunity from 2018 to

2023.  Exhibit 6 and 7 are examples of the market analysis that Anomatic produced regularly for

its German owner.  Based upon this information, Mr. George accessed the Kroll Cost of Capital

Navigator for the purposes of formulating a proper discount rate using Kroll's equity risk data portfolio.  George Depo., ECF 98-3, PageID 1272-73.

Mr. George testified that the Kroll Cost of Capital Navigator is a commonly used tool for assessing and selecting a proper discount rate.  George Depo, ECF-98-3, PageID 1271-72.  Courts have accepted the use of Kroll in the selection of discount rates. *See, e.g., Ritter v. Johnson*, No. 21-cv-10815-DJC, 2023 WL 6282909, at *4 (D. Mass. Sept. 26, 2023) (applying the Kroll Risk Free Rate in performing the court's own damages award calculation).

 Mr. George used four acceptable inputs to select the discount rate:

1. The risk-free rate

2. The estimated BETA

3. Equity risk premium

4. A size premium

Mr. McElroy does not dispute the use of this tool or the inputs. McElroy Report, ECF 98-8, at PageID 1436.  Anomatic only questions the selection of the estimated Beta in its motion.  Motion to Excluded George, ECF 98-1 at PageID 1143. Mr. George explained in his deposition that he selected a .92 estimated BETA based upon the risk of the market opportunity ultimately being unavailable.  George Depo, ECF 98-3 at PageID 1262-1266.  Mr. George based the assessment of risk upon his review of the data and analysis reviewed from ICMA, Nilsen, K.E.P., Anomatic, USA Cards and his interviews with Chris Molke, an undisputed credit card manufacturing and sales expert. Mr. George's approach of market assessment is an accepted approach.[8] It has been

---

[8] LITIGATION SERVICES HANDBOOK, THE ROLE OF THE FINANCIAL EXPERT (2017), §§ 8.24, 10.2 (explaining businesses must often decide between multiple options for where to invest their capital. Opportunity cost refers to the economic benefit forgone by using a resource for one purpose instead of another and is the appropriate discount rate for companies to evaluate the relationship between risk and return on investment opportunities, because risk is related not only to the entity undertaking the opportunity, but to the opportunity itself.); *Id.* § 10.1 (explaining the value of any asset or project results from its ability

adopted by courts. Properly disclosed and properly anchored in reliable methodology, George's opinion on discount rates should be left to cross-examination and competing expert testimony. *See, e.g., Hutchens v. Abbott Labs., Inc.*, No. 1:14CV176, 2016 WL 10566144, at *4–5 (N.D. Ohio Dec. 22, 2016) (holding expert's choice of single discount rate, instead of time-averaged discount rate, did not render opinion unreliable and was matter for cross examination); *Hill v. Century Arms, Inc.*, No. 3:21-CV-31-TAV-DCP, 2023 WL 7431143, at *4 (E.D. Tenn. Nov. 9, 2023) (holding expert's failure to update calculations from originals using outdated discount rate was matter for cross examination); *Swierczynski v. Arnold Foods Co.*, 265 F. Supp. 2d 802, 809–10 (E.D. Mich. 2003) ("While the parties disagree over the appropriate discount rate . . . this is a matter that goes to weight, rather than admissibility.").

Mr. George's discount period is also appropriate and directly tied to the timing of the harm created by Anomatic's patents. *See Hutchens*, 2016 WL 10566144, at *4–5. Anomatic wrongly states that the damages Mr. George is calculating started on June 18, 2020, when Anomatic's patent application was published by the USPTO. While Mareiners suffered harm when its trade secrets were published by the Anomatic through the USPTO, the harm being assessed by Mr. George did not occur until the patent application was allowed and issued by the USPTO on November 23, 2021.

---

to provide future cash flows. Future cash flows can be derived from businesses, contracts, investments, or projects. The current or present value of a project, a company, or an investment is derived from a calculation of expected cash flows discounted to the present using an appropriate rate.); *Id.* at pp. 18, 28, § 11.6 (explaining a discount rate is applied to account for both the time value of money and the risk or reward of the investment. The appropriate discount rate for the valuation model represents the market rate-of-return requirements for investments with risk characteristics similar to that of the subject asset. And further explaining it is appropriate to adjust the discount rate for cash flow amounts that may be related to a specific project that has different elements from the company as a whole, such as when a company plans to expand its business into a different area in which it has little or no experience.)

