# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| **MAREINERS, LLC** | ) | **Case No. 22-CV-03433-EAS-KAJ** |
|  | ) |  |
| Plaintiff, | ) | **Judge EDMUND A. SARGUS, JR.** |
|  | ) | **Magistrate Judge:  Kimberly A. Jolson** |
| v. | ) |  |
|  | ) | **SEALED – CONTAINS HIGHLY** |
| **ANOMATIC CORPORATION** | ) | **CONFIDENTIAL INFORMATION** |
|  | ) |  |
| Defendants. | ) | **ORAL ARGUMENT REQUESTED** |

## PLAINTIFF MAREINERS, LLC'S MEMORANDUM
## IN OPPOSITION TO DEFENDANT ANOMATIC CORPORATION'S
## MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................. **ERROR! BOOKMARK NOT DEFINED.**

LOCA: CIVIL RULE 7.2(A)(3) SUMMARY ........................................................................ VII

I.     INTRODUCTION ................................................................................... 1

II.    FACTUAL BACKGROUND .................................................................. 3

III.   ARGUMENT ......................................................................................... 12

    A.    DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY
        JUDGMENT ON MAREINERS' TRADE SECRET CLAIMS ......................... 13

        1.   Mareiners Has Identified Legally Protectable Trade Secrets. ................. 13

            a.   Mareiners' Process is a combination trade secret. ...................... 14

            b.   Mareiners protected its Process. ................................................. 18

            c.   The undisputed record demonstrates Anomatic recognized
                Mareiners' trade secret................................................................ 20

        2.   Mareiners Sufficiently Identified the Trade Secrets Anomatic
            Misappropriated. ...................................................................................... 22

            a.   Mareiners' Process is Not Vague or Overly Inclusive................ 23

                i.    Mareiners Process Does Not Contain Vague and
                    Undefined Terms ............................................................. 28

                ii.   Summary Judgment is Improper Even if Mareiners
                    Has Not (It Has) Sufficiently Identified the Trade
                    Secrets, .......................................................................... 31

            a.   Whether Mareiners' Disclosed its Two Standalone Trade
                Secrets in the '202 Patent is Irrelevant ...................................... 32

        3.   Genuine Issues of Material Fact Exists As to Whether Defendant
            Misappropriated Mareiners' Process ....................................................... 32

            a.   There is a Genuine Issue of Material Fact as to Whether
                Anomatic Used Mareiners' Process............................................. 34

                i.    Anomatic's Failure to Even Attempt to the Show
                      the Absence of a Genuine Dispute of Material Fact
                      Precludes Summary Judgement on Counts I and II ........ 34

                ii.   Anomatic Used Mareiners' Process in the Anomatic
                    Patents ............................................................................ 36

            b.   There are Genuine Disputes of Material Fact as to Whether
                  Anomatic Disclosed Mareiners' Process in the Anomatic
                  Patents ......................................................................................... 39

        4.   ANOMATIC'S ARGUMENTS REGARDING DAMAGES ARE
            NOT A BASIS FOR GRANTING SUMMARY JUDGMENT ............. 45

        a.      Mareiners Has Put Forth and Identified an Admissible Damages Theory, and, in Liu of Actual Damages, Mareiners is Entitled to Other Relief .......... **Error! Bookmark not defined.**

        b.      Apportionment is Not a Factor in this Case **Error! Bookmark not defined.**

**B.**      ANOMATIC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON MAREINERS' CORRECTION OF INVENTORSHIP CLAIMS ................................................................................ 49

    1.      Mareiners has demonstrated standing to pursue its correction of inventorship claim ...................................................... 51

        a.      Mareiners Has Suffered an Injury in Fact Sufficient to Confer Standing to Pursue Its Correction of Inventorship Claim ............................................................................ 52

           i.    Mr. Goertzen's Assignment is Admissible and Should be Considered ....................................... 53

           ii.   Anomatic's Argument that Mareiners Cannot Have an Ownership Because It Cannot Establish Mr. Goertzen's Sole Inventorship is Meritless ..................... 57

                  *a.*    *Anomatic's Argument that Mareiners Lacks Standing Because It Does Not Have an Ownership Interest is Fundamentally Flawed.* ................................................. 58

                  *b.*    *Evidence in the record supports a finding that Mareiners is the sole inventor of Anomatic's Patents* .............................. 58

                  *c.*    *The parties' Agreements do not prevent Mareiners from having an ownership interest if Mr. Goertzen is found to be a joint inventor* .............................................. 59

                  *d.*    *Mareiners has a suffered an injury sufficient to confer standing* ................................ 62

    2.      Genuine Issues of Material Fact Exist Regarding Mr. Goertzen's Status as an Inventor of the Anomatic Patents ......................... 64

        b.      Substantial Evidence Corroborates Mr. Goertzen's Claim of Inventorship ......................................................... 65

           i.    Mr. Jennings' and Mr. Baer's testimony is exactly the type of proper corroborating evidence the Federal Circuit has identified to support inventorship claims ......................................... 66

ii

        d.     The Evidence Corroborates and Establishes Mr. Goertzen's inventorship...................................................................... 67

               i.     Mr. Goertzen's Knowledge of the Claim Limitation Regarding the Use of a Magnetic Stripe and Barcode Contained Within an Overlay is Sufficiently Corroborated ................................................. 68

               ii.    Mr. Goertzen's Knowledge of the Claim Limitation Regarding a Beveled or Double Beveled Edge is Corroborated. ................................................................. 69

               iii.   Mr. Goertzen's Knowledge of the Claim Limitation Regarding the Method of Method of Manufacturing an Anodized Metallic Transaction Card is Corroborated ................................................................. 71

               iv.   Mr. Goertzen conceived of and possessed the AA 5182 Aluminum Alloy having the requisite temper designation .................................................................. 74

C.     ANOMATIC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON MAREINERS' STATE LAW CONTRACT CLAIMS ............. **Error! Bookmark not defined.**

     1.    There Are Genuine Issues of Material Fact Concerning Whether Anomatic Breached the NDA and the PLA by Disclosing Mareiners' Confidential Information ....................................... 76

        a.     Summary Judgment on the State Law Claims Should be Summarily Denied. .................................................... 76

        b.    Anomatic Breached the NDA and PLA by Disclosing Mareiners' Trade Secrets in the Anomatic Patents..................... 77

     2.    Anomatic Clearly Breached the PLA by using Mareiners' Process to Secure Patents on Mareiners' Innovation. ........................................... 77

        a.     Mareiners has Produced Exhibits and Witnesses that Demonstrate that Anomatic's Patents Prevent Manufacture and Sale of Image Anodized Transaction Cards........................ 77

        b.    Discussions Regarding Commercially Available Design Arounds Should Occur Before the Jury As it is Not a Defense to Breach, is Fact Based, and All of the Evidence Supports Mareiners. ..................................................... 80

        c.    Genuine Issues of Material Fact Exists as to Whether Anomatic Breached the PLA By Obtaining the Anomatic Patents ........................................................................ 82

     3.    Mareiners' is Not Asserting a Stand Alone Claim for Breach of the Duty of Good Faith and Fair Dealing ....................................... 88

4. There are Genuine Issues of Material Fact Precluding Summary Judgment on the Basis that Mareiners Breached the NDA and PLA**Error! Bookmark not defined.**

5. Mareiners has established that it was harmed when Anomatic used Mareiners Process to secure patents on Mareiners' image anodized transaction cards in breach of the agreements. ....... **Error! Bookmark not defined.**

# TABLE OF AUTHORITIES

**Cases**

*Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*,
    511 F. App'x 398 (6th Cir. 2013) ................................................................ 39

*AtriCure, Inc. v. Jian Meng*,
    842 F. App'x 974 (6th Cir. 2021) ............................................................... 42

*Atricure, Inc. v. Jian Meng*,
    842 F. Appx. 974 (6th Cir. 2021) ............................................................... 30

*Bd. of Educ. Ex rel. Bd. Of Trs. Of Fla. State Univ. v. Am. Bioscience, Inc.*,
    333 F.3d 1330 (Fed. Cir. 2003) ................................................................. 82

*BearBox LLC v. Lancium LLC*,
    125 F.4th 1101 (Fed. Cir. 2025) ....................................................... *passim*

*in State ex. Rel. Besser v. Ohio State Univ.*,
    732 N.E.2d 373 (Ohio 2000) ..................................................................... 23

*Boehm v. Black Diamond Casino Events, LLC*,
    116 N.E. 3d 704 (Ohio Ct. App. 2018) ..................................................... 53

*C.f. Oldnar Corp. v. Panasonic Corp.*,
    766 Fed.Appx. 255 (6th Cir. 2019) ........................................................... 92

*Caudill Seed & Warehouse Co., Inc. v. Jarrow Formulas, Inc.*,
    53 F.4th 368 (6th Cir. 2022) ............................................................. *passim*

*CenTra, Inc. v. Estrin*,
    538 F.3d 402 (6th Cir. 2008) ..................................................................... 74

*CHKRS, LLC v. City of Dublin*,
    984 F.3d 483 (6th Cir. 2021) ........................................................... 58, 60, 65

*Cleveland Branch, NAACP v. City of Parma*,
    263 F.3d 513 (6th Cir. 2001) ................................................................ 58, 65

*Crown Die & Tool Co. v. Nye Tool & Mach. Works*,
    261 U.S. 24 (1923) ..................................................................................... 68

*DG Gas, LLC v. TA Franchise Sys. LLC*,
    No. 1:24-CV-01002-PAB, 2025 WL 814928 (N.D. Ohio Mar. 14, 2025) ............................ 97

*Eden Hannon & Co. v. Sumitomo Tr. & Banking Co.*,
    914 F.2d 556 (4th Cir. 1990) ..................................................................... 44

v

*Handel's Enterprises, Inc. v. Schulenburg*,
    765 F. App'x 117 (6th Cir. 2019) ............................................................22, 23, 38

*Howe v. City of Akron*,
    801 F.3d 718 (6th Cir. 2015) ............................................................61, 62, 63

*Impression Prods., Inc. v. Lexmark Int'l, Inc.*,
    581 U.S. 360 (2017)............................................................................68, 69

*James B. Oswald Co. v. Neate*,
    98 F.4th 666 (6th Cir. 2024) .............................................................................22

*Lucarell v. Nationwide Mut. Ins. Co.*,
    97 N.E.3d 458 (Ohio 2018)................................................................................96

*McKay v. Federspiel*,
    823 F.3d 862 (6th Cir. 2016) ......................................................................59, 65

*Minco Inc. v. Combustion Eng'g, Inc.*,
    95 F.3d 1109 (Fed. Cir. 1996)............................................................................87

*Minnesota Mining & Mfg. v. Johnson Johnson*,
    976 F.2d 1559 (Fed. Cir. 1992)...........................................................................87

*Parker Hannifin Corp. v. Standard Motor Prods., Inc.*,
    No. 1:19CV00617, 2019 WL 5425242 (N.D. Ohio Oct. 23, 2019)....................96, 97

*Pierce Point Cinema 10, L.L.C. v. Perin–Tyler Family Found., L.L. C.*,
    2012–Ohio–5008..............................................................................................98

*Presidio, Inc. v. People Driven Tech., Inc.*,
    686 F. Supp. 3d 652 (S.D. Ohio 2020) ..........................................................52, 53

*Ridge Corp. v. Altun LLC*,
    No. 2:21-cv-5915, 2023 WL 1765918 (S.D. Ohio Feb. 3, 2023) ...........................34

*Rogers Indus. Prods. Inc. v. HF Rubber Mach.*,
    936 N.E.2d 122 (Ohio. Ct. App. 2010)................................................................40

*Shukh v. Seagate Tech., LLC*,
    803 F.3d 659 (Fed. Cir. 2015)............................................................................70

*Stratienko v. Cordis Corp.*,
    429 F.3d 592 (6th Cir. 2005) .............................................................................44

*Tera v. Rice Driving D, L.L.C.*,
    248 N.E.3d 196 (Ohio 2024)........................................................................91, 95

*State ex rel. The Plain Dealer v. Ohio Dep't of Ins.*,
    687 N.E.2d 661 (Ohio 1997), *superseded by statute on other grounds,* 1993
    Ohio H.B. 320 ...................................................................................................23

*U.S. S.E.C. v. Sierra Brokerage Servs., Inc.*,
    712 F.3d 321 (6th Cir. 2013) ............................................................................42

*UniRAM Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*,
    617 F.Supp.2d 938 (N.D. Cal. 2007) ...............................................................50

*United States v. Jackson-Randolph*,
    282 F.3d 369 (6th Cir. 2002) ............................................................................74

*In re VerHoef*,
    888 F.3d 1362 (Fed. Cir. 2018)..........................................................66, 76, 82

**Statutes**

18 U.S.C. § 1836 ......................................................................................................53

18 U.S.C. § 1836(b)(3)(A)-(D) .................................................................................53

18 U.S.C. § 1839(3) ..................................................................................................22

35 U.S.C. § 262 ........................................................................................................70

Code § 1333.61(D).....................................................................................................22

Ohio Rev. Code § 1333.61 .......................................................................................53

Ohio Rev. Code § 1333.61-64 ..................................................................................53

Ohio Rev. Code § 1333.62-64 ..................................................................................53

## LOCAL CIVIL RULE 7.2 (a)(3) SUMMARY

Disputed issues of material fact abound in this hotly contested breach of contract and trade secret misappropriation case. Mareiners has produced documents, witnesses, and obtained clear admissions from Anomatic that establish its trade secrets, its development of an image anodized transaction card using its trade secrets, its disclosure of both to Anomatic under an NDA, and Anomatic's unlawful use of the trade secrets to patent Mareiners' transaction card in breach of contract, causing clear and distinct harm to Mareiners. As evidenced by the length of the moving papers, and this response, little is undisputed, and summary judgment is unavailable.

## I.  **Evidence supporting Mareiners' protectable trade secrets requires a jury trial.**

Mareiners has produced evidence demonstrating the existence of protectable trade secrets that were disclosed to Anomatic under a non-disclosure agreement. Anomatic paid $250,000 for the right to commercially use Mareiners' trade secrets after Mareiners educated Anomatic on its proprietary ▮▮▮▮ process. Anomatic caused harm to Mareiners when it used the trade secrets in a patent application directed to the pictured image anodized transaction card that Anomatic was asked to mass produce. Anomatic deprived Mareiners of its ability to commercialize these cards when it secured three patents on the metallic transaction cards Mareiners first disclosed to Anomatic on August 17, 2017 (pictured), and more fully disclosed to Anomatic over the coming year. Anomatic's arguments to the contrary ignore documents and testimony, and cannot result in summary judgment.



### A.  Principal Argument One: Mareiners ▮▮▮▮ Process is a trade secret

Substantial evidence has been produced demonstrating that Mareiners' trade secrets are sufficiently specific to warrant protection under state and federal law. Mareiners provided a detailed description of the trade secrets. Witnesses confirmed that Mareiners' trade secrets are

only shared after a nondisclosure agreement is executed. Mareiners produced reports from two anodizing experts confirming that the description was specific and detailed and not readily known in the industry. At best, there is a healthy factual dispute requiring a jury trial.

### B. Principal Argument Two: Anomatic Disclosed Mareiners Trade Secrets in the Specifications of the Patent Application filed in December of 2018, which matured into three US Patents covering Mareiners' image anodized transaction card

This is an unlawful use case. Anomatic used Mareiners' proprietary image anodizing process in the specification of United States Patent Application Number 16/712,552 (the "'552 Patent") to secure patents entitled "Metallic Transaction Cards." At Anomatic's request, Mareiners spent several weeks in New Albany in February and June of 2018 teaching Anomatic Mareiners' Process, and countless hours on the phone educating Anomatic on the same. Anomatic entered into a Patent License Agreement, and agreed to pay Mareiners 10% of $1.9 billion, in order to maintain access to the Process. Without permission or disclosure, Anomatic crafted a patent application covering the metallic transaction card Mareiners first disclosed to Anomatic on August 17, 2017. The '552 patent application matured into three patents: United States Patent No. 11,182,655, (the "'655 Patent") United States Patent No. 11,816,518 (the "'518 Patent") and United States Patent No. 12,204,965. Mareiners provided charts and illustrations, as well as testimony, detailing the columns and lines where the Mareiners' Process was disclosed by Anomatic in the above patents. Sufficient evidence exists to support Mareiners' claims for misappropriation through use and disclosure to require a jury trial on the issues.

### C. Principal Argument Three: Mareiners established misappropriation damages.

Mareiners' damages are definite and certain warranting jury consideration. Mareiners owner, Reiner Goertzen, testified during his deposition regarding the harm caused by Anomatic's unlawful effort to steal his image anodized transaction card. Mr. Baer and Mr. Molke have provide foundational testimony for damages. Mareiners' damages expert has analyzed the damages caused

by Anomatic.  Mareiners attempted to capitalize on that market opportunity with Chris Molke, an established credit card manufacture and sale expert, who had secured $30 million in capital finance, leased a manufacturing facility, prepared a detailed business plan, and had confirmed that his long time clients were ready to purchase Mareiners' image anodized transaction cards.  But for Anomatic's unlawfully obtained monopoly, Mareiners licensee would have captured market share and paid Mareiners 10% royalties on all sales.

## II.  Arguments Concerning Plaintiff's Correction of Inventorship Claims

Mareiners has provided documents, physical samples, and third-party fact testimony corroborating the disclosure of Mareiners' image anodized transaction card that is claimed in the Anomatic Patents.  Importantly, Anomatic had no prior experience manufacturing transaction cards.  Anomatic's witnesses confirmed that Mareiners disclosed the image anodized transaction card, the manufacturing specifications, the physical samples and the industry opportunity under the non-disclosure agreement.  After 8 months of due diligence on Mareiners disclosure, Anomatic signed the non-exclusive Patent License Agreement with Mareiners and paid $250,000.  Despite this, Anomatic filed the '552 application without alerting Mareiners. Summary judgment is inappropriate on the record evidence, including the testimony from Steve Rusch, Anomatic's Vice President, that Mr. Goertzen should have received inventorship credit.

### A.  Principal Argument One: Mareiners has standing to Pursue change of Inventorship

Mr. Goertzen assigned any and all rights he possessed to the image anodized transaction card to Mareiners.  As there is no dispute regarding this assignment, summary judgment on standing must be denied.

### B.  Principal Argument Two: Mr. Goertzen is the sole inventor of the Image Anodized Transaction Card

It is undisputed that Mr. Ormiston had no experience with the design or manufacture of transaction cards before Mr. Goertzen contacted him by phone in August of 2017. Documents, physical samples and witness testimony have been timely produced that corroborate Mr. Goertzen as the sole inventor of the claim limitations in the Anomatic Patents. These documents will allow a reasonable jury to conclude that Mr. Ormiston learned these features from Mr. Goertzen's disclosure and teachings in 2017 and 2018, and not from independent or collaborative innovation.

III.    **Arguments Concerning Plaintiff's State Law Breach of Contract Claims**

Disputed issues of material fact exist precluding summary judgment on the breach of contract claims. The record evidence supports the conclusion that Anomatic breached the Parties contracts when it took Mareiners' image anodizing technology and described it in a patent application directed to the image anodized transaction card that Mareiners asked Anomatic to mass produce. Summary judgment is simply not available on this record.

   A. **Principal Argument One: Anomatic used Mareiners' trade secrets in a patent application that covered Mareiners' innovation in breach of two contracts.**

Disputed issues of material fact exist regarding the nature and scope of Anomatic's disclosure preventing summary judgment. As demonstrated in response to Interrogatories 4 and 5, as well as in Exhibit A to Mareiners Responses to Interrogatories 8 and 9, Anomatic disclosed Mareiners trade secrets in the specification included with the '512 application, which matured into three US Patents. Mareiners has produced experts in the field of anodizing that have confirmed that the information disclosed by Anomatic was not generally known or readily ascertainable at the time of the disclosure. Mareiners has secured admissions from Anomatic's witnesses that rebut the suggestion that Anomatic possessed the information independent of Mareiners' disclosure.

   B. **Principal Argument Two: Anomatic was not contractually permitted to patent Mareiners Intellectual Property.**

Scott Rusch, one-time owner and President of Anomatic, testified that Anomatic would not patent the products of a customer "because that customer's product is their intellectual property." As the Parties signed Anomatic's standard mutual NDA at the start of the relationship, this admission by Mr. Rusch confirms that there are genuine issues of material fact in dispute. Further, the Parties signed a non-exclusive licensing agreement such that it would be a breach for Anomatic to secure a monopoly over the product governed by the contract. A jury must assess the claims and defenses for breach of contact.

### C. Principal Argument Three: Ohio does recognize a breach of contract claims arising out of Anomatic's bad faith

Ohio courts recognized that the duty of good faith requires the parties to deal reasonably with each other, and it applies where one party has discretionary authority to determine certain terms of the contract. The evidence establishes that Anomatic breached its duty to Mareiners when it secretly sought a patent on the product that Mareiners requested that it mass produce. Disputed issues of material fact exist requiring that this matter go to the jury.

### D. Principal Argument Four: Mareiners is not in breach of the Non-Disclosure Agreement.

Mareiners did not breach the non-disclosure agreement. Rather, Mareiners consulted with parties that were covered by non-disclosure agreement. Anomatic's effort to generate a defense is without merit and should not result in summary judgment.

### E. Principal Argument Five: Mareiners has established clear harm caused by Anomatic's breach of contract.

Anomatic's patents claim the image anodized transaction card that Mareiners developed and asked Anomatic to mass produce. In breach of contract, Anomatic deprived Mareiners, and continues to do so by securing and holding on to patents that cover Mareiners' innovation. The damages are similar to those caused by the misappropriation of trade secrets.

## I.    **INTRODUCTION**

Without permission and in breach of its agreements with Mareiners, Anomatic secured three patents on Mareiners' image anodized transaction card, precluding Mareiners, or its licensees, from capitalizing on the well-established marketplace for metallic credit cards in the United States. Mareiners introduced Anomatic to the metallic credit card market after execution of a mutual non-disclosure agreement.  Through Mareiners, Anomatic received the specifications for manufacturing image anodized transaction cards that were produced using Mareiners' proprietary and secret image anodizing process – specifications that Anomatic secretly used to secure patents for itself.  But for Anomatic's unlawful monopoly obtained through three patents on Mareiners innovation, Mareiners' licensees, USA Cards and HardCoat Inc., would be selling image anodized transaction cards to banks and institutions that had longstanding relationships with Mareiners' licensees.

Very little in this matter is undisputed.  Witnesses, PowerPoint presentations, emails and physical samples confirm that Mareiners delivered its fully developed, image anodized transaction card to Anomatic in the Fall of 2017 for the purposes of mass production, yet Anomatic claims Mareiners cannot corroborate Mareiners' invention of this product. Steve Rusch, Anomatic's Vice President of New Product Development, admitted that Mareiners should have received inventorship credit, yet Anomatic now denies that he should.  Mark Ormiston, the wrongly named inventor of the Anomatic Patents, claims that Mareiners' image anodizing process was long known in the industry and therefore not a trade secret, yet he claimed it as new and novel as of December 18, 2018, the date he filed United States Patent Application 16/712,552.  Scott Rusch, Anomatic's President, admitted that Anomatic agreed to pay Mareiners $250,000 and a 10% royalty on sales of Mareiners' image anodized transaction cards because of Mareiners "███████ process . . . all the technical aspects of anodizing that relate to

1

████████ material, ████████ anodized aluminum, including ████████████████████████████ and many, many other technical details", Ex. 1 to Declaration of Aaron Bradford, Scott Rusch Depo., pp. 307:12-308:6; 313:21-314:01 (stating that Anomatic "wanted to proceed forward with an agreement with him because of the trade secrets? A: That's correct."), yet Anomatic argues that Mareiners had no trade secrets, that they lack value, and that Mareiners was not harmed when it claimed these trade secrets as its own.

Seventy-three pages are dedicated to a failed effort to establish that material issues of fact are not in dispute. As detailed in this Opposition, each Count is supported by record evidence sufficient to allow a reasonable jury to conclude that Mareiners prevails. Mareiners has provided a detailed description of its image anodizing process – a description it provided to Anomatic in 2017 and 2018 in advance of Anomatic agreeing to part with 10% of $2.9 billion for the right to use the same. Mareiners has disclosed two leading anodizing experts, Dr. George Oh and Dr. Judy Runge, to confirm that Mareiners' Process was not known or readily ascertainable, even after a review of the references identified by Anomatic's rebuttal expert. Mareiners has provided detailed testimony on the value and market advantages that the secrets provided it, and its anodizing licensees. Mareiners **and** Anomatic have produced the actual credit card samples that corroborate that Mareiners, not Anomatic, fully-developed the product. Document discovery has confirmed that Anomatic, including Mark Ormiston, had no prior experience with transaction cards. In reality, Mareiners developed and disclosed its solution, the image anodized transaction card, along with applicable manufacturing and

product specifications and testing standards to Anomatic under an NDA.

Mareiners has provided detailed documents and supporting fact testimony establishing that Anomatic took the information received from Mareiners, claimed it as its own, and had its engineer file a secret patent application that has since matured into three US Patents. Simply put, the claims of these three patents are directed to an anodized metallic card body having a beveled and colored edge, the very product Mareiners came to Anomatic to mass produce.

These intentional acts, done with the blessing of its German parent, were in breach of the Parties' non-disclosure agreement and non-exclusive Patent License Agreement. But for these actions to unlawfully secure a monopoly on Mareiners innovation, Mareiners would be enjoying royalty payments from USA Cards and other licensees on the sale of the image anodized transaction cards that Mareiners developed in the amount calculated by Mr. Jeffrey George and USA Cards. That these facts are undisputed in light of Anomatic's own witness testimony and document production establishes that, at a minimum, disputed issues of material fact abound between the Parties warranting a jury trial on all issues.