Based upon the record, Mr. George understood that USA Cards and Mareiners did not learn of the '655 patent until Q1 of 2022. Mr. Goertzen testified that he learned of the '655 patent when Mr. Steve Rusch disclosed its existence over the phone and then in an email:

> Q:    As we get into 2022, did you continue to have conversations with Mr. Steve Rusch about patents that Anomatic was pursuing?
>
> A:    I did. I mean the only, what tipped me off was I got a phone call where he stated that all customers – oh geez.
> All customers needed to go through Anomatic and it didn't really hit me until 20 days later when I reread it and him saying that all customers had to go through Anomatic and so I brought it up with Steve that my licensees are entitled and he said no, they're not entitled because we have the patent for all metallic or—we have patents around image anodized credit cards.
>
> . . .
>
> Q:    When Mr. Rusch told you that all licensees would have to come through him for credit cards, did you contact Mr. Molke and let him know that?
>
> A:    I did, and told him that from that comment that he made me, that you need to start looking into exactly what these patents entail and that's when I knew that I – that the trust that I had with him was gone. He lied to me the whole time. And not just Steve. I mean Mark, everybody, Scott, the whole Anomatic team was not truthful to me on what they were doing.
>
> Q:    I'm going to give you what's been marked as Exhibit 241. It's an email dated March 8th, 2022. The first bullet point, if you can go ahead and read that into the record?
>
> . . .
>
> A:    "Anomatic has successfully patented the contact-only AnoCARD."
>
> Q:    And that's a statement made by Mr. Rusch to you?
>
> A:    Yes. That's the card I gave him to duplicate at the beginning.
>
> Q:    And when you saw those words for the first time, was that the first time you had learned that Anomatic had sought patents on the product you brought to them?
>
> A:    Yes. That's when I realized that he stole what I developed.
>
> Q:    And when you saw those words, did that lock in what he had said earlier, that the industry would have to come through him?

A:  It made sense why he kept saying 60/90 days the whole time and why he specifically said that every customer you have will now run through Anomatic. No matter if that's CPI or that's Visa or . . . . He said: "I have got control of everything."

Ex. 15, Mareiners' Depo., Vol II, pp 326:2-328:20.  At the time Mareiners learned of the newly issued patent, USA Cards had (1) $30 million in committed funding, (2) manufacturing facilities leased, (3) a business plan that called for a nine month ramp up to production, (4) a leading credit card manufacturing expert, Chris Molke, at the helm, (5) leading anodizing experts at US Anodize and Mareiners to assist with image anodizing and (6) demand from customers such as JP Morgan Chase, US Bank, Capital One, and Tier 2 Banks such as Fifth Third, all of whom have purchased credit cards from Mr. Molke.  Mareiners long time licensee, HardCoat, was also prepared to fill demand for the cards as detailed in Michael Kelner's Deposition.  Based upon the following timeline found in the USA Cards Business Plan, Mr. George understood that USA Cards would be selling transaction cards by the end of 2022 or January of 2023:





USA Cards Business Plan, ECF 98-6 at PageID 1389-90.  It was reasonable for Mr. George to

begin the discount period at the time the evidence establishes that Mareiners would be paid it 10%

royalty by USA Cards on the sale of image anodized transaction cards.

### 4. Mr. George's report is properly tied to Mareiners' breach of contract and trade secret claims.

Mr. George's opinions are relevant to the measure of damages claimed by Mareiners.  Mr.

George was not asked to express an opinion directed to the value of Mareiners' trade secrets,

independently or collectively.  Mareiners provided this testimony through Mr. Goertzen, the owner

of Mareiners and the person with personal knowledge of the value of the Mareiners Process.  His

testimony regarding value was provided in response to Interrogatories 8 and 9.  Ex. 16, Plaintiff

Mareiners, LLC's Third Amended/Supplemental Objections and Responses to Defendant

Anomatic Corporation's Second Set of Interrogatories (4-21), pp 31-40.

Mr. George's opinion is directly relevant to one of the harms claimed in Claims 1-4 – lost

business opportunity.  *Supra* fn. 6 Anomatic routinely misstates Mareiners claims by limiting its

misappropriation case to disclosure.  Mareiners' has consistently claimed that Anomatic breached

its contractual obligations when it used Mareiners' trade secrets to obtain three patents on

Mareiners' image anodized transaction card.  Namely, Anomatic included Mareiners' trade secrets

28

in the specification of the patent application filed on December 12, 2018, for the purposes of convincing the USPTO that it had a new, novel and non-obvious innovation, i.e. an image anodized transaction card as claimed in Claim 1 of the '655 patent.  This patent did not issue until November of 2021 and Mareiners did not learn of its existence until Q1 of 2022.  Mr. George has timed his damages analysis with USA Cards planned market entry in January of 2023.  Anomatic wrongly attempts to assert that the damages period began in 2020.  While Anomatic's patent applications published, Anomatic did not provide the application to Mareiners, and the monopoly created by the application was not established.   Rather, the preclusive effect created by the patent only occurred when the USPTO issued the patent in November of 2021.  Mr. George properly linked his damages analysis with the time when Mareiners and its licensees learned of the patent and stopped their effort to come to market in 2022 or early 2023.