## II.   **FACTUAL BACKGROUND**

Anomatic, with no prior experience with the design and manufacture of transaction cards, entered into a non-disclosure agreement with Mareiners to learn about anodized aluminum transaction cards. A year later, Anomatic directed its engineer, Mark Ormiston, to file a patent application claiming a new, novel, non-obvious anodized metallic transaction card. Mr. Ormiston has since been issued three patents on metallic transaction cards claiming a simple anodized card body:

1.   United States Patent No. 11,182,655 issued November 23, 2021. Ex. 2.

2.   United States Patent No. 11,816,518 issued November 14, 2023. Ex. 3.

3. United States Patent No. 12,204,965 issued January 21, 2025. Ex. 4.

The Parties do agree that Anomatic's patents are the product of a single provisional application filed on December 12, 2018, by Mr. Ormiston. The claims of each patent are different, however, with each set of claims broader than the last. Claim 1 of the '655 patent, for example, claims an anodized metallic card body with a front, a back and a peripheral surface, that features a magnetic stripe or a bar code contained with an overlay, with the card body having a double beveled and colored edge. See Ex. 2, Claim 1, Col. 15, ll. 34-50. Claim 1 of the '965 patent issued this year, drops the overlay, bar code and mag stripe, and reads as follows:

> What is claimed is:
> **1**. A card, comprising:
> a metallic card body having a front face, a rear face, and
>     a peripheral surface extending between the front face
>     and the rear face;
> a front beveled peripheral surface extending around the
>     metallic card body where the front face meets the
>     peripheral surface; and
> wherein the front beveled peripheral surface is colored to
>     cover a metallic color of the metallic card body.

Ex. 4, Col. 14., ll. 34-43. This is Mareiners' innovation wrongfully and unlawfully claimed by Anomatic. Mareiners developed the image anodized transaction card starting in 2014 after it developed and commercialized its image anodizing process that it protects as its trade secrets, and has licensed to anodizers around the United States. Anomatic contributed no innovative steps above what Mareiners delivered to Anomatic. This lawsuit was initiated to address Anomatic's unlawful monopoly that prevents Mareiners from commercializing its valuable innovation.

Mr. Goertzen is the founder and owner of Mareiners LLC, an Oregon-based image anodizing company. Mr. Goertzen is an engineer by training and education, having completed a degree in manufacturing engineering from the Oregon Institute of Technology. Ex. 5, Reiner Goertzen Depo., Vol. 1., pp. 89:05-90:15. After school, Mr. Goertzen went to work as a

4

manufacturing engineer for Electro Scientific Industries ("ESI") in Beaverton, Oregon where he gained his first experience with anodized aluminum parts. *Id*. at 90:19-92:21. After departing ESI, Mr. Goertzen investigated and developed a proprietary anodizing process that could ▮▮▮ brilliant image ▮▮ the anodic coating of anodized aluminum. Generally speaking, anodized aluminum products are mono-chromatic:



Working out of a home lab and with local anodizers, Mr. Goertzen developed a novel image anodizing process that called for ▮▮▮▮▮▮▮ image ▮▮ the surface of anodized aluminum:



***Ex. 6, Depo Exhibit 104: Original Image Anodized Aluminum provided to RealTree in 2007.***

Mr. Goertzen presented the above print to Keith Jennings of RealTree®, a leader in camouflage printed products. Ex. 7, Keith Jennings Depo., pp. 26:17-36:12. Mr. Jennings was skeptical that

---

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮

Mr. Goertzen would be able to reliably and repeatedly decorate anodized aluminum with a complex pattern such as RealTree's famous copyrighted pattern. *Id*. Mr. Jennings challenged Mr. Goertzen's image anodizing process and Mr. Goertzen's process passed RealTree's rigorous color and durability standards. *Id*. As a result, Mr. Goertzen and Mareiners gained its first set of licensees in 2006. *Id*.

Mr. Goertzen licenses his patent and proprietary trade secrets to a series of job shop anodizers, for over two decades, throughout the United States. Ex. 8, Plaintiff Mareiners LLC's Second Supplemental Objections and Responses to Defendant Anomatic Corporation's First Set of Interrogatories, pp. 5-6, 8. A job shop anodizer is a contract manufacturer that makes products in accord with the specifications provided by the actual product owner and innovator. Ex. 18, Scott Rusch Depo., at 19:05-20:04. As licensor, Mr. Goertzen trains licensed anodizers on his trade secret image anodizing process – a ███████ image anodizing process. Ex. 8, pp. 8-9. To train an anodizer on his process, Mr. Goertzen must identify the anodizing process that the new licensee uses, and then modify it to follow his image anodizing process. *Id*. During the license, Mr. Goertzen remains available to troubleshoot the anodizing process with his licensees as they add new image anodized products to their portfolio. *Id*. He is hands-on, working with his licensees to make certain the process is properly deployed and produces a brilliant image on the anodized surface of bikes, flashlights, archery products, surgical trays, architectural elements, murals, knives, gun stocks, hunting equipment, business cards, tile backsplashes, and transaction cards.

In 2014, Mr. Goertzen turned his attention to the development of his own product featuring his image anodized manufacturing process – an anodized aluminum transaction card. Ex. 5, Reiner Goertzen Depo., at 99-114. Mr. Goertzen worked with ████████████████████████ to identify the relevant ISO standards for credit cards as well as start testing his prototypes against those standards. *Id*. at 123:12-124:06, 190:12-190:18; 238:05-21. He purchased a series of

fabricated aluminum credit cards from National Band & Tag as well as Damon Company, and worked with two licensees, US Anodize and HardCoat, Inc., to anodize the purchased raw aluminum cards. *Id.* at 56:23-57:17. He worked with 3M to secure material for an overlap, a laminate that is used to apply items such as the credit cards hologram and mag stripe to metal surfaces. *Id.* at 64:13-65:20; 76:06-77:07; 77:20-85:22. Mr. Goertzen worked with ████████ ████████ and ██████████ to include items such as the chip and the dual interface features. Ex. 9, Mareiners Depo., Vol. I., pp. 29:12-36:24; Ex. 10, Mareiners Depo., Vol II, pp. 315:18-322:18. Through these interactions and consultations, Mr. Goertzen secured prototype credit cards that featured image anodized aluminum surfaces with beveled edges, a magnetic stripe, a chip and dual interface capabilities as depicted below Ex. 11, 3rd Supp. Resp. to 2nd Set of Interrogatories, pp. 46-54 and Ex. A.; Ex. 5, Goertzen at 56:06-62:10, 76:06-77:07.

In 2015 and 2016, Mr. Goertzen surveyed a number of manufacturers and purchasers of transaction cards on their interest in image anodized transaction cards. Ex. 10, 2nd Supp. Resp. to 1st Set of Interrogatories, p. 7. For example, Mr. Goertzen met with JP Morgan Chase to assess their interest. Ex. 5, Goertzen Depo., Vol. 1, pp. 99:16-100:16; Ex. 7, Jennings at 38:21-42:07. Having confirmed substantial interest demand for the new image anodized transaction card of his design, Mr. Goertzen sought to find job shop anodizers that could meet the demand for his product. *Id*.

On July 31, 2017, Mr. Goertzen contacted Anomatic, among others, to determine if it could assist him in bringing to market an image anodized transaction card that Mr. Goertzen had already developed for the transaction card industry. Ex. 11, 3rd Amended/Supp. Responses to 2nd Set of Interrogatories, p. 10. At the time of first contact by Mr. Goertzen, Anomatic had no experience with manufacturing transaction cards. Ex. 15, Steve Rusch Depo., at 38:07-12. It was a high-volume anodizer that dedicated 98% of its time to the manufacture of solid colored cosmetic

packaging (caps, lids, bottles and jars). Not surprisingly, Anomatic did not have patents on products. *Id*. at pp. 52:13-53:14. It was a high-volume job shop anodizer, meaning it manufactured anodized aluminum products designed by others. *Id*. at 53:13-55:14, 219:12-220:11. While Anomatic's lacked any expertise in the transaction card industry, Mr. Goertzen felt Anomatic could potentially help him fill massive orders for image anodized transaction cards from potential customers such as JP Morgan Chase, US Bank, and Capital One since Anomatic anodized billions of parts for other customers. Ex. 8, 2nd Supp. Responses to First Interrogatories, pp. 5-6.

On August 17, 2017, Mr. Goertzen and Anomatic signed a mutual non-disclosure agreement. Ex. 2. The same day, Mr. Goertzen, Mr. Teek Murphy and Mr. Cory Baer presented the image anodized transaction card, and associated manufacturing process, to Mr. Steven Rusch, VP of New Product Development, and Mr. Mark Ormiston, ***the eventual sole named inventor on the subject patents***. Ex. 12, Email Dated August 17, 2017, from Mareiners to Anomatic, with attached Presentation on Image Anodized Transaction Cards (MAR00012235 & MAR00002724). Mareiners provided an assessment of the market size, a description of the market opportunity, and its intellectual property as follows:



8



*Id*. at pp. 9, 18. Mareiners was seeking an anodizer with the following capabilities:



*Id*. at pp. 19-20. After the meeting, Mr. Goertzen shipped VISA spec cards and older samples to Anomatic:



Ex. 13. Interested, Anomatic invited Mr. Goertzen to travel to New Albany in November of 2017 with Mr. Cory Baer and Mr. Keith Jennings.  Under an NDA signed by all, Mr. Goertzen detailed

the image anodizing process and worked with Mr. Ormiston to produce samples on the spot for Anomatic to test and examine. Ex. 18, Scott Rusch Depo. Vol. I at 242:15-245:09; 243:06-254:07. Following this meeting, the Parties entered into a Business Agreement to further evaluate the following marketplace for Mr. Goertzen's innovation:

3. Market Development – Proof of Market
   • MAREINERS agrees to coordinate joint meetings with Anomatic to evaluate the market opportunities such as those listed below and determine whether a larger production scale capability is warranted.

| IMMEDIATE OPPORTUNITIES – ACTIVELY DISCUSSING | | | | | | |
|---|---|---|---|---|---|---|
| | COMPANY | PRODUCT | DESIRED TIMING | VOLUME | UNIT PRICE | REVENUE |
| 1 | | | On Market | 300,000 | | |
| 2 | | | Q1 2018 | 20,000,000 | | |
| 3 | | | Q1 2018 | 80,000,000 | | |
| 4 | | | Q1 2018 | 20,000,000 | | |
| 5 | | | 2018 | 200,000,000 | | |
| | | | | 320,300,000 | | |

Ex. 14, Business Agreement signed November 29, 2017. Thereafter, Mr. Goertzen continued to provide disclosure of product specifications and manufacturing specifications that he developed before his first contact with Anomatic. Mr. Goertzen traveled back to New Albany in February of 2018 and spent a week training Anomatic's manufacturing engineers on his image anodizing process for metallic tranaction cards. In March, Anomatic's executive team of Steve Rusch, Scott Rusch and Mark Ormiston valued the relationship with Mareiners as follows:

10

On Mar 22, 2018, at 01:32 PM, Steve Rusch <SRusch@anomatic.com> wrote:

Reiner and Cory,

Below is a snapshot of the phased approach we are envisioning to scale production to support the projected sales.  Note from a timing perspective, the investment correlated to the installed capacities will move up, but for ease of understanding I have these listed directly side-by-side.  For eg., we are projecting to invest $8M in 2019 to support a capacity expansion at our current facility in New Albany, Ohio, which would very likely run concurrent to the design and build of a new state-of-the-art facility.

To complete our Phase 1 analysis for Proof of Market and Proof of Principle, our expectation is for the following:

   I.   Identify and validate the production process, equipment required and the costs for capital and manufacturing.
   II.  Validate the product through customer submissions and line trials to ensure the product is compliant to industry standards.
   III.  Exhibit at the ICMA Expo with Reiner to show the product and hear first-hand from the industry and potential customers to validate the market opportunity.

| | Year | Unit Sales | Selling Price | Gross Sales | Proj Ano Investment | Capacity | Commission % | MARINERS $ | Notes |
|---|---|---|---|---|---|---|---|---|---|
| **PHASE I** | 2018 Q3 | 500,000 | $10.00 | $5,000,000 | $5,000,000 | | 2.5% | $125,000 | Production Startup - Outsource Fab |
| | 2018 Q4 | 1,200,000 | $10.00 | $12,000,000 | $1,000,000 | | 3.0% | $360,000 | Production Startup - Outsource Fab |
| | 2019 Q1 | 1,200,000 | $10.00 | $12,000,000 | null | 6,000,000 | 3.0% | $360,000 | In-house Fab |
| | 2019 Q2 | 1,500,000 | $9.00 | $13,500,000 | $1,000,000 | | 3.0% | $405,000 | In-house Fab |
| **PHASE II** | 2019 Q3 | 3,000,000 | $8.00 | $24,000,000 | $8,000,000 | 15,000,000 | 3.0% | $720,000 | New Anodizing Line & Capacity Expansion at Company HQ |
| | 2019 Q4 | 3,500,000 | $8.00 | $28,000,000 | | | 3.0% | $840,000 | |
| **PHASE III** | 2020 Q1 | 15,000,000 | $7.00 | $105,000,000 | $50,000,000 | 100,000,000 | 3.0% | $3,150,000 | New Dedicated Manufacturing Site Incl Equipment for Installed Capacity of 100M |
| | 2020 Q2 | 20,000,000 | $6.50 | $130,000,000 | | | 3.0% | $3,900,000 | |
| | 2020 Q3 | 35,000,000 | $6.00 | $210,000,000 | $40,000,000 | 200,000,000 | 3.0% | $6,300,000 | Capacity Expansion |
| | 2020 Q4 | 45,000,000 | $5.50 | $247,500,000 | | | 3.0% | $7,425,000 | |
| **PHASE IV** | 2021 | 150,000,000 | $5.00 | $750,000,000 | $75,000,000 | 400,000,000 | 3.0% | $22,500,000 | Capacity & Facility Expansion |
| | 2022 | 250,000,000 | $4.50 | $1,125,000,000 | | | 3.0% | $33,750,000 | |
| | 2023 | 300,000,000 | $4.00 | $1,200,000,000 | $40,000,000 | 500,000,000 | 3.0% | $36,000,000 | Capacity Expansion |
| | 2024 | 400,000,000 | $4.00 | $1,600,000,000 | $10,000,000 | | 3.0% | $48,000,000 | Capacity Expansion |
| | | | | **$227,000,000** | | | | **$163,835,000** | |

Ex. 16, Email dated March 22, 2018, from Steve Rusch to Reiner Goertzen; *see also* Ex. 15, Steve Rusch Depo. at 162:03-173:12;.  Mr. Goertzen attended the 2018 ICMA Trade Show alongside Anomatic and returned to New Albany in June for additional training.  Through this time, Mr. Goertzen attended frequent manufacuting calls with the Anomatic engineers to work through questions about the manufacture of his image anodized transaction card.

The Parties entertained an exclusive license that would allow Anomatic to be the sole manufacturer of Mr. Goertzen's image anodized transaction cards.  Ex. 15, Steve Rusch Depo. at 187:08-188:10.  After Anomatic opted for a non-exclusive license, the Parties ultimately entered into the non-exclusive Patent License Agreement which provided Anomatic with a non-exclusive license to manufacture image anodized aluminum credit cards using Mareiners proprietary trade secrets.  Ex. 17, Patent License Agreement.

Unbeknownst to Mr. Goertzen and before the non-exclusive Patent License Agreement was signed, Anomatic engineers and chief executives were talking about ways to patent Mr. Goertzen's image anodized aluminum transaction card, thereby securing an exclusivity without

permission or compensation. Ex. 1, Scott Rusch Depo., pp. 373:24-376:23; Ex. 19, Anomatic Executive Update, p. 3. Under the Nondisclosure Agreement, Mr. Goertzen retained ownership over the technology that he developed. Ex. 20, Nondisclosure Agreement, ¶¶ 1, 3. On December 13, 2018, rather than discuss their intentions with Mr. Goertzen, Anomatic secretly filed a patent application that would ultimately mature into three increasingly broader patents with the title "METALIC TRANSACTION CARD.".

Mr. Goertzen was not provided a copy of the application or the issued patent. Ex. 10, Mareiners at 326:01-330:13. On March 8, 2022, Mr. Steve Rusch disclosed, for the first time, that Anomatic had "successfully patented the 'contact only' Anocard." Ex. 21, Email dated March 8, 2022 from Steve Rusch to Reiner Goertzen. Shocked, Mr. Goertzen asked for the patent number, which Mr. Rusch provided via text message. Ex. 10, Mareiners at 328:25-329:08. Mr. Goertzen will testify that he read the claims of the '655 patent and readily recognized that his innovation, namely his prototype, had been patented by Anomatic using his trade secrets and his product specifications. Ex. 11, pp. 45-53, Ex. A; Ex. 10, Mareiners at 329:12-335:3. He was heartbroken. Not only would Anomatic secretly patent his innovation, but the patent meant his other licensed job shop anodizers could not come to market with his innovation. *Id.*

## III.   **ARGUMENT**

As set forth above, there are genuine issues of material fact that the Court and the jury must decide. As a result, this Court can, and should, deny Anomatic's motion for summary judgment (the "Motion") based on that direct and circumstantial evidence. Anomatic's motion for summary judgment improperly asks the Court to deny a jury the opportunity to review the evidence and evaluate the merits of Mareiners' trade secret and breach of contract claims. Similarly, it improperly asked the Court to deny Mareiners the opportunity to present disputed issues of

material fact to the Court for its evaluation of Mareiners' claim for correction of inventorship, on the merits. For these reasons, and those set forth more fully below, the Motion should be denied.

## A. DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON MAREINERS' TRADE SECRET CLAIMS

Mareiners brings claims for trade secret misappropriation under both the federal DTSA and OUTSA. Courts have analyzed these claims together because the elements are substantially similar. *James B. Oswald Co. v. Neate*, 98 F.4th 666, 674-675 (6th Cir. 2024). For liability to attach under either, a plaintiff must show the existence of a protectable trade secret and misappropriation of that trade secret. Genuine issues of material fact exist as to both of these issues. Summary judgment on Mareiners' misappropriation claims must be denied.

### 1. Mareiners Has Identified Legally Protectable Trade Secrets.

"The question of whether something is a trade secret is a question of fact to be determined by the trier of fact upon the great weight of the evidence." *Handel's Enterprises, Inc. v. Schulenburg*, 765 F. App'x 117, 122 (6th Cir. 2019) (citation omitted). DTSA and OUTSA define a "trade secret" as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, … formulas, designs, prototypes, methods, techniques, [or] processes… whether or how stored, compiled, or memorialized" if (1) "the owner thereof has taken reasonable measures to keep such information secret" and (2) "the information derives economic value … from not being generally known … [or] readily ascertainable through proper means." 18 U.S.C. § 1839(3); *see also* .

"[I]t is not possible to state precise criteria for determining the existence of a trade secret." *Caudill Seed & Warehouse Co., Inc. v. Jarrow Formulas, Inc.*, 53 F.4th 368, 380 (6th Cir. 2022) (citation omitted). "Still, caselaw provides some general guiding principles." *Id.* The Supreme Court of Ohio has articulated six factors to consider in determining whether information constitutes

a trade secret pursuant to OUTSA:

> (1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, *i.e.*, by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*State ex rel. The Plain Dealer v. Ohio Dep't of Ins.*, 687 N.E.2d 661, 672 (Ohio 1997), *superseded by statute on other grounds,* 1993 Ohio H.B. 320, *as stated in State ex. Rel. Besser v. Ohio State Univ.*, 732 N.E.2d 373 (Ohio 2000). "Although no factor is dispositive, the Ohio Supreme Court has emphasized that '[a] business or possessor of a potential trade secret must take some active steps to maintain its secrecy in order to enjoy presumptive trade secret status.'" *Handel's Enters.*, 765 F. App'x 117, 122 (6th Cir. 2019) (alteration in original) (quoting *State ex rel. The Plain Dealer*, 687 N.E.2d at 672).

The Sixth Circuit has recognized that "[a] new combination of known steps or processes can be entitled to trade-secret protection." *Caudill*, 53 F.4th at 380 (citation omitted). "The fact that some or all of the components of [a combination] trade secret are well-known does not preclude protection for a secret combination, compilation, or integration of the individual elements. Indeed, a plaintiff may prevail in a trade-secrets case without identifying a specific item of information that is not publicly known or readily accessible." *Id.* (alteration in original) (internal quotation marks and citations omitted).

### a. Mareiners' Process is a combination trade secret.

Mareiners has identified a "unique and defined" combination trade secret that Anomatic misappropriated—a process "for allowing for the crisp application of multi-colored images ▉▉▉▉ ▉▉▉▉ an anodized aluminum alloy surface[,]" which includes ▉▉▉▉ steps that define

14

"Mareiners' Process." The Mareiners Process was defined for Anomatic in response to Interrogatory 1. *See* Ex. 8, **Mareiners' 2nd Suppl. Objs. & Resps. to Anomatic 1st Interrogs., Resp. 1**; *see also* Appendix II.

It is undisputed that Anomatic gained access to Mareiners Process after it signed and agreed to a non-disclosure agreement in August of 2017. Ex. 20, Nondisclosure Agreement. That same week, Mareiners presented its image anodized transaction cards to Mareiners produced using Mareiners Process:







Ex. 12, August 17, 2017 Mareiners Presentation to Anomatic (**MAR00002724**). It is undisputed that Mareiners traveled to Anomatic to train Anomatic engineers on Mareiners Process. Anomatic ultimately signed a non-exclusive Patent License Agreement in August of 2018 after 12 months of due diligence into Mareiners Process, its scalability and the market opportunity to use the Process to produce Mareiners' Image Anodized Transaction Card. Anomatic proceeded with contracting with Mareiners because of "Reiner's ▮▮▮▮▮ process . . . all the technical aspects of anodizing that relate to ▮▮▮▮▮ material, ▮▮▮▮▮ anodized aluminum, including ▮▮▮▮▮ ▮▮▮▮▮ and many, many other technical details". Ex. 1, Scott R., 307:12-308:6; 313:21-314:01 (stating that Anomatic "wanted to proceed forward with an agreement with him because of the trade secrets? A: That's correct."). Anomatic paid Mareiners $250,000 for the right to use the Mareiners Process and agreed to pay a 10% royalty on sales of Mareiners' Image

16

Anodized Transaction Card. Ex. 17, Patent License Agreement. At the time, Anomatic estimated that it would make $2.9 billion utilizing Mareiners' Process and that it would pay Mareiners $163 million in royalties over five years:

**CONFIDENTIAL**

## PROJECTED PRODUCTION SCALE & SALES SUMMARY 

- See next slide for detailed capital investments to support capacities

| | Year | Unit Sales | Selling Price | Gross Sales | Proj Ano Investment | Capacity | Commission % | MAREINERS $ | Notes |
|---|---|---|---|---|---|---|---|---|---|
| PHASE I | 2018 Q3 | 300,000 | $13.00 | $3,900,000 | $2,000,000 | | 2.50% | $125,000 | Production Startup - Outsource Fab |
| | 2018 Q4 | 1,000,000 | $13.00 | $13,000,000 | $1,000,000 | 5,000,000 | 3.00% | $360,000 | Production Startup - Outsource Fab |
| | 2019 Q1 | 1,000,000 | $13.00 | $13,000,000 | null | | 3.00% | $360,000 | In-house Fab |
| | 2019 Q2 | 1,200,000 | $10.00 | $12,000,000 | $1,000,000 | | 3.00% | $405,000 | In-house Fab |
| PHASE II | 2019 Q3 | 3,000,000 | $8.00 | $24,000,000 | $8,000,000 | 15,000,000 | 3.00% | $720,000 | New Anodizing Line & Capacity Expansion at Company HQ |
| | 2019 Q4 | 3,500,000 | $8.00 | $28,000,000 | | | 3.00% | $840,000 | |
| PHASE III | 2020 Q1 | 15,000,000 | $7.00 | $105,000,000 | $50,000,000 | 100,000,000 | 3.00% | $3,150,000 | New Dedicated Manufacturing Site |
| | 2020 Q2 | 20,000,000 | $6.50 | $130,000,000 | | | 3.00% | $3,900,000 | Incl Equipment for Installed Capacity of 100M |
| | 2020 Q3 | 35,000,000 | $6.00 | $210,000,000 | $40,000,000 | 200,000,000 | 3.00% | $6,300,000 | Capacity Expansion |
| | 2020 Q4 | 45,000,000 | $5.50 | $247,500,000 | | | 3.00% | $7,425,000 | |
| PHASE IV | 2021 | 150,000,000 | $5.00 | $750,000,000 | $75,000,000 | 400,000,000 | 3.00% | $22,500,000 | Capacity & Facility Expansion |
| | 2022 | 250,000,000 | $4.50 | $1,125,000,000 | | | 3.00% | $33,750,000 | |
| | 2023 | 300,000,000 | $4.00 | $1,200,000,000 | $40,000,000 | 500,000,000 | 3.00% | $36,000,000 | Capacity Expansion |
| | 2024 | 400,000,000 | $4.00 | $1,600,000,000 | $10,000,000 | | 3.00% | $48,000,000 | Capacity Expansion |
| | | | | $5,461,400,000 | $227,000,000 | | | $163,835,000 | |

Ex. 19, April 4, 2018, AnoCard Executive Summary, p. 13 (ANOMATIC 00098945-00098958).

A reasonable jury could certainly find that Mareiners' Process constitutes a legally protectable trade secret. In addition to the above transactional evidence, Mareiners spent "10 years experimenting with over 50 combinations of ████████████ and process steps to arrive at a stable repeatable process." Ex. 22, 8/18/17 Email from T. Murphy to S. Rusch, at 19.) Mareiners' licensed its Process to anodizing companies, giving them a competitive edge by enabling them to offer permanent image-embedding services that few, if any, non-licensee anodizers offer. *E.g.*, Affidavit of Gregory J. Maack, ECF No. 104-40 at PageID 3168-69 ¶¶ 6-10; Ex. 23, Kelner Depo. at 26:21-27:04, 28:15-29:04.) In return, licensees paid Mareiners licensing fees, and continue to

pay Mareiners 10% royalties. (*E.g.*, Affidavit of Gregory J. Maack, ECF No. 104-40 at PageID 3168 ¶¶ 11, 18; Ex. 23, Kelner Depo. at 11:18-12:1.)