Contrary to Anomatic's motion, Mr. George's opinions are not directed to causation.  He was asked to assume that the jury finds a breach of contract by Anomatic through its improper use of Mareiners' trade secrets. Similarly, he was asked to assume that Anomatic misappropriated Mareiners' trade secret when it used Mareiners' trade secrets to secure a patent on Mareiners' innovation.  His damages analysis tracks the known facts and the timing for the shutdown of USA Cards caused by the reality that Anomatic had cornered the market for contact only credit cards as declared by Mr. Steve Rusch in Q1 of 2022.

**B.  6TH CIRCUIT'S DECISION IN *ENDLESS RIVER* DOES NOT SUPPORT EXCLUSION OF MR. GEORGE'S OPINIONS**

*Endless River* is distinguishable: there, Dr. Malec was tasked with valuing the software in April of 2018, at the time the partnership terminated. *Endless River*, 2025 WL 233659, at *7. He used the plaintiff's own revenue projections created at the outset of a partnership three years earlier, not evidence of the value of the software created by the partnership itself. *Id.* at *7–8. In

29

other words, he relied upon information that was irrelevant to value: "And, in any case, the question for the jury was not what the value of the Quote Exchange would have been had the partnership gone to plan. It was what the value of the Quote Exchange was as of April of 2018 if TransUnion had returned the source code when the partnership was terminated. Given that analytical framework, failure to take into account the progression of the partnership renders the valuation fundamentally unreliable." *Id.* at *8. In stark contrast, here, Mr. George did not rely upon Mareiners' business projections, but instead he relied upon Anomatic's own projections, Mr. Molke's projections regarding the industry (as an undisputed credit card manufacturing and sales expert), as well as analyses from ICMA, Nilsen and K.E.P.

The facts here also sharply contrast those in *Endless River* because there, an important fact the court relied upon was the stark difference between Dr. Malec's projections and the actual success (or rather, lack thereof) of the disputed software to launch a massive industry. *See Endless River*, 2025 WL 233659, at *8 ("Dr. Malec's reliance on the profit projection to the exclusion of Quote Exchange's actual performance is troubling because of the stark gap between the profit projection's estimates and the Quote Exchange's real-world earnings."). That is to say, despite a demonstrated market failure, Dr. Malec unquestioningly relied upon projections showing that the business would be a booming success, despite demonstrated evidence to the contrary. *Id.* But here, in this case, there are no such facts. Indeed, as laid out above, the anodized card business did not fail, nor did the market fail to pan out like in *Endless River*. Instead, Anomatic, for reasons unrelated to the viability of Mareiners' business proposition, unilaterally decided to terminate efforts to pursue the same in favor of focusing on other aspects of its business. And unlike *Endless River* where the market failed to pan out as anticipated, Mareiners (through USA Cards) had demonstrated demand and significant funding to back its projections.

Moreover, with Anomatic having illicitly obtained the Anomatic Patents, Mareiners was unable to pursue the market with other potential players. That is, unlike *Endless River* where the parties' business failed in the market, Mareiners was entirely deprived of the opportunity to even test its models against the realities of the market because of Anomatic's actions at the center of this entire suit. Indeed, Anomatic's own actions are to blame for the untested nature of *all* projections Mr. George relies upon—Anomatic's own projections due to its unilateral decision to exit the market, and the remaining projections based on Anomatic's patent efforts. Therefore, the instant facts are clearly distinguishable from those in *Endless River*.

Dated: March 28, 2025

/s/ Aaron P. Bradford
Aaron P. Bradford (admitted *pro hac vice*)
abradford@taftlaw.com
Stephen J. Segall (admitted *pro hac vice*)
ssegall@taftlaw.com
Tara M. Williams (admitted *pro hac vice*)
twilliams@taftlaw.com
Taft, Stettinius & Hollister LLP
675 Fifteenth Street, Suite 2300
Denver, CO 80202
Telephone: (303) 297-2900
Fax: (303) 298-0940

James D. Abrams (0075968), Trial Counsel
jabrams@taftlaw.com
Taft Stettinius & Hollister LLP
41 South High Street, Suite 1800
Columbus, OH 43215
Telephone: (614) 221-2838
Fax: (614) 221-2007

*Counsel for Plaintiff, Mareiners, LLC*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was served electronically via the Court's CM/ECF system on March 28, 2025, upon counsel for all parties.

*/s/ Aaron P. Bradford*⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣⁣
Aaron P. Bradford

*Counsel for Plaintiff Mareiners, LLC*