### b. Mareiners protected its Process.

Mareiners has taken reasonable measures and steps to maintain the secrecy of its Process. Among other things, Mareiners has required third parties to sign non-disclosure agreements ("NDA's") before its trade secrets were disclosed to them, often limited the scope of what it shared even when NDAs were in place, and identified its proprietary process steps as confidential and "closely guarded trade secrets" prior to disclosure. Ex. 8, Mareiners' Resp. to Anomatic's Interrogatories, at 21-23; Ex. 22, 8/18/17 Email from T. Murphy to S. Rusch, 19.

Anomatic was subject to Mareiners' requirements to maintain the secrecy of its Process. After Mareiners and Anomatic signed a non-disclosure agreement, Ex. 24, 8/18/17 Email from M. Ormiston to R. Goertzen, 2, Mareiners identified its Process as "*CONFIDENTIAL*" and a "Closely guarded trade secret," Ex. 22, 8/18/17 Email from T. Murphy to S. Rusch, 19, and shared high-level information about it. Ex. 8, Mareiners' Resp. to Anomatic's Interrogatories, at 11-15; Ex. 22, 8/18/17 Email from T. Murphy to S. Rusch, 19. Still, Mareiners was protective over the information it was willing to share, and with whom it was willing to share the information. Ex. 25 (Steve R. PowerPoint ("Need Mareiners to be more forthcoming on the ██████ process envisioned."); Ex. 10 at MAR00015582 (suggesting the word ██████ in marketing materials be replaced with "proprietary digital image anodizing process" because the "process needs to be a 'secret' to a certain degree."); Ex. 15, Steve R Depo. at 237:19-238:19 (testifying that Anomatic removed ██████ from marketing, in part, because Mareiners had some concerns about alerting the industry that images were achieved through a ██████ process).

Mareiners' disclosed its Process and Anomatic recognized its value. Anomatic proposed, Ex. 12 at MAR00000100, and the Parties executed, a Business Agreement, Ex. 26, Anomatic-

18

Mareiners Business Contract, for the purpose of giving Anomatic time, before signing a licensing or acquisition agreement, to determine "whether the production steps that were indicated by [Mareiners] were accurate." Ex. 18, Scott R. Vol. I at 258:22-259:25. In exchange, Anomatic paid Mareiners $30,000, Ex. 26, Anomatic-Mareiners Business Contract; Ex. 18, Scott R. Depo. Vol. I at 258:22-259:25, after concluding that Mareiners' Process would be a "grand slam" and "result in significant growth and opportunities" for Anomatic. Ex. 27, 10/18/17 Email from Steve R. to Scott R., 14.

Months later, before executing a license agreement, Anomatic tried to hold Mareiners' Process out as its own, before the Parties had a license agreement in place. Ex. 28, 3/8/18 Email from Steve R. to R. Goertzen, 4 ("All marketing and discussions to only center on Anomatic…. Customer visits and trade events to be represented as Anomatic-only"); Ex. 29, 3/17/18 Email from S. Rusch to R. Goertzen, ANOMATIC0025727 (Marketing Mareiners' Process as "Anomatic's patented digital image anodizing process); Ex. 15, Steve R. Depo. at 136:05-137:17, 140:09-20; Ex. 29, ANOMATIC00257424 ("Despite our commercial agreement being in process, we would like your affirmation and support in marketing this solely as an Anomatic product in the spirit of our partnership."); *see also* Ex. 18, Scott R. Depo. at 159:25-160:11.

Mareiners objected, advising Anomatic that it had already "risked a great deal in sharing [its] patent, trade secrets, and customer base with you[,]" that it was "very concerned that [Anomatic's] marketing brochure for the show leads people to believe Anomatic owns" Mareiners' intellectual property, and "ask[ed] that an agreement in writing be submitted to [Mareiners] before" Anomatic marketed cards made with Mareiners' intellectual property. Ex. 30, 3/19/18 Email from R. Goertzen to Steve R.

Ultimately, the Parties proceeded to execute two additional agreements that, again, demonstrate the value of Mareiners' Process. First, the Parties executed a Business Agreement

Extension, under which Mareiners agreed to allow Anomatic to market cards at a trade show on the condition that Anomatic paid additional $30,000 and communicated to potential customers that the process used to make the aluminum cards was a proprietary process owned by Mareiners and Mr. Goertzen. Ex. 1, Steve R. Depo. at 173:18-174:07; Ex. 31, 3/22/18 Email from R. Goertzen to Scott & Steve R.; Ex. 32, 3/23/18 Email from R. Goertzen to Scott R.; Ex. 1 Scott R. Depo. at 304:04-18. Months later, the Parties executed a Patent License Agreement ("PLA"), under which Anomatic agreed to pay Mareiners an additional $190,000 and a royalty for the use of Mareiners' trade secrets. Ex. 17, PLA(Depo. Ex. 3) at Art. 3.1, 3.2(b); Ex. 18 (Scott R.) at 260:19-261:22.

    **c. The undisputed record demonstrates Anomatic recognized Mareiners' trade secret.**

    Anomatic cannot credibly dispute that Mareiners' Process constitutes a legally protectable trade secret. Anomatic's own President and CEO admitted that Mareiners disclosed trade secrets to Anomatic, Ex. 33, 3/15/18 Email from Scott R. to M. Pfannhauser. Specifically, Mr. Rusch testified that Mareiners disclosed trade secrets "related to Reiner's process, certainly[,]" and "would have included all the technical aspects that relate to ██████ material, ████████ anodized aluminum, including ████████████████ and many, many other technical details[,]" as well as "details that were provided to [Anomatic] related to how to apply the decorated image ████████████ Ex. 1, Scott R. Depo. at 305:05-308:06; *see also id.* at 251:13-252:11 (testifying that Mr. Goertzen listed steps of anodizing process he was using for prototype cards).

    **2. <u>Mareiners Sufficiently Identified the Trade Secrets Anomatic Misappropriated.</u>**

    Incredulously, despite acknowledging that Mareiners' Process constitutes a trade secret, Anomatic seeks summary judgment alleging Mareiners did not describe its Process with sufficient specificity. Summary Judgment Memorandum, ECF No. 103 at PageID 19-14. "But the specificity

bar is not as high as [Anomatic] tries to set it." *Atricure, Inc. v. Jian Meng*, 842 F. Appx. 974, 980 (6th Cir. 2021). Anomatic has waived this argument by proceeding with discovery in this matter, for good reason. Mareiners description of its trade secrets is detailed and enables the production of image anodized aluminum products as confirmed by Mareiners' experts Dr. George Oh and Dr. Judy Runge. At a minimum, the record evidence reveals material issues of fact that remain in dispute regarding the sufficiency of Mareiners description warranting a jury trial.

### a. Mareiners' Process is Not Vague or Overly Inclusive.

A trade secret is defined with reasonable specificity when it is "particular enough to separate the trade secret from matters of general knowledge in the trade or special knowledge of persons skilled in the trade." *Caudill*, 53 F.4th at 381 (citation and internal quotation marks omitted). "A combination-trade secret plaintiff must describe the secret with sufficient specificity that its protectability can be assessed and to show that its compilation is unique." *Id.* (internal quotes omitted).

Mareiners has identified its Process with sufficient specificity to enable its protectability and uniqueness to be assessed. Mareiners defined its Process as a combination trade secret consisting of ▮ well-detailed steps that must be complete "*en* route to achieving the desired image ▮▮▮▮▮▮▮▮▮ on the aluminum cards[.]" Ex. 11, Mareiners' 3rd Supp. Resp. to Anomatic's Interrogatories at 8-9, 18. This disclosure enabled experts disclosed by both Parties to assess whether Mareiners' Process is unique.

The experts disclosed by Mareiners examined Mareiners' Process and concluded it comprised of a unique combination of steps.[2] For example, Dr. George Oh examined the steps, individually, and in combination, in Mareiners' Process and opined:

> The Mareiners' Process uses a unique combination of choices to product [*sic*] a high quality, durable ▮▮▮▮ image ▮▮▮ anodized aluminum. Many of the combinations were not known to me. Moreover, Mareiners' Process injects steps that are completely outside of standard anodizing processes, including all steps related to ▮▮▮▮ I have not seen anything similar in the anodize industry.

Ex. 34, Oh Report at 64; *see also id*. at 15-23 (examining the steps of Mareiners' Process, identifying unique features therein, and concluding it is not generally known or readily ascertainable); Ex. 35, Oh Depo at 19:25-20:06 (confirming under Oath that Exhibit 34 is his expert report); *id*. at 55:04-55:25 (Mareiners' Process "is not generally known or readily ascertainable by professionals in the anodizing ▮▮▮▮▮ industry.")

Dr. Jude Runge similarly concluded that "Mareiners' Process is comprised of a unique combination of steps that are not generally know [*sic*] or readily ascertainable[.]" Ex. 36, Runge Report at 16; Ex. 37 (Runge Depo.) at 41:04-15 (identifying same as her expert report); *see also id*. at 75:13-77:8 (testifying that she analyzed the steps in Mareiners' Process and characterizing it as a 'unique process" as compared to "anodizing processes as an industrial whole"); *id*. at 85:11-86:06, (testifying that the "meaningfulness" of the steps in Mareiners' Process is "in how they compliment [*sic*]one another to make a final product"); *id*. at 89:08-23, 90:11-15 (testifying that Mareiners Process is different from others ▮▮▮▮▮ processes in the industry in that it

---

[2] Anomatic's former President and CEO also testified that Mareiners' Process had unique elements. (*See* Ex. 1 (Scott R.) at 253:04-254:03 ("What's critical about this product is … ▮▮▮▮▮▮▮▮▮; *id*. at 254:14-255:22 (testifying that ▮▮▮▮▮▮▮▮ required by Mareiners' Process [*sic*]."); *id*. at 260:01-17 ("I don't know at what point, you know, our team started to get comfortable ▮▮▮▮▮▮ the ▮▮▮▮▮ process, the ▮▮▮▮▮ all of that…. I don't recall if they ever did).)

████████████████████████████ as opposed to ████████████████████

█████████████████████████████████████████████████)

Conversely, Anomatic's experts opine that Mareiners' Process is not unique. Mr. Coudray, who claims no anodizing expertise, (*e.g.*, Ex. 38 (Coudray Depo.) at 208:08-13), testified that Mareiners' Process could be obtained from publicly available literature:

> Q. Yeah; I guess what I'm trying to understand is are you opining that based on the literature that you reviewed, that each step and the sequence of steps that are set forth in Mareiners' Process could be identified from the literature you identified?
> A. I am opining that, yes.

*Id*. at 215:14-20. Mr. Coudray concludes that Mareiners' ███ STEPS are the equivalent of general ingredients and process cooking steps of a recipe and lack the specificity of a unique use case or application." Ex. 39 (Coudray Initial Report) at 75. Mr. Ormiston's Rule 26 Disclosure does not summarize an opinion specific to Mareiners' Process and cannot help Anomatic gain summary judgment over competing expert testimony from Runge and Oh.

Anomatic's claim that "Mareiners squandered the opportunity the Court gave it to correct its failure to define its trade secrets with reasonable particularity" is simply hollow.  The Court did not hold that Mareiners' Process was too vague and inclusive to constitute a trade secret. The Court noted that Mareiners labeled "the entire process and all its individual elements trade secret," because the "several steps and sub-steps and the process could be arranged in an unwieldly number of potential combinations." (Discovery Order, ECF No. 32 at PageID 378-379.) Mareiners responded by identifying "a combination trade secret consisting of … the full ███ step process detailed in Mareiners' Process."[3] Ex. 11 (Pltf's 3rd Suppl. Resp. 1st Set of Interrogatories, dated

---

[3] Mareiners listed additional trade secrets pursuant to the Court's order, Ex. 22  Pltf's 3rd Suppl. Resp. 1st Set of Irogs, dated 10/23/23) at 18, but is only seeking damages under Claims 1 and 2 for the misappropriation of its entire Process. As such, Mareiners is only responding to arguments that implicate the combination trade secret consisting of the 14-steps in Mareiners' Process.

10/23/23) at 18. Doing so undisputably complied with the Court's order. (Notice of Compliance, ECF No. 33; Joint Motion to Change Deadlines, ECF No. 39 (Joint Mot. Change Deadlines) at PageID 415-416 ("[Anomatic] confirmed it was satisfied [Mareiners] complied with the Court's Order.").)

*Next*, Anomatic argues that Mareiners' Process is insufficiently specific because it "is more akin to a choose-your-own-adventure puzzle". (Summary Judgment Memorandum, ECF No. 103 at PageID 1539.) This argument mischaracterizes Mareiners' Process and is unsupported. Mareiners' Process <u>requires every step be completed</u>, but affords licensees with necessary flexibility to account for their particular equipment and target product. For example, Step █ of Mareiners' Process requires ███████████████████████and allows the user to ███████████████████████ App'x II. Similarly, Step█ requires ████████████████████████████████████████████████████ ███████████████████████ *Id.* Anomatic has not and cannot cite case law that holds that a trade secret is insufficiently specific where it identifies additional means that can be used to achieve an end.

Anomatic's argument—that Mareiners' Process is insufficiently defined because it identifies ████████████████ and █████████████—similarly fails. Mareiners' Process requires every step be complete, but identifies ranges or approximate times, recognizing the reality certain steps can be accomplished by using *x* ████████████████████████ than using *y*. Again, Anomatic fails to

---

[4] Anomatic also argues Mareiners' Process is insufficiently specific because of the ████ for the █████ process is "undefined." (ECF No. 103 at PageID 1539.) Mareiners identified an ██████████ in its initial discovery response, Ex. 22 (10/23/23 3rd Suppl. Resp. to Irog at 7 ("*e.g.*, 45-60 seconds")), and there is no dispute that a ██████ was disclosed to Anomatic days after the NDA was signed, Ex. 5 (Dep. Ex. 166) at Slide 12 ████████████████████████ ████████████.

24

provide legal authority supporting its argument that the identification of █████████ ████ renders a trade secret insufficiently specific is unsupported by case law.[5]

Instead, Anomatic relies on cases that support Mareiners' position. (Summary Judgment Memorandum, ECF No. 103 at PageID 1539) (citing *Caudill*, 53 F. 4th Supp. at 583-84)[6]; *id.* at PageID 1542 (citing *Ridge Corp. v. Altun LLC*, No. 2:21-cv-5915, 2023 WL 1765918, at *3 (S.D. Ohio Feb. 3, 2023)).[7] In *Caudill*, the Sixth Circuit affirmed the district court's holding that a plaintiff sufficiently defined its trade secret as "research and development on supplements, broccoli, and chemical compounds" where plaintiff "demonstrated that it had assembled a unique combination of processes and information … at a level of depth beyond merely listing technical concepts." 53 F.4th at 377, 381-82. In *Ridge*,[8] the court found that Mareiners' identification of "the Product and its underlying technology," and research conducted by a former employee, as trade secret information was adequate because it "sufficiently communicat[ed] the boundaries of [Mareiners'] claim." *Ridge*, 2023 WL 1765918, at *7.

Like the trade secrets in *Caudill* and *Ridge*, Mareiners' Process is defined with sufficient specificity as confirmed by Dr. Runge and Dr. Oh. Any debate over this topic in the face of their testimony and reports is proof that material issues of fact remain in dispute and require a jury trial.

---

[6] Anomatic presumably intended to cite "*Caudill*, 53 F.4th at 381 (quoting *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583–84 (7th Cir. 2002))", not *Caudill*, 53 F.4th at 581-582.

[7] Anomatic cited to *Ridge* and other non-binding authority in its Motion, in violation the Court's Order Setting Trial Date and Settlement Conference, which states that "counsel shall cite [any] non-binding authorities *only* in an appendix[.]" (ECF No. 22 at PageID 162 (emphasis added)). Mareiners thus feels due diligence requires it to address such non-binding authority in its Response, as opposed to its appendix.

Anomatic claims that Mareiners' responses to discovery asking Mareiners to identify where the steps of Mareiners' Process appear in Anomatic's patents "highlight the utter lack of specificity contained in" its Process. (Summary Judgment Memorandum, ECF No. 103 at PageID 1539-41.) This is nonsensical. Mareiners provided column and line references from the '655 and '518 patent for each step in Mareiners' Process. See Ex 11, 3rd Amended/Supp. Responses to 2nd Set of Interrogatories. This disclosure was sufficient for Anomatic's counsel to produce two deposition exhibits containing each step and the associated disclosure in an adjoining column. Ex. 40, Claim Chart; Ex. 41, Deposition Ex. 52. In the end, Anomatic's protests highlight the existence of material issues of fact that are in dispute.

### i. Mareiners Process Does Not Contain Vague and Undefined Terms

Anomatic further contends that Mareiners' Process is not sufficiently defined because it contains vague and undefined terms. (Summary Judgment Memorandum, ECF No. 103 at PageID 1541-1544.) First, and most importantly, this argument fails because, as established above, Mareiners identified its Process with sufficient specificity for the experts disclosed by Mareiners to conclude that the combination of steps therein is unique, and for Anomatic's expert to reach an opinion to the contrary. It necessarily follows that both Parties' experts understand the terms in Mareiners' Process[9].

Anomatic's claim that terms in Mareiners' Process are "unclear" is disingenuous. Anomatic's documents and testimony from its employees demonstrate that, long before this litigation, Anomatic knew what the terms in Mareiners' Process meant. (*E.g.*, Ex. 30 (ANOMATIC00003249-3305 (SS)) at 3259 ("The programmable hoist lifts the assembly ▮▮▮▮

---

[9] As discussed above, Anomatic's expert opines that each step set forth in Mareiners' Process could be identified from publicly available literature. Ex. 27 (Coudray) at 215:14-20. To reach this conclusion, Mr. Coudray must have necessarily understood what the terms in Mareiners' Process mean and/or observed that the same terms used in Mareiners' Process are used in the publicly available literature upon which he relies



[REDACTED])[10]; Ex. 31 (ANOMATIC00063433-63434 and 35) at ANOMATIC00063433, 35 (internal Anomatic email detailing information about [REDACTED] that Anomatic "considered a trade secret", noting that [REDACTED] and referencing [REDACTED] in connection with same); Ex. 42 (Caudill) at 74:17-75:7 ("we had [REDACTED] the cards"); Ex. 43 (Ormiston) at 48:25-49:25 ("there's a lot of [REDACTED] that goes on. There's [REDACTED]—on these lines"); *id.* at 63:18-64:11 ("We have to [REDACTED] the belt and that tooling because you're going to [REDACTED]; *id.* at 75:19-77:08 (referencing [REDACTED]; *id.* at 52:03-53:06 [REDACTED]; *id.* at 47:14-48:24 [REDACTED]; *id.* at 50:11-22 (referring to [REDACTED]; *id.* at 75:19-77:08 (testifying that in a [REDACTED] process "you have to get rid of all the [REDACTED]); *id.* at 166:18-167:06 (acknowledging that Mr. Goertzen "probably" "emphasize[d] the need for a more [REDACTED] and referencing an [REDACTED]; Ex. 44, 2/12/18 Meeting Notes at 5 (Anomatic engineer noting the need to [REDACTED])

Anomatic's conduct following this Court's Opinion and Order, (Discovery Order, ECF No. 32), on its Motion to Compel and for Protective Order, (Motion to Compel, ECF No. 25), confirms that the terms in Mareiners' Process are not vague and undefined. Anomatic moved for "an order compelling [Mareiners] to disclose its trade secrets with reasonable particularity," arguing (i) clarity was needed in how Mareiners listed its trade secrets; and (ii) Mareiners' Process used "vague and undefined terms." Discovery Order, ECF No. 32 at PageID 378-380. The Court granted

---

10

the motion, "urge[d] the parties to confer and attempt to arrive at a common understanding regarding Plaintiff's use of terminology," and advised—if they could not—"Plaintiff should be prepared to support its use of language with an expert declaration." *Id.* at PageID 380. At Anomatic's request, the Court also entered a protective order that "Defendant need not produce any confidential discovery until Plaintiff has identified the allegedly misappropriated trade secrets with reasonable particularity." *Id.* at PageID 373.

Mareiners responded by "supplement[ing] its discovery responses with specificity" and Anomatic represented to Mareiners and the Court that "it was satisfied that the discovery response complied with the Court's Order." Joint Motion to Change Deadlines, ECF No. 39 at PageID 415-416. Anomatic then proceeded to "review and produce confidential documents responsive to" Plaintiff's [discovery requests]." *Id.* at PageID 416. If Anomatic truly believed that the terms were vague and undefined, it should have insisted that Mareiners submit an expert declaration *before* it produced confidential information that it was not required to produce until it was satisfied that Mareiners' trade secrets were sufficiently defined. Anomatic neither did so then, nor did it request an expert declaration at any point thereafter.

Nonetheless, Mareiners provided further information supporting the use of language in its Process. Dr. Oh and Dr. Runge issued detailed expert reports that methodically analyze each step in Mareiners' Process—alone and in combination—"against the backdrop of standard, commonly practiced anodizing processes," demonstrating the meaning and use of terms in the context of Mareiners' Process. Ex. 36, Runge Rpt. at 11-15; *see also* Ex. 34, Oh Rpt. at 15-22. Moreover, Anomatic deposed both these experts and, when asked, they explained the meaning of terms that Anomatic claims are vague. (*E.g.*, Ex. 35 (Oh Tr.) at 116:20-117:13 (explaining ████████ ; *id.* at 77:24-78:18 (explaining ████████ ); *id.* at 120:06-19 (explaining ████████ *id.* at 130:11-13 ████████ refers to the ████████ .

Anomatic's focus on Mr. Goertzen's testimony is, again, misplaced. Anomatic argues that "Mareiners *itself* does not even understand what" terms mean in its Process because, in Anomatic's view, Mareiners could not explain the difference between steps that are in its Process, and steps that are not. (Summary Judgment Memorandum, ECF No. 103 at PageID 1542-43.) Mareiners need only identify the components of its process with sufficient specificity to "show that [their] compilation is unique." *Caudill*, 53 F.4th at 381 (citation omitted). The needless attacks on Mr. Goertzen, who has been teaching this process to licensees for over two decades without complaint, underlines that material issues of fact are in dispute and require a jury to resolve.

      ii. <u>Summary Judgment is Improper Even if Mareiners Has Not (It Has) Sufficiently Identified the Trade Secrets,</u>

Anomatic argues that the "Mareiners Process and ███ Process are simply not described with reasonably particularity", that this is "case dispositive," and that "Mareiners is not entitled to trade secret protection and the Court should enter judgment in Anomatic's favor on Counts I and II of the Amended Complaint." (Summary Judgment Memorandum, ECF No. 103 at PageID 1544.) But Anomatic does not cite a single instance in which a court determined at the summary judgment stage that a trade secrets claimant failed to identify a trade secret with sufficient particularity. This is unsurprising given that the question of whether a claimant sufficiently disclosed its trade secrets is a fact-specific question decided on a case-by-case basis. *Handel's Enters.*, 765 F. App'x at 122 ("The question of whether something is a trade secret is a question of fact to be determined by the trier of fact upon the great weight of the evidence."); *Caudill*, 53 F.4th at 381 ("Whether a particular type of information constitutes a trade secret is a question of fact."). The undisputed facts set forth in Section IV.A.1.a.i-ii, *supra*, arguably establish that Mareiners sufficiently disclosed its Process. At baseline, they demonstrate genuine issues of material fact exist and summary judgment on Counts I and II is improper.

### a. Whether Mareiners' Disclosed its Two Standalone Trade Secrets in the '202 Patent is Irrelevant

Anomatic's argument that U.S. Patent No. 7,022,202 (the "'202 Patent") discloses the ███████████ Process" and the ████████ Process" is moot. Though Mareiners identified those individual steps of its ████████ Process as standalone trade secrets that Anomatic also misappropriated, Mareiners will not ask the jury to find damages based on misappropriation of either one of these trade secrets alone. Mareiners will only ask the jury to award damages if it finds that Anomatic misappropriated Mareiners' combination trade secret consisting of the ████████ defined as Mareiners' Process. Though Mareiners disputes Anomatic's argument that the '202 Patent discloses Mareiners' standalone trade secrets, it is not addressing Anomatic's arguments here, as their alleged disclosure is irrelevant to whether Mareiners' Process constitutes a legally protectable trade secret.

### 3. Genuine Issues of Material Fact Exists as to Whether Defendant Misappropriated Mareiners' Process[11]

Whether a trade secret has been misappropriated is a question of fact for the jury. *See, e.g.*, *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x 398, 409–10 (6th Cir. 2013) (whether trade secret was publicly disclosed was a question of fact for fact finder); *see also Rogers Indus. Prods. Inc. v. HF Rubber Mach.*, 936 N.E.2d 122, 127-28 (Ohio. Ct. App. 2010) (reversing a trial court's award of summary judgment on a misappropriation claim because genuine

---

[11] Anomatic's Motion addresses misappropriation of the ████████ Process" and ████████ Process Combination Trade Secret" separately from misappropriation of Mareiners' Process. (Summary Judgment Memorandum, ECF No. 103 at PageID 1546-53.) Though Mareiners identified the ████████ Process" and ████████ Process" as trade secrets that Anomatic misappropriated, Mareiners will not ask the jury to find damages based on misappropriation of either of these trade secrets alone. As noted above, Mareiners will only seek redress for misappropriation of Mareiners' combination trade secret consisting of the ██ steps defined as Mareiners' Process. As such, Mareiners' response is directed to misappropriation of Mareiners' Process as a whole—it does not separately address misappropriation of the ████████ Process" or ████████ Process."

issues of material fact existed as to whether patent application disclosed trade secret design). As

Anomatic states "[u]nder the DTSA and the OUTSA, one generally misappropriates a trade secret

through disclosure or use of a trade secret without express or implied consent." (Summary

Judgment Memorandum, ECF No. 103 at PageID 1546 (citations omitted).)

> Unauthorized use or disclosure
>
> need not extend to every aspect or feature of the trade secret; use of any substantial portion of the secret is sufficient to subject the actor to liability. Traditional trade secret law recognizes that the user of another's trade secret is liable even if he uses it with modifications or improvements upon it effected by his own efforts, so long as the substance of the process used by the actor is derived from the other's secret. This tradition has a solid foundation: if a trade secret misappropriator could avoid liability by changing a few details in their final product, the protections that law provides would be hollow indeed.

*Caudill*, 53 F.4th at 384-95 (internal quotes and citations omitted).

> The Sixth Circuit has recognized that,
>
> even if such a requirement existed, it would make a good deal of sense to relax it in a combination-trade-secrets case like this one, in which the acquired trade secret is comprised a party's entire … process. That is because when a trade secret consists of … information that has been collected and sorted, it will always be possible to identify increasingly minute details of the combination that a plaintiff would need to show were specifically misappropriated." *Id.* Thus, "[t]rade secrets law does not demand a mirror-image between the misappropriated secrets and the eventual product derived from them."

*Id.* at 386 (citations omitted).

Defendant ignores Sixth Circuit law, the well-pleaded complaint, and the facts of this case.

Defendant incorrectly claims "there is no allegation of misappropriation based on use." Summary

Judgment Memorandum, ECF No. 103 at PageID 1546. Accordingly, it does not move for

summary judgment on Mareiners' claims that Anomatic misappropriated Mareiners' Process by

improperly *using* it. Instead, it solely focuses on whether Anomatic misappropriated Mareiners'

trade secrets via *disclosure* in the Anomatic Patents. Here, it improperly argues that the Court

should rule as a matter of law that "the information disclosed by the Anomatic Patents is

insufficient to allow another to learn and replicate Mareiners Process." *Id*. at PageID 1556-1557. As Anomatic did not attempt address Anomatic use of Mareiners' Process to obtain patents on Mareiners' image anodized transaction cards, summary judgment may be denied without addressing disclosure. Regardless, material issues of fact clearly exist on whether Anomatic did in fact disclose trade secrets in its patent application as detailed in response to Interrogatories 5 and 6, and as detailed in Anomatic's own deposition exhibits – Exhibit 50 and 52. Ex. 40 (Dep. Ex. 50); Ex. 41 (Dep. Ex. 52).

### a. There is a Genuine Issue of Material Fact as to Whether Anomatic Used Mareiners' Process

#### i. Anomatic's Failure to Even Attempt to the Show the Absence of a Genuine Dispute of Material Fact Precludes Summary Judgement on Counts I and II

Defendant attempts to mislead the Court and avoid undisputed facts that clearly show it wrongfully utilized Mareiners' Process by representing that "there is no allegation of misappropriation based on use." *Id*. at PageID 1546. This representation is contrary to the Court's order denying Anomatic's motion to dismiss, acknowledging that "Plaintiff alleges that the '655 patent used and openly published Plaintiff's trade secrets." (Order Denying Motion to Dismiss, ECF No. 34 at PageID 388.) Incredulously, Anomatic made this representation to the Court on the same day it filed a different motion acknowledging that Mareiners "has brought five causes of action … centered around claims that Anomatic ***improperly used Mareiners' alleged trade secrets*** and obtained patents over technology that Mareiners' Mr. Goertzen alleged conceived." Motion to Bifurcate, ECF No. 101 at PageID 1507.

As both this Court and Anomatic have recognized, Mareiners alleges misappropriation based on use, and disclosure. Throughout this action, Mareiners has alleged, among other things, that the Anomatic Patents "explicitly disclose[] and claim[] Mareiners' trade secrets" by "claim[ing] the by-product of Mareiners' trade secrets" and "disclosing to the world, in a stepwise

fashion, how to accomplish" Mareiners' Process," resulting in "significant harm financial harm to Mareiners." (Complaint, ECF No. 1 at PageID 5 ¶¶ 14-16; *see also* First Amended Complaint, ECF No. 77 at PageID 890-91 ¶¶ 83-85.) Thus, Mareiners gave Anomatic "fair notice of the nature and basis or grounds for a claim" of its misappropriation claim based on Anomatic's use. *U.S. S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (citing Fed. R. Civ. Pro. 8(a)(2)); *AtriCure, Inc. v. Jian Meng*, 842 F. App'x 974, 982 (6th Cir. 2021) ("'[U]se' is a broad term for trade secrets. As a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment of the defendant is a 'use.') (citation omitted). Defendant recognized as much in its motion to dismiss. (Motion to Dismiss, ECF No. 9 at PageID 59 (arguing "the use of Mareiners' alleged trade secrets cannot be misappropriation").)

Nonetheless, Anomatic attempts to argue otherwise by claiming Mareiners' disclaimed any use-based theory of misappropriation in a footnote in its response to Anomatic's motion to dismiss. This argument fails for three reasons. *First*, and most importantly, Mareiners' use-based misappropriation theory "does not cause a 'shift in the thrust of the case' that would prejudice [Anomatic] because [Mareiners'] initial [and amended] complaint[s] specifically identif[y] the legal and factual bases for its claim[.]" *Sierra Brokerage*, 712 F.3d at 327 ("The federal rules, and the decisions construing them, evince a belief that when a party has a valid claim, he should recover on it regardless of his … failure to perceive the true basis of the claim at the pleading stage."(citation omitted)).

*Second*, the footnote does not constitute a disclaimer of a use-based theory of misappropriation because the Court's decision did not rely upon Mareiners' representation that Anomatic's disclosure of Mareiners' trade secrets was the basis of its misappropriation claims. To the contrary, the Court acknowledged that Mareiners alleged both use- and disclosure-based theories of misappropriation and denied Anomatic's motion nonetheless. (Order Denying Motion

to Dismiss, ECF No. 34 at PageID 387-88.) *Finally*, Anomatic cannot claim prejudice because Mareiners expressly notified Anomatic over a year ago that it disagreed with its disclaimer argument and was pursuing use-based theories of misappropriation. (Joint Status Report, ECF No. 49 at PageID 467 ("Mareiners disagrees" that the footnote is a "disclaimer of any other form of alleged misappropriation."); *id.* at PageID 468 (Mareiners "asserts that it is entitled to seek information on other ways in which Anomatic[] has misused its trade secrets.").

The Court can and should deny summary judgment on Mareiners' misappropriation claims on the sole ground that Anomatic failed to address Mareiners' use-based misappropriation claim. Anomatic knew Mareiners' misappropriation claims "center around claims that ***Anomatic improperly used Mareiners' alleged trade secrets***." (Motion to Bifurcate, ECF No. 101 at PageID 1507.) Yet, it did not argue, let alone not show, that there is no genuine dispute as to any material fact regarding Mareiners' claim that Anomatic misappropriated its trade secrets by using them in the Anomatic Patents. For this reason alone, summary judgment on the misappropriation claims is improper.

ii. Anomatic Used Mareiners' Process in the Anomatic Patents

Mareiners detailed Anomatic's use[12] of Mareiners trade secrets in response to Interrogatory 5, 6, 8 and 9 as well as Exhibit A thereto. Moreover, Mr. Oh opines that steps of Mareiners' Process are disclosed in the Anomatic Patents. Ex. 35, Oh Depo. at 164:14-20, 166:14-168:4, 169:01-170:23, 172:4-17, 174:17-175:15, 176:07-177:13. Based upon this unlawful use, Anomatic was awarded three US Patents and a monopoly over Mareiners' image anodized transaction cards. In the face of this evidence, Anomatic cannot meet its burden to show that there is no genuine

---

[12] Anomatic itself admits that the Anomatic Patents include at least some of the steps in Mareiners' Process. [*See* ECF No. 103 at PageID 1553 ("The Anomatic Patents omit a ... portion … of Mareiners' alleged ███ Step Process.").)

dispute of material fact as to whether Anomatic used Mareiners' Process in the Anomatic Patents. Anomatic did not try. Summary judgment should be denied relative to use of Mareiners Trade Secrets.

Beyond this direct evidence, the case law is clear that circumstantial evidence alone can be sufficient in a trade secrets case. *Stratienko v. Cordis Corp.*, 429 F.3d 592, 600 (6th Cir. 2005). "Misappropriation can rarely be proved by convincing direct evidence." *Eden Hannon & Co. v. Sumitomo Tr. & Banking Co*., 914 F.2d 556, 561 (4th Cir. 1990) (quoting *Greenberg v. Croydon Plastics Co., Inc.*, 378 F. Supp. 806, 814 (E.D. Penn. 1974)). Instead, plaintiffs are usually required to present circumstantial evidence in contradiction of outright denials by self-serving defendants like Anomatic. *See id.*

Here, circumstantial evidence will clearly demonstrate that Anomatic used Mareiners' Process in the Anomatic Patents. By way of example, Anomatic, its executives, or employees:

- Agreed it was appropriate to "communicate to potential customers the process used on the aluminum cards is a proprietary process owned by Mareiners, LLC, and Reiner Goertzen." Ex. 15, Steve R. at 173:18-174:07.;

- Admitted that Mr. Goertzen is the sole "innovator of the anodized aluminum credit card" with ▮▮▮▮▮▮ that Anomatic was looking to bring to market." Ex. 1, Scott R. at 282:11–283:07;

- Admitted that Mr. Goertzen should have been given inventorship credit in the patent applications Anomatic filed that matured into the Anomatic Patents. Ex. 15, Steve R. at 218:10–23;

- Had to "get comfortable with the ▮▮▮▮▮▮▮▮▮▮▮▮▮ process, the ▮▮▮▮▮▮ all of" the steps of the ▮▮▮▮▮▮ process that Mr. Goertzen shared with [Anomatic]" Ex. 18, Scott R. at 260:01-11;

- Recognized that Mareiners' Process required a ▮▮▮▮▮▮▮▮▮▮▮▮▮ than what Anomatic ▮▮▮▮▮▮ Ex. 1, Scott at 260:01-12; Ex. 2, Caudill at 192:16-22; Ex. 44, ID Card Meeting Notes at 3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- Admitted that the reference in its credit card marketing materials to "Anomatic's patented digital image anodizing process" actually refers to a process owned by Mareiners. Ex. 1, Steve at 139:05-142:04.

This circumstantial evidence, standing alone, establishes a genuine issue of material fact regarding whether Anomatic misappropriated Mareiners' Process by using it in the Anomatic Patents.

In the context of its *disclosure* argument, Anomatic argues that the Anomatic Patents omit certain steps in Mareiners' Process, and, include "two intervening"[13] steps that Anomatic characterizes as "material deviations." (Summary Judgment Memorandum, ECF No. 103 at PageID 1547-54.) Anomatic "cannot avoid liability in this fashion…. Trade-secrets law does not demand a mirror-image between the misappropriated secrets and the eventual product deprived from them." *Caudill*, 53 F.4th at 385-86. This is especially true where, as here, a combination trade secret is at issue, because "an even higher threat exists of a misappropriating party changing one element of a combination to evade liability." *Id.* The Court need not consider Anomatic's arguments because the direct and circumstantial evidence demonstrate that Anomatic used Mareiners' Process in the Anomatic Patents. "Holding otherwise would" allow a "trade-secret thief [to] misappropriate a … process, design a competing product in far less time than it would have otherwise taken, and avoid liability because it did not debut the same product as its victim-competitor." *Id.*

    **b. There are Genuine Disputes of Material Fact as to Whether Anomatic Disclosed Mareiners' Process in the Anomatic Patents**

---

[13] The "intervening steps" that Anomatic identifies are not material, as Anomatic claims. (ECF No. 103 at PageID 1552-53 (describing two intervening steps). First, with respect to ████████ Mareiners' Process similarly calls for ████████████████████████████ ██████████████████████████ App'x II at Step 1(b)-Step 2. With respect to the ███████████████ the Anomatic Patents disclose it as an optional step, (Exs. 35, 36 ('655, '518) at ████████████████████████████ ██████████████████, as it ████████████████████████████ (*see* Anodized Aluminum Technical Primer, ECF No. 104-46 at PageID at 3229.), not improve image quality.

Anomatic spends twelve pages of its brief arguing that it is entitled to summary judgment because the Anomatic Patents do not *disclose* Mareiners' alleged trade secrets. As noted above, the Court need not consider these arguments because Anomatic failed to show there is no genuine dispute of material fact regarding the *use* of Mareiners' Process in the Anomatic Patents. In any event, genuine issues of material fact preclude summary judgment on Mareiners' claim that Anomatic disclosed Mareiners' Process in the Anomatic Patents.

Mareiners can demonstrate that an anodizer could replicate Mareiners' Process from the disclosures in the Anomatic Patents. Mareiners' Process is comprised of a "unique combination" of steps, many of which are generally known, while others "are completely outside of standard anodizing processes." Ex. 34 Oh Rpt. at 64; *but see* Ex. 38 (Coudray Depo.) at 215:14-20 (opining that each step and the sequence of steps that are set forth in Mareiners' Process could be identified from publicly available literature). Evidence in the record demonstrates that the "meaningfulness of Mareiners' Process is in the way the ███████ steps compliment [*sic*] each other to make a final product." Ex. 37 (Runge) at 85:11-86:07. Specifically, Mareiners' Process defines "range[s] of operating an anodizing process" that allow for the crisp application of multi-colored images ███ ███████ anodized aluminum alloy surface. Ex. 37 (Runge) at 95:16-96:04; Ex. 11 (10/23 3rd Supp. Resp) at 8).

Substantial evidence demonstrates that the Anomatic Patents disclose the critical, unique combinations of Mareiners' Process. There is no dispute that Step █ of Mareiners' Process, wherein ████████████████ "during the aluminum anodizing process, ███████████ is not well known." Ex. 34, Oh Rpt. at 21; Ex. 35 (Oh) at 51:10-52:18;  Ex. 37 (Runge) at 89:08-90:15; Ex. 2 (Caudill) at 175:16-176:18, 179:03-08; Ex. 45 (Hobbs) at 24:20-25:01. Anomatic recognized this and decided not to use the word ██████████ in its marketing materials so it could keep Mareiners' Process "secret to some degree." Ex. 10 (MAR00015582); *see also* Ex. 15 (Steve)

237:25-239:19).). It then turned around and obtained the Anomatic Patents, without consulting Mr. Goertzen, wherein it not only used the word ██████████ but detailed where in the anodizing process this key step occurs.

The Anomatic Patents also disclose Mareiners' key teachings that enable the ████████ high-resolution image to be crisp and durable. Mareiners' Process calls for ████████████████ ████████ Appx. II at Step 2. Evidence in the record shows that ████████████████ ██████ requirement for the successful embodiment of a high resolution, multi-colored image ████████████████████████████████ makes this step not generally known or readily ascertainable."[14] Ex. 36, Runge Rpt. at 13; *see also* Ex. 37 (Runge) at 41:04-09; Ex. 34 Oh Rpt. at 18 ████████████████████████████ is not generally known or readily ascertainable."); Ex. 35 (Oh) at 20:04-10. Nonetheless, the Anomatic Patents disclose the range dictated by Mareiners' Process. In fact, they go a step further, disclosing ████████████████████████████ that Mr. Goertzen disclosed to Mr. Ormiston. Ex. 43 (Ormiston) at 170:23-172:05; Exs. 2, 3 ('655 and '518 Patents) at ████████████ ██ A fact that Anomatic confirmed after conducting at least twelve trials. Ex. 42 (Caudill) at 212:09-214:13, 227:11-229:06.

The Anomatic Patents also disclose the Process' "most drastic divergence from standard anodizing practice." Ex. 34, Oh Rpt. at 19. After the ████████ step, Mareiners Process requires

---

[14] The statement in Anomatic's manual that ████████████████████████████ ████████████ Anomatic Training Manual, ECF No. 103-45 at PageID 1608), does not establish that ████████ is required to ████████ Anomatic's handbook makes no reference to preferred ████████ for the various decorative techniques it describes, let alone a reference to Anomatic even having knowledge of ████████ Moreover, the record indicates that Anomatic typically applied ████████████████ and had to adjust their anodizing line to accommodate Mareiners' Process. Ex. 32 (Caudill) at 192:16-22; Ex. 33 (Dep. Ex. 274) at 3

█████████████████████████████████████████████████████████████████

████████████████████████████████████████ Appx. II at Step 3. Mareiners' experts opine that

"[t]he ██████████████████████████████████ is not at all known in any context," and

therefore not readily ascertainable in ███████████████████" Ex. 34, Oh Rpt., at 19; *see also*

Ex. 35 (Oh) at 20:4-10; *id.* at 132:24-133:17 (testifying that ████████████████████████ is

"exceedingly rare and unknown"); Ex. 36, Runge Rpt., at 14 ("[I]t is highly unusual to ████████

████████████████████████████████████████ Moreover, the ████████████████████████

███████ is not standard practice and would strike most anodizers as unnecessary."); Ex. 37

(Runge) at 41:04-09.)

      The record supports these opinions. In 2010, Mareiners discovered that its licensee was

getting poor results because it "refused to [follow Step █ because they said it's not necessary."

Ex. 46, 2/9/10 Email from R. Goertzen to J. Maack. Because the ██████████ was ███████

properly with ██████████████████████████████████████████████████████████

███████████████████ as Mareiners instructed, ████████████████████████████████

█████████████████████████ *Id.* Anomatic similarly had to adjust its standard process by ████

█████████████████████████████████████████████████████████████████

██████████ Ex. 44, ID Card Meeting Notes at 5 ████████████████████████████████;

Ex. 42 (Caudill) at 19:17-20:22 (testifying that in standard anodizing processes ████████████

████████████████████████████████████████.) Though this step in Mareiners' Process

constitutes a "drastic divergence from standard anodizing practice," the Anomatic Patents disclose

it. (*Compare* Ex. 2, 3 ('655, '518) at ██████████████████████████████████████████





████████████████████████████████████ However, other parameters may be utilized) *with* Appx. II at Step 3).

 The record also shows that the use of ██████████████████████ (Appx. II at Steps 12-13), to ██████████████ is not generally known or readily ascertainable in the industry. Ex. 35 (Oh) at 145:15-146:02 ████████████████████████ ████████████); *id.* at 160:13-22 (acknowledging ████████ is a known ██████ option generally, but it's not well known that it should be used in the context of ██████ into anodized aluminum); *id.* at 176:04-177:13, *id.* at 179:19-180:09 (acknowledging that an anodizer could do testing to determine if █████████████████████ "[a]ssuming they have the time and facilities to do the testing."); *see also* Ex. 37 (Runge) at 103:16-105:01; *id.* at 107:18-109:01 ("The sequence of steps in combination ████████ is rather brilliant, in my opinion.").)

 Anomatic's own documents illustrate this fact. Anomatic's Anodized Aluminum Technical Primer details decorating techniques it employs—none of which involve ████████████████ ██████████████ (*See generally* Anodized Aluminum Technical Primer, ECF No. ████) The most analogous decorative process that Anomatic references is a ██████████ process, wherein █████████████████████████████ (Anomatic Training Manual, ECF No. 104 ██ at ██████████ Here, Anomatic ██████ the part ██████████ —it did not use ██████████████████████ *Id.* The record indicates that Anomatic did not think of using ██████████████████████ until Mr. Goertzen trained Anomatic's employees. (*See* Ex. 42 (Caudill) at 129:12-24, 201:03-13); Ex. 44, ID Card Meeting Notes at 5 ████████████████ ████). Again, Anomatic turned around and disclosed these critical steps in Mareiners' Process in the Anomatic Patents. (*Compare* Appx III at ██████████ *with* Anomatic Patents Process, ECF No. 103-2 at PageID 1604.) Given the foregoing disclosures, a reasonable jury could conclude that

one skilled in the art of anodizing could replicate Mareiners' Process based upon the specification in Anomatic's Patents.

Anomatic argues in a conclusory fashion that the Anomatic Patent's omission of steps in Mareiners' Process is "dispositive because they preclude even those skilled in the art from replicating the Mareiners' Process." (Summary Judgment Memorandum, ECF No. 103 at PageID 1554.) But the Sixth Circuit has clearly stated that "[t]rade-secrets law does not demand a mirror-image between the misappropriated secrets and the eventual product derived from them." *Caudill*, 53 F.4th at 386 (citation omitted). And the *UniRAM* decision upon which Anomatic relies to argue otherwise clearly states that "it is not true as a matter of law that [plaintiff's misappropriation] claim will survive *only if* [the] disclos[ure] [is] the exact combination[] that make up its trade secrets." *UniRAM Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*, 617 F.Supp.2d 938, 942-43 (N.D. Cal. 2007) (denying summary judgment because the question of disclosure "is a question of fact to be decided at trial").

At this juncture, Anomatic has not and cannot establish that the alleged omissions are dispositive. The alleged omissions "may be naturally related to one other, … may be standard in the industry, [or] may be obvious to those skilled in the art[.]" *Id.* at 943.[15] Evidence in the record supports that someone skilled in the art could identify and plug in the missing steps of the Anomatic Patents and replicate Mareiners' Process. (*See, e.g.*, Ex. 43 (Ormiston) at 59:24-60:17 ("You always want to ████████████████████); Ex. 39 (Coudray) at 220:10-222:11 (opining that Step █ Step █ Step █ and Step █ of Mareiners' Process are generally known or readily available); Ex. 35 (Oh) at 140:21-25 (It seems "fairly straightforward that" if you are doing

---

[15] Again, Mareiners is only addressing this non-binding authority here, as opposed to in its Appendix, to respond to Anomatic's (improper) reliance of the same in its Motion.

██████████████████████████████████████████ you "should ███████████████████████████████
██████████

Anomatic argues that the testimony of a Mareiners' licensee "conclusively establishes that the information disclosed by the Anomatic Patents is insufficient to allow another to learn and replicate Mareiners Process." Summary Judgment Memorandum, ECF No. 103 at PageID 1556. This argument is meritless and actually demonstrates that Mareiners' Process is, in fact, a trade secret. Step █ and █ of Mareiners' Process generally call for ████████████████████████████ ████████████████████████████ App'x II.

Instead of including the details of the ████████████████████████████████████ ██████████████ in its Process, Mareiners' maintains them as separate trade secrets. Ex. 11, 10/23 Plts' 3rd Supp. Discl. at 14-16. The fact that licensees pay Mareiners a signing fee and a royalty for the use of its Process alone, with the understanding that Mareiners would not provide the details of the ████████████████████████████████████████████████ (Affidavit of Gregory J. Maack, ECF No. 104-40 at PageID 3169-70 ¶¶ 11, 15-17), establishes that Mareiners' Process has independent economic value. The independent economic value of Mareiners' Process is further demonstrated by the fact that obtaining the details of the ████████████████████████ ████████████████████████████████████████ comes at an additional cost. (*See id.* at PageID 3171 ¶ 23.)

To argue that Mareiners Process cannot be replicated "if one does not know Mareiners' ██████████ Process and its ████████████████████████████████ Summary Judgment Memorandum, ECF No. 103 at PageID 1555, Anomatic misrepresents the testimony of Mareiners' licensee and ignores that of its own employees. The licensee did not testify "it is impossible, even with professional assistance, to replicate Mareiners' Process," as Anomatic represents. *Id.* To the

42

contrary, he testified that his company was able to replicate Mareiners' Process, but the results were not "high-quality" and "properly colored." *Id*. at PageID 3171 ¶ 20.

Anomatic's own employee and expert acknowledge that Mareiners' Process can be replicated without disclosure of the details Mareiners' ████████ Process and ██████████████ ████████ In fact, its engineers testified that they opted against using Mareiners' expertise in favor of another company that "was more familiar ████████████ and actually, we got better results." Ex. 42 (Caudill) at 174:08-175:23.) Clearly, genuine issues of material fact exist as to whether someone skilled in the art could replicate Mareiners' Process based on the disclosures in the Anomatic Patents. For these reasons, summary judgment on Mareiners' misappropriation claim is improper.

### 4. ANOMATIC'S ARGUMENTS REGARDING DAMAGES ARE NOT A BASIS FOR GRANTING SUMMARY JUDGMENT

#### a. Mareiners Has Put Forth and Identified an Admissible Damages Theory, and, in Liu of Actual Damages, Mareiners is Entitled to Other Relief

Mareiners has disclosed the expert report of Jeff George, and, as detailed in Mareiners' contemporaneously filed response in opposition to Defendant's *Daubert* motion, Mr. George should be permitted to testify. In such case, there is no dispute that Mareiners can establish damages and Anomatic's motion for summary judgment should denied.

In any event, summary judgment would still be improper because Anomatic's argument that an order granting its *Daubert* motion would entitle it to judgment is unsupported by the law and the facts. To support this argument, Anomatic proclaims that damages is "the final element of its trade secret misappropriation claims." Mot. Summ. J., ECF No. 103 at PageID 1557 (citing *Presidio, Inc. v. People Driven Tech., Inc.*, 686 F. Supp. 3d 652, 692 (S.D. Ohio 2020); 18 U.S.C. § 1836(b)(3)(B)) Defendant's reliance on *Presidio* is misleading in multiple respects.

43

*First*, Defendant's represents that the *Presidio* opinion is binding authority from the Sixth Circuit. The *Presidio* decision is actually out of the Southern District of Ohio, and as such, is non-binding authority. *Second,* Defendant's placement of the parenthetical quote after the citations to the DTSA and OUTSA suggest the quoted language comes from those statutes. *Third*, the quoted language is *dicta*—the Court denied summary judgment in that case, much like it should here, on the basis that Plaintiff put forth sufficient evidence of damages. *Presidio* does not establish that damages is an element of a claim for misappropriation of trade secrets. *See generally Presidio*, 686 F. Supp. 3d at 682-83.

To the contrary, the Ohio Court of Appeals examined OUTSA § 1333.61 and held "as evident from the text of the statute, proof of damages is not an element for a valid claim of misappropriation." *Boehm v. Black Diamond Casino Events, LLC*, 116 N.E. 3d 704, 708-09 (Ohio Ct. App. 2018) (citing Ohio Rev. Code § 1333.61 ("[T]he trial court erred as a matter of law in requiring proof of damages for a claim of misappropriation of trade secrets.")). Like the OUTSA, the text of the DTSA does not include proof of damages as an element of a valid claim of misappropriation. *Compare* Ohio Rev. Code § 1333.61-64 *with* 18 U.S.C. § 1836.

Thus, even if Defendant's *Daubert* motion to exclude Mr. George's testimony on damages is granted (it should not be), Anomatic's summary judgment motion fails. In addition to actual damages, the OUTSA and DTSA provide additional remedies such as a reasonably royalty, unjust enrichment, injunctive relief, exemplary relief, and attorneys' fees. 18 U.S.C. § 1836(b)(3)(A)-(D); Ohio Rev. Code § 1333.62-64. Therefore, regardless of the ruling on Defendant's *Daubert* motion, Mareiners is entitled to bring its case before a jury, and should have the opportunity to seek redress for Anomatic's malicious and illegal behavior, (*see* Mareiners' 3rd Amended Responses to Anomatic's 2nd Set of Discovery, ECF No. 104-35 at PageID 2998-3003 (explaining Mareiners' entitlement to punitive and treble damages)),  including an award for Anomatic's unjust

44

enrichment,[16] ownership of the Anomatic Patents, Mareiners' attorneys' fees, exemplary damages, and/or an order requiring Anomatic to pay Mareiners a reasonable royalty on any product Anomatic sells using Mareiners' trade secrets.

### b. Apportionment is Not a Factor in this Case

Anomatic's argues that Mareiners' "failure to apportion damages is fatal to Mareiners" case. This argument fails because: (1) Mareiners is only seeking damages for the misappropriation of one trade secret—the combination trade secret consisting of the 14-steps defined as Mareiners' Process; (2) it fails to account for the fact that the other asserted trade secrets are subsumed in Mareiners' Process; (3) incorrectly assumes that just because two asserted trade secrets were not disclosed in Anomatic's patents, that Mareiners' Process could not be replicated by one skilled in the art of anodizing; and (4) fails to account for the possibility that a jury could find that Mareiners' use of Mareiners' Process resulted in the lost opportunity that Mr. George calculated.

Anomatic is correct that Mr. George opined on the lost business opportunity that resulted from Mareiners' misappropriation of trade secrets and breach of contract. But it is incorrect in arguing that his approach needed "to apportion damages on a trade secret by trade secret basis." Mareiners is not seeking damages for the misappropriation of any trade secret other than the combination trade secret consisting of the 14-steps defined as Mareiners' Process. Because Mareiners is only seeking damages for one trade secret, there is nothing to apportion. As such, Anomatic's argument is moot.

---

[16] If the Court grant Anomatic's *Daubert* motion, Mareiners should be entitled to present factual evidence demonstrating Anomatic's unjust enrichment, such as the exclusivity fees Anomatic refused to pay, opting instead to obtain exclusivity via the Anomatic Patents. (*See, e.g.*, Ex. 1 (Scott) at 146:17-24; Ex. 52 (ANOMATIC00239880, ANOMATIC00239881-ANOMATIC00239889) at ANOMATIC00239889.)

Even if Mareiners *was* planning to submit a claim for misappropriation of Mareiners' Process *and* the other the asserted trade secrets (again, Mareiners will only ask for damages if the jury finds Anomatic misappropriated Mareiners' Process), summary judgment would still be improper. Mareiners' Process is a combination trade secret consisting of ██ steps. All of the other trade secrets that Mareiners asserted were misappropriated are steps within Mareiners' Process. Ex. 11, 10/23 3rd Suppl. at 18 (identifying Mareiners Process as a combination trade secret and separately identifying steps therein that Mareiners contended are separate combination and standalone trade secrets). As such, Mareiners' argument that Mr. George's approach fails as a matter of law would be premature, even if Mareiners were pursuing damages for misappropriation of both Mareiners Process and the separately claimed trade secret steps therein. Under that hypothetical scenario (which is not present here), Mr. George's opinion would arguably provide an insufficient basis for an award *if* the jury found that Anomatic misappropriated certain steps, but not Mareiners' Process. If, however, the jury found that Anomatic misappropriated Mareiners' Process, then Mr. George's opinion would provide a reasonable basis for an award because the other asserted trade secrets are subsumed with the Process. Fortunately, the Court need not engage in this analysis because Mareiners is only seeking damages for the misappropriation of its Process.

Anomatic then contends that Mr. George's approach fails as a matter of law for the additional reason that it necessarily includes the values of two of alleged trade secrets that Anomatic is not alleged to have misappropriated. But Anomatic's own expert opines that these steps have no independent value. Ex. 39, Coudray Depo. at 220:10-222:11 (testifying that these steps were generally known or publicly available.) Still, Anomatic argues otherwise, claiming that one of these alleged trade secrets—Mareiners' ███████ Process—is a necessary predicate to performing Mareiners' ███████ Process. But, as demonstrated above, this is patently false. Mareiners' licensee made no such attestation. And Anomatic's own employee testified that instead

46

of using Mareiners to help with ███████ Anomatic "used somebody else that was more familiar ███████████, and, actually we got better results." Ex. 42 (Caudill) at 173:08-175:15.

Mr. George's opinion provides the factfinder with a reasonable basis to determine the value of the opportunity Mareiners lost out on as a result of Anomatic misappropriated Mareiners' Process by using and disclosing Mareiners' Process in the Anomatic Patents. Mr. George's approach does not fail as a matter of law because there is nothing to apportion here.

## B. ANOMATIC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON MAREINERS' CORRECTION OF INVENTORSHIP CLAIMS

Anomatic claims "[t]he undisputed material facts" show it is entitled to summary judgment on Mareiners' Count V. In support, Anomatic relies on the assumption it will succeed on other summary judgment arguments, or arguments that are expressly fact intensive for which there is not agreement.

The record evidence establishes that Mareiners invented the image anodized transaction cards claimed in the Anomatic Patents. Claim 1 of the '655 patent, for example, claims simple features such as an anodized card body with a front, back and peripheral surface, an overlay with a mag stripe and a double beveled and colored edge. This describes Mareiners' solution as of 2017 prior to reaching out to Anomatic – Anomatic was just supposed to mass produce it:





Ex. 49, 8/17/17 Mareiners Presentation to Anomatic (MAR00002724). Mareiners has detailed a claim by claim analysis demonstrating that it was the inventor of all claims in the Anomatic Patents. Ex. 11, 3rd Amended/Supp. Resp. to 2nd Second Set of Interrogatories pp. 46-54 & Exhibit A. Anomatic's argument ignores that its Vice President overseeing AnoCARDs admitted that Mr. Goertzen should have been provided inventorship credit:

> Q. Do you believe in good faith that Mr. Goertzen, who brought this opportunity to you, who described to you an aluminum credit card, that when you filed for an aluminum credit card patent, that he should have been given inventorship credit?

> A. Certainly, yeah. I have no challenge with that, and in good faith and all the financial models that you'll see, all credit card sales, regardless of the ███████ process that we provided to Reiner included royalties to him, even if we never used the ███████ process.

Ex. 15 (Steve R.) at 218:10–23; *see also* Ex. 18 (Scott R.) at 282:11–283:07. Anomatic's argument also ignores the undisputable fact that Mr. Goertzen assigned any and all his interest in the Anomatic Patents to Mareiners before this action commenced, a fact that was stipulated to on August 17, 2017, when Anomatic received the above presentation. Ex. 50, Assignment, (MAR00021556, MAR00021555, MAR00021557); *see also* Ex. 51 (ANOMATIC00257424) ("[W]e would like your affirmation and support in marketing this solely as an Anomatic product in the spirit of our partnership."); Ex. 18 (Steve R.) at 173:23–174:7 (testifying Anomatic agreed

it was proper to represent to potential customers the "process used on the aluminum cards is a proprietary process owned by Mareiners, LLC"); Ex. 32, 3/23/18 Email from R. Goertzen to Scott R., at MAR00000365 (requiring Anomatic to "communicate to potential customers that the sample ███████ anodized aluminum cards were produced by Mareiners LLC").) This evidence alone renders Anomatic's bid for summary judgment on Count V improper.

Despite clear evidence that Mareiners invented the image anodized transaction cards that Anomatic wrongly claimed as its own, genuine disputes of material fact remain requiring a trial on the merits. Summary judgment is certainly improper on this fact intensive claim.

### 1. Mareiners has demonstrated standing to pursue its correction of inventorship claim

This Court has previously adjudicated Mareiners' standing—Anomatic has already tried and failed to make the same argument it submits here. That, alone, should be more than sufficient to summarily deny this portion of Anomatic's arguments.

The Sixth Circuit has made clear that standing is evaluated as of the time the complaint is filed, not at a later stage of the case, and indeed, need not even be maintained throughout the litigation. *Cleveland Branch, NAACP v. City of Parma*, 263 F.3d 513, 524 (6th Cir. 2001) (reversing grant of summary judgment, stating "[o]ur review of Supreme Court and Sixth Circuit case law informs us that, contrary to the district court's conclusion, standing does not have to be maintained throughout all stages of litigation. Instead, it is to be determined as of the time the complaint is filed."). Thus, even if Mareiners' claim might ultimately fail, or if the facts have somehow changed, if Mareiners had standing in the beginning of the case, Mareiners continues to have standing even if its claims ultimately fail. C*HKRS, LLC v. City of Dublin*, 984 F.3d 483, 489 (6th Cir. 2021) ("[J]ust because a plaintiff's claim might fall on the *merits* does not deprive the plaintiff of *standing* to assert it."). The Court has already adjudicated Mareiners' standing regarding its inventorship claim. (Order Denying Motion to Dismiss, ECF 34 at PageID 395-97).

Anomatic should not be permitted a second bite at the apple. On these grounds alone, Anomatic's standing argument should be rejected.

Nevertheless, Mareiners addresses Anomatic's standing arguments below. Here, Anomatic argues only the "injury in fact" prong of standing. *See McKay v. Federspiel*, 823 F.3d 862, 867 (6th Cir. 2016) (identifying the three prongs of standing). While Mareiners bears the burden of proving it has standing, the Court must "take[] to be true" Mareiners' "affidavit[s] or other evidence [of] specific facts." *Id.*

### a. Mareiners Has Suffered an Injury in Fact Sufficient to Confer Standing to Pursue Its Correction of Inventorship Claim

Mareiners has suffered a cognizable injury – theft of its image anodized transaction card using its trade secrets – that is more than sufficient to confer constitutional standing to correct inventorship. At the outset, Anomatic was introduced to Mareiners image anodized transaction card by its owner, Mareiners, on August 17, 2017. Ex. 49, 8/1717 Mareiners Presentation to Anomatic (MAR00002724). No doubt regarding ownership existed from 2017 until this motion was filed. Prior to filing this suit, and out of an abundance of caution, Mr. Goertzen assigned all rights to Mareiners, an act that seemed perfunctory under the known facts. Ex. 52, Assignment. When Anomatic hinted that it would challenge standing, the Assignment was provided to Anomatic in an attempt to avoid unnecessary litigation. Unsurprisingly, Anomatic now argues that the intellectual property Assignment from Mr. Goertzen to Mareiners is inadmissible due to the timing of disclosure. Harmless, Mareiners' disclosure of the Assignment confirms what the Parties knew in real time – Mareiners is the owner of the technology for which Anomatic was required to pay a royalty of 10%.

Undeterred, Anomatic argues that Mareiners cannot prove Mr. Goertzen solely invented the Anomatic Patents, and as a result, cannot prove Mareiners' has an ownership interest therein.

Standing is assessed as of the filing of the Complaint, and ultimate success or failure to prove a claim does not weigh on the inquiry. *See C*HKRS, 984 F.3d at 489 ("[J]ust because a plaintiff's claim might fall on the *merits* does not deprive the plaintiff of *standing* to assert it."). Anomatic's argument fails because: (i) there is ample evidence to establish a genuine dispute of material fact regarding Mr. Goertzen's sole inventorship, and (ii) it presumes that Mr. Goertzen is precluded from being a joint inventor and assigning his ownership interest to Mareiners.

Finally, Anomatic contends that Mareiners lacks a sufficient "concrete" interest in the Anomatic Patents to confer standing because Mareiners has no financial interest tied solely to its status as an inventor. Here, Anomatic again ignores binding authority, erroneous assumptions underpinning its theory, and the record. Anomatic's argument fails because it wrongly assumes that Mareiners cannot establish an ownership interest in the Anomatic Patents, and genuine disputes of material fact exist regarding whether Mareiners suffered financial and reputational harm resulting from Anomatic omitting Mr. Goertzen as a named inventor, and Mareiners as assignee, of the Anomatic Patents.

i. Mr. Goertzen's Assignment is Admissible and Should be Considered

Anomatic's first argument regarding standing rests on the premise that an August 2022 Assignment, Ex. 50, Assignment, at MAR00021557, (the "Assignment"), wherein Mr. Goertzen conveyed his entire right, title, and interest in the Anomatic Patents to Mareiners, is inadmissible because Mareiners did not produce it until just after the discovery deadline. The timing of Mareiners' disclosure was harmless and the Assignment should be considered.

Federal Rule of Civil Procedure 37(c)(1) provide that a party is not permitted to use information which it failed to disclose as required under Rules 26(a) or 26(e)(1), "unless such failure [i]s… harmless." Anomatic ignores a crucial fact—Rule 37(c)(1) is inapplicable here because Mareiners' disclosed the Assignment *pursuant to and complying with,* its ongoing

obligation under Rule 26(e)(1). *See* Fed. R. Civ. Pro. 26(e)(1) ("A party … must supplement or correct its disclosure … in a timely manner if the party learns … the disclosure [] is incomplete or incorrect"); Fed. R. Civ. Pro. 37(c)(1) ("If a party fails to provide information … ***as required by Rule [26](e)***, the party is not allowed to use that information…" (emphasis added)). Mareiners did not "fail[] to provide information … as required by Rule 26(e)," because Mareiners supplemented its disclosures *in compliance with* Rule 26(e). *See id.* In any event, even if Rule 37(c)(1) applies, it does not warrant exclusion here, because Mareiners' timing was harmless.

Under Sixth Circuit law, "'harmless' involves an honest mistake on the part of a party coupled with sufficient knowledge on the part of the other party." *Howe v. City of Akron*, 801 F.3d 718, 747 (6th Cir. 2015). The timing of Mareiners' disclosure is a classic example of a "harmless" error. In assessing whether a party's late disclosure was "substantially justified" or "harmless," courts analyze the following five factors:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Id.* at 748. Examining the Sixth Circuit factors shows this is precisely the type of "harmless" disclosure that does not warrant exclusion. *Id.* at 748.

Regarding the first factor, Anomatic knew no later than the filing of original complaint, that Mr. Goertzen assigned any and all interest in the Anomatic Patents to Mr. Goertzen. (Complaint, ECF No. 1 ¶ 49.) In fact, Anomatic understood well before then that Mareiners was the owner of all of Mr. Goertzen's innovations. In late 2017 and early 2018, Anomatic signed an NDA with Mareiners, requested Mareiners' blessing to market anodized aluminum transaction cards as solely an Anomatic product, and, in response to Mareiners' objection, agreed to communicate to potential customers that said cards were made by Mareiners and used Mareiners'

Process. Ex. 20 (NDA); *see also* Ex. 51, XXX (ANOMATIC00257424) ("we would like your affirmation and support in marketing this solely as an Anomatic product in the spirit of our partnership"); Ex. 18 (Steve) at 173:23-174:07 (testifying that Anomatic agreed it was appropriate to communicate to potential customers that the "process used on the aluminum cards is a proprietary process owned by Mareiners, LLC"); Ex. 32, 3/23/18 Email from R. Goertzen to Scott R. (requiring Anomatic to "communicate to potential customers that the sample ███████ anodized aluminum cards were produced by Mareiners LLC").)

Furthermore, in discovery responses verified by Mr. Goertzen, Mareiners is identified as the owner of intellectual property that Mr. Goertzen innovated. Anomatic cannot reasonably claim it was surprised to learn that Mareiners is the owner of any and all intertest Mr. Goertzen has in the Anomatic Patents.[17]

The second factor also weighs against exclusion because Anomatic need not do anything to "cure" any claimed surprise. The Assignment simply confirms what Anomatic already knew— he did. Anomatic's knowledge that Mr. Goertzen assigned his interest in the Anomatic Patents, coupled with its failure to hold open any depositions pending production of the Assignment, demonstrate there is nothing to cure in response to the production of the Assignment.

The third factor also weighs against exclusion, because Mareiners' disclosure does not affect trial. It is highly unlikely that the Assignment would, or will be, an issue at trial whether it was timely produced earlier or is now considered. This is especially true given that the Court will decide this claim. This ties into the fourth factor, which again weighs against exclusion. If the absence of a written assignment is dispositive, as Anomatic claims, the Assignment is vitally

---

[17] As the foregoing demonstrates, it can hardly be said that the Assignment is evidence "offered against" Anomatic, but rather merely satisfies a formality underlying this action. *See Howe*, 801 F.3d at 748.

important. If the Court excludes it, or refuses to consider it, then Mareiners may be foreclosed from pursuing its correction of inventorship claims in this action.

Mareiners' explanation for the disclosure further weighs in favor of finding the timing of the Assignment's disclosure harmless. Anomatic's assertion that it expressly sought the Assignment in discovery is misleading. Anomatic's brief identified the most relevant discovery request it made with respect to this issue:

> [I]dentify each agreement entered into between Mareiners and a party other than Anomatic concerning the Alleged Trade Secrets . . ., the '202 Patent, and/or technology related to Anodized Metallic Transaction Cards.

(Summary Judgment Memorandum, ECF No. 103 at PageID 1562.) Notably, this is an interrogatory, not a request for production. In response to this discovery request, Mareiners identified and produced dozens of agreements between it and third-party companies and individuals. Ex. 40 (1/14/25 Mareiners Resp. to Anomatic 3rd ROGs) at 6-7(identifying in response to ROG 22 numerous ranges of produced documents). Understandably, Mareiners did not consider Mr. Goertzen—Mareiners' sole proprietor, owner, and employee—a "third party" within the scope of this request.

Anomatic did not expressly request the Assignment until Mr. Goertzen's deposition on December 16, 2024. Though, Mr. Goertzen did not recall the specifics of the Assignment then, he later recalled executing it and promptly provided it to Mareiners' current counsel of record, who promptly produced it. The lapse in time between the disclosure, and Anomatic's first express request for the Assignment is understandable given the holidays and several dozen depositions that occurred thereafter. Mareiners' explanation for the timing of the Assignment's production weighs against exclusion. *See Howe*, 801 F.3d at 748.

Fundamental fairness and judicial economy should be considered in deciding whether to

exclude the Assignment. There is no dispute that the Assignment occurred before this action's commencement. Nor is the Assignment a surprise. Mr. Goertzen is the sole owner and only employee of Mareiners. As such, Mareiners has been the owner, at all relevant times, of any and all interest Mr. Goertzen has in the Anomatic Patents. The production of the Assignment just weeks after the close of discovery, and before Anomatic's Motion was filed, does not impact Mareiners' standing, which it has always had. Finding Mareiners lacks standing because it disclosed the Assignment shortly after the discovery deadline would be manifestly unjust as the Assignment was executed before the action was filed.

Judicial economy also favors consideration of the Assignment. Dismissing Mareiners' Correction of Inventorship claim on the basis of the late Assignment might result in a separate action, implicating many of the same facts that are relevant to Mareiners' misappropriation and breach of contract claims. Rather than wasting resources of the judiciary and the Parties, the issue of inventorship should be decided now. The timing of the Assignment was harmless. Accordingly, the Court should not exclude the Assignment, and Anomatic's arguments related to the same should fail.

      ii.  <u>Anomatic's Argument that Mareiners Cannot Have an Ownership Because It Cannot Establish Mr. Goertzen's Sole Inventorship is Meritless</u>

Anomatic argues that Mareiners cannot establish ownership, even if the Assignment is considered, because it cannot establish that Mr. Goertzen is the sole inventor of the Anomatic Patents. This argument fails for three reasons. *First*, it puts the cart before the horse, improperly injecting the likelihood of Mareiners' proving sole inventorship on the merits into a standing analysis. *Second*, it wrongly assumes that there are no genuine issues of material fact regarding Mareiners' sole inventorship. *Third*, it incorrectly assumes that the Parties' agreements preclude

Mareiners from having joint ownership of the Anomatic Patents, and that Mareiners will not be able to minimally prove joint inventorship.

> a. *Anomatic's Argument that Mareiners Lacks Standing Because It Does Not Have an Ownership Interest is Fundamentally Flawed.*

Despite moving for summary judgment on the issue of Mareiners' standing, Anomatic seemingly focuses its entire effort in this section to disputing the merits of Mareiners' claim for sole inventorship. But because this section deals with standing, Mareiners' likelihood or ability to succeed on the merits should be wholly irrelevant to determining whether Mareiners has standing (it does). *See* C*HKRS*, 984 F.3d at 489 ("[J]ust because a plaintiff's claim might fall on the *merits* does not deprive the plaintiff of *standing* to assert it."); *NAACP*, 263 F.3d at 524 ("[S]tanding does not have to be maintained throughout all stages of litigation. Instead, it is to be determined as of the time the complaint is filed.").

Anomatic inherently admits that if Mareiners successfully proves Mr. Goertzen is the sole inventor of the Anomatic Patents, it has suffered an injury sufficient to confer standing. *See* Summary Judgment Memorandum, ECF No. 103 at PageID 1564. Anomatic argues "Mareiners does not have an ownership interest in the Anomatic Patents because it cannot establish that Mr. Goertzen was the sole inventor of the Anomatic Patents." *Id.* (capitalization normalized). In doing so, Anomatic effectively concedes that if Mareiners *can* establish that Mr. Goertzen was the sole inventor, then it *does have a claim of* ownership. Nevertheless, Mareiners demonstrates below that there are genuine disputes of material fact regarding whether Mr. Goertzen is the sole inventor of the Anomatic Patents, especially when taking Mareiners' evidence as true, as required in this context. *See McKay*, 823 F.3d at 867 (stating a court must take as true "affidavit[s] or other evidence [of] specific facts" a plaintiff sets forth in response to a summary judgment motion regarding standing).

        b. *Evidence in the record supports a finding that Mareiners is the sole inventor of Anomatic's Patents*

As laid out with respect to Section 2, below, Mareiners has established a genuine dispute of material fact that Mr. Goertzen is the sole inventor of the Anomatic Patents. Substantial proof that Mr. Goertzen is the sole inventor exists in many forms. For example, prototype sample cards exist that Mr. Goertzen produced before entering into the relationship with Anomatic that feature the claims of the Anomatic Patents. Ex. 11, 3rd Amended/Supp. Resp. to 2nd Second Set of Interrogatories pp. 46-54 and Exhibit A.  Mareiners provided claim charts depicting how Mr. Goertzen's sample cards practice every limitation of the claimed inventions. *Id.*  Anomatic's responses to Mareiners' Requests for Admission and numerous documents demonstrate that Mr. Goertzen conceived the claims in the Anomatic Patents well before it reached out to Anomatic. *See, e.g., Id.*; Ex. 12, 8/17/17 Email from Mareiners to Anomatic; Ex. 52, Anomatic Resp. to Mareiners' 3rd RFAs. Furthermore, as also explained in greater detail below, Mr. Ormiston's contributions—if any—to the claims of the Anomatic Patents constituted nothing more than applying Mr. Goertzen's teachings and disclosures with concepts and features that were well known in the art, which is insufficient to convey inventorship. *See In re VerHoef*, 888 F.3d 1362, 1366 (Fed. Cir. 2018) ("A joint inventor must . . . do more than merely explain … well-known concepts and/or the current state of the art.") (quoting *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1351 (Fed. Cir. 1998)). Anomatic's argument that Mareiners cannot have an ownership interest must fail because, as demonstrated below, there are genuine disputes of material fact as to whether Mr. Goertzen's is the sole inventor of the Anomatic Patents.

        c. *The parties' Agreements do not prevent Mareiners from having an ownership interest if Mr. Goertzen is found to be a joint inventor*

Mareiners' has produced prototypes, product specifications, manufacturing specifications,

testing standards, corroborating witness testimony from Anomatic and third parties that prove sole

inventorship. Anomatic wrongly contends that Mareiners can only establish an ownership interest

in the Anomatic Patents if it proves sole inventorship. This argument is entirely founded on

Anomatic's "latest and greatest," unsupported interpretation of the NDA and PLA—that the IP

provisions therein render Anomatic the owner of the entirety of the Anomatic Patents if joint

inventorship is found, even if they include claims that constitute Mareiners' own, preexisting

confidential information. The Court has already rejected this interpretation:

> The Nondisclosure Agreement **does not provide for the full transfer or conveyance of the ownership of Plaintiff's confidential information to Defendant**. Instead, **it provides for the nondisclosure of the confidential information** except for its use in the business relationship between Plaintiff and Defendant. As the business relationship developed, the Plaintiff and Defendant entered into the Patent Licensing Agreement, which anticipated the development of new intellectual property that *resulted from* or related to the confidential information disclosed by Plaintiff. Defendant would own the new intellectual property that was developed with the use of Plaintiff's confidential information.
>
> **Whether the '655 Patent is new intellectual property is one of the issues in the action that is disputed.**

Order Denying Motion to Dismiss, ECF No. 34 at PageID 392 (bold emphasis added, italics in

original).[18]

Thus, even assuming joint inventorship, Mareiners still alleged and produced sufficient

evidence to establish it has the requisite financial interest in the Anomatic Patents to confer

standing in this case. Material and substantial fact disputes remain regarding Mareiners' breach of

contract claims regarding the NDA and PLA, both of which involve copious contract interpretation

and application to the facts at hand—the interpretation of terms like "Developed IP," is crucial to

---

[18] The Court's interpretation of the NDA and PLA will directly bear on this dispute. This, alone, is a basis upon which the Court should summarily deny Anomatic's motion, because if the Court finds a genuine dispute of material fact exists with regard to any of the above issues of contract interpretation or application, Anomatic's assumptions—and its arguments—fall therewith.

the outcome of this standing dispute.

For example, Anomatic's position seems to be that, if the Anomatic Patents contain any "Developed IP," (i.e., any new matter beyond the Confidential Information), then the *entire patent* is "Developed IP" belonging to Anomatic. Summary Judgment Memorandum, ECF No. 103 at PageID 1590-93. But strictly speaking, the patent itself is *not* the "intellectual property;" it is merely a legal tool to *protect* underlying intellectual property, i.e., the inventions themselves. *See, e.g., Impression Prods., Inc. v. Lexmark Int'l, Inc.*, 581 U.S. 360, 374 (2017) ("The right to use, sell, or import an item exists independently of the Patent Act. What a patent adds—and grants exclusively to the patentee—is a limited right to prevent others from engaging in those practices."); *Crown Die & Tool Co. v. Nye Tool & Mach. Works*, 261 U.S. 24, 36 (1923) (explaining an inventor has the common law right to make, use, and sell the invention himself, "which induces the government to clothe him with the power to exclude everyone else"). Anomatic included Mareiners' confidential information in a patent, and specifically claimed the Image anodized transaction cards supplied by Mareiners to Anomatic to mass produce. Any argument that Anomatic also included "Developed IP" does not strip Mareiners of its "common-law right to make, use and vend" its inventions. *See Crown Die*, 261 U.S. at 36. Importantly, Anomatic has not demonstrated that the claimed Developed IP was novel and contributed to Anomatic's ability to secure a patent. A jury could readily conclude that inclusion of ubiquitous, mundane items, such as an overlay, to the innovative image anodized transaction card invented Mareiners did not contribute to the patented invention. Under Anomatic's view of the world, any contribution regardless of its nature or novelty precludes Mareiners from establishing inventorship.

Indeed, if the patent claims both Developed IP and Mareiners' Confidential Information, nothing in the PLA states it becomes, de facto, Anomatic's property. *See Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th 368, 384 (6th Cir. 2022) ("Traditional trade

59

secret law recognizes that the user of another's trade secret is liable even if he uses it with modifications or improvements upon it effected by his own efforts, so long as the substance of the process used by the actor is derived from the other's secret." (cleaned up)). Mareiners identified this in responding to Anomatic's motion to dismiss, and the Court seemingly agreed. *See* Order Denying Motion to Dismiss, ECF No. 34 at PageID 392 ("The Nondisclosure Agreement does not provide for the full transfer or conveyance of the ownership of Plaintiff's confidential information to Defendant. . . . Defendant [] own[s] the new intellectual property that was developed with the *use of* Plaintiff's confidential information."). It would be nonsensical for the PLA to operate in the manner Anomatic alleges, especially when using terms such as "***Developed*** IP." Thus, if the Anomatic Patents have claims directed to Mareiners' Confidential Information, Mareiners retains its common law interests in those claims, despite the fact that the patent also contains additional "Developed IP," which it does not. *See Impression Prods.*, 581 U.S. at 375.

Mareiners has identified substantial evidence to support that, at minimum, Mr. Goertzen is a joint inventor of the Anomatic Patents. Mareiners (via Mr. Goertzen) provided Anomatic with at least fifty sample cards that meet all limitations of at least some claims of the Anomatic Patents. Ex. 11, 3rd Amended/Supp. Resp. to 2nd Second Set of Interrogatories pp. 46-54, and Exhibit A. Indeed, Anomatic provided responses to Mareiners' Requests for Admission admitting that Mareiners' sample cards practiced most every limitation of the claims of the Anomatic Patents. And as will be described in further detail below, Mareiners' evidence corroborates' Mr. Goertzen's inventorship of the remaining limitations. Ex. 11, 3rd Amended/Supp. Resp. to 2nd Second Set of Interrogatories pp. 46-54 and Exhibit A. In either the case of sole or joint inventorship, Mareiners has established a genuine dispute of material fact rendering summary judgment in Anomatic's favor improper.

*d.  Mareiners has a suffered an injury sufficient to confer standing*

60

As Anomatic concedes, Mareiners is presumed "to have an injury in fact" sufficient to confer standing if Mr. Goertzen "assigned to Mareiners any intellectual property rights he had to an invention for an anodized aluminum transaction card," and Mareiners establishes that Mr. Goertzen is the ***sole*** inventor of the Anomatic Patents[.]" (Summary Judgment Memorandum, ECF No. 103 at PageID 1561-62.) As established above, the Parties' agreements do not preclude Mareiners from being an owner of the Anomatic Patents if Mareiners establishes Mr. Goertzen was a joint inventor. Mareiners is thus presumed to have an injury in fact if it demonstrates that Mr. Goertzen was a joint inventor. *See* 35 U.S.C. § 262 ("each of the joint owners of a patent may make, use, offer to sell, or sell the patented invention within the United States … without the consent of and without accounting to the other owners.") As demonstrated below, genuine issues of material fact exist as to whether Mr. Goertzen is the sole or joint inventor of the Anomatic Patents. As such, summary judgment on the basis that Mareiners has not suffered an injury in fact, and thus lacks standing, is improper.

Putting that aside, summary judgment is also improper on the basis of standing because Mareiners has suffered an injury in fact in the form of reputational harm. Anomatic's argument to the contrary is premised on the legally flawed presumption that Mareiners' reputational harm springing from the incorrect inventorship is insufficient under the controlling law to establish a "concrete financial interest" in the patents. But this is simply not the case—the Federal Circuit has made clear such an injury more than suffices to establish standing. *Shukh v. Seagate Tech., LLC*, 803 F.3d 659, 663 (Fed. Cir. 2015) ("Today we hold that concrete and particularized reputational injury can give rise to Article III standing. As we noted[,] 'being considered an inventor of important subject matter is a mark of success in one's field, comparable to being an author of an important scientific paper.'" (citation omitted)). And this makes sense, reputational injuries undergird many claims conferring standing, from trademark infringement to defamation.

61

Mareiners *has* suffered financial harm, but even if it had not, it certainly suffered reputational harm sufficient to confer standing. *See Shukh*, 803 F.3d at 663. This is ***precisely*** the type of injury the Federal Circuit found confers standing. *See id.* Accordingly, Mareiners has a sufficient reputational interest in the Anomatic Patents to confer standing, and the Court should deny Anomatic's motion. Therefore, even ignoring the clear and genuine disputes of material fact Mareiners has established regarding its ownership under either a sole or joint inventorship theory, Mareiners has established a genuine dispute of material fact regarding Mareiners' concrete financial interest in the asserted patents stemming from its reputational injury, and the Court should deny Anomatic's motion as it relates to standing for the same reason.

## 2. Genuine Issues of Material Fact Exist Regarding Mr. Goertzen's Status as an Inventor of the Anomatic Patents.

Mareiners' inventorship claim is simple – Mareiners developed an image anodized transaction card using its trade secrets prior to contacting Anomatic in July/August of 2017. This is corroborated by documents, presentations, physical samples and testimony/admissions from Anomatic as already detailed in the standing section. Mr. Goertzen's claims to inventorship were detailed in response to interrogatories. Ex. 11, 3rd Amended/Supp. Resp. to 2nd Second Set of Interrogatories pp. 46-54 and Exhibit A. That Anomatic disagrees with Mr. Goertzen is proof that material issues of disputed fact exist warranting a hearing on inventorship.

Anomatic's arguments here once again rest upon dubious readings of the law. Anomatic relies on outdated Federal Circuit case law and non-precedential lower court opinions to paint a picture that testimony from any remotely interested party is insufficient to establish that Mr. Goertzen's inventorship. But this is simply not so. Indeed, merely two months ago, the Federal Circuit unequivocally identified what is or is not proper corroborating evidence:

> An alleged joint inventors' testimony alone is insufficient to establish inventorship by clear and convincing evidence. Thus, an alleged co-

62

inventor must supply evidence to corroborate his testimony. Corroborating evidence may take many forms, including ***contemporaneous documents*** or ***physical evidence***, ***circumstantial evidence about the inventive process***, and ***oral testimony of someone other than the alleged inventor***. To determine whether testimony has been sufficiently corroborated, a "rule of reason" test is applied where all pertinent evidence is examined in order ***to determine whether the inventor's story is credible***. A court's conclusion about corroboration under this "rule of reason" analysis ***is a factfinding***[.]

*BearBox LLC v. Lancium LLC*, 125 F.4th 1101, 1117–18 (Fed. Cir. 2025) (emphasis added) (cleaned up) (upholding a court's credibility determination following a bench trial). Mareiners has proffered more than ample evidence to support its sole inventorship claim, let alone to survive summary judgment. And Anomatic's arguments disregarding entire categories of evidence (e.g., Messrs. Jennings's and Baer's testimony) and run contrary to the Federal Circuit's own understanding of its case law. The Court should deny Anomatic's motion regarding Count V.

### b. Substantial Evidence Corroborates Mr. Goertzen's Claim of Inventorship

Anomatic's argument that "Mareiners has made no effort in discovery to corroborate Mr. Goertzen's [inventorship]," Summary Judgment Memorandum, ECF No. 103 at pageID 1571, is simply untrue and disingenuous. By Anomatic's admission, Mareiners provided detailed discovery responses, including by providing claim charts depicting how Mr. Goertzen's sample cards practice every limitation of the claimed inventions. Ex. 11, 3rd Amended/Supp. Resp. to 2nd Second Set of Interrogatories pp. 46-54 and Exhibit A. Anomatic also contends Mareiners could not produce any of the cards depicted in the claim charts. This is false. Mareiners provided the depicted cards to Anomatic years ago as part of the business relationship between the Parties. Indeed, these cards underpinned Anomatic's agreement to enter into business with Mareiners. While Anomatic contends Mr. Goertzen cannot corroborate the cards' exact manufacture date beyond his testimony, it cannot contend those cards were manufactured after the Parties began their relationship.

Anomatic's entire argument is premised on its theory that Mareiners lacks corroborating evidence of inventorship. Yet these cards are *the best* form of corroborating evidence—they practice every limitation of most claims in the Anomatic Patents. Anomatic, itself, admits this fact through its responses to Mareiners' Requests for Admission.[19] Where Anomatic disputed a limitation, Mareiners produced separate evidence that either (often both) (a) Mr. Goertzen conceived of and communicated the relevant limitation to Anomatic or (b) such limitation was well known in the art before the priority date of the Anomatic Patents. For example, Mareiners proffered numerous discovery responses, produced numerous documents, and elicited copious testimony from Anomatic's witnesses that Mr. Goertzen is the proper inventor, *see, e.g.,* Scott Rusch Depo. Tr. at 282:06–283:07 ("Q... Were you aware of anybody at Anomatic who had innovated a ▮▮▮▮▮▮ anodized aluminum credit card? A. No."); Steven Rusch Depo. Tr. at 218:10–23 ("Q. . . . Do you believe in good faith that Mr. Goertzen . . . should have been given inventorship credit? A: Certainly, yeah. I have no challenge with that…"). Taken together with Messrs. Goertzen's, Jennings', and Baer's testimony, Mareiners has produced ample evidence to establish a genuine dispute of material fact.

i. <u>Mr. Jennings' and Mr. Baer's testimony is exactly the type of proper corroborating evidence the Federal Circuit has identified to support inventorship claims</u>

Anomatic next seeks to have the Court render a credibility determination regarding Mr. Jennings' and Mr. Baer's testimony. Such a determination is improper for summary judgment. Anomatic attempts to couch its credibility arguments, claiming Messrs. Jennings' and Baer's testimony is insufficient to corroborate inventorship under Federal Circuit law. But this is simply incorrect. In January, the Federal Circuit reiterated such testimony falls *exactly* within the scope

---

[19] For the sake of brevity, Mareiners here addresses in detail only those limitations which appear to be in dispute based on Anomatic's RFA responses, and incorporates by reference Anomatic's responses to the same. Ex. 53.

of proper "corroborating evidence": "Corroborating evidence may take many forms, including . .

. *oral testimony of someone other than the alleged inventor*." *BearBox LLC*, 125 F.4th at 1117-

18 (emphasis added) (citation and internal quotations omitted). Messrs. Jennings' and Baer's

testimony is thus a "proper form[]" of corroborating evidence under unambiguous Federal Circuit

precedent. *Id.*

Since Messrs. Jennings' and Baer's testimony is proper corroboration, Anomatic's

remaining arguments reduce to seeking the Court to make an improper credibility determination.

*See, e.g., CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008) ("It is an error for the district

court to resolve credibility issues against the nonmovant . . . [t]he district court errs by granting

summary judgment for the defendant where issues of credibility are determinative of the case.").

For example, Anomatic argues "[t]he cross-corroboration requirement is heightened here because

Messrs. Baer and Jennings are both interested witnesses[.]" Summary Judgment Memorandum,

ECF No. 103 at 1575. This is a clear credibility argument: "the witnesses are biased because they

have an interest in the case." *See United States v. Jackson-Randolph*, 282 F.3d 369, 383 (6th Cir.

2002) ("This court has stated that bias is always relevant in assessing a witness's credibility."

(internal quotations omitted)). Because the Court cannot make credibility calls at summary

judgment, Anomatic's arguments regarding Messrs. Baer and Jennings must fall as a matter of

law. *See CenTra, Inc.*, 538 F.3d at 412.

### d.  The Evidence Corroborates and Establishes Mr. Goertzen's inventorship

Evidence in the record sufficiently corroborates and arguably establishes Mr. Goertzen's

claims for sole inventorship. As set forth above, Anomatic's own executives acknowledge that, at

minimum, Mr. Goertzen should have been listed as an inventor of the Anomatic Patents. Anomatic

recognizes the wealth of evidence supporting Mareiners' clear and convincing claim for correction

of inventorship. Nonetheless, it incorrectly argues that summary judgment should be granted on

this claim because Mr. Goertzen's knowledge of three specific claim limitations in the Anomatic Patents is uncorroborated. This argument fails because evidence clearly corroborates that Mr. Goertzen had preexisting knowledge regarding these specific claim limitations. Moreover, even if Mr. Goertzen's knowledge regarding these claims could not be corroborated (it can), summary judgment would still be improper because genuine issues of material fact exist as to Mr. Goertzen's inventorship of other claims, namely the independent claims.

      i. <u>Mr. Goertzen's Knowledge of the Claim Limitation Regarding the Use of a Magnetic Stripe and Barcode Contained Within an Overlay is Sufficiently Corroborated</u>

At the outset, Mareiners Mr. Molke's testimony corroborates that Mr. Goertzen conceived of and possessed the magnetic stripe and barcode integrally contained within an overlay limitations. Ex. 55, Molke Dep. 172:10-176:17. But even ignoring this, as Anomatic urges, Mareiners produced ample evidence to corroborate Mr. Goertzen invented these limitations.

Beyond Mareiners' witness testimony, Mareiners produced, for example, communications between Mr. Goertzen and IC Group (predating Mareiners and Anomatic's relationship) discussing durability testing and the overlay. Ex. 53, 7/31/17 Email from B. Kellogg to R. Goertzen. Mr. Goertzen incorporated this change, and Mareiners produced evidence it shared this information with Anomatic. *See, e.g.*, Jennings Depo. Tr. at 60:07–61:17. Further, Mareiners elicited testimony from Anomatic's witnesses that such overlays were commonplace and well known. Ex. 44, Godwin Depo. Tr. at 38:12–39:12, that utilizing overlays was one of only two ways to include a mag stripe Ex. 55 Molke Depo. Tr. at 33:22–34:9, and that Anomatic tested placing overlays on metal cards for Mareiners. I*d*. Indeed, Mareiners elicited testimony from Anomatic witness Jeffrey Godwin that third party vendors offer overlay solutions for just this application. Ex. Godwin Depo. Tr. at 40:25-41:20.

Moreover, Mr. Molke, a purported expert in the credit card industry, testified that the idea

of using an overlay on a metallic card would not be innovative. Ex 55. Molke Depo. Tr. at 176:11–17. Thus, this element is not inventive and is presumptively within the grasp of every person of ordinary skill in the art. So even if Mr. Ormiston contributed this element to the claim, doing so would not qualify him as a joint inventor. *E.g., In re VerHoef*, 888 F.3d 1362, 1366 (Fed. Cir. 2018) ("A joint inventor must . . . do more than merely explain to the real inventors well-known concepts and/or the current state of the art.") (quoting *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1351 (Fed. Cir. 1998)).

Anomatic's arguments regarding this claim element (and others) seemingly circle its view that Mareiners has not produced a "smoking gun" piece of evidence directly and unequivocally depicting Mr. Goertzen's inventorship. That is, Anomatic seems to argue Mareiners must produce direct evidence depicting Mr. Goertzen's invention and timeline. But this simply is not the case:

> Corroborating evidence may take many forms, including **contemporaneous documents** or **physical evidence**, **circumstantial evidence about the inventive process**, and **oral testimony of someone other than the alleged inventor**.

*BearBox*, 125 F.4th at 1117–18 (emphasis added) (internal quotations omitted). Circumstantial evidence of the type Anomatic itself identifies Mareiners has produced in substantial amounts is perfectly valid—not to mention the "hard" evidence, corroborating testimony, and more Mareiners has provided. *See, e.g.,* Summary Judgment Memorandum, ECF No. 103 at 1572-74 (discussing the sample cards Mareiners provided), 1577 (discussing a presentation Mareiners produced including images of cards with magnetic stipes). Taken together, Mareiners produced ample evidence establishing a genuine dispute of material fact regarding its sole inventorship claim. Thus, Anomatic is not entitled to summary judgment on the basis that Mr. Goertzen's knowledge regarding the "overlay" claim element is uncorroborated.

    ii. <u>Mr. Goertzen's Knowledge of the Claim Limitation Regarding a Beveled or Double Beveled Edge is Corroborated.</u>

Evidence in the record also corroborates Mr. Goertzen's independent conception of the beveled or double beveled edge limitation. By way of example, by 2016 Mr. Goertzen had metal card specifications in his possession that described and illustrated a double beveled edge:



**Figure 1 Card edge profile**

Ex. 43 at MAR00011624; *see also* Ex. 44, Godwin at 20:09-14 (testifying that a beveled edge is when "you take a burr off of the edge so it's not a straight, sharp corner."). That same year, Mr. Goertzen directed his licensee, who was assisting him with making prototype cards, to "place a beveled edge" on them because "CHASE won't want a sharp straight edge." Ex. 45 at MAR00006280.)

Then, in December 2017, Mareiners advised Anomatic that the two cards it submitted for testing did "not have the right chamfer", noting that it was a "cosmetic issue[] that can be easily fixed." Ex. 46 (Depo. Ex. 293 ). As Anomatic's own employees testified, the words "chamfer" and "bevel" are used interchangeably in the engineering world. Ex. 32 (Caudill Depo. Tr. at 154:24–155:4 ("So champer [*sic*] and bevel are the same."); Ex. 44 (Godwin Depo. Tr.) at 21:20–22:01 ("Q. . . . Could a bevel be a subset of a chamfer? . . . A. In my opinion, yes…. [I]f somebody's talking about a bevel being a chamfer, it could in the—in the same.").) And while the Anomatic Patents do identify multiple types of non-square edges, they tellingly do not identify chamfers, let alone distinguish a chamfer from a bevel. (*See* ECF 103, Ex. J at 9:04–14.)

Moreover, Anomatic's former employee admitted that a prototype card that Mareiners gave

Anomatic did not have "sharp edges," that the edges "[c]ould have been "beveled," and that one would need a microscope to make that determination. Ex. 32 (Caudill Depo. Tr. at 152:3–153:5, 153:24–154:9).) Though, he was sure the cards had some form of deburring. *Id.* at 152:10–19 ("You can [] tell from the manufacturing process something that hasn't [been deburred]").[20] And the improperly named inventor of the Anomatic Patents admitted that he could not say with certainty that none of the prototypes Mareiners provided had a beveled edge because he did not look at all the cards "under magnification" before they "were given to different people[.]" Ex. 2 (Ormiston) at 115:24-116:20.

Anomatic's contention that Mareiners relies solely on Mr. Goertzen's testimony to establish his possession of this claim limitation is simply false. Substantial evidence corroborates Mr. Goertzen's knowledge of a claim limitation including regarding a beveled or a double-beveled edge. As such, there is a genuine dispute of material fact regarding Mr. Goertzen's inventorship of this claim limitation.

     iii. <u>Mr. Goertzen's Knowledge of the Claim Limitation Regarding the Method of Method of Manufacturing an Anodized Metallic Transaction Card is Corroborated</u>

Anomatic's own admissions and employee testimony corroborates Mr. Goertzen conceived of and possessed the claims method of manufacturing. Both the independent claim 16 in the '655 Patent and independent claim 13 of the '518 Patent claim are broad, generic "methods" of manufacturing a metallic transaction card that provide virtually no detail about the actual method used to manufacture cards. Instead, they principally describe physical features of the resulting card that the claimed method purportedly produces. Thus, the Court should reject Anomatic's argument

---

[20] Anomatic also briefly argues its expert examined two (of the more than fifty) sample cards Mareiners provided to Anomatic, and that examination established the sample cards were not beveled. This examination of only a 10% subsample does not prove every card Mr. Goertzen provided lacked a beveled edge, nor does it establish entitlement to summary judgment.

that "neither the physical samples nor the images of the physical samples . . . can tell the factfinder anything about the manner in which they were formed, how they were anodized, and whether they were milled." Summary Judgment Memorandum, ECF No. 103 at PageID 1580.

Indeed, Anomatic's own employees observed features on physical samples described, or indicative of, the method identified in the claims. (*Compare* Ex. 2 (Ormiston) at 114:03-06, 119:23-120:07 (testifying Mareiners' sample cards have a chip inserted into a milled pocket), *with* Ex. 35 ('655 Patent) at Claim 14; *compare* Ex. 2 (Ormiston) at 119:23-24 (testifying the sample cards had a colored edge), *and* Ex. 32 (Caudill) at 153:06-09 (same), *with* Ex. 35 ('655 Patent) at Claim 15 ("wherein the front and rear beveled peripheral surfaces are colored █████████ ██████ ); *compare* Ex. 2 (Ormiston) at 119:23-120:02 (testifying Mareiners' sample cards have a mag strip adhered to the back), *with* Ex. 36 ('518 Patent) at Claim 14 ("providing a magnetic stripe on the rear face of the metallic card body"); *compare* Ex. 2 (Orniston) 115:13-17 (testifying some Mareiners prototype cards had silver edges, suggesting they "were cut out after anodizing"), *with* Ex. 35 (the '655 Patent) at Claim 18 ("metallic card body comprises anodizing the metal sheet before stamping the card bodies from the metal sheet material.").

Anomatic's focus on the August 2017 presentation slides is intentionally misleading given the undisputed fact that Mareiners disclosed most of its confidential information at later dates. *E.g.*, Ex. 2 (Ormiston Depo.) at 99:25-101:12. Mareiners elected to give Anomatic the high-level August 2017 presentation before meeting face-to-face, to make sure the Parties were "all on the same page first." Ex. 47 at (ANOMATIC00189258). Following the presentation, Mareiners provided Anomatic with approximately fifty prototype transaction cards. Ex. 48 (MAR00000058 - MAR00000059); Ex. 42 (Goertzen Depo. 12/16) at 55:03-07.

Anomatic then advised Mareiners there was "interest and intrigue" but "[t]here are still a number of lingering questions and in order for Anomatic to be serious and potentially move

70

forward … the logical next step is a face-to-face meeting." Ex. 49 at MAR00001615). The Parties scheduled an in-person meeting on November 14, 2017, and Anomatic asked Mareiners for information regarding "how the metal cards are currently fabricated." Ex. 50 (Depo. Ex. 262) at 2; *see also* Ex. 9 (Depo. Ex. 130) at Slide 15 ("Need Marieners [*sic*] to be more forthcoming on the fabrication process").

The record demonstrates Mr. Goertzen provided Anomatic with manufacturing processes involving forming, anodizing, and milling metallic transaction cards. Anomatic's President and CEO admitted Mr. Goertzen shared various steps with Anomatic, including "stamping the card or machining of the card", "the anodizing, ███████████ … all those different parameters … on the anodizing side [] and also on the metal fabrication side. So I do remember him providing that information to us." Ex. 1 (Scott R.) at 251:13-252:11).

Similarly, Mark Ormiston—the (improperly) named inventor of the Anomatic Patents— recalled Mr. Goertzen disclosing "[b]est practices for card manufacturing" to Anomatic. Ex. 3 (Depo. Ex. 264); Ex. 2 (Ormiston) at 128:05-16. Mr. Ormiston's notes from an October 20, 2017, meeting indicate Mareiners disclosed milling metallic card bodies, using a CNC machine, putting a "chip pocket" in cards, and its idea for a "mag strip indent." Ex. 3 (Depo. Ex. 264) at ANOMATIC00262040; Ex. 2 (Ormiston) at 94:16-20, 128:17-129:15. The record also demonstrates Mr. Goertzen had and disclosed card requirements Anomatic needed to meet using its milling machine. (*See, e.g.*, Ex. 32 (Caudill) at 246:10-248:06 (testifying Mr. Goertzen "had card requirements" for use on milling machine).)

Moreover, Mr. Ormiston's emails and testimony corroborate that Mr. Goertzen communicated his knowledge of a manufacturing process that involved anodizing a metallic card body. *E.g.*, Ex. 51 at (MAR00004648) (email from Goertzen to Ormiston checking in to "see how the meeting went discussing my anodizing process"); Ex. 2 (Ormiston) at 152:23-153:10, 171:02-

71

172:05 (testifying to ███████████████ Mr. Goertzen disclosed to Anomatic). Mr. Goertzen's knowledge and disclosure of the method of manufacturing an anodized metallic transaction card claimed in Anomatic's patents is corroborated by significant evidence. *See BearBox*, 125 F.4th at 1117–18.

    iv. <u>Mr. Goertzen conceived of and possessed the AA 5182 Aluminum Alloy having the requisite temper designation</u>

Anomatic's final argument regarding inventorship of the Anomatic Patents relates to Mr. Goertzen's conception and possession of the dependent claims claiming use of AA 5182 aluminum alloy having a temper designation selected from H18, H19, H26, H34, or H39. This argument, like those above, fails, since Mareiners produced ample evidence supporting its claims.

First, Mareiners produced substantial corroborating evidence that Mr. Goertzen had knowledge of ████████████████████ and that alloys from those series with the right properties could and would work in Mareiners' process. For example, Mr. Goertzen experimented (and told Anomatic) with ████████████ aluminum alloys. Ex. 55 at MAR00011491████████████; Ex. 2 Ormiston Depo. Tr. at 135:14–22 ████ Furthermore, Mareiners produced evidence Mr. Goertzen knew metal cards must pass bend testing, and knew ████████ aluminum alloy was one alloy with suitable properties in this regard. *See generally* MAR00015012–31 (Depo. Ex. 36) (referencing bending stiffness testing).

There is no dispute Mareiners shared this information with Anomatic. Ex. 2 Ormiston Depo. Tr. at 135:14–22 (admitting Mr. Goertzen identified ████████████ aluminum alloys), 187:9–188:16 (explaining Mr. Goertzen identified ████ to Anomatic); Ex. 1 Scott Rusch Depo. Tr. at 251:05–10 (identifying ███ as an alloy Mr. Goertzen provided). Moreover, and importantly, Mareiners produced evidence that Mr. Goertzen knew and shared that ████████ aluminum alloys (such as the claimed ████████) yielded high quality images. Thus, Mr. Goertzen invented the ███

█████ claim limitation because he knew that █████ aluminum alloys with the requisite properties (e.g., bending and yield strength) were suitable for his invention, i.e., he conceived of the invention using █████ because only "ordinary skill would be necessary to reduce the invention to practice" based on Mr. Goertzen's testing and teachings. *See Bd. of Educ. Ex rel. Bd. Of Trs. Of Fla. State Univ. v. Am. Bioscience, Inc.*, 333 F.3d 1330, 1338 (Fed. Cir. 2003) ("Conception is the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice. An idea is sufficiently definite and permanent when only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation." (cleaned up) (internal citation omitted)).

And even if Mr. Goertzen did not directly invent this limitation, Mareiners produced evidence demonstrating he shared information with Anomatic that made using the claimed █████ █████ with the identified tempering readily ascertainable, such that Mr. Ormiston would not be considered a joint inventor. *See In re VerHoef*, 888 F.3d at 1366 ("A joint inventor must: . . . make a contribution to the claimed invention ***that is not insignificant in quality, when that contribution is measured against the dimension of the full invention***, and [] do more than merely explain to the real inventors well-known concepts and/or the current state of the art." (emphasis added) (citation omitted)); *Bd. of Educ.*, 333 F.3d at 1338 ("One does not qualify as a joint inventor merely by assisting the actual inventor.").

## C. <u>ANOMATIC IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON MAREINERS' STATE LAW CONTRACT CLAIMS</u>

Mareiners alleges that Defendant breached the Nondisclosure Agreement and PLA executed by the Parties in August 2017 and August 2018, respectively. Specifically, Mareiners alleges that Defendant breached the NDA and the PLA (collectively "the Agreements") by disclosing Mareiners' confidential information in the Anomatic Patents. (Am. Compl., ECF No. 77 at PageID Nos. 897, 899 ¶¶ 118, 130.) Mareiners' further alleges that Defendant breached the non-exclusive

PLA by patenting Mareiners' invention, thereby seizing the exclusivity Defendant desperately wanted but refused to pay for. *Id*. at ¶¶ 50, 61-64, 70, 77, 80-81, 89-90, 123-124. As documented below, these breaches have prevented, and continue to prevent, Mareiners from collecting royalties in the transaction card industry from the sale of anodized aluminum transaction cards using Mareiners' trade secrets and confidential information[21] irrespective of whether Anomatic used or disclosed such information in the Anomatic Patents. There are genuine disputes of material fact regarding these issues and Anomatic is not entitled to judgment as a matter of law.

1. **There Are Genuine Issues of Material Fact Concerning Whether Anomatic Breached the NDA and the PLA by Disclosing Mareiners' Confidential Information**

Mareiners submits that Anomatic breached both the NDA and the PLA by "disclosing its confidential information to the U.S. Patent & Trademark Office, and later, the general public by filing" patent applications that incorporated Mareiners' confidential information." (Am. Compl., ECF No. 77 at PageID 897, 898, ¶¶ 118, 130). The Agreements broadly define "Confidential Information" to include, among other things, "product designs and/or specifications, … inventions, … manufacturing or other technical or scientific know-how, specifications, technical drawings, … technology, processes, and any other trade secrets, discoveries, ideas, concepts, know-how, techniques, materials" and also includes "embodiments made by RECIPIENT that are based on or contain any such information." Ex. 24, 8/18/17 Email from M. Ormiston to R. Goertzen, at ANOMATIC00001397.

a. **Summary Judgment on the State Law Claims Should be Summarily Denied.**

The definition of "Confidential Information" encompasses much more than just trade secrets. Mareiners alleges that Anomatic not only disclosed its trade secrets, but other confidential

---

[21] Anomatic concedes that at least the following information that Mareiners disclosed constitutes "Confidential Information" under the Parties' Agreements: "the fact the Mareiners used certain ████████████████ and Mareiners' "vendors, suppliers," and significant contacts in the financial industry. Ex. 15 (Steven) at 224:13-225:07.

information, including the claims of the Anomatic Patents. (*See*, *e.g.,* Am. Compl. ECF No. 77 at

PageID 890 ¶ 80) (the claims of the Anomatic Patent "literally cover the technology that Mr.

Goertzen disclosed to Anomatic, which he had independently developed well before contacting

Anomatic. ***In addition to disclosing the trade secret in the specification***, Anomatic claimed as its

own the very technology that Mareiners disclosed to Anomatic under the NDA"); *id*. at PageID

892 ¶ 80 ("The transaction cards and manufacturing processes disclosed in the claims were

invented by Mr. Goertzen, disclosed to Anomatic, and improperly converted into patent claims).

Yet, in the motion, Anomatic submits that the Court should enter judgment on Mareiners'

claims that Anomatic breached the NDA and PLA on the sole basis that Mareiners' trade secret is

not disclosed in the Anomatic Patents (it is) and does not constitute confidential information under

the NDA (it does). The Court can and should summarily deny Anomatic's motion for summary

judgment on Mareiners' state law contract claims because Anomatic did not show that there is no

genuine issue of material fact regarding whether Anomatic disclosed the wider swath of Mareiners'

confidential information, particularly the "technology", "inventions," "transaction cards and

manufacturing processes disclosed in the claims" of the Anomatic Patents that "were invented by

Mr. Goertzen, disclosed to Anomatic, and improperly converted into patent claims[.]"

### b. Anomatic Breached the NDA and PLA by Disclosing Mareiners' Trade Secrets in the Anomatic Patents.

Anomatic's attempts to evade liability for its breach of the NDA and PLA by misconstruing and/or

ignoring the law and the terms of the NDA. *First*, Anomatic asserts that there can be no breach of

the Agreements because the Anomatic Patents do disclose Mareiners' Process. Memo. ISO Mot.

Summ. J., ECF No. 103 at PageID1583. This argument fails because Anomatic: (1) did not address

whether the Anomatic Patents disclosed Mareiners' Confidential Information in the claims that

Mareiners did not identify as trade secrets, *supra*; (2) failed to establish that liability for disclosing

confidential information under the Agreements is conditioned on the information meeting the

stringent requirements of a trade secret; and (3) wrongly assumes it has successfully shown the absence of a genuine dispute regarding Anomatic's misappropriation of Mareiners' trade secrets. *Eng'g Excellence, Inc. v. Meola*, 2002-Ohio-5412, at ¶ 33 (Ohio Ct. App. 2002) ("Appellant correctly asserts that confidential information does not have to rise to the level of a trade secret in order to be the subject of a valid non-disclosure agreement").

Anomatic's *second* argument is unsupported by the NDA and the law. Anomatic argues that Mareiners '202 Patent, combined with Anomatic's training manual demonstrates that Mareiners' Process was either generally known in the relevant industry or independently developed by Anomatic prior to the receipt of information from Mareiners. Memo. ISO Mot. Summ. J., ECF No. 103 at PageID 1584 (citing App'x D). Anomatic attempts to break the unified Mareiners' Process into individual parts, and then attacks each part as being readily ascertainable in the Mareiners' '202 Patent or independently developed by Anomatic. *Id.*

But to make this argument Anomatic cites language in the NDA, but conveniently omits end of that paragraph:

> Confidential Information disclosed hereunder shall not be deemed to be within the foregoing exceptions merely because such Confidential Information is embraced by more general knowledge in the public domain or in RECIPIENT's possession. In addition, no combination of features shall be deemed wo be within the foregoing exceptions merely because individual features are in the public domain or in RECIPIENT's possession, unless the combination itself and its principles of operation are in the public domain or in RECIPIENT's possession.

Ex. 20 (NDA- Dep. Ex. 2) at ANOMATIC00001398. It also ignores well-established Sixth Circuit law: "The fact that some or all of the components of[a combination] trade secret are well-known does not preclude protection for a secret combination, compilation, or integration of the individual elements. Indeed, "a plaintiff may prevail in a trade-secrets case without identifying a specific item of information that is not publicly known

or readily accessible." *Caudill*, 53 F.4th 368. Thus, Mareiners "need not show that that any individual item in a combination is unique[.]" *Caudill*, 53 F.4th 368.

Anomatic's argument piecing together individual steps from the '202 Patent and Anomatic's training manual is clearly improper. Especially considering that Anomatic's Anomatic's Training manual does not even reference ████████ Anomatic Training Manual, ECF No. 104-45 at PageID 3256. And, as discussed above, calls for a different ████ step than that employed by Mareiners' Process. (*Compare* Anomatic Training Manual, ECF No. 104-45 at PageID 3256 *with* App'x II at Step ████).

Moreover, Anomatic's reliance on the '202 Patent is fundamentally flawed. Dr. Runge testified that the '202 Patent does not disclose any part of Mareiners' Process. Ex. 37 (Runge) at 64:15-65:25. And, even if it did the Sixth Circuit "has found that a defendant may not avoid a finding of misappropriation based upon a public patent if the defendant does not, in fact, obtain information from that patent." *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x 398, 409–10 (6th Cir. 2013) (citation omitted). Anomatic's argument that there can be no breach of the NDA or PLA because Mareiners' Process does not constitute "Confidential Information" and/or was not disclosed in the Anomatic Patents must be rejected.

2. **Anomatic Clearly Breached the PLA by using Mareiners' Process to Secure Patents on Mareiners' Innovation.**

    a. **Mareiners has Produced Exhibits and Witnesses that Demonstrate that Anomatic's Patents Prevent Manufacture and Sale of Image Anodized Transaction Cards.**

    Anomatic remains willfully blind to the clear evidence of damage caused by its actions. USA Cards founders testified that the existence of the '655 patent caused the loss of $30 million in committed investment and USA Cards ability to come to market. Ex. 55, Molke Depo at 158:20-159:8; Ex. 66, Baer Depo at 71:24-73:12, 79:9-79:15. Anomatic admitted that Mr. Molke and Mr.

Baer are "free to testify that [they] … made a strategic decision not to go to market with the metal cards *because they believed investors would be unwilling to fund the enterprise in the face of the patent*." Motion to Exclude Molke, ECF 97-1 at PageID 1061; Motion to Exclude Baer, ECF 96-1 at PageID 987. That is precisely what USA Cards concluded based upon the existence of Anomatic's patents and their impact on their ability to make Mareiners' image anodized transaction cards. Mr. Baer, who was one of the investors contributing to the $30 million capital raise Ex. 66, Baer Depo at 79:9-13, noted that once he learned of the patent and its scope from Mr. Molke, he concluded that "we were cooked, we had to figure this out before we could move forward." *Id*. at 79:09-79:15.

At that time, Mareiners stood to receive 10% of USA Cards sales. At the time the patents were revealed, USA Cards had (1) $30 million in committed funding, (2) manufacturing facilities leased, (3) a business plan that called for a nine month ramp up to production, (4) a leading credit card manufacturing expert, Chris Molke, at the helm, (5) leading anodizing experts at US Anodize and Mareiners to assist with image anodizing and (6) demand from customers such as JP Morgan Chase, US Bank, Capital One, and Tier 2 Banks such as Fifth Third, all of whom have purchased credit cards from Mr. Molke in the past. USA Cards Business Plan, ECF 96-6 at PageID 1380-1401; Baer Dec., ECF 96-3 at PageID 1003-4; Molke Dec. ECF 97-3 at PageID at 1074-1084. As a direct and proximate result of Anomatic's patent issued on November 2021, USA Cards halted all operations. Ex. 55 Molke Depo at 158:21-159:8; Ex. 66, Baer Depo at 79:09-79:15. Record evidence establishes that Mareiners was set to generate 10% royalties from USA Cards, projected by Chris Molke to be over $100 million in the first five years.

**USA Cards, Inc. 5-Year ProForma**
Conservative Sales Projections

| Description | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Projected Income | | | | | |
| Income | | | | | |
| Sales | | | | | |
| Unit Sales as Percentage of 2019 TAM | 1.37% | 4.02% | 8.67% | 12.27% | 18.44% |
| Anodized | $ 56,712,500 | $ 150,650,000 | $ 319,500,000 | $ 446,400,000 | $ 683,500,000 |
| PVC | $ 23,250,000 | $ 76,000,000 | $ 163,435,000 | $ 301,125,000 | $ 374,820,000 |
| Perso and Fulfillment | $ 9,309,375 | $ 31,257,000 | $ 73,768,000 | $ 133,389,000 | $ 172,765,000 |
| Shipping and Delivery Income | $ 250,875 | $ 913,500 | $ 2,168,000 | $ 4,251,000 | $ 5,695,000 |
| Total Sales | $ 89,522,750 | $ 258,820,500 | $ 558,871,000 | $ 885,165,000 | $ 1,236,780,000 |
| Total Income | $ 89,522,750 | $ 258,820,500 | $ 558,871,000 | $ 885,165,000 | $ 1,236,780,000 |
| | | | | | |
| Cost of Goods Sold | | | | | |
| | | | | | |
| Productions Costs (Anodized Cards) | $18,148,000 | $46,701,500 | $95,850,000 | $129,456,000 | $184,545,000 |
| Productions Costs (Plastic Cards) | $10,462,500 | $33,440,000 | $71,911,400 | $123,461,250 | $153,676,200 |
| Production Costs (Royalty for Imaging Patent) | $7,996,250 | $22,665,000 | $48,293,500 | $74,752,500 | $105,832,000 |
| Productions Costs (Personilization and Fulfillment) | $1,675,688 | $5,313,690 | $12,540,560 | $21,342,240 | $27,642,400 |
| Freight and Shipping Costs (Fulfillment) | $ 245,858 | $ 895,230 | $ 2,124,640 | $ 4,165,980 | $ 5,581,100 |
| Total Production Expense | $ 38,528,295 | $ 109,015,420 | $ 230,720,100 | $ 353,177,970 | $ 477,276,700 |
| Total COGS | $ 38,528,295 | $ 109,015,420 | $ 230,720,100 | $ 353,177,970 | $ 477,276,700 |
| | | | | | |
| Gross Profit | $ 50,994,455 | $ 149,805,080 | $ 328,150,900 | $ 531,987,030 | $ 759,503,300 |

USA Cards Business Plan, ECF 98-6 at PageID 1389-90.  This is real and tangible damage that the jury will be asked to consider as being caused by Anomatic's breach.

In support of this disclosed damages theory, Mareiners has timely disclosed the report of Mr. Jeffrey George.  Filed contemporaneous with this Opposition to Anomatic's Motion for Summary Judgment, Mareiners has filed an Opposition to the Motion to Exclude Jeffrey George. Mareiners incorporates its Opposition herein by reference as it directly addresses Anomatic's suggestion that Mareiners cannot prove damages.

In view of the clear and disclosed theory of damages arising from the state law claims for breach of contract, summary judgment must be denied.  Whether or not Mr. George is permitted to testify, which he should be, Mareiners has articulated and evidenced clear and tangible harm and damages that are neither speculative nor imagined.  When Anomatic unlawfully secured patents on Mareiners innovation, Anomatic deprived Mareiners of the ability to commercialize its own innovation.

**b. Discussions Regarding Commercially Available Design Arounds Should Occur Before the Jury As it is Not a Defense to Breach, is Fact Based, and All of the Evidence Supports Mareiners.**

As the inventor of the image anodized transaction card, Mareiners should have available to it all embodiments, not just those that Anomatic has left behind after securing three increasingly broader patents. More importantly, Anomatic cites to no case law to support that a partial or total defense exists for a breaching party when their unauthorized use of confidential information did not entirely obliterate the available business opportunity to the owner of the confidential information. To the contrary, when discussing lost profits, the rule is that "testimony that an infringer might have been able to design around a patent does not, in itself, defeat a claim for lost profits." *Minco Inc. v. Combustion Eng'g, Inc*., 95 F.3d 1109, 1119 (Fed. Cir. 1996). Even if such a defense existed, summary judgment would not be warranted as "the existence of a non-infringing substitute is a question of fact …." *Minnesota Mining & Mfg. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1577 (Fed. Cir. 1992) (*citing Radio Steel & Mfg. Co. v. MTD Prods., Inc.*, 788 F.2d 1554, 1556 (Fed. Cir. 1986)).

As has been described, Chris Molke and Cory Baer testified that the existence of the '655 patent caused the loss of $30 million in committed investment and USA Cards ability to come to market. Ex. 55, Molke Depo at 158:20-159:8; Ex. 66, Baer Depo at 71:24-73:12, 79:9-79:15. Anomatic has admitted that the jury will hear that USA Cards ceased operations "because they believed investors would be unwilling to fund the enterprise in the face of the patent." Motion to Exclude Molke, ECF 97-1 at PageID 1061; Motion to Exclude Baer, ECF 96-1 at PageID 987. That is precisely what USA Cards concluded based upon the existence of Anomatic's patents on Mareiners' image anodized transaction cards. When asked if he would have proceeded after a lawyer told him that there was a way around the patent, Mr. Molke responded "Let me answer it

this way. No, I would not.  I could not. . . . I'm not allowed to put a bank at jeopardy of something that I know is out there."  Ex. 55 Molke Depo at 158:21-159:8.  Mr. Baer confirmed that, as an investor, "we were cooked, we had to figure this out before we could move forward."  *Id*. at 79:09-79:15.  Despite requests for assignment of the Anomatic Patents, Anomatic remains in possession.  The fact it has not sued is precisely because USA Cards halted out of respect for the patents Anomatic unlawfully obtained.

The existence of non-infringing substitutes, in the eyes of a lawyer, would not have saved this opportunity for Mareiners.  It is important to recognize that no witness has testified that commercially viable, non-infringing substitutes exist.  The arguments on pages 56-60 in the Memorandum (ECF 103 at PageID 1586) are purely attorney generated  and are not evidence that the court or the jury can rely upon to assess whether non-infringing substitutes existed in 2022, or today.

Factually, USA Cards intended to manufacture image anodized transaction cards with an overlay and a colored edge.  Molke Dec. ECF 97-3 at PageID 1076-1084.  Mr. Molke had used overlays on metal cards prior to 2017 through his company Alchemy Plastics, and had discussed the same with Mareiners prior to Anomatic being contacted.  Ex. 55, Molke Depo. at 172:10-175:08.  Ex. 5, Goertzen Depo Vol. I, 76:6-76:23.  The '655 patent deprived Mareiners of the ability of coming to market with an image anodized transaction card with an overlay. More fundamentally, an anodized card body is colored on all surfaces such that it would be impossible to anodize a card body and leave the peripheral surface unanodized.  The '518 patent essentially leaves Mareiners and USA Cards with an option that does not exist commercially.

Forgotten in Anomatic's brief is the fact that its December 18, 2018 patent application generated a third patent on January 21, 2025. Claim 1 of the '965 patent claims:

> **1.** A card, comprising:
> a metallic card body having a front face, a rear face, and
>  a peripheral surface extending between the front face
>  and the rear face;
> a front beveled peripheral surface extending around the
>  metallic card body where the front face meets the
>  peripheral surface; and
> wherein the front beveled peripheral surface is colored to
>  cover a metallic color of the metallic card body.

This claim drops the overlay, mag stripe, bar code and the double bevel. It is hard to image a commercially viable image anodized transaction card that does not infringe the above claim which arises from the offending patent application filed in 2018. And Mareiners should not be forced to design around its own innovation.

The very attempt to seek summary judgment on such a factually charged issues as non-infringing substitutes confirms that Anomatic's motion should be denied. Afterall, Mr. Goertzen provided a detailed, claim by claim analysis of his disclosure to Anomatic, including his prototype, and confirmed that the claims of the '655 patent mirror his disclosure. Ex. 11, 3rd Amended/Supp. Resp. to 2nd Second Set of Interrogatories pp. 46-54 and Exhibit A. This is not an expert's opinion – this is a father recognizing his child. Mr. Baer and Mr. Molke have testified that USA Cards was going to come to market with a commercial embodiment and that the '655 and '518 patents blocked that opportunity. Baer Dec., ECF 96-3 at PageID 1003-4; Molke Dec. ECF 97-3 at PageID, ¶¶65 & 74 on pages 1076-1084. Importantly, Anomatic has provide no witness, expert or lay, that has rebutted their conclusion. That Anomatic disagrees through attorney argument alone is sufficient to dispose of this issue.

### c. Genuine Issues of Material Fact Exists as to Whether Anomatic Breached the PLA By Obtaining the Anomatic Patents

Anomatic breached the PLA by obtaining the Anomatic Patents. Incredulously, Anomatic argues otherwise, claiming that the <u>non-exclusive</u> *license* agreement is actually an *acquisition* agreement that "expressly authorized Anomatic to obtain <u>exclusive</u> rights to manufacture and sell anodized aluminum cards." This argument is especially egregious given the testimony of Scott Rusch—the President and CEO that executed the PLA on Anomatic's behalf:

> Q. Right. You agree that Anomatic did not sign an exclusive with Mr. Goertzen?
> A. I agree with that.
> Q. That he was free to use other job shop anodizers.
> A. Absolutely.
> Q. And he was free to work with other companies to bring an anodized aluminum transaction card to market?
> A. Absolutely.

Ex. 18 (Scott) at 144:09-18. This makes sense. Mareiners introduced Anomatic to the metallic credit card industry and his solution—anodized aluminum transaction cards:



Ex. 5 at MAR00000046; Ex. 18 (Scott) at 148:02-09 (Q: Before Mr. Goertzen and Mareiners arrived with aluminum transaction cards, had Anomatic ever explored the transaction card or loyalty card space—A: Never. Q: So there wasn't any work that had been done before Mr. Goertzen arrived? A: Not on transaction cards, no."). And Anomatic was not in the business of patenting its customer's innovations. Ex. 18 (Scott) at 49:25-51:3 ("Q: When a customer brings to

you a product that they want you to manufacture in your plants, do you feel you have the ability to seek a patent on the product that they've brought to you? A: Okay. I would say generally no, because the customer's product is their intellectual property.").

Anomatic's position—that "[a]ny limitation on the potential scope of Mareiners' licensing activity as a result of the Anomatic Patents is not a breach of the PLA", (ECF No. 103 at PageID 1593)— was manufactured for this litigation. It is at direct odds with Mr. Rusch's above testimony, the PLA's terms, the law of contract construction, and the facts. The Ohio Supreme Court has made clear that "when confronted with an issue of contract interpretation, [the court's] role is to **give effect to the intent of the parties.**" *Tera v. Rice Driving D, L.L.C.*, 248 N.E.3d 196, 201 (Ohio 2024) (citation omitted). To this end, courts "examine the contract as a whole and presume that the intent of the parties is reflected in the language of the contract. In addition, [they] … look to the plain and ordinary meaning of the language used in the contract unless another meaning is clearly apparent from the contents of the agreement." *Id.* (internal citation and quotation marks omitted).

Here, under the PLA, Mareiners granted Anomatic: "**a non-exclusive license** under the Licensed Technology to use the Licensed Technology and make Licensed Products[.]" Ex. 20 at Art. 2.1. Significantly, the PLA broadly defines "Licensed Technology" in Article 1.2 as

the technologies and subject matter specifically described in [the '202 Patent], drawn ████████████████████████████████████████████████████

████████████████████████████████████████████████████

**and** wherein the Licenses Technology **extends to** … **all know how related to the development and manufacture of Licensed Products** (as defined below) provided to [Anomatic] by Mareiners or [Mr. Goertzen].

In Article 2, License Grant, the PLA expressly states that Anomatic:

84

> acknowledges and agrees that Licensor may grant other licensees to other licensees to other licensees and that sales of Licensed Products manufactured by other licensees may be sold.

Ex. 20 at Art. 2.3. In addition, the PLA incorporates the NDA, Ex. 20 at Art. 7.1, thus specifying that all "Confidential Information" that Mareiners disclosed to Anomatic shall remain the property of Mareiners, Ex. 8 ¶ 5, throughout the effective term of the PLA, Ex. 20 at 7.1. "Confidential Information"

> means all confidential and/or proprietary information relating [Mareiners Patent and Trade Secrets Patent #7022202] disclosed or made available by DISCLOSER to RECIPIENT including but not limited to … product designs and/or specifications, inventions, **manufacturing or other technical or scientific know-how,** specifications, technical drawings, technology, processes, and any other trade secrets, discoveries, ideas, concepts, **know-how,** techniques, materials, … of a technical nature or concerning research and development and/or engingeering activity…. Confidential information also includes … other tangible embodiments ... that are based on or contain any of such information ….

Ex. 8 at ¶ 1.

As noted, "Licensed Technology" is broadly defined in Article 1.2 of the PLA to "*extend to … all know how related to the development and manufacture of Licensed Products.*" *C.f. Oldnar Corp. v. Panasonic Corp.*, 766 F. App'x. 255, 257 (6th Cir. 2019) ("The [Development and Supply Agreement] broadly defines 'Intellectual Property … as "know-how, one or more patents, trade secrets, and non-patentable inventions.") This plain language clearly evidences the Parties' understanding that Mareiners' Licensed Technology not only included processes for applying images onto goods, but also includes "know how" related to actually *developing and manufacturing* certain goods upon which  images might be applied.

Thus, the PLA unambiguously expresses the Parties' intentions  that Anomatic be one of Mareiners' licensees, entitled to a non-exclusive right to utilize Mareiners' ████ processes and/or Mareiners' know how related to developing and manufacturing specific goods. Similarly, it unambiguously expresses the Parties mutual understanding that Mareiners "may grant other

licenses to other licensees [to use the same Licensed Technology] and that the sales of Licensed

Products *manufactured* by other licensees may be sold." [Ex. 20 at Art. 1.2, 2.4.]

Stated differently, Anomatic is allowed to use Mareiners Process on a wide variety of

products, and is also permitted to use the "know how" that Mareiners disclosed related to actually

developing and manufacturing specific products upon which images could be applied. However,

Anomatic's right is limited given the non-exclusive nature of its license. Section 2.4 of the PLA

thus prohibits Anomatic from preventing Mareiners from licensing other licensees to use any know

how that Mareiners' disclosed to Anomatic that relates to actually manufacturing and developing

specific goods that an image could be applied to.

Therefore, the PLA unambiguously provides that Mareiners disclosure, if any, of know

how related to developing and manufacturing anodized aluminum card constitutes Mareiners

"Licensed Technology" under Art. 1.3 of the PLA, Ex. 20. As such, Anomatic would be in breach

of its express "agree[ment] that [Mareiners] may grant other licenses to other licensees and that

the sale of Licenses Products manufactured by other licensees may be sold", *Id*. at Art. 2.4, if

Anomatic Patents comprise Anomatic's "know how related to the development and manufacture"

of anodized aluminum cards, *id*. at Art. 1.3, and prevent Mareiners from licensing that know how

or prevent the sale of anodized aluminum cards manufactured by other licensees.

This interpretation, when juxtaposed against the definition of "Confidential Information,"[22]

and Mareiners' right to maintain ownership of the same, clearly evidence the Parties' mutual

understanding that the PLA precluded Anomatic from stopping Mareiners from licensing other

---

[22] Which again, includes, among other things, "product designs and/or specifications, inventions, **manufacturing or other technical or scientific know-how,** specifications, ideas, concepts, **know-how,** techniques … of a technical nature or concerning research and development and/or engineering activity" and "tangible embodiments." Ex. 8 ¶ 1.

licensees to manufacture a product that Mareiners conceived. Indeed, Anomatic's President and CEO recognized as much. Ex. 18 (Scott) at 144:09-18.

Still, Anomatic's Motion argues otherwise, submitting that the "PLA Expressly Authorized Anomatic to Obtain the Anomatic Patents," (ECF No. 103 at PageID 1590). Here,[23] Anomatic claims:

> this Court previously held that the Parties contemplated and ultimately agreed that Anomatic would own any and all of the rights to *any* intellectual property resulting from or relating to Anomatic's development manufacture, or sale of articles or goods onto which a finish or image may be applied utilizing the technology Mareiners was licensing to Anomatic and that Mareiners (not Anomatic) was prohibited from filing a patent application relating to this intellectual property.

Summary Judgment Memorandum, ECF No. 103 at PageID 1592 (citing ECF No. 34 at PageID 392). Defendant misrepresents the Court's holding. Though Anomatic made this argument in its motion to dismiss, *id*. at PageID 390, the Court expressly rejected it and denied the motion. (ECF No. 34). Instead, the Court held that the NDA and the PLA "provide to Defendant ownership *only* of [*new*] intellectual property that resulted from or related to Plaintiff's confidential information— not the ownership of Plaintiff's confidential   information itself." *Id*. at PageID No. 392-93 (emphasis in original). "Whether the [Anomatic Patents] [are] *new* intellectual property is one of the issues in this action that is disputed." *Id*. at PageID 392.

Thus, the PLA does not expressly authorize Anomatic to obtain the Anomatic Patent, and the impact the patents may have on Mareiners' ability to license its technology can, in fact, form the basis of a claim for breach of contract. A reasonable jury could certainly conclude that the Anomatic Patents do not constitute "new" intellectual property, that they prevented Mareiners

---

[23] Defendant's argument that the intellectual property provision is specious, at best. Clearly the grant of the license in the License Agreement is the specific provision and "particular matter" the Parties were concerned with, and the "intellectual property ownership provision" a general provision.

from licensing its technology to other licensees, and, thus find that Anomatic breached its contractual agreement that "Mareiners may grant other licenses to other licensees and that the sales of [anodized aluminum transaction cards] manufactured by other licensees may be sold." Ex. 20 at Art. 2.4.

Assuming, *arguendo,* that "Mareiners' right to license the use of its technology", (ECF No. 103 at PageID 1591),  under the PLA is unclear, as Anomatic claims, then the claim should still go to the jury.  *Tera*, 248 N.E.3d at 201 ("It is generally the role of the fact-finder to resolve any ambiguity in the contract."). In such case, "[e]xtrinsic evidence [would] be admissible to ascertain the intent of the parties[.]" *Id.* As detailed above, evidence in the record demonstrates that the Parties' strategic relationship was focused exclusively on manufacturing anodized aluminum transaction cards, and the Parties both understood that Mareiners was free to work with other companies to bring an anodized aluminum transaction card to market. A reasonable jury could thus find that by obtaining the Anomatic Patents, Anomatic breached its "agreement that [Mareiners] may grant licenses to other licensees and that the sale of [image anodized cards] manufactured by other licensees  may be sold."

### 3. Mareiners' is Not Asserting a Stand Alone Claim for Breach of the Duty of Good Faith and Fair Dealing

Anomatic's submits that the "Court should reject Mareiners' alternative theory based on the implied duty of good faith and fair dealing," (ECF No. 103 at PageID No. 1594). This contention is based on incorrect assumptions and a misunderstanding of the law. Anomatic incorrectly assumes the Court will find that there are no genuine disputes of material fact as to whether Anomatic breached the PLA: (i) by disclosing Mareiners' confidential information; and/or (ii) by obtaining patents that prevented Mareiners from licensing to other licensees its "know how related to the development and manufacture of anodized aluminum cards. As demonstrated above,

genuine issues of material fact exists regarding both these issues. If the Court agrees with respect to either, it need not decide whether Anomatic is misinterpreting the law.

But even if Anomatic is entitled to judgment as a matter of law (it is not) on both claims of express breaches of the PLA, summary judgment would still be improper. Relying primarily on *Lucarell v. Nationwide Mut. Ins. Co.*, Anomatic argues the lack of an express breach of the PLA would leave Mareiners with an improper "independent cause of action for breach of the implied duty of good faith and fair dealing[.]" Summary Judgment Memorandum, ECF No. 103 at PageID 1594 (citing *Lucarell v. Nationwide Mut. Ins. Co.,* 97 N.E.3d 458, 464 (Ohio 2018)). This is not true. As *Lucarell* acknowledges, there can be "a violation of the implied duty where there is a breach of a specific obligation imposed by the contract, such as one that permits a party to exercise discretion in performing[.]" 97 N.E.3d at 464.

Indeed, Ohio Courts have allowed claims for breach of good faith and fair dealing to stand, absent an express breach of the underlying contract, when the duty impliedly arose from provisions in the contract. *See, e.g.*, *Parker Hannifin Corp. v. Standard Motor Prods., Inc.*, No. 1:19CV00617, 2019 WL 5425242, at *26 (N.D. Ohio Oct. 23, 2019).

> As Ohio courts have explained, the duty of good faith requires the parties to deal reasonably with each other, and it applies where one party has discretionary authority to determine certain terms of the contract. The implied duty of good faith and fair dealing may not be used to override the express terms of a contract and has no application where one party to the contract has the absolute and exclusive authority to make the decision at issue. The duty may be implied, however, where a contract is silent as to an issue, in which case good faith is used to fill the gap.

*Id*. at *26.

In *Parker*, plaintiff claimed defendant breached the implied duty by failing to inform defendant of any limitations, qualifications, or conditions attached to its performance under the Parties' contract. Defendant argued this "claim should be dismissed because Ohio courts do not recognize an independent cause of action for breach of the duty of good faith and fair dealing apart

89

from a breach of the underlying contract." *Id.* The Court acknowledged that plaintiff failed to direct the Court to any specific contractual provision that expressly addressed the obligation (if any) to provide the notice plaintiff claimed it was entitled to. *Id.* at *27. Nonetheless, the court refused to construe the breach of duty claim as asserting an independent cause of action because plaintiff alleged that defendant's duty of good faith and fair dealing impliedly arose from the provision under which defendant was performing, "i.e. it 'fills a contractual gap' in the subject provision regarding the parties' obligations to" provide timely notice. *Id.* The court held these allegations were sufficient and refused to dismiss the claim. *Id.* at *27-28.

In *DG Gas, LLC v. TA Franchise Sys. LLC*, No. 1:24-CV-01002-PAB, 2025 WL 814928, at *27 (N.D. Ohio Mar. 14, 2025), the Court similarly denied a motion to dismiss a breach of the implied duty of good faith and fair dealing. There, the defendant argued the claim should be dismissed because the plaintiff "cite[d] an implied contractual duty, not an express duty[.]" *Id.* Taking as true the allegations that the defendant encouraged the plaintiff to continue performing under the contract, and investing time and resources, despite knowing it was impossible to perform by the date set out in the contract, and presuming that defendant did in fact promise it would get back to plaintiff about a new deadline, but never did, was sufficient to imply a duty of good faith. *Id.* at *21, *27. The Court reasoned that the contract did not expressly provide the defendant with the ability to terminate the contract under these circumstances and concluded that good faith had to be used to fill the gap. *Id.* at *27.

If Mareiners' claims that Anomatic breached the PLA are dismissed (they certainly should not be), then the Court should allow Mareiners to move forward with its breach of PLA claim based on an implied duty arising from Defendant's performance under the Intellectual Property Provision of the PLA. Ex. 20 at Art. 6.1. As this Court held in its Order on Anomatic's motion to dismiss, the PLA provides that "Defendant would own the *new intellectual property* that was

developed with the *use of* Plaintiff's confidential information"—but Mareiners retained its ownership in its confidential information. (Order, ECF No. at 34 at PageID 392.)

The PLA is silent as to how Anomatic would maintain ownership of any such "*new intellectual property".* It thus leaves it to Anomatic's discretion as to whether it would maintain any qualifying "*new intellectual property"* as a trade secret, or pursue a patent. But regardless of how Anomatic decides to maintain its "*new intellectual property,"* it has an implied duty, arising from other provisions in the contract, not to choose a form of ownership that involves or discloses Mareiners' confidential information, in whole or part, Ex. 20 Art. 7.1; Ex. 8 ¶ 4, or comprising Mareiners' right to "grant other licenses to other licensees" to use Mareiners' "know how related to the development and manufacture of Licensed Products" and generate royalties from for the sale "of Licensed Products manufactured by [those] licensees." Ex. 20 §§ 2.1, 1.3, 2.4.

"It is well-established [Ohio] law that courts should interpret a contract so as to give effect to all of the contract's provisions." *Pierce Point Cinema 10, L.L.C. v. Perin–Tyler Family Found., L.L. C.,* 2012–Ohio–5008, ¶ 11. Implying the foregoing duties would give effect to the "non-exclusive" nature of the PLA and Article 2.4, without rendering Article 6.4 meaningless. This is evidenced by the fact that Anomatic secured a patent on intellectual property on a hybrid metallic transaction card, that does not constitute Mareiners' own confidential information and therefore does not prevent Mareiners from granting licenses to other licensees. This is further evidenced by the fact that the PLA is silent as to how Anomatic can maintain ownership of any qualifying "new" intellectual property. Ex. 20 at Art. 6.1. Instead of filing a patent, Anomatic could maintain ownership as a trade secret, without contravening Mareiners' right to grant other licenses to other licensees."

Conversely, if Anomatic does not have an implied duty to maintain its ownership of intellectual property in the manner set forth above, the non-exclusive nature of the PLA, and

Anomatic's express "acknowledg[ment] agree[ment] that [Mareiners] may grant other licenses to other licensees and that sales of Licensed Products manufactured by other licensees may be sold" would be rendered meaningless. Ex. 20 at Art. 2.1, 2.4; *see also id.* at Art. 1.3. Accordingly, regardless of whether Mareiners' claims for express breaches of contract stand, Mareiners should be permitted to pursue its breach of the PLA claim based on breaches of the implied duties arising from Anomatic's specific obligations under various provisions of the PLA.

**4. There are Genuine Issues of Material Fact Precluding Summary Judgment on the Basis that Mareiners Breached the NDA and PLA**

Anomatic is not entitled to summary judgment on the basis that Marieners breached the NDA and the PLA. Anomatic fails to demonstrate it is entitled to summary judgment as a matter of law on this issue.

"A breach of one of several terms in a contract does not discharge the obligations of the parties to the contract, unless performance of that term is essential to the purpose of the agreement, and default by a party who has substantially performed does not relieve the other party from performance. Stated another way, a party does not breach a contract when such party has substantially performed the terms of the contract, and mere nominal, trifling or technical departures are not sufficient to constitute breach. For the doctrine of substantial performance to apply, the part unperformed must not destroy the value or purpose of the contract." *Hansel v. Creative Concrete & Masonry Constr. Co.*, 2002-Ohio-198, ¶¶ 11-12 (internal citations omitted).)

Anomatic has not and cannot show that there is no genuine dispute of material fact as to whether Anomatic breached the NDA and PLA, much less establish that the information shared destroyed the value or the purpose of the contract. This is especially true, given that the evidence in the record. Anomatic considered the NDA to be a unilateral agreement and, despite having an

NDA in place, did not share information with Mr. Goertzen that it truly regarded as confidential *See, e.g*., Ex. 43 (Ormiston) at 99:25-100:10;

The record also indicates that Mr. Goertzen sought and received permission to share information with the recipients Anomatic now takes issue with. This evidence alone demonstrate a genuine issue of material fact as to whether Mareiners committed a breach, let alone one significant enough to destroy the value and purpose of the Parties' Agreements.

   5. **Mareiners has established that it was harmed when Anomatic used Mareiners Process to secure patents on Mareiners' image anodized transaction cards in breach of the agreements.**

Mareiners has articulated the harm caused by Anomatic's unlawful use of its innovations to secure a monopoly over Mareiners only product. Anomatic was supposed to be a safe-place for Mareiners innovation.  The words of Scott Rusch ring loud:

   Q:    When a customer brings to you a product that they want you to manufacture in your plants, do you feel you have the ability to seek a patent on the product they've brought to you?

   A:    Okay.  I would say generally no, because that customer's product is their intellectual property.

Ex. 18, Scott Rusch Depo at 50:11-50:24.  The NDA that governs this case is the same NDA that Anomatic uses with all of its customers.  Despite manufacturing 1000s of unique products for the largest companies in the world, Anomatic has never sought a patent on any products, until now. Mareiners has never had it explained why its innovation was fair game, other than the fact that Anomatic had valued this opportunity at over $1.9 billion in revenue in the first five years, and it wanted to corner the market.

Regardless, Mareiners has produced testimony from Cory Baer and Chris Molke establishing that Mareiners would receive 10% of all sales of image anodized transaction cards sold by USA Cards.  At the time the patents were revealed, USA Cards had (1) $30 million in

committed funding, (2) manufacturing facilities leased, (3) a business plan that called for a nine month ramp up to production, (4) a leading credit card manufacturing expert, Chris Molke, at the helm, (5) leading anodizing experts at US Anodize and Mareiners to assist with image anodizing and (6) demand from customers such as JP Morgan Chase, US Bank, Capital One, and Tier 2 Banks such as Fifth Third, all of whom have purchased credit cards from Mr. Molke in the past. USA Cards Business Plan, ECF 96-6 at PageID 1380-1401; Baer Dec., ECF 96-3 at PageID 1003-4; Molke Dec. ECF 97-3 at PageID at 1074-1084.   As a direct and proximate result of Anomatic's patent issued on November 2021, USA Cards halted all operations. Ex. 55 Molke Depo at 158:21-159:8; Ex. 66, Baer Depo at 79:09-79:15.  Record evidence establishes that Mareiners was set to generate 10% royalties from USA Cards, projected by Chris Molke to be over $100 million in the first five years.

**USA Cards, Inc. 5-Year ProForma**
**Conservative Sales Projections**

| Description | | Year 1 | | Year 2 | | Year 3 | | Year 4 | | Year 5 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Projected Income** | | | | | | | | | | |
| **Income** | | | | | | | | | | |
| **Sales** | | | | | | | | | | |
| Unit Sales as Percentage of 2019 TAM | | 1.37% | | 4.02% | | 8.67% | | 12.27% | | 18.44% |
| Anodized | $ | 56,712,500 | $ | 150,650,000 | $ | 319,500,000 | $ | 446,400,000 | $ | 683,500,000 |
| PVC | $ | 23,250,000 | $ | 76,000,000 | $ | 163,435,000 | $ | 301,125,000 | $ | 374,820,000 |
| Perso and Fulfillment | $ | 9,309,375 | $ | 31,257,000 | $ | 73,768,000 | $ | 133,389,000 | $ | 172,765,000 |
| Shipping and Delivery Income | | 250,875 | $ | 913,500 | $ | 2,168,000 | $ | 4,251,000 | $ | 5,695,000 |
| Total Sales | $ | 89,522,750 | $ | 258,820,500 | $ | 558,871,000 | $ | 885,165,000 | $ | 1,236,780,000 |
| Total Income | | 89,522,750 | $ | 258,820,500 | $ | 558,871,000 | $ | 885,165,000 | $ | 1,236,780,000 |
| **Cost of Goods Sold** | | | | | | | | | | |
| Productions Costs (Anodized Cards) | | $18,148,000 | | $46,701,500 | | $95,850,000 | | $129,456,000 | | $184,545,000 |
| Productions Costs (Plastic Cards) | | $10,462,500 | | $33,440,000 | | $71,911,400 | | $123,461,250 | | $153,676,200 |
| Productions Costs (Royalty for Imaging Patent) | | $7,996,250 | | $22,665,000 | | $48,293,500 | | $74,752,500 | | $105,832,000 |
| Productions Costs (Personilization and Fulfillment) | | $1,675,688 | | $5,313,690 | | $12,540,560 | | $21,342,240 | | $27,642,400 |
| Freight and Shipping Costs (Fulfillment) | $ | 245,858 | $ | 895,230 | $ | 2,124,640 | $ | 4,165,980 | $ | 5,581,100 |
| Total Production Expense | $ | 38,528,295 | $ | 109,015,420 | $ | 230,720,100 | $ | 353,177,970 | $ | 477,276,700 |
| Total COGS | | 38,528,295 | $ | 109,015,420 | $ | 230,720,100 | $ | 353,177,970 | $ | 477,276,700 |
| **Gross Profit** | $ | 50,994,455 | $ | 149,805,080 | $ | 328,150,900 | $ | 531,987,030 | $ | 759,503,300 |

USA Cards Business Plan, ECF 98-6 at PageID 1389-90.  This is real and tangible damage that the jury will be asked to consider as being caused by Anomatic's breach.

In support of this disclosed damages theory, Mareiners has timely disclose the report of Mr. Jeffrey George.   Filed contemporaneous with this Opposition to Anomatic's Motion for

Summary Judgment, Mareiners has filed an Opposition to the Motion to Exclude Jeffrey George. Mareiners incorporates its Opposition herein by reference as it directly addresses Anomatic's suggestion that Mareiners cannot prove damages.

In view of the clear and disclosed theory of damages arising from the state law claims for breach of contract, summary judgment must be denied. Whether or not Mr. George is permitted to testify, which he should be, Mareiners has articulated and evidence clear and tangible harm and damages that are neither speculative nor imagined. When Anomatic unlawfully secured patents on Mareiners innovation, Anomatic deprived Mareiners of the ability to commercialize its own innovation. The jury will have ample tools and evidence to reach its own conclusion regarding the proper measure.

Dated: March 28, 2025

*/s/ Aaron P. Bradford*
Aaron P. Bradford (admitted *pro hac vice*)
abradford@taftlaw.com
Stephen J. Segall (admitted *pro hac vice*)
ssegall@taftlaw.com
Tara M. Williams (admitted *pro hac vice*)
twilliams@taftlaw.com
Taft, Stettinius & Hollister LLP
675 Fifteenth Street, Suite 2300
Denver, CO 80202
Telephone: (303) 297-2900
Fax: (303) 298-0940

James D. Abrams (0075968), Trial Counsel
jabrams@taftlaw.com
Taft Stettinius & Hollister LLP
41 South High Street, Suite 1800
Columbus, OH 43215
Telephone: (614) 221-2838
Fax: (614) 221-2007

*Counsel for Plaintiff, Mareiners, LLC*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was served electronically via the Court's CM/ECF system on March 28, 2025, upon counsel for all parties.

/s/ Aaron P. Bradford
Aaron P. Bradford

*Counsel for Plaintiff Mareiners, LLC*

## Appendix I – Supplemental Authority

Pursuant to the Order entered in this case on March 21, 2023 (Trial Setting Order, ECF No. 22), Plaintiff Mareiners submits the following Appendix of Supplemental Authority of non-binding authority cited in its Memorandum in Opposition to Defendant Anomatic Corporation's Motion for Summary Judgment.

## A. NON-BINDING AUTHORITY RELATED TO MISAPPROPRIATION

*Presidio Inc. v. People Driven Tech. Inc.*, 686 F.Supp.3d 652, 681 (S.D. Ohio 2023) ("Proof of trade secret misappropriation under either the federal DTSA or the state law OUTSA requires similar elements.")

### 1. Mareiners Has Identified Legally Protectable Trade Secrets

*Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 906 (3d Cir. 2021) ("the trade secret must be described with sufficient particularity … to permit the defendant to ascertain at least the boundaries within which the secret lies. Beyond those outer boundaries, however, deciding "whether a plaintiff has sufficiently disclosed its trade secrets is 'a fact-specific question to be decided on a case-by-case basis.") (internal quotations omitted)

*InteliClear, LLC v. ETC Global Holdings, Inc.*, 978 F.3d 653 (9th Cir. 2020) (reversing summary judgment on misappropriation claim because "there is a genuine issue of material fact as to whether [plaintiff] identified its trade secrets with sufficient particularity. A reasonable jury could conclude that the uniquely designed tables, columns, account number structures, methods of populating data, and combination or interrelation thereof, are protectable trade secrets.")

### 2. There are Genuine Issues of Material Fact regarding Anomatic's Misappropriation

*Cheryl & Co. v. Krueger*, 536 F. Supp. 3d 182, 208 (S.D. Ohio 2021) (question of fact as to whether defendant used alleged trade secrets precluded summary judgment on misappropriation claim.)

*Snyder v. Beam Techs., Inc.*, No. 20-CV-03255-NYW, 2023 WL 4136668, at *8 (D. Colo. June 22, 2023) ("In addition, it is well settled that the user of another's trade secret is liable even if he uses it with modifications or improvements upon it effected by his own efforts, so long as the substance of the process used by the actor is derived from the other's secret." (internal citations and quotations omitted).

*Zenum Aero, Inc. v. Boeing Company*, C21-0896JLR, 2024 WL 1803118, at *5 (W.D. Wash. April 22, 2024) (explaining that a formula need not be perfected, fully developed, or include all aspects needed to produce the final product to qualify as a trade secret. A "formula is a trade

secret… even it added an additional ingredient is added to the formula" at a later date and "even if … scientists were still testing, developing, and improving upon it.")

### 3. Mareiners Has Sufficiently Demonstrated It Has Suffered Damages as a Result of Anomatic's Trade Secret Misappropriation

*Presidio Inc. v. People Driven Tech. Inc.*, 686 F.Supp.3d 652, 681 (S.D. Ohio 2023) (denying defendant's summary judgment argument that plaintiff's damages claims are too speculative to be sustained because whether the calculation "applied the correct methodology or properly distinguished legitimate from illegitimate damages is not relevant …. Instead, what matters is whether Plaintiffs have demonstrated with reasonable certainty that they have suffered damages; the precise amount of damages is left for a jury to determine.")

*Nephron Pharms. Corp. v. Hulsey,* No. 618CV1573ORL31LRH, 2021 WL 1113789, at *2 (M.D. Fla. Jan. 11, 2021) ("exclusion of expert testimony on [the basis that damages opinion did not apportion damages to each trade secret alleged to be misappropriated] is premature and inappropriate" because "the question of whether any of the trade secrets [the expert] considers were misappropriated is for the jury.")

## B. <u>NON-BINDING AUTHORITY RELATED TO BREACH OF CONTRACT</u>

*Snyder v. Beam Techs., Inc.*, No. 20-CV-03255-NYW, 2023 WL 4136668, at *8 (D. Colo. June 22, 2023) ("If a person can be held liable for trade secret misappropriation for using a modified version of a trade secret, it necessarily follows that a person does not obtain ownership over another's property simply by modifying it.")

**APPENDIX II**
**MAREINERS' PROCESS**





Ex. 22, Pltf's Third Suppl. Objs. and Resps. at 12; *id*. at 18 (in "response to the Court's Order and Opinion (Discovery Order, ECF No. 32), identifying Mareiners' Process as "a combination trade secret consisting of the full ███ process detailed in Mareiners' Process.")).

**APPENDIX III**
**THE ANOMATIC PATENTS' EXPRESS USE OF STEPS IN MAREINERS' PROCESS**



- 

172041215v